## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, 1025 Connecticut Avenue NW Suite 701, Washington, DC, 20036,<br><br>BROOKLYN DEFENDER SERVICES, 177 Livingston Street, 7th Floor, Brooklyn, NY 11201,<br><br>FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT, P.O. Box 86299, Tucson, AZ 85754,<br><br>HIAS, 1300 Spring Street, Suite 500, Silver Spring, MD 20910, and<br><br>NATIONAL IMMIGRANT JUSTICE CENTER, 111 W. Jackson Blvd. Suite 800, Chicago, IL 60604,<br><br>  *Plaintiffs,*<br><br>  *v.*<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, 950 Pennsylvania Avenue NW, Washington, DC 20530,<br><br>U.S. DEPARTMENT OF JUSTICE, 950 Pennsylvania Avenue NW, Washington, DC 20530,<br><br>DAREN K. MARGOLIN, in his official capacity as Director of the Executive Office for Immigration Review, 950 Pennsylvania Avenue NW, Washington, DC 20530,<br><br>PAMELA J. BONDI, in her official capacity as U.S. Attorney General, 950 Pennsylvania Avenue NW, Washington, DC 20530,<br><br>  *Defendants.* | **COMPLAINT**<br><br>**Case No.** |

## INTRODUCTION

1.      This case challenges an interim final rule that—in the vast majority of cases—will eliminate access to appellate review before the Board of Immigration Appeals (BIA or Board), review that is required under the scheme for administrative and judicial review established by Congress. See Appellate Procedures for the Board of Immigration Appeals, 91 Fed. Reg. 5,267 (Feb. 6, 2026) (the "IFR"). For the few appeals that do manage to get consideration on the merits, the IFR truncates review timelines and briefing opportunities, substantially diminishing the role that the BIA plays in ensuring the fundamental fairness of immigration removal proceedings.

2.      Despite the substantial changes to appellate review that the IFR creates, Defendants issued it on February 6, 2026, in a rushed fashion, with no prior notice and no pre-implementation opportunity for comment, with an effective date of March 9, 2026.

3.      The IFR systematically disadvantages immigrants seeking to establish their claims and entitlement to relief from removal. It likewise makes the work of Plaintiff Organizations— legal services organizations seeking to assist noncitizens in that process—monumentally more difficult and, in many cases, completely impossible.

4.      The IFR is part and parcel of the Trump-Vance Administration's systemic efforts to upend immigrants' rights to due process and interfere with the ability of organizations like Plaintiffs to defend those immigrants' rights. Like so many other actions the Trump Administration has taken in the immigration context, the IFR is unlawful and must be vacated and set aside. In the interim, it must be stayed or enjoined.

5.      The IFR imposes sweeping changes to immigration proceedings before the BIA. Among other changes, it:

   a.   Establishes a new rule requiring the summary dismissal of all appeals unless the full en banc BIA votes within 10 days to permit consideration on the merits and requires dismissal no later than 15 days after an appeal is filed;

   b.   Requires BIA dismissal decisions to be made before any transcript of the proceedings or the immigration judge's oral decision is created;

c.  Shortens the deadline to file a notice of appeal from an immigration judge decision from 30 to 10 days in most cases;

d.  Mandates simultaneous briefing in any appeal that is not summarily dismissed and prohibits any extension of the briefing schedule absent "exceptional circumstances," which must be based on hardship to the applicant;

e.  Eliminates the appealing party's ability to file a reply brief, unless one is requested by the BIA;

f.  Eliminates immigration judges' ability to review a transcript of their decisions, including oral decisions, before the transcript is transmitted to the BIA;

g.  Eliminates the Chief Immigration Judge's authority to extend deadlines or hold cases in abeyance pending resolution of potentially relevant cases before other courts or agencies.

6.    Were that not enough, the IFR's changes work in tandem with multiple actions Defendants have taken in recent months to make access to a full and fair hearing before an immigration judge, before any appeal can be taken, non-existent. That is precisely why this IFR is so pernicious. It eliminates appellate review in the vast majority of cases—review that is mandated by Congress—thereby shielding the significant violations of noncitizens' due process and statutory rights occurring every day in the immigration courts from review on appeal.

7.    Without any meaningful review at the BIA, many errors of law or denials of due process that will—and already routinely do—arise in removal proceedings before immigration judges will become final, executable agency decisions, even though in many cases the noncitizen would otherwise have been able to obtain relief on appeal.

8.    On top of that, the IFR purports to deem all claims not raised before the BIA within the shortened ten-day appeal period to be waived, thereby preventing individuals from seeking further review of those claims in the courts of appeals.

9.    Each of these changes—which eliminate avenues to legal relief and will inevitably result in the removal of immigrants who are eligible for protection—irreparably harms Plaintiffs, nonprofit legal service providers with a collective mission of working to ensure access to full and fair proceedings before the immigration courts for as many noncitizens as possible. The IFR will

undermine Plaintiffs' core work by making it nearly impossible to represent potential clients and eliminating options the Plaintiffs would otherwise use to serve existing and future clients. It will also make Plaintiffs' work of ensuring access to a full and fair process much more time consuming in each case, which will require Plaintiffs to expend more resources serving fewer individuals. Indeed, Plaintiffs have already been forced to divert precious resources to respond to and stave off the worst effects of the IFR.

10.    The IFR violates the procedural and substantive requirements of the Administrative Procedure Act (APA) and must be set aside. Among other things, the IFR violates the APA because it was promulgated without required notice-and-comment rulemaking. The IFR is contrary to law because it exceeds the agency's statutory authority by eviscerating protections enshrined in the Immigration and Nationality Act (INA), including the right to counsel and to a full and fair hearing, and violates binding agency regulations intended to protect the rights of individuals appearing before the Agency, thereby violating longstanding principles of fairness articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). The IFR is also arbitrary and capricious. It fundamentally kneecaps the BIA's role as an appellate body, and Defendants issued it without considering multiple important aspects of the problem while relying on erroneous data and assumptions and ignoring reliance interests and the evidence before the agency. In addition, the IFR violates the Due Process Clause of the Fifth Amendment by denying noncitizens a fair opportunity to be heard before being deported from this country. And the IFR fails to comply with the certification requirements under the Regulatory Flexibility Act (RFA).

11.    Without further relief from this Court, the Congressionally mandated system of appellate, administrative review and further review in the federal courts of appeals—which ensures noncitizens are accorded basic fairness before they may be expelled from this country—will cease to function. The Court's intervention is necessary to prevent further harm to Plaintiffs, the populations they serve, and the public.

## JURISDICTION AND VENUE

12.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331; the claims arise under federal law, including the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

13.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers. The APA further authorizes the Court to stay, set aside, enjoin, or vacate agency action that is outside the statutory authority of the agency; is arbitrary, capricious, or contrary to constitutional right; or is otherwise not in accordance with law. 5 U.S.C. §§ 705–706.

14.     Venue is proper under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States, the action does not involve real property, and Defendants reside in this District. Plaintiff Amica is headquartered in this District.

## THE PARTIES

15.     Plaintiffs are legal services organizations that serve immigrants around the country, with a substantial focus on representing noncitizens appearing before the Executive Office for Immigration Review (EOIR), including before the Board of Immigration Appeals (BIA).

16.     Amica Center for Immigrant Rights (Amica), formerly Capital Area Immigrants' Rights Coalition, is a nonprofit organization based in Washington, D.C., that provides legal services to immigrants. Amica Center administers numerous programs that are designed to assist noncitizens appearing before EOIR, particularly before the immigration courts in Annandale, Virginia and Baltimore, Maryland and before the BIA. Amica Center provides full legal representation for unaccompanied immigrant children and detained adults; serves as appointed attorneys for people living with mental or developmental health conditions; offers legal information, intakes, brief legal advice, and pro bono counsel for detained adults who are pro se; and litigates strategic cases in the federal courts. In 2025, Amica provided legal services to 1480 people and represented 800 people in defensive removal proceedings before EOIR.

17.     Plaintiff Brooklyn Defender Services (BDS) is a public defender organization

4

based in New York City that provides multi-disciplinary and client-centered criminal defense, family defense, immigration, and civil legal services, along with social work and advocacy support. The BDS Immigration Practice seeks to advance access to legal representation for low-income noncitizens as they navigate the immigration system to stabilize their immigration status and remain with their families and loved ones. The core function of the BDS Immigration Practice is to provide legal services and representation to noncitizens in removal proceedings before EOIR, including the BIA, and in complex affirmative applications before USCIS. BDS regularly litigates appeals at the BIA and in the U.S. Courts of Appeals. Since 2009, the BDS Immigration Practice has advised or represented clients in approximately 10,500 immigration matters.

18.    Plaintiff Florence Immigrant and Refugee Rights Project (FIRRP) is a nonprofit organization headquartered in Tucson, Arizona, with offices in Phoenix and Florence, Arizona. FIRRP provides free legal and social services to adults and unaccompanied children in immigration custody in Arizona. Its core work focuses on ensuring that noncitizens facing removal proceedings before EOIR have access to counsel, understand their legal rights, and are treated fairly and humanely. FIRRP directly represents detained immigrants before the IJs and the BIA, including noncitizens deemed incompetent to represent themselves due to mental health needs or disabilities. FIRRP also provides pro se assistance to noncitizens detained in Arizona. FIRRP writes pro se materials for these programs, which are also used in similar programs nationwide. In 2024, FIRRP provided legal services, including legal orientation and education to more than 12,500 adults and children and their client base consists almost entirely of detained individuals subject to EOIR and BIA proceedings.

19.    Plaintiff HIAS is a global nonprofit organization and resettlement agency headquartered in Silver Spring, Maryland, that is dedicated to ensuring that forcibly displaced people find welcome, safety, and freedom. HIAS operates in eleven countries, including the United States, supporting refugees, asylum seekers, and other forcibly displaced persons. HIAS's U.S.-based team has provided immigration legal services including before EOIR, the BIA, and federal

courts for more than 50 years. HIAS also provides guidance, mentorship, and training and support to volunteer attorneys across the United States to provide pro bono representation to immigrants seeking humanitarian relief. Since 2025, HIAS has served at least 76 clients in removal proceedings and has represented 12 clients before the BIA. Of HIAS's approximately 412 current clients, about one third are or have been in removal proceedings.

20.     Plaintiff National Immigrant Justice Center (NIJC) is a nonprofit organization headquartered in Chicago, Illinois with offices in Washington, D.C.; San Diego, California; and Goshen and Indianapolis, Indiana. NIJC's mission is to defend the legal rights of immigrants by providing high-quality immigration legal services for as many low-income immigrants as it can reach. One of NIJC's key priorities is ensuring access to counsel and fair process for those in defensive removal proceedings. NIJC's core work therefore includes providing full representation before IJs and the BIA as well as the operation of two Immigration Court Helpdesks (ICH) in Chicago and Indianapolis, which provide information and assistance to those proceeding pro se. NIJC also serves as appointed counsel in cases involving individuals who are adjudicated mentally incompetent. In 2025, NIJC provided legal services to more than 10,000 noncitizens and represented more than 8,200 clients in their immigration cases, including removal defense cases and in appeals before the BIA and U.S. Courts of Appeals.

21.     Defendant EOIR is a sub-agency of Defendant U.S. Department of Justice (DOJ) responsible for adjudicating administrative claims concerning federal immigration laws, including proceedings before the immigration courts and BIA. EOIR issued the challenged IFR. EOIR is headquartered in Falls Church, Virginia.

22.     Defendant DOJ is a cabinet-level department of the federal Government headquartered in Washington, D.C.

23.     Defendant Daren K. Margolin was appointed as the EOIR Director in October 2025. He is sued in his official capacity. Defendant Margolin is responsible for the direction and supervision of the immigration courts and the BIA. Defendant Margolin issued the instant IFR. He

is sued in his official capacity.

24.    Defendant Pamela J. Bondi is the Attorney General of the United States. She is responsible for the administration of the immigration laws and oversees EOIR. She is sued in her official capacity.

## BACKGROUND

### I. Overview of Proceedings before EOIR

25.    Immigration law is well known for its complexity. *See, e.g.*, *Ardestani v. INS*, 502 U.S. 129, 138 (1991); *Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1987). The consequences that flow from immigration proceedings are also notably severe, often involving matters of life or death. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("[D]eportation is a particularly severe 'penalty.'" (citation omitted)); *Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

26.    In the face of these complexities, the INA guarantees certain basic protections. When the Department of Homeland Security (DHS) wishes to remove a noncitizen, subject to exceptions not relevant here, it must obtain an order of removal from an Immigration Judge (IJ), who is charged with conducting removal proceedings, finding facts, and granting relief or ordering removal. *See* 8 U.S.C. §§ 1229a(a)(1), (c)(1)(A).

27.    The INA also makes it clear that IJ decisions are appealable, first to the BIA and then, if resulting in a removal order, to the federal courts of appeals. An IJ's decision "shall become final upon the earlier of (i) a determination by the Board of Immigration Appeals affirming such order; or (ii) the expiration of the period in which the [noncitizen] is permitted to seek review of such order by the Board of Immigration Appeals." 8 U.S.C. § 1101(a)(47)(B); *see also* 8 U.S.C. § 1158(d)(5) (providing for 30-day appeal deadline in asylum cases).

28.    Judicial review of administratively final removal orders before the United States Courts of Appeals is governed by 8 U.S.C. § 1252. Section 1252(a)(5) provides that "a petition for

review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter." Such a petition is due no later than "30 days after the date of the final order of removal," and it "shall" be filed with a copy of the underlying agency decision. *Id.* §§ 1252(b)(1); 1252(c)(1).

29.    In addition to these layers of review, both the INA, 8 U.S.C. § 1229a, and the Due Process Clause of the Fifth Amendment require full and fair proceedings for noncitizens facing removal. "[D]ue process requires that [deportation] hearings be fundamentally fair." *Rosales v. ICE*, 426 F.3d 733, 736 (5th Cir. 2005) (citation omitted); *see also Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005); *Borges v. Gonzales*, 402 F.3d 398, 408 (3d Cir. 2005).

30.    Under the INA, noncitizens are entitled to legal representation of their own "choosing," but "at no expense to the Government." 8 U.S.C. §§ 1229a(b)(4)(A), 1362. And though the INA does not provide for universal appointed counsel, it does recognize the significant role legal representation plays in the process. *See, e.g., id.* §§ 1158(d)(4)(A)-(B) (requiring the government to advise asylum applicants "of the privilege of being represented by counsel" and to provide them with an updated list of people "who have indicated their availability to represent [noncitizens] in asylum proceedings on a pro bono basis"); 1229(a)(1)(E) (providing that noncitizens "may" be represented by counsel and that they "will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2)"); 1229(b)(2)(requiring the government to provide lists to noncitizens of pro bono legal services providers); 1228(a)(2) (requiring that, in the case of noncitizens facing removal based on certain convictions, "the Attorney General shall make reasonable efforts to ensure that the [noncitizen's] access to counsel and right to counsel under section 1362 of this title are not impaired").

31.    In addition to the right to representation, the INA addresses various other rights of noncitizens in removal proceedings, including "a reasonable opportunity to examine the evidence,"

an opportunity "to present evidence," and an option "to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B). "[A] complete record shall be kept" of these removal proceedings. *Id.* §1229a(b)(4)(C).

## II. Immigration Court Procedures and Recent Shifts in Immigration Court Practice

32.    These protections notwithstanding, the system for adjudicating immigration cases is rife with flaws. Many noncitizens participate in hearings with life-or-death consequences without representation and sometimes without even an interpreter capable of speaking a language they understand. And in the past few months the Trump-Vance Administration and the Board of Immigration Appeals have taken multiple actions that make access to a full and fair hearing before an immigration judge, before any appeal can be taken, non-existent.

33.    An increasing percentage of proceedings before BIA now take place while the noncitizen is detained by the Department of Homeland Security (DHS). Indeed, as of mid-February 2026, there were approximately 68,000 people in immigration detention, with more than 70% of them facing full removal proceedings under 8 U.S.C. § 1229a. Detained noncitizens have limited access to the internet and telephones and virtually no ability to gather evidence in support of a case for relief.

34.    Other recent changes have likewise exacerbated the system's longstanding challenges. *First*, a series of BIA decisions has substantially restricted access to a full and fair hearing before an immigration judge. For example, in *Matter of H-A-A-V-*, 29 I. & N. Dec. 233 (BIA Sept. 2025), the BIA held that in cases where the underlying pleadings seem insufficient, an IJ "may pretermit the applications [for relief] without a full evidentiary hearing on the merits of the claim." *Id.* at 238. This ruling applies not only to discretionary relief but even to claims for withholding of removal or relief under the Convention Against Torture, which are mandatory, meaning IJs may not dismiss them as a matter of discretion if the noncitizen is otherwise entitled to protection from removal on those grounds.

35.    Indeed, in a different case, the BIA recently held that an application for asylum and

withholding of removal "may be considered waived or abandoned" if the noncitizen fails to fully fill out the form. *Matter of C-A-R-R-*, 29 I. & N. Dec. 13 (BIA Mar. 2025). These cases mean that a person—especially a pro se, non-English speaker—may have all his fear-based claims dismissed because of an inability to properly complete a 12-page application in English.

36.    Following *Matter of H-A-A-V*, the Board expanded the use of pretermission even further. In *Matter of C-I-G-M & L-V-S-G-*, the Board severely limited IJs' authority to consider a noncitizen's asylum application in cases where the government seeks to rely on an "Asylum Cooperative Agreement" to have the individual removed to a third country. 29 I. & N. Dec. 291 (BIA Oct. 2025). The BIA explicitly prohibited IJs from engaging in factfinding over whether the noncitizen "would have access to a full and fair procedure" to seek asylum in a third country, even though that is a statutory requirement for ordering removal to a third country pursuant to an agreement. *Id.* at 293 (quoting 8 U.S.C. § 1158(a)(2)(A)). Notably, the government has entered into ACAs with several refugee-producing countries that do not have functioning asylum systems, including Guatemala, Honduras, Ecuador, Uganda, and Belize. And DHS has, in turn, relied on ACAs to seek pretermission in thousands of cases, often raising the issue on the eve of an individual's merits hearing or even in the middle of such a hearing.

37.    The combined impact of this series of BIA decisions is that many individuals are not receiving an opportunity to explain why they qualify for asylum or related protection to an immigration judge *at all*.

38.    *Second*, the fees for pursuing immigration relief increased dramatically in the summer of 2025, making access to a fair hearing contingent on wealth. The fee for an appeal to the BIA is now $1,030, a $920 increase. Many applications before an IJ are also much more costly. For example, the fee for an application to adjust status (i.e. to get a green card) previously ranged from $0 to $1,400, depending on the basis for the adjustment; recent changes more than doubled that fee by adding a $1,500 charge to the existing amounts. *See* P.L. 119-21 §100013 (July 2025), *codified at* 8 U.S.C. § 1812.

39.     Though some of these fees can be waived, that authority has likewise recently been restrained. *See Matter of Garcia Martinez*, 29 I. & N. Dec. 169 (BIA Aug. 2025) (any person represented by "private counsel [is] presumed to have the ability to pay any requisite filing fee" and fee waiver applications for non-detained individuals will be "presumptively invalid" if the lists their income on the form as "zero" without "evidence to explain why" the individual has no income or cannot pay fees).

40.     *Third*, last year DHS also expanded expedited removal and then began relying on that expansion to seek dismissal of cases pending before EOIR so that individuals in those cases could be subjected to expedited removal without receiving a hearing on the merits of their asylum applications before an IJ and without an opportunity to appeal to the BIA.

41.     *Fourth*, in December 2025, DHS issued a new policy that now makes it impossible for a person who is detained and in removal proceedings to get biometrics completed for adjudication of an application before United States Citizenship and Immigration Services (USCIS). Because of this policy, certain cases that are pending before an IJ cannot be adjudicated on the merits, so IJs will have no choice but to order removal notwithstanding the individual's eligibility to remain in the United States because the Rule prohibits extensions in such circumstances.

42.     *Fifth*, alongside these substantive changes, DHS and DOJ have eliminated federal funding for programs that provide for pro se assistance to people in removal proceedings—most notably the Legal Orientation Program (LOP) and Immigration Court Helpdesk (ICH). *See Amica Ctr. for Immigrant Rts. v. DOJ*, No. 25-298 (RDM), 2025 WL 1852762 *3 (D.D.C. July 6, 2025). The agencies likewise tried to cancel programs that ensure access to counsel to unaccompanied immigrant children and to those deemed incompetent for self-representation, but those efforts have been enjoined. *See Cmty. Legal Servs. in E. Palo Alto v. HHS*, 780 F. Supp. 3d 897 (N.D. Cal. 2025); *Am. Gateways v. DOJ*, No. 25-01370 (AHA), 2025 WL 2029764 (D.D.C. July 21, 2025).

43.     *Finally*, Defendants have vastly lowered the standards and expertise needed to

11

serve as an immigration judge. EOIR fired almost 100 IJs in 2025, many of whom had significant immigration experience, and simultaneously lowered the requirements to serve as a Temporary Immigration Judge (TIJ). *See* Designation of Temporary Immigration Judges, 90 Fed. Reg. 41,883 (Aug. 28, 2025) (to be codified at 8 C.F.R. pts. 1001, 1003, 1208, 1240). This rule amended 8 CFR § 1003.10(e)(1) to allow EOIR to "designate or select *any* attorney to serve as a TIJ for a renewable term not to exceed six months, subject to all statutory and regulatory limits on temporary service." *Id.* (emphasis added) (citation modified). Before this change, TIJs needed immigration experience serving either as a former IJ or DOJ attorney or as an Administrative Law Judge at EOIR. As a result of the new 2025 rule, EOIR has appointed 52 TIJs in the last few months, most of whom are from the military and have no immigration law experience. EOIR now provides just three weeks' training to new TIJs, in which the new TIJs are told to deny asylum applications in most cases. Defendants are even advertising to fill vacant IJ positions, referring to the position as "Deportation Judge" instead of Immigration Judge.

44.     These and many other recent substantive and procedural changes have made access to a full and fair hearing before an IJ harder and harder to come by, and the need for appellate review as a safeguard for fundamental fairness even more important.

45.     Defendants know all this, and yet have chosen through the IFR to eliminate any appellate review in the vast majority of cases—review that is mandated by Congress as part of its overall review scheme, 8 U.S.C. §§ 1101(a)(47)(B), 1158(d)(5)(A), 1252—thereby shielding the significant violations of noncitizens' due process and statutory rights occurring every day in the immigration courts, as well as the many potential errors of law and fact that Defendants' changes to immigration court practice are causing.

### III.   Appeals to the BIA Before the IFR

46.     The BIA has existed for more than 85 years since it was created by the Attorney General in 1940. A.G. Order 3888, 5 Fed. Reg. 2454 (July 1, 1940); *see Matter of L-*, 1 I. & N. Dec. 1 (BIA; A.G. 1940).

47.     The Board has a history of lean staffing: in 1995 the number of members increased from 5 to 12, and by 2002 there were a total of 23 authorized positions. Procedural Reforms To Improve Case Management, 67 Fed. Reg. 54,878 (Aug. 26, 2002). In 2024, through rulemaking, the Board was expanded to 28 positions. *See* Expanding the Size of the Board of Immigration Appeals, 89 Fed. Reg 22,630 (Apr. 2, 2024).

48.     In April 2025, however, EOIR reduced the size of the Board to 15 permanent members. *See* Reducing the Size of the Board of Immigration Appeals, 90 Fed. Reg. 15,525 (Apr. 14, 2025). The Board's website currently lists 15 permanent and 4 temporary members.

49.     For decades, the BIA has been "unable to adjudicate immigration appeals in removal proceedings effectively and efficiently." *See BIA: Procedural Reforms To Improve Case Management*, 67 Fed. Reg. 54,878 (Aug. 26, 2002). This challenge persists. By November 2025, there were about 203,000 cases pending at the BIA. *See* EOIR Adjudication Statistics: All Appeals Filed, Completed, and Pending (Nov. 18, 2025), https://bit.ly/3ZENryx. The average adjudication timeline was 52 days for detained noncitizens and 625 days for individuals who are not detained. GAO, Actions Needed to Track and Report Noncitizens' Hearing Appearances (Dec. 2024), https://bit.ly/4rDgnDm (analyzing data from 2016 to 2023).

50.     Although the first Trump administration tried to implement sweeping changes to appellate procedures before the BIA in a predecessor to the IFR at issue in this case (discussed in Part IV below), those regulatory changes were enjoined and later replaced, so they never took effect. *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 52,491 (proposed rule Aug. 26, 2020); 85 Fed. Reg. 81,588 (Dec. 16, 2020) (final rule); *see also CLINIC v. EOIR*, No. 1:21-cv-00094, 2021 WL 3609986 (D.D.C. Apr. 4, 2021); *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919 (N.D. Cal. 2021).

51.     Under long-standing procedures, appeals begin with the filing of the Notice of Appeal, Form E-26, within thirty days of the IJ's decision. 8 C.F.R. § 1003.3(a). The Notice of Appeal is a basic, 12-question form, that allows the parties to indicate their intention to file a

"written brief or statement" at a later point. *Id.* § 1003.3(b). This filing occurs in most counseled cases.

52.     The BIA can reject an appeal if the Notice of Appeal is late or without the proper fee, but the Board may exercise its discretion to accept a late filing or waive the fee. 8 C.F.R. § 1003.8(a)(3); *Matter of Morales-Morales*, 28 I. & N. Dec. 714 (BIA 2023) ("[T]he Board has authority to accept what are otherwise untimely appeals, and consider them timely, in certain situations because 8 C.F.R. § 1003.38(b) is a claim-processing rule and not a jurisdictional provision."). The BIA's authority to waive the fee, however, has been recently restrained. *See Matter of Garcia Martinez*, 29 I. & N. Dec. 169 (BIA Aug. 2025).

53.     Next, the BIA provides a briefing schedule; this can happen at any time subsequent to the Board receiving the Notice of Appeal. *See* 8 C.F.R. § 1003.3(c)(1). The schedule is accompanied by the IJ's written decision if one exists and a full transcript of the hearings, which would include the IJ's oral decision.

54.     For cases that are on the EOIR electronic filing system—called the EOIR Courts & Appeals System or ECAS—a represented noncitizen's counsel would be able to access the audio recording of the proceedings prior to the creation of a written transcript and the issuance of a briefing schedule. When a case is not on ECAS, however, counsel must generally wait for the transcript or request the audio recording directly from the immigration court or BIA, which can take weeks or months. A detained, pro se noncitizen would also have no way of accessing ECAS from detention and thus would also have to wait for the transcript and briefing schedule to issue. Similarly, an attorney beginning representation of a person who was previously pro se or who was represented by a different attorney would be able to see some materials on ECAS but would not be able to listen to the audio recording, so that attorney would likewise have to wait for the schedule to get a first glimpse at the decision and the IJ's reasoning.

55.     Once the schedule is issued, the parties have 21 days to file their briefs, starting from the date on which the briefing schedule is issued. The briefing schedule is consecutive for

non-detained litigants (*i.e.*, appellee files its brief after appellant) and concurrent when the noncitizen is detained (*i.e.*, briefs are filed simultaneously). 8 C.F.R. § 1003.3(c)(1). Reply briefs must be accompanied by a motion to accept the reply brief, which must assert surprise at the opposing party's assertions. *Id.*; *See* BIA Practice Manual § 4.6(h).

56.     Currently, either party may seek an extension of the briefing deadline of up to 90 days, which the BIA may grant in its discretion. *See* 8 C.F.R. § 1003.3(c)(1). The BIA's current practice is to grant "an additional 21 days to file a brief regardless of the amount of time requested." BIA Practice Manual §§ 4.7(c)(i)(A)-(B). Although current regulations permit multiple extensions, they are granted "only in rare circumstances." *Id.*

57.     ECAS has streamlined processing in important ways for individuals who are represented by the same counsel that represented them before the IJ. With ECAS, a person in this posture will generally receive the briefing schedule in real time by email and will be able to listen to the audio recording of the proceedings to begin working on a brief before the schedule arrives. ECAS also allows attorneys to file briefs electronically.

58.     A non-detained, pro se person might be able to achieve some of these things using the Respondent Access Portal on ECAS, but that requires Internet access, reading and understanding English, and navigating a complex electronic docket management system.

59.     Detained individuals, pro se noncitizens, and any individual whose file is still available only in paper form, however, still face immense barriers. These groups must rely on mail to receive the briefing schedule and to send their brief to the BIA, which must arrive on or before the filing deadline. For any person in one of these groups, it is routine for 10 days or more of the current 21-day briefing schedule to be lost to mailing delays.

60.     After the completion of briefing, the time parties must wait for a decision is unpredictable. For detained individuals, the BIA might issue a decision anywhere from one to six months later, though it can often take longer. For non-detained individuals, it routinely takes a year or even several years to receive a decision.

61.     Under the current regulations, appeals are initially screened by a screening panel. 8 C.F.R. § 1003.1(e)(1). Though the regulations do not specify whether this screening occurs before or after a briefing schedule issues, they do allow for dismissal only "after completion of the record of proceeding." *Id.* § 1003.1(e)(3).

62.     Moreover, the limited permissible bases for summary dismissal suggest that such screening occurs before briefing but can be revisited. A Board member may summarily dismiss an appeal only if the Notice of Appeal is incomplete; if the appeal involves conceded factual or legal conclusions; if the appeal was filed by the prevailing party before the IJ; if the Board determines that the appeal was filed for an improper purpose *after reviewing the record*; if the appellant indicates on the Notice of Appeal form that they will file a brief and fails to do so; if the appeal is not within the Board's jurisdiction; if the appeal is untimely; or if the appellant affirmatively waived their right to appeal.

63.     When a case is not summarily dismissed, "a single Board member" is assigned "to determine the appeal on the merits [consistent with the regulations], unless the Board member determines that the case is appropriate for review and decision by a three-member panel under the standards of [8 C.F.R. § 1003.1(e)(6)]." 8 C.F.R. § 1003.1(e)(3).

64.     The current regulations provide for "affirmance without an opinion," which allows the assigned Board member to affirm an IJ's decision without a separate opinion if "the result reached in the decision under review was correct, [and] any errors in the decision under review were harmless or nonmaterial" and one of two additional conditions is met: (1) the issues on appeal are controlled by Board or federal court precedent and do not involve "a novel factual situation," or (2) "[t]he factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion on the case." 8 C.F.R. § 1003.1(e)(4). Per these regulations, summary affirmance would not be possible without review of the record and the IJ's decision.

65.     In all other cases, either a single Board member or a three-member panel "shall issue a brief order affirming, modifying, or remanding the decision under review." 8 C.F.R.

§ 1003.1(e)(5).

66.     Current regulations explicitly disfavor en banc proceedings, which "shall ordinarily be ordered only where necessary to address an issue of particular importance or to secure or maintain consistency of the Board's decisions." 8 C.F.R. § 1003.1(a)(5).

### IV.  Previous Efforts by the First Trump Administration to Overhaul the BIA

67.     The first Trump administration attempted to overhaul the BIA in 2020. In August 2020, EOIR issued a Notice of Proposed Rulemaking: Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 52,491 (Aug. 26, 2020). EOIR finalized the Rule in December 2020 with virtually no changes and set it to take effect on January 16, 2021, days before President Biden's inauguration. 85 Fed. Reg. 81,588 (Dec. 16, 2020).

68.     In the same period from August to December 2020, the administration adopted a barrage of other changes that overlapped with the 2020 BIA Rule, with DHS and DOJ promulgating a host of rules that threatened to dramatically alter noncitizens' access to immigration courts and their ability to obtain substantive relief. *See, e.g.*, 85 Fed. Reg. 75,925 (Nov. 27, 2020) (outlining stricter standards for continuances in immigration court); 85 Fed. Reg. 75,942 (Nov. 27, 2020) (tightening standards for motions to reopen); 85 Fed. Reg. 82,750 (Dec. 18. 2020) (imposing new, heightened fees for nearly all EOIR filings); 85 Fed. Reg. 80,274 (Dec. 11, 2020) (altering eligibility grounds for asylum, withholding of removal, and relief under the Convention Against Torture); 85 Fed. Reg. 81,698 (Dec. 16, 2020) (mandating the summary denial of asylum applications if certain filing requirements are not met).

69.     The 2020 Rule regarding BIA appellate procedures introduced multiple changes limiting the authority of the BIA, many of which are repeated in the Rule at issue in this case. Like this IFR, the 2020 Rule shortened the BIA's briefing schedule, mandated concurrent briefing, limited reply briefs, and permitted briefing extensions only in exceptional circumstances. 85 Fed. Reg. at 81,588, 81,638.

70.    The 2020 Rule also addressed summary dismissals, though in a much less draconian fashion than the IFR at issue here. The 2020 Rule required that the BIA screen all cases on appeal for summary dismissals within 14 days of the filing and adjudicate the case within 30 days. 85 Fed. Reg. at 81,652-53.

71.    The 2020 Rule also mandated case completion timelines. As with this IFR, all appeals had to be disposed of within 90 days if they were before a single Board member or 180 days if they were before a three-judge panel. *Id.* at 81,653. And, again as here, when those timelines were not met, the 2020 Rule empowered the Chairman to take cases out of the hands of the Board members for referral to the director of EOIR or the Attorney General. *Id.*

72.    Before the 2020 Rule went into effect, two different suits challenged it, including one in this court filed by many of the same plaintiffs who now challenge this IFR. *CLINIC v. EOIR*, No. 1:21-cv-00094 (RJL) (D.D.C. filed Jan. 11, 2021); *Centro Legal de la Raza v. EOIR*, No. 3:21-cv-00463 (LB) (N.D. Cal. filed Jan. 19, 2021).

73.    Both courts enjoined or stayed operation of the Rule, reasoning that plaintiffs were likely to succeed on the merits of their claims. In the District of Columbia case, the court held that it "need not wrestle with each of [the] alleged violations because it finds plaintiffs have shown a likelihood of success on the merits with respect to whether the Rule was promulgated using the requisite procedures." *CLINIC v. EOIR*, No. 1:21-cv-00094 (RJL), 2021 WL 3609986, at *2 (D.D.C. Apr. 4, 2021). The Court emphasized that the government had followed a truncated notice and comment period despite the "Rule's complexity and the numerous changes involved," and the fact that "the executive branch [was] engage[d] in a slew of interrelated rulemaking activity" at the time. *Id.* at *3.

74.    The court in the Northern District of California likewise relied on the abbreviated comment period, but it went further and, among other things, addressed why the 2020 Rule was likely arbitrary and capricious. *Centro de la Raza v. EOIR*, 524 F. Supp. 3d 919, 953–62 (N.D. Cal. 2021) (adequacy of comment period); *id.* at 962-71 (arbitrary and capricious).

18

75.     In the portion of the *Centro de la Raza* opinion addressing why the 2020 Rule was likely arbitrary and capricious, the court noted that the 2020 NPRM, despite its stated interest in increasing court efficiency, had entirely failed to consider a study by Booz Allen Hamilton that EOIR had commissioned on the very subject of increasing efficiency in the immigration courts. *Centro Legal*, 524 F. Supp. 3d at 963. The report made numerous recommendations that were counter to the 2020 Rule including, for example, a finding that the "issuance of oral decisions actually *contributes* to inefficiencies in adjudicating cases because it prevents both the parties and the BIA from deliberating on the issues of the case." *Id.* at 947 (emphasis in original). Yet EOIR "did not even mention or consider" the study, which the Court found was likely to contribute to a finding that the Rule was arbitrary and capricious. *Id.* at 963.

76.     The court also concluded that many of the 2020 Rule's substantive provisions, including its sweeping changes to the briefing schedule, were likely arbitrary and capricious. *Centro Legal*, 524 F. Supp. 3d at 962-71. The court held that the agency failed to consider that "the vast majority of individuals before the immigration court are pro se, [and] many do not speak English." *Id.* at 965. The court similarly faulted the agency for failing to consider the implications of the fact that IJs "often issue their orders orally," which the court framed as an issue of "critical importance" based on "EOIR's own procedures." *Id.* The court also highlighted the agency's failure to consider that noncitizens generally do not have "the documents necessary [] to seek representation" at the appellate level until the BIA mails them the briefing schedule, transcript of Immigration Court proceedings, and IJ's order. *Id.* The Court reasoned that these factors, particularly when considered with the use of paper files and mail, was prominent in 2020 (and remains common for many individuals today), meant that noncitizens would have insufficient time to present an appeal. *Id.* at 965-66.

77.     After both the D.C. and California courts enjoined or stayed the 2020 Rule, both cases were held in abeyance while the Department reviewed the Rule. On September 8, 2023, the Department issued an NPRM "propos[ing] to restore the longstanding procedures in place prior to

the [2020] Final Rule." Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 88 Fed. Reg. 62,242, 62,254 (proposed Sept. 8, 2023). The Department issued a final rule the following year, rescinding the 2020 Rule. *See* Efficient Case and Docket Management in Immigration Proceedings, 89 Fed. Reg. 46,742 (May 29, 2024). That 2024 Rule, which took effect July 29, 2024, is superseded by the IFR at issue here, even though the preamble to the new IFR mentions it only in passing. *See* 91 Fed. Reg. at 5,269.

## V.    The Challenged Interim Final Rule

78.    On February 6, 2026, EOIR published the Interim Final Rule that is at issue here: Appellate Procedures for the Board of Immigration Appeals, 91 Fed. Reg. 5,267 (Feb. 6, 2026). The IFR is set to take effect on March 9, 2026.

79.    Defendants initially set a 30-day comment period, with comments due on or before March 9, 2026 – the day the IFR is set to take effect.  On February 26, 2026, Defendants announced that they had extended the comment period by another 30 days, in response to requests from "interested organizations." The new comment deadline is April 8, 2026, which is 30 days after the IFR is set to take effect. The IFR fundamentally overhauls and largely eliminates appellate review of IJ decisions. It replaces longstanding appellate procedures with a system that sharply limits access to review, accelerates adjudication timelines, and constrains the ability of noncitizens to meaningfully present their claims. It ensures that significant violations of noncitizens' due process and statutory rights, and even basic errors caused by Defendants' many interrelated changes to the functioning of immigration courts, will go uncorrected by the BIA, defying the very purpose of the statutory right to administrative review established by Congress. And it renders thousands of individual claims waived by operation of its requirement that most administrative appeals be dismissed, thereby undermining the judicial review Congress provided for in the federal courts of appeals.

### A.    Shortened Timeline for Notice of Appeal

80.    First, the IFR shortens the timeline for filing an appeal to the Board, reducing the

general filing deadline of the Notice of Appeal from 30 days to 10 days except for certain asylum cases. 91 Fed. Reg. 5,270. The 10-day deadline will apply to all non-asylum cases and most asylum denials, except ones where the judge "has adjudicated an asylum application and did not deny the application under [8 U.S.C. § 1158(a)(2)]." *Id.* That statutory provision, in turn, addresses circumstances where an applicant may be barred from seeking asylum for failure to apply within one year of entry, because they have previously sought asylum, or because they can be removed to a third country pursuant to a "Safe Third Country Agreement." *Id.* at 5,272 (citing 8 U.S.C. § 1158(a)(2)(A)-(C)).

81.     This change in the timeline means applicants now have just ten days to secure the $1,030 fee necessary to file an appeal, find appellate counsel, and prepare and file the necessary documents for filing an appeal with sufficient time to ensure that they are *received* at the BIA by the deadline. The IFR does not acknowledge that for many noncitizens, particularly those who are detained and/or pro se, this time frame is not sufficient for them to even receive notice of the IJ's decision, much less take these steps to prepare to mount a response to it.

82.     The consequences of this limited time frame are serious. The IFR mandates that any argument not raised in the Notice of Appeal be deemed "waived." 91 Fed. Reg. 5,278. And arguments waived before the Board cannot be raised on a petition for review to the federal court of appeals in the first instance, cutting off otherwise Congressionally mandated judicial review in the federal courts for many issues.

83.     The IFR is likewise unclear as to how the two-deadline system applies in cases implicating different deadlines. For example, the IFR says that a denial based on the one-year filing deadline for asylum is subject to the 10-day rule, but if an IJ made an alternative ruling that the applicant failed to demonstrate a well-founded fear of future persecution, that finding would be subject to a 30-day deadline. And when an asylum *grant* is appealed by DHS, it will always have a 30-day deadline to appeal because the 10-day deadline only comes into play if there is a *denial* on one of those bases.

**B.  Presumptive Dismissal of Appeals without Record Production**

84.    Second, the IFR mandates that most appeals of IJ decisions on the merits of a removal order or termination decision will be summarily dismissed without any review. In all such cases, if the BIA takes no action within 10 days of receipt of the appeal, it "shall be deemed to have been summarily dismissed." 91 Fed. Reg. 5,277 (quoting new 8 C.F.R. § 1003.1(d)(2)(ii)). Incoming appeals are distributed to a single BIA member, who decides whether to refer it to the entire BIA for an *en banc* vote. Appeals are summarily dismissed unless a majority of permanent BIA members vote to accept the case for review within 10 days of the filing of the appeal.

85.    All such summary dismissals "shall constitute the final decision of the Board." *Id.* at 5,277 (quoting new 8 C.F.R. § 1003.1(d)(2)(iii)). Such dismissals "shall be effectuated through the issuance of a written order no later than 15 days after the appeal is filed." *Id.* (quoting new 8 C.F.R. § 1003.1(d)(2)(ii)).

86.    Through this mechanism, the IFR transforms the BIA from an appellate adjudicatory body into an entity that primarily exists to receive an appellate filing fee and then immediately dismiss appeals, effectively eliminating substantive review in the majority of cases.

87.    And the few cases the BIA *does* take will likely be DHS appeals or appeals that favor the government's position. This pattern is already the norm in the BIA's exercise of its authority to issue precedential decisions—an authority that, like the IFR's summary dismissal policy, requires a majority vote from all permanent Board members. 8 C.F.R. § 1003.1(g)(3). Since January 2025, only one of the BIA's 37 precedential decisions has favored the noncitizen over DHS. *See* Trump 2.0 BIA/AG Precedential Decisions, Nat'l Immigr. Project (last updated Feb. 18, 2026), https://bit.ly/4bZVpto. Under the IFR, this trend is likely to become reality for *all* appeals, effectively eliminating any chance for a noncitizen to vindicate their rights before the BIA.

88.    What's more, the IFR is structured such that decisions on dismissal will be made *before* a full record of proceedings (ROP) is created. The IFR provides, specifically, that the ROP will not be forwarded to the BIA unless the case is accepted by the *en banc* Board for review. 91 Fed. Reg. 5,278; 8 C.F.R. § 1003.1(e)(3). Indeed, under the IFR, transcripts of the immigration

court proceedings—including oral IJ decisions—will be created only *after* the majority of the *en banc* Board agrees to consider the case on the merits. 91 Fed. Reg. 5,277-78. This provision likewise covers immigration judge decisions that are rendered orally. As a result, the screening BIA member will decide whether to refer the case to the en banc Board, and the en banc Board will decide whether to review the case, based entirely on what is listed in the Notice of Appeal, Form EOIR 26. Under the IFR, it is likely that the BIA will never even look at the IJ's decision before the appeal is summarily dismissed.

### C. Truncated Briefing Process

89.    Third, for the rare appeals that *are* accepted for review, the IFR imposes aggressive and strict briefing deadlines. The IFR imposes a single, simultaneous briefing schedule of twenty days for both parties, regardless of whether an individual is detained. Where no transcript is warranted, briefs must be filed in no case more than 35 days after the appeal is filed. Where a transcript is warranted, briefs are simultaneously due within 20 days after the Board makes the transcript available. It is unclear under the IFR what information will be considered to determine whether a transcript is "warranted."

90.    The IFR also practically eliminates reply briefs. "The Board shall not accept" reply briefs unless "invited or ordered" by the Board. 91 Fed. Reg. 5,277. This change, combined with the simultaneous briefing, means that the parties have no opportunity to respond to arguments made in the other party's brief.

91.    The IFR further restricts briefing by providing that extensions may be granted only as a matter of discretion and only under exceptional circumstances as defined by 8 U.S.C. § 1229a(e)(1). 91 Fed. Reg. 5,273. Section 1229(a)(e)1), in turn, "refers to exceptional circumstances (such as battery or extreme cruelty to the [noncitizen] or any child or parent of the [noncitizen], serious illness of the [noncitizen], or serious illness or death of the spouse, child, or parent of the [noncitizen], but not including less compelling circumstances) beyond the control of the [noncitizen]." *Id.* In other words, unlike the routine practice in federal courts, the circumstances

of counsel are irrelevant; the IFR mandates that workload concerns, travel plans, or "similar concerns within the control of either party" do not constitute exceptional circumstances. *Id*. at 5,277-78.

### D.  Mandatory Case Completion Timelines without Discretion to Extend

92.    Fourth, the IFR imposes mandatory case completion deadlines. Cases assigned to a single Board member must be decided within 90 days of completion of the record, and cases assigned to a three-member panel must be decided within 180 days. 91 Fed. Reg. 5,277.

93.    If an appeal is not adjudicated on time, the IFR *requires* the Board chairman to assume control of the case or refer it to the Attorney General for final resolution. The IFR says, "In those cases where the panel is unable to issue a decision within the established time limits, the Chairman *shall* either self-assign the case or assign the case to a Vice Chairman for final decision within 14 days or *shall* refer the case to the Attorney General for decision." 91 Fed. Reg. 5,277 (quoting 8 C.F.R. § 1003.1(e)(8)(ii) (emphasis added)).

94.    The IFR also removes "two provisions that authorize the Chief Appellate Immigration Judge to either extend adjudication deadlines in particular cases or to hold cases based on a pending, potentially impactful action, either a new binding case decision or a new regulatory action." 91 Fed. Reg. 5,274. As to the former, the IFR says the current regulation "has no clear underlying rationale consistent with principles of good government and effective adjudication." *Id*. As to the latter, the IFR states that such previously existing delay authority is inefficient and puts too much authority in the hands of the Chief Appellate Immigration Judge, even where the delay is based, for example, on the pendency of an issue accepted for review by the Supreme Court.

95.    Taken together, each of these changes the IFR makes will substantially impact noncitizens and the attorneys who seek to assist them.

### VI.  The IFR's Harm to Plaintiffs' Core Services and Their Clients

96.    Plaintiffs Amica, BDS, FIRRP, HIAS, and NIJC are nonprofit organizations that provide legal services to immigrant communities. Absent a decision staying implementation of the

IFR, followed by vacatur of the IFR and/or declaratory relief preventing it from taking effect, the IFR irreparably harms Plaintiffs' "core business activities" of providing legal representation and pro se support to individuals facing removal proceedings before EOIR, including before the BIA. *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1564 (2024).

97.    Full legal representation before EOIR is at the heart of each Plaintiff organization's core work. *See, e.g.*, Koop Decl. ¶ 11 (describing an intentional shift in NIJC's services to focus on serving immigrants in a defensive posture before EOIR); St. John Decl. ¶¶ 9-10 (articulating FIRRP's focus on representing detained individuals facing removal proceedings); Ex. D, Mayer-Salins Decl. ¶¶ 4-7 (describing Amica's core programs, which focus on supporting people in defensive removal proceedings before EOIR); Ex. B, Jones Decl. ¶¶ 7-12 (describing the scope of BDS's programs, which largely represent individuals in removal proceedings); Ex. A, Brown Decl. ¶¶ 9-10 (roughly one-third of HIAS's immigration clients have or have had cases pending before EOIR).[1] The IFR substantially impedes this core work in various respects.

98.    ***Eliminating Access to Appellate Review.*** First, the IFR makes summary dismissal of appeals the norm rather than the exception, fundamentally eliminating the substantive, adjudicative role that the BIA has played for more than 80 years. The impact of this change on Plaintiff Organizations will be staggering. Plaintiff Organizations are committed to ensuring full and fair removal proceedings, regardless of the ultimate outcome of those proceedings. Ex. C, Koop Decl. ¶¶ 5 ("NIJC's mission is to establish and defend the legal rights of immigrants regardless of background and transform the immigration system to one that affords equal opportunity for all."), 86 ; Jones Decl. ¶ 5 (describing BDS's mission to "provide[] outstanding representation" and "to protect and uphold the rights of people"); Brown Decl. ¶ 30 ("HIAS's BIA appellate practice exists to ensure proper review of immigration court proceedings."); Mayer-

---

[1] The declarations referenced in this complaint are attached as exhibits to the contemporaneously filed motion for a stay under 5 U.S.C. § 705. *See, e.g.*, *Jud. Watch, Inc. v. FBI*, No. 18-cv-2316, 2019 WL 4194501, at *4 n.4 (D.D.C. Sept. 4, 2019) (finding declarations referenced in the complaint incorporated by reference).

Salins Decl. ¶ 35 (describing Amica's "mission to confront the impact that the unjust immigration system has on our clients and communities" and describing the prejudice they will face due to the IFR). Ex. E, St. John Decl. ¶ 3 ("Our vision is to ensure that every person facing removal proceedings has access to counsel, understands their rights, and is treated fairly and humanely.").

99.     But without *any* BIA appellate review, many errors of law or denials of due process that will inevitably arise in removal proceedings before overburdened IJs facing enormous pressures to complete cases quickly will become final, executable agency decisions, even though there would otherwise have been a good prospect of obtaining relief on appeal. Koop Decl. ¶¶ 31 (describing how the IFR would eliminate BIA review of critical cases where a litigant was pro se before the IJ), Koop Decl. ¶¶ 31, 57,  ("All told, this [IFR] will drastically limit NIJC's ability to accept BIA appeals, which will in turn impact our ability to ensure that noncitizens get a fair day in court") 85; *see* Jones Decl. ¶ 17, 20 (describing success in more than half of BDS's appeals, demonstrating "that the BIA detects IJ errors in a majority of BDS merits cases it reviews."); *id.* ¶ 30 ("The [IFR] will therefore result in the deportation of BDS clients based on IJ decisions that contain legal and factual errors and who are eligible for immigration relief and status"); Mayer-Salins Decl. ¶ 25 ("the current administration has fired experienced IJs in favor of 'deportation judges' and exerted enormous pressure on IJs to rule against clients regardless of the facts of their case or even the applicable law."); St. John Decl. ¶ 71 ("The harm that occurs from failing to correct IJ's who routinely commit clear legal error goes well beyond any single individual appeal, because IJs hear hundreds of cases each year and routine errors can violate the rights of many, even if only relatively few decide to appeal... under the current Rule [IFR], it is highly unlikely that even an IJ with a pattern of obvious and correctable errors would come to the attention of the BIA, as these types of clear error are not particularly complex or novel and, as such, would likely be summarily dismissed rather than dealt with by the BIA.")

100.     In announcing the IFR, Defendants attempted to respond to this problem by asserting that access to judicial review at the courts of appeals remains. But that is not a solution.

Many issues that have traditionally been reviewable before the Board under its more expansive review authority are beyond the scope of federal court review under 8 U.S.C. § 1252. *See, e.g., Patel v. Garland*, 596 U.S. 328, 347 (2022) ("[J]udicial review of fact determinations is precluded in the discretionary-relief context."). And on top of that, even issues that could be reviewed in federal court under § 1252 will be deemed "waived" before the BIA by operation of the IFR if not raised in the notice of appeal, blocking judicial consideration of the issue in many cases. Koop Decl. ¶ 85 ("The only way to preserve access to federal court appellate review . . . is through exhaustion at the Board, which will be largely pointless," given the IFR); Jones Decl. ¶¶ 38-42. These critical differences between the BIA and circuit courts' standards of review means that Plaintiffs' clients will be deprived "any review at all" of many decisions before the IJ. *See* Brown Decl. ¶ 32 (describing the different legal framework between the BIA and federal circuit courts and how the IFR presumption of summary dismissal will effectively eliminate any meaningful appellate review of IJ decisions); St. John Decl. ¶ 73 ("the [IFR] fails to consider the substantial procedural as well as practical barriers that undermine EOIR's assumption that appealing parties under this [IFR] can still get full meaningful review through a PFR."), ¶ 79 (noting § 1252(d)'s exhaustion requirement, which under the IFR would require a notice of appeal "to capture any and all arguments that a party may want to raise on appeal.")

101.    For example, if a person is denied asylum for failure to meet the one-year filing deadline and a judge rejects the applicant's argument that changed or extraordinary circumstances should excuse the deadline under 8 U.S.C. § 1158(a)(2)(D), that is a decision the BIA would have traditionally reviewed. *See e.g., Matter of Y-C-*, 21 I. & N. 286, 288 (BIA Mar. 2002) (sustaining appeal and holding that the noncitizen established extraordinary circumstances to excuse failure to file within one year). Circuit courts, however, have a long history of refusing to entertain appeals on this issue. *See, e.g., Real v. Att'y Gen. of U.S.*, 147 F.4th 361, 367 (3d Cir. 2025) ("'[E]xtraordinary circumstances' is a discretionary determination not subject to judicial review."); *Escobar v. Garland*, 122 F.4th 465, 474 (2d Cir. 2004) (Section 1158 "generally 'divests courts of

jurisdiction to review determinations of timeliness or the applicability of the one-year rule.'"). The IFR makes an appeal of that issue subject to a 10-day filing deadline, and it is likely to be summarily dismissed. 91 Fed. Reg. 5,272.

102.    Additionally, appealing to a federal court of appeals is far more resource intensive than an appeal to the BIA, and the bulk of Plaintiffs' respective staff are trained in representation within EOIR for administrative appeals and have little or no circuit court experience. Brown  Decl. ¶¶ 11 (noting that HIAS has only filed one petition for review (PFR) in the declarant's time with the organization, for which HIAS needed outside help because HIAS attorneys "did not have the experience or licensure required to practice before that court") 12-15; St. John Decl. ¶ 82 (noting that FIRRP has only 2 staff members with PFR expertise and explaining that "appellate practice before the federal Courts of Appeal is an entirely different beast than practice before the immigration court, or even the BIA ... and requires a different skill set, expertise, and workflow."); Jones Decl. ¶ 28 ("BDS has no full-time PFR attorneys and instead relies entirely on additional work done by a small number of experienced staff with considerable other responsibilities. In addition, BDS relies on extensive collaboration with law school clinics and pro bono co-counsel from private law firms to litigate PFRs ."); Mayer-Salins Decl. ¶¶ 8, 10 (describing that "hundreds of hours of staff time can go into one PFR" whereas most attorneys spend about "25 to 35 hours on a BIA appeal"). Even the Plaintiffs that have a regular federal court practice have substantially greater limits on their capacity to take cases at this level.  *See* Koop Decl. ¶¶ 41, 79 (explaining that federal appeals require more resources than BIA appeals and are not always provided for in funding NIJC receives and that NIJC's current procedure for reviewing cases for federal court litigation would become unworkable); *see also* Jones Decl.  ¶ 29 ("Because of the additional labor required to litigate PFRs—including IFP and stay motions—the [IFR] would task BDS's limited supervision and staff resources to pursue substantive appellate review no longer available at the BIA. And BDS would have to train additional attorneys to litigate PFRs. BDS does not currently have funding to hire additional immigration staff.); Mayer-Salins Decl. ¶¶ 10 (explaining that "a

small cohort of attorneys" have the skills to handle the initial assessment needed to prepare a PFR), ¶¶ 16-17 (describing the limited training opportunities for staff to be trained to handle PFRs, given competing grant requirements). St. John Decl. ¶ 82 (stating that, "two attorneys able to take approximately 30 new cases a year will nowhere near meet the need for representation in PFRs that this Rule [IFR] will create. The massive increase in the number of PFRs that will be required under the Rule [IFR] will interfere with FIRRPs current core work by shifting focus of our daily practice from being primarily before the agency – both EOIR and the BIA – to needing a much more significant presence before the Ninth Circuit Court of Appeals.")

103.    Further, Plaintiffs with a federal appellate practice are harmed by the rule to the extent that it will lead to "issues [that] are unexhausted in BIA briefing, undeveloped, or otherwise not preserved," which limits Plaintiffs' ability to challenge the agency action in federal court. Koop Decl. ¶¶ 57, 73 (explaining the harm of eliminating IJ's review of transcripts of oral decisions, which is an important safeguard to ensure an accurate record for appellate review, including in federal circuit court), 85-86 (describing the IFR as creating a $1,030 tax for litigants to access the federal courts of appeals); St. John Decl. ¶ 78 ("Because Courts of Appeal are generally limited in their review to what was before the agency, it is unclear whether transcripts would be provided as part of the CAR for a PFR."), 8 U.S.C. § 1252(d)(1). As a result, Plaintiffs will not be able to assist as many people in federal appeals from immigration court errors or it will make these appeals more complex, thereby exacerbating the need to expend more resources on PFRs. St. John Decl. ¶¶ 78-83 (describing the harms to multiple of FIRRP's programs that would be created by increased need to file petitions for review); Koop Decl. ¶¶ 42 (explaining the concern that NIJC will have file appeals with incomplete information or lose clients' appeal rights altogether), 79 ("the [IFR] will require NIJC to devote more resources to fewer cases, meaning we will serve fewer clients."); Mayer-Salins Decl. ¶ 32 (explaining the concern that Amica would not be able to meet their funding deliverables due to reduced caseloads under the IFR). Koop Decl. ¶ 56; 8 U.S.C. § 1252(d)(1).

104.    ***Requiring Notices of Appeal to Contain All Relevant Issues for Appeal Reduces Capacity.*** Second, the IFR changes the deadline for filing most Notices of Appeal, and states that most appeals will be dismissed before a record or written transcript of the IJ's decision is even produced. 91 Fed. Reg. 5,278. The impact of these changes—combined with the risk of summary dismissal upon filing—means that Plaintiffs will have to do their appellate work on an accelerated timeline at the beginning of the appeal process. Specifically, where Plaintiffs could have previously completed a brief Notice of Appeal and sought a briefing schedule for full presentation of their arguments, they now must present all arguments in the Notice of Appeal itself because it may be the only chance they will get. Koop  Decl. ¶ 33 (explaining that NIJC may have to attach evidence from the record and fully explain legal arguments in the notice of appeal, which would be especially challenging given the 10-day deadline to file); Jones Decl. ¶¶ 36 (explaining that the IFR "does not provide BDS attorneys with sufficient time to draft the NOA itself" because it "will require that BDS file all of its written arguments in the NOA to avoid summary dismissal and to avoid waiver of any appellate issues"); Brown Decl. ¶ 40 (HIAS attorneys will need to craft "comprehensive legal arguments" in the notice of appeal to increase the likelihood that the BIA will vote en banc to accept the appeal for consideration); Mayer-Salins Decl. ¶ 31 ("Once the IJ issues a decision, staff would need to set aside all other work to prepare a robust NOA since very few BIA cases would include an opportunity for briefing."). St. John Decl. ¶ 58(" While on its face the form seems deceptively simple, the Notice of Appeal is in fact an extremely high-stakes document that now requires exceptional detail and attention because the Rule [IFR] creates a default assumption in favor of summary dismissal without briefing in most cases unless the *en banc* BIA votes to have full briefing.") This change alone is likely to add hours of additional work for Plaintiffs' staff. Koop Decl. ¶ 33-34 (explaining how NIJC's standard practice is to reserve the right to raise additional issues on appeal after review of the transcript, whereas under the IFR, NIJC would need to take robust notes or informal transcripts at the IJ hearing to raise *any* potential issue in the notice of appeal, in addition to providing fully-fleshed out legal arguments and

evidence with the Notice); Jones Decl. ¶ 36 ("The 10-day deadline simply does not provide sufficient time for BDS attorneys to adequately brief these issues."); Brown Decl. ¶ 40 (concluding that the IFR will make filing the Notice of Appeal "more onerous" for HIAS attorneys and provide HIAS with even less time to file); Mayer-Salins Decl. ¶ 30 ("[Amica] would need to overhaul our appeals procedures to a more resource-intensive model to make appeals to the BIA and therefore a circuit court feasible."), 31 (describing the need to start preparing for an appeal *before* an IJ decides the case); St. John Decl. ¶ 58 ("The Notice of Appeal will now require a much more detailed and thorough statement of the errors in the case, akin to a full legal brief with citations both to the record and caselaw. Any other approach both will likely result in a default summary affirmance and risk potential exhaustion issues if or when a PFR to the Court of Appeals becomes necessary."). And because Notices of Appeal are now generally due in 10 days, the time frame for this work is compressed to days from a period that would have been several weeks at minimum in the prior system. Brown Decl. ¶¶ 21-23 ("Even under the best of circumstances in the current system, thirty days is not much time to prepare a strong notice of appeal, particularly for cases in which HIAS did not represent the respondent at the Immigration Court level."); Mayer-Salins Decl. ¶ 29 (describing how Amica often requests a 21-day briefing extension, which is "crucial to competent and zealous representation," given competing deadlines and limited resources); St. John Decl. ¶ 59 ("The truncated 10-day deadline creates substantial tension for attorneys managing various client and case demands.").

105.    These changes do not, as the IFR suggests, simply move forward work that Plaintiffs would have had to do eventually. The IFR's changes will also require Plaintiffs to take on new work in a compressed timeline to adequately complete a Notice of Appeal. Jones Decl. ¶ 39 (describing that because all issues must be exhausted in the NOA, BDS attorneys will be required to listen to the digital audio recording, "a task more cumbersome than reviewing the written transcript" within ten days of the IJ decision, which "is not realistic and will significantly increase the amount of time it will take an attorney to prepare the NOA."); Brown Decl. ¶ 23

(noting that, because of delays in receiving the recording for a client who appeared pro se before the immigration judge—a recording the client has *still* not received roughly three months later—HIAS attorneys had to prepare the notice of appeal based on her best understanding of the judge's decision); St. John Decl. ¶ 91 ("In turn, this will create additional work and obstacles for FIRRP as we will have to scramble to assist *pro se* individuals on compressed timelines.). For instance, even in cases before the IJ, Plaintiffs will have to do more work to prepare for a potential appeal. Mayer-Salins Decl. ¶ 31 (describing how Amica will need to start preparing for an appeal before a merits hearing before the IJ, given that even just securing a fee waiver form from a detained client often takes longer than 10 days.). One organization notes, for example, they will need to devote more labor and time to trying to create real-time transcripts of hearings in the event that an appeal is necessary. *See* Koop Decl. ¶ 34. All of these extra steps add up to hours of additional work just to request an opportunity for review from the BIA. And because of the dismissal process, much of this work may not even be reviewed, which will make it hard for Plaintiffs to justify doing this necessary work when faced with numerous competing obligations, which interferes with the core work of the organizations. *See, e.g.*, Brown Decl. ¶ 37 ("Attorneys will then have to prepare a notice of appeal to the maximum of our abilities, just for that appeal to also never get so much as a skim by the BIA before it is summarily dismissed."); Koop Dec'l ¶¶ 85-86 (describing the "ethical bind" that NIJC will face and explaining "NIJC is focused on serving indigent clients, and this change impairs that core work by making the process of accessing justice financially out of reach for many."); St. John Decl. ¶ 88 ("this Rule [IFR] will make appeals more time-intensive and onerous, while also eliminating much of the critical flexibility that FIRRP attorneys rely upon to competently manage a robust detained caseload. This ultimately will reduce how many people FIRRP can represent on appeal, interfering with FIRRP's core services of providing people with representation and legal services before the agency and undermining our mission of ensuring that every detained person has access to counsel and receives a fundamentally fair court process.")

106.    ***Impeding Ability to Represent Pro Se and Detained Litigants.*** The challenges with

filing an appeal described above are immensely more complex and likely impossible in cases where the noncitizen was pro se or represented by different counsel before the IJ. In these circumstances, Plaintiffs' attorneys generally will not be able to have an intake appointment to meet with a prospective client, let alone have the chance to listen to the audio recordings of the hearings, before the deadline for filing an appeal passes. St. John Decl. ¶ 55 (explaining how lack of information impedes the case-acceptance process); Mayer-Salins Decl. ¶¶ 26-27 (describing administrative challenges to accessing the audio recording when an attorney starts representation after an IJ ruling and how, even now, pro se litigants have "slim chances" of finding an attorney to represent them on appeal); Koop Decl. ¶¶ 40, 52 (explaining that most NIJC programs have a wait time of around one week or more to conduct an intake for new clients and the administrative challenges to representing a previously pro se person); Brown Decl. ¶¶ 22-23, 25-26 ("[U]nder the new ten-day filing deadline, most potential clients would likely not reach us in time . . . . To adequately serve this client base, HIAS would need to change our intake procedure."). This impediment will make it difficult and perhaps ethically impossible for Plaintiffs to take on representation of a previously pro se person because they may not have any way of knowing what the issues on appeal are. Koop  Decl. ¶¶ 31, 34, 37-38, 42 (explaining the difficult ethical issues of advising a client on a serious issue in that short-time frame, often without critical information needed to advise the client of the strength of their case); Brown Decl. ¶ 16 (stating that, because it is so unlikely for attorneys "to receive notice of an asylum denial, request a copy of the DAR, review it, and prepare a comprehensive Notice of Appeal by the [IFR's] new deadline," HIAS's pro se assistance is "effectively going to come to an end"); St. John Decl. ¶ 66( describing obstacles to identifying issues on appeal without the necessary case record.).

107.    For Plaintiffs who are focused on supporting pro se litigants on both the detained and non-detained dockets, the shortened appeals period and need to exhaustively brief all issues in the Notice of Appeal will make an entire body of core work impossible. For example, Plaintiff FIRRP has a long history of providing support to detained, pro se individuals through the

immigration court process. St. John Decl. ¶ 18. The IFR's changes will make the information and resources needed to mount a successful BIA appeal completely out of reach for most detained individuals. St. John Decl. ¶ 39 (discussing the lack of internet access for detained individuals); Koop Decl. ¶ 38 (describing challenges in getting even a phone call with a detained person in time to mount an appeal); Mayer-Salins Decl. ¶¶ 22-23 (describing how at many detention facilities, it takes litigants more than 10-days to receive mail, including a written IJ decision).

108.    And in the non-detained context, even if a pro se person is able to overcome some of the technical and logistical challenges that the IFR creates, the IFR will nonetheless substantially impair Plaintiffs' ability to provide pro se support through the appellate process. For example, NIJC runs an Immigration Court Helpdesk (ICH) in Chicago and Indianapolis, and through these help desks, assists pro se individuals with the task of filing a Notice of Appeal. Koop Decl. ¶ 8. But the attorneys at this ICH will not be able to know the details necessary for sufficient completion of a person's Notice of Appeal; indeed, the attorneys may not even understand the applicable timeline because asylum claims are subject to the 10-day deadline for some things and a 30-day deadline for others. In the likely event that a pro se helpdesk participant has trouble explaining the IJ's decision, the ICH staff will have to guess the relevant deadline. Koop Decl. ¶ 45.

109.    ***Requiring Briefing on Compressed Timeline.*** For the rare case that is accepted for merits consideration under the IFR, the new timelines and lack of extensions will again reduce Plaintiffs' capacity to take on appeals. Jones Decl. ¶ 48 ("The overall shortened period for BIA appeals—including the shortened briefing deadline, shortened briefing deadline, and the limitation on briefing extensions—would make it significantly more difficult for BDS staff to draft ethically responsible BIA briefs while maintaining their current caseload and intake schedule, and would therefore require that BDS take on fewer new clients."); Koop Decl. ¶ 80 ("NIJC staff—overall— will be more limited in appellate representation capacity because we will have to preserve capacity amongst staff to address briefing in an unknown timeframe."); Brown Decl. ¶¶ 38-45 (stating that

the IFR's changes to the briefing timeline "will cause substantial hardship to HIAS and our clients"); Mayer-Salins Decl. ¶¶ 29-32 (noting how the lack of opportunity to seek an extension creates case management hurdles given competing deadlines, constraints to meeting with clients in detention, and the inevitable need under the IFR to begin preparing a simultaneous PFR, given the risk of removal soon after denied relief at the BIA); St. John Decl. ¶ 88 (changing in briefing timelines "will reduce how many people FIRRP can represent on appeal").

110.    Under the IFR, briefing schedules are 20 days and extensions will be rarely granted because they require extreme hardship to Plaintiffs' clients. 91 Fed. Reg. 5,277-78. This change means that Plaintiffs' attorneys will be unable to get even one extension of the 20-day deadline for their own medical reasons, conflicts, or other planned leave. Brown Decl. ¶ 44 ("There exists no exception based on needs of the attorney who, for the most part, is the relevant party in the appellate process."); St. John Decl. ¶ 87 (describing the lack of "consideration whatsoever of other professional deadlines, which is key because of the BIA is entirely unpredictable regarding when it will issue a briefing deadline"); Mayer-Salins Decl. ¶ 29 (noting the lack of extension for attorney illness); Koop Decl. ¶¶ 53-54. Because Plaintiffs will not know when the briefing schedule will issue—the IFR does not proscribe a timeline for this step—attorneys will have to be prepared to complete briefs on a shortened timeline at an unknown point. To ensure capacity to ethically and competently handle these appeals, Plaintiffs will have to do fewer of them. *See* Jones Decl. ¶¶ 32-33 ("The 10-day appeal deadline will make it significantly more difficult for BDS attorneys to undertake all necessary tasks before filing an adequate NOA." ); Brown Decl. ¶ 43 ("[The IFR's] inflexible twenty-day deadline impinges on an attorney's ability to properly execute a legal brief that properly cites the record and provide their client with the zealous representation that attorney ethics require."); Mayer-Salins Decl. ¶ 32 ("It would be impossible to meet our grant deliverables if we dramatically reduced caseloads or constantly reassigned cases to attorneys unfamiliar with the procedural history so that an attorney could address the series of emergencies this IFR creates."); St. John Decl. ¶¶ 23, 84-87, 98 (explaining how the briefing schedule changes

will limit the number of appeals they can competently work on); Koop Decl. ¶¶ 48-57 (same).

111. ***Hindering Reliance on Pro Bono Partners for Legal Representation.*** Multiple Plaintiff Organizations rely on pro bono attorneys to increase their capacity and advance their goals of providing full legal representation to as many people as possible. Koop Decl. ¶¶ 19, 54-55; Jones Decl. 28; 44; Brown Decl. ¶ 8; Mayer-Salins Decl. ¶ 5; St John Decl. ¶¶ 11, 15, 21. The IFR's changes will make it entirely impossible to place cases for individuals who were pro se or had different counsel before the IJ with pro bono attorneys for appeals. Koop  Decl. ¶¶ 18, 50, 55-56, 80 (explaining that, due in part, to complex case acceptance processes and because of lack of familiarity with immigration law and processes, law firms that provide pro bono representation in NIJC cases may be unable to file BIA appeals); Jones Decl. ¶ 49 ("The overall shortened period for BIA appeals under the [IFR], however, will mean that BDS will generally no longer be able to coordinate and co-counsel with pro bono partners" who … "usually do not represent the noncitizen at the immigration court-level and are generally not immigration law specialists."); Brown Decl. ¶ 28 (noting that the difficulties the IFR creates around meeting and accurately communicating appellate deadlines creates a "chilling effect" that threatens "potentially severe consequences for HIAS attorneys as well as the volunteer attorneys we mentor"); Mayers-Salin Decl. ¶ 33 (explaining that Amica would not have enough time to find a law firm and for the law firm to check conflicts and review their training on BIA practices); St. John Decl. ¶ 86 (explaining how the combined impact of a shortened briefing schedule, limited opportunities for extensions, and no chance to review the record in advance will make it more difficult to place pro bono BIA appeals). Indeed, because of the IFR, Plaintiff NIJC has already canceled a pro bono pilot program aimed at increasing representation on appeal for pro se individuals because this IFR made it not feasible. Koop Decl. ¶ 82.

112. And even for cases where the pro bono attorney handled the case before an IJ, it will likely be impossible to require them to carry on with the appellate process under the IFR's new parameters. Koop Decl. ¶¶ 18, 51, 55-56. Immigration law is a complex area of law; even

attorneys who regularly practice in this area will have difficulty drafting and filing a well-crafted brief that will be of assistance to the adjudicator on these timelines. Pro bono counsel, who are not familiar with immigration law or processes, will likely not be able to take on cases on this shortened timeline. St. John Decl. ¶ 54("the Rule [IFR] creates very real potential ethical concerns for pro bono attorneys who want to help people by representing them, but feel unable to do so on the extremely abbreviated timeframes allowed.")

113.     ***Introducing Uncertainty into Complex Legal Process.*** The difficulty for pro bono attorneys and Plaintiffs' own staff is further compounded by the uncertainty that the IFR creates. The presumption is that all cases will be summarily dismissed except in limited circumstances, but the IFR is silent as to what kinds of cases will qualify for that more substantive consideration, and indeed seems to leave that determination—at least in the first instance—in the hands of a single Board member who will be deciding if a specific case should be referred for *en banc* consideration. For Plaintiffs, this uncertainty translates into an inability to appropriately plan as to how best to use their limited resources. Koop Decl. ¶ 29-34, 77 (explaining that without guidance about how the Board will decide what cases to accept, NIJC attorneys will have to do extra work filing thorough a Notice of Appeal in all cases and be prepared for unexpected briefing schedules to appear); Brown Decl. ¶ 40 (noting that the IFR "does not articulate what factors the BIA will consider that favor accepting an appeal," so HIAS attorneys will have to perform additional briefing "to simply guess what might entice the BIA to accept its appeal"). St. John Decl. ¶ 102 (explaining that FIRRP staff will require additional training on how to file PFRs at the same time that they are drafting and filing the BIA Notice of Appeal, given the likelihood that any given notice of appeal will be summarily dismissed.)

114.     The IFR also creates uncertainty about the deadline to file an appeal. The IFR fails to account for the reality that IJs often rule on issues that would be subject to the 10-day deadline alongside issues that fall within the 30-day deadline. *See* Koop Decl. ¶ 43; Brown Decl. ¶ 26; St. John Decl. ¶ 34 ("As a lawyer with 15 years of experience in immigration law and appellate

practice, it is unclear from the text of the Rule how the BIA will treat [these] situations"); Mayer-Salins Decl. ¶ 24. This uncertainty creates the risk noncitizens could inadvertently miss the deadline to appeal, especially if an IJ's oral ruling was ambiguous, which would thus lead Plaintiffs to encourage everyone to follow the 10-day deadline. Koop Decl. ¶¶ 43-45; Mayer-Salins Decl. ¶ 24 (explaining that Amica would advise litigants to assume the deadline is 10-days due to the ambiguity and to avoid errors by the BIA clerk); Brown Decl. ¶ 26 ("To be safe, then, HIAS attorneys would need to presume that all potential appeal clients face a ten-day filing deadline, which would artificially co-opt our calendars and capacity . . . .").

115. ***New Case Completion Deadlines Will Harm Existing Cases.*** The IFR is prospective in its application, which means it will not apply to the more than 200,000 cases that are currently pending before the BIA, some of them for many years. The IFR is silent as to how the Board will address those cases amidst this new mandatory reprioritization. The inevitable result is that existing cases on Plaintiffs' respective dockets will languish, which causes Plaintiffs real harm. Even where a case is fully briefed and pending, Plaintiffs must remain in contact with the client and continue to perform ancillary services for them. Koop Decl. ¶ 67 (explaining attorney's obligation to stay in touch with the client and assist with ancillary matters); Brown Decl. ¶ 36 (the cost of "cases endlessly pending on appeal is significant").  But if the BIA made decisions in the languishing cases, the Plaintiffs could resolve those cases – either by expanding the scope of representation to the circuit courts of appeals or immigration court – or by closing the matter, thus freeing up capacity to take on a new case. If these individuals are detained, they must also confront their clients' growing desperation as their time in detention grows.  *See* Mayer-Salins Decl. ¶ 25 (noting that many pro se litigants "would choose a stipulated deportation instead of languishing in harsh detention conditions with no hope of a neutral arbiter"); Koop Decl. ¶ 41 (explaining that the potential for prolonged detention factors into NIJC's recommendation to detained clients seeking appeal.). These languishing cases, in turn will occupy Plaintiffs' staff capacity to take on new matters, which is necessary to advance their core work and also to secure funding. *See, e.g.*,

Koop Decl. ¶ 67 (explaining how this provision and others will require NIJC to take on fewer cases); St. John Decl. ¶ 55 (**"**For FIRRP attorneys who directly represent individuals, the reduction from 30 to 10 days to file a Notice of Appeal also undermines core work by reducing overall capacity to represent clients and potentially forcing FIRRP to take on fewer clients.")

116.    ***Jeopardized Funding.*** The reduced case capacity caused by many aspects of the IFR is likely to put Plaintiffs' funding at risk. Plaintiffs receive funding from a variety of sources, including private foundations, governmental funds (federal, state, and local), and private donors. In some instances, the metrics that determine funding are tied to the number of clients the organization serves. Koop Decl. ¶¶ 81 (explaining that much of NIJC's funding is based on accepting and filing new cases to meet certain funder deliverables); *id.* ¶  79 (explaining that the IFR will require NIJC to file more federal appeals, including in cases where funding does not cover federal litigation); Mayer-Salins Decl. ¶¶ 19, 21 (explaining that  grants structured based on number of clients served and matters worked on means the more time-intensive PFR cases will not be funded at the same levels as BIA appeals). Plaintiffs anticipate that, because the IFR will decrease the number of clients they can serve, their funding will similarly decrease. Koop Decl. ¶ 67, Jones Decl. ¶ 16; St. John Decl. ¶¶ 96-98 ("It surely will require substantial additional fundraising to sustain these mission critical efforts."); *see also* Brown Decl. ¶¶ 12, 31 (noting that the IFR will make HIAS unable "to meet financial deliverables and grant requirements" by rendering it "exceedingly difficult" to take on appellate cases for clients HIAS did not represent before the Immigration Judge; Mayer-Salins Decl. ¶ 18 (explaining that one grant "requires [its] largest bucket of deliverables to be representation in administrative proceedings").

117.    In addition, some funding sources—including funding that numerous Plaintiff organizations receive to serve as appointed counsel for individuals deemed incompetent for self-representation—may not be used to fund litigation against the government, which includes petitions for review. *See, e.g.*, Mayer-Salins Decl. ¶ 18 (explaining that its grants to serve individuals deemed incompetent by an IJ do not allow Amica to bill for federal court

representation). This limit does not apply to representation in administrative appeals to the BIA, but it does bar circuit court litigation. The IFR makes circuit courts the only likely option for merits-based appellate review, yet plaintiffs will not be able to rely on existing funding streams to do this work, which means they will no longer be able to do work that was once directly funded. St. John Decl. ¶ 100 ("the NQRP contract funds representation before the BIA, but does not provide funding for representation on PFR's before the Ninth Circuit. Because this Rule [IFR] will cause more of our clients' cases to be summarily dismissed without review, in order to reverse IJ errors in these cases, FIRRP will not only lose income that previously was provided for appeals to the BIA, but will also need to divert funds to provide representation to these clients at the Ninth Circuit.")

118.    ***New Training Obligations.*** The IFR will also require Plaintiffs to retrain staff, pro bono partners, and volunteers on representation before the BIA and to develop new training and programmatic materials. *See* St. John Decl. ¶ 102 ("Internally, this [IFR] also complicates FIRRP's training for staff. Specifically, resources will have to be dedicated to educate and re-train staff on practice before EOIR in light of this new [IFR]."); Koop Decl. ¶ 82-83 (noting the need to provide additional mentorship to pro bono partners and pro se noncitizens); Mayer-Salins Decl. ¶ 32 (describing the need to train staff, especially those with less experience with circuit courts, on preparing for BIA representation and on handling PFRs); Brown Decl. ¶ 31 ("HIAS would have to incur considerable cost and expense to develop a circuit court practice, including . . . the requisite training and mentorship required to ensure attorneys are competent to practice there . . . .). For example, FIRRP is a leader among providers of legal services to detained noncitizens, and it develops materials that are used by pro se litigants around the country. FIRRP will have to divert substantial resources to amending existing guides to reflect changes and create new templates and other materials to help pro se individuals navigate the IFR's many changes. St. John Decl. ¶ 75 ("While historically relatively few non-citizens required a full explanation of how to navigate PFR to a Federal Court of Appeals, as most cases were ultimately resolved before the agency, under the

Rule, it is fair to assume that more people will now elect to attempt to seek review before the Courts of Appeals since there was no meaningful opportunity to present their case before the BIA. This will require significant resources from FIRRP's *pro se* cohort to explain the process, update and improve *pro se* materials, and orient and support individuals in the PFR process.").

119.    ***Inability to Perform Core Services.*** Finally, the IFR upends access to a fair and just removal process with every provision it enacts. Plaintiff Organizations are committed to ensuring the fairness of these proceedings, but the IFR puts fundamental fairness out of reach for many. *See, e.g.*, Koop Decl. ¶ 86 (summarizing how the IFR frustrates NIJC's core mission to ensure that "all immigrants receive a fair day in court"); St. John ¶ Decl. 14 ("this [IFR] will result in an inability to perform FIRRP's core services and will have a tremendously detrimental impact on the people we serve."); Mayer-Salins Decl. ¶ 35 (explaining how the IFR would interfere with its core mission by making "merits review before the BIA [] non-existent for nearly all of our clients"). Indeed, though imperfect, the BIA is needed as a forum to correct errors and prevent miscarriages of justice that can occur before the immigration courts.

120.    ***Harm to Clients.*** By denying Plaintiffs' clients the right to fair proceedings guaranteed by the INA and the due process clause, the IFR harms third parties with whom Plaintiffs have a close relationship: their clients and the pro se individuals who seek to receive their assistance in navigating removal proceedings before EOIR.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the APA, 5 U.S.C.§ 706(2)(D) – Failure to Observe Required Procedure**

121.    The paragraphs above are incorporated and reasserted as if fully set forth here.

122.    A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C.§ 706(2)(D).

123.    The APA requires that agencies follow public notice-and-comment rulemaking procedures before promulgating regulations. *See* 5 U.S.C. § 553(b), (c). Defendants failed to provide notice and an opportunity for public comment on the IFR in any manner prior to its

41

*issuance on February 6, 2026.*

124.    The IFR is a legislative rule within the meaning of the APA.

125.    The APA's notice and comment exceptions relating to "foreign affairs function[s] of the United States," *id.* § 553(a)(1), and "rules of agency organization, procedure, or practice" applies, *id.*, § 553(b)(A), are inapplicable.

126.    Had the IFR been the subject of advance publication and notice-and-comment rulemaking under the APA, Defendants could have considered comments from Plaintiffs opposing its adoption pre-implementation.

127.    The 30-day extension of the comment period, which defendants announced February 26, 2026, means that the IFR will go into effect before the comment period has finished. Defendants will not be able to consider comments opposing the IFR until it has already taken effect.

## COUNT II
**Violation of the APA, 5 U.S.C.§ 706(2)(A), (B) – Contrary to Law and Constitutional Right**

128.    The paragraphs above are incorporated and reasserted as if fully set forth here.

129.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious" or otherwise "not in accordance with law." 5 U.S.C. § 706(2)(A)-(C).

130.    The IFR is contrary to law because it violates the INA in multiple ways.

131.    First, the INA guarantees noncitizens "the privilege of being represented (at no expense to the Government) by [] counsel . . . as he shall choose," 8 U.S.C. § 1362; *see also* 8 U.S.C. §§ 1229a(b)(4)(A). The IFR's compressed and unalterable timeline for a notice of appeal and merits brief, in conjunction with the IFR's other provisions, deprive noncitizens of the ability to meaningfully exercise their right to counsel.

132.    Second, the INA guarantees noncitizens "a reasonable opportunity to examine the evidence against [them], to present evidence on [their] own behalf, and to cross-examine witnesses presented by the Government," 8 U.S.C. § 1229a(b)(4)(B), *see also Matter of R-C-R-*, 28 I. & N. Dec. 74, 77 (BIA 2020) (a noncitizen "who faces removal is entitled to a full and fair removal

hearing under" the INA). The IFR's compressed and unalterable timeline for a Notice of Appeal and merits brief, in conjunction with its other provisions, deprive noncitizens of the ability to have their claims fairly considered.

133.    Third, the INA requires a "complete record [to] be kept" of removal proceedings, 8 U.S.C. §1229a(b)(4)(C)), so that the parties and the BIA have the benefit of the transcript and record in deciding whether to proceed on appeal. The IFR renders that requirement meaningless by requiring parties to essentially make their whole case without the benefit of the record, and means that the summary dismissal decision under the IFR will be made before the record is complete and available for review. That in turn interferes with an individual's ability to mount a challenge to the proceedings that were conducted before the IJ on a petition for review in the federal courts.

134.    Fourth, the INA establishes a statutory framework to determine whether a noncitizen is subject to removal, and that framework positions the BIA as the appellate review body. *See* 8 U.S.C. § 1101(a)(47). The IFR eviscerates the BIA's ability to conduct meaningful appellate review and therefore violates the INA.

135.    Fifth, the INA provides for a 30-day deadline to file an appeal in asylum cases. 8 U.S.C. § 1158(d)(5)(A)(iv). But the IFR shortens that appeal period to ten days for many asylum applicants. And though the IFR claims to preserve the 30-day deadline for some asylum decisions, in many cases that timeframe is not actually available. It is routine that asylum claims are adjudicated concurrently with other issues, including applications for withholding of removal and CAT protection, which are subject to the 10-day deadline, which means an applicant will have to file within 10 days to preserve their appellate rights on all issues.

136.    Sixth, the IFR violates binding agency regulations intended to protect the rights of individuals appearing before the Agency and is therefore an *Accardi* violation. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

137.    Binding agency regulations require Board members to "exercise their independent

judgment and discretion in considering and determining the cases coming before the Board." 8 CFR § 1003.1(d)(1)(ii).

138.    The regulations also state that "[t]he Board shall resolve the questions before it in a manner that is timely, impartial, and consistent with the Act and regulations." *Id.*

139.    The IFR requires summary dismissal in the vast majority of cases, even without any review, exercise of judgment, or use of discretion by any Board member. As such, the IFR requires the agency to avoid "resolv[ing]" any question put before it, except in a small number of cases and thus violates binding regulations, in violation of the *Accardi* doctrine.

### COUNT III
### Violation of the APA, 5 U.S.C.§ 706(2)(A) – Arbitrary & Capricious

140.    The paragraphs above are incorporated and reasserted as if fully set forth here.

141.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

142.    The IFR is arbitrary and capricious because Defendants "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

143.    For example, Defendants failed to consider the impact of the upending of appellate practice on noncitizens in removal proceedings and the attorneys and organizations seeking to assist them. The IFR especially overlooked the impact on noncitizens who are detained, pro se, or both. Defendants similarly failed to consider the statutory and due process rights of noncitizens in removal proceedings, including the right to counsel. As a result of the IFR, more erroneous removals of individuals entitled to relief will occur, a fatal flaw the IFR utterly fails to grapple with.

144.    Defendants also ignored the interplay between the IFR and other recent changes that affect a noncitizen's right to a full and fair removal process, including (i) numerous BIA

decisions and actions by the current administration that make individualized and neutral merits-based review at the IJ level more difficult and (ii) a substantial increase in the cost of filing an appeal to the BIA. Defendants likewise ignored the IFR's impact on the dockets of the federal courts of appeals. These are just some, among many factors that Defendants failed to consider.

145.    Defendants also substantially altered their prior position without adequate explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Defendants departed from longstanding presumption that cases filed to the BIA would be reviewed on the merits and also from policies that allowed 30 days to file notices of appeal without assessing reliance interests associated with the existing policies or alternatives within the ambit of the existing policy.

146.    Defendants failed to consider the reliance interests of Plaintiffs and other pro bono legal service providers that have designed programs and accepted cases and clients with the reasonable expectation that Defendants would not arbitrarily and capriciously change EOIR procedures. *See DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30–31 (2020).

147.    In their reliance on a purported efficiency rationale, Defendants failed to consider reasonable alternatives to the changes contained in the IFR in addressing case backlogs, including expanding the size of the Board. Defendants similarly ignored how the IFR's reasoning is contrary to a study that EOIR itself commissioned to identify ways for efficiency gains at the agency.

148.    Defendants' rely on faulty data and their explanations run counter to the evidence before the agency, including evidence that the BIA decides in favor of the appealing party much more often than what the IFR acknowledges.

149.    The IFR also fails to acknowledge let alone consider the Fifth Amendment's Due Process Clause and the rights of noncitizens in removal proceedings impacted by the IFR. "'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993).

150.    That means that "'no person shall be' removed from the United States 'without opportunity, at some time, to be heard'" in a meaningful way. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (quoting *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)). "One way we ensure that the 'standards of fairness' are met is by guaranteeing that [noncitizens] have the opportunity to be represented by counsel." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005).

151.    The IFR is arbitrary and capricious because it fails to acknowledge or address the Due Process Clause issues caused by its compressed and unalterable timeline for a notice of appeal and merits brief, in conjunction with the IFR's other provisions, and that these issues effectively deprive noncitizens of the ability to meaningfully exercise their right to counsel or have their claims fairly considered.

152.    For these reasons, and many others, the IFR is arbitrary and capricious.

### COUNT IV
### Violation of Constitution - Fifth Amendment Due Process Clause

153.    The paragraphs above are incorporated and reasserted as if fully set forth here.

154.    "'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings.'" *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).

155.    That means that "'no person shall be' removed from the United States 'without opportunity, at some time, to be heard'" in a meaningful way. *A.A.R.P.*, 145 S. Ct. at 1367 (quoting *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)). "One way we ensure that the 'standards of fairness' are met is by guaranteeing that [noncitizens] have the opportunity to be represented by counsel." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005).

156.    The IFR violates the Due Process Clause because its compressed and unalterable timeline for a notice of appeal and merits brief, in conjunction with the IFR's other provisions, deprive noncitizens of the ability to meaningfully exercise their right to counsel or have their claims fairly considered.

## COUNT V
## Violation of the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*

157.    The paragraphs above are incorporated and reasserted as if fully set forth here.

158.    The agency failed to comply with the requirements of the Regulatory Flexibility Act (RFA).

159.    The IFR is a "rule" within the meaning of the RFA. *Id*. § 601(2).

160.    The RFA requires federal administrative agencies to analyze the effects on "small entities" of rules they promulgate, and to publish initial and final versions of those analyses. *See* 5 U.S.C. §§ 603–604.

161.    The RFA defines "small entities" to include small businesses, small nonprofit organizations, and small governmental jurisdictions. *Id*. § 601(6).

162.    Plaintiffs are "small entities" within the meaning of the RFA and are directly affected by the IFR, which, among other things, will require them to expend substantial resources, including to update training materials and evaluate the IFR's impact on their cases.

163.    The IFR's regulatory flexibility analysis does not comply with the RFA because Defendants unlawfully concluded that the IFR does not require such an analysis. 91 Fed. Reg. at 5,276.

164.    The IFR is therefore procedurally invalid and should be set aside under the APA.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.    Issue a stay under 5 U.S.C. § 705 of the IFR;

b.    Preliminarily and/or permanently enjoin Defendants from enforcing the IFR;

c.    Hold unlawful, vacate and/or set aside the IFR under 5 U.S.C. § 706;

d.    Declare that the IFR is unlawful under the APA, the INA, the RFA, and the Due Process Clause;

e.    Award Plaintiffs' counsel attorneys' fees and costs for this action; and

f.      Award such other and further relief that the Court may deem just, equitable, and proper.

g.      In the alternative, if the IFR is allowed to take effect, declare that an appeal to the BIA is not an administrative remedy available as of right and thus is not required for exhaustion purposes, under 8 § U.S.C. 1252(d)(1) or otherwise.

Dated: February 26, 2026

Respectfully submitted,

/s/ Erez Reuveni

Keren Zwick (D.D.C. Bar No. IL0055)
Mary Georgevich**
Maria E. Dambriunas* (D.C. Bar No. 1738154)
Fizza Davwa**
Nicole May**
**NATIONAL IMMIGRANT JUSTICE CENTER**
111 W. Jackson Blvd. Suite 800
Chicago, Illinois 60604
kzwick@immigrantjustice.org
mgeorgevich@immigrantjustice.org
mdambriunas@immigrantjustice.org
fdavwa@immigrantjustice.org
nmay@immigrantjustice.org
Phone: (312) 660-1364

* Application for admission to D.D.C. forthcoming
** Application for admission *pro hac vice* forthcoming

Erez Reuveni (D.D.C. Bar No. CA00244)
Allyson R. Scher (D.C. Bar No. 1616379)
Catherine M.A. Carroll (D.C. Bar No. 497890)
Robin F. Thurston (D.C. Bar No. 1531399)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
ereuveni@democracyforward.org
ascher@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org
Phone : (202) 448-9090

Michelle Lapointe (D.C. Bar No. 90032063)
Suchita Mathur (D.C. Bar No. 90013156)
**AMERICAN IMMIGRATION COUNCIL**
2001 L Street, NW, Suite 500
Washington, D.C. 20036
mlapointe@immcouncil.org
smather@immcouncil.org
Phone: (202) 507-7645

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Erez Reuveni, hereby certify that on February 26, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system. I also served copies of this filing on counsel for Defendants, Papu Sandhu, via email.

<u>/s/ Erez Reuveni</u>
Erez Reuveni