**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, ET AL., | |
| *Plaintiffs*, | |
| v. | Civ. Action No. 1:26-cv-00696-RDM |
| EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, ET AL., | |
| *Defendants*. | |

**BRIEF OF *AMICI CURIAE* FORMER IMMIGRATION JUDGES AND FORMER
MEMBERS OF THE BOARD OF IMMIGRATION APPEALS IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTION FOR A STAY**

John R. Jacob
  D.C. Bar No. 444412
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Tel:  (202) 887-4000
Fax:  (202) 887-4288
Email:  jjacob@akingump.com

*Counsel to* Amici Curiae *Former Immigration
Judges and Former Members of the Board of
Immigration Appeals*

# TABLE OF CONTENTS

I.      INTEREST OF *AMICI CURIAE* ...................................................................1

II.     INTRODUCTION ..........................................................................................1

III.    ARGUMENT ...................................................................................................4

    A.    Board Review Is a Critical Appellate Function ......................................4

        1.    *The Establishment of the BIA and its Purpose*.............................4

        2.    *BIA Is a Statutory Construction That Effectuates the Meaningful Administrative Appeals Process Required by 8 U.S.C. § 1252(d)* ..............6

        3.    *Federal courts have established basic standards of administrative adjudication that the Board is required to meet*...........................................8

        4.    *The Board has Long Functioned in a way That Respects its Role as a Review Body*.........................................................................................9

            a.    Filing Form E-26, Notice of Appeal ..................................9

            b.    Review by the Board Clerk's Office................................12

            c.    Review by the Board attorney and Board Member ......................12

            d.    Panel and *en banc* Review ..............................................14

            e.    Congress Intended for Immigration Judge Decisions to be Subject to Agency Review ...............................................15

            f.    Appellate Review Provides Discipline and Guidance to Immigration Judges.......................................................16

    B.    The Interim Final Rule Functionally Eliminates the BIA as an Appellate Body.........................................................................................16

IV.    CONCLUSION...............................................................................................21

# TABLE OF AUTHORITIES

**CASES:**

*Benslimane v. Gonzales*,
    430 F.3d 828 (7th Cir. 2005) ..................................................................6, 8

*Contreras v. Bondi*,
    134 F.4th 12 (1st Cir. 2025).........................................................................20

*Dong v. U.S. Attorney General*,
    550 F. App'x 700 (11th Cir. 2013) ..............................................................8

*Marquez v. Bondi*,
    160 F.4th 418 (4th Cir. 2025) ......................................................................8

**STATUTES:**

5 U.S.C.
    app. (1940). ...................................................................................................5
    § 705...............................................................................................................1

8 U.S.C.
    § 1101(a)(47)(B) ...........................................................................................6
    § 1103(g) .......................................................................................................15
    § 1229a(e)(1)................................................................................................17
    § 1252(d) ....................................................................................................3, 6
    § 1252(d)(1) .............................................................................................6, 15
    § 1812(d)(2)(A)...........................................................................................15

**OTHER AUTHORITIES:**

8 C.F.R.
    § 1001.1(h)....................................................................................................18
    § 1003.1(d)(2)...............................................................................................13
    § 1003.1(d)(2)(ii).........................................................................................18
    § 1003.38(b)(1)............................................................................................18

5 Fed. Reg. 3,502 (Sep. 4, 1940) ....................................................................4

90 Fed. Reg. 15,525 (Apr. 14, 2025) ............................................................14

91 Fed. Reg. 5,267 (Feb. 6, 2026) ....................................................... *passim*

Am. Immigr. Law.'s Assoc., AILA Testimony on BIA Reform, Statement of
    Stephen Yale-Loehr of Am. Immigr. Law.'s Assoc. on The Operations of the
    Executive Office for Immigration Review (EOIR), before the House Comm.
    on the Judiciary Subcomm. on Immigr. and Claims (Feb. 6, 2002) .........................................5

APPLESEED, ASSEMBLY LINE INJUSTICE, BLUEPRINT TO REFORM AMERICA'S
IMMIGRATION COURTS (May 2009) .......................................................................20

Fed. R. App. P. 29(a)(4)(E)..........................................................................................1

I LOVE LUCY, *Lucy and Ethel at the Chocolate Factory* (Paramount Plus, accessed
Feb. 25, 2026) ............................................................................................................20

Nat'l Immigr. Project, *The BIA and AG's Systemic Destruction of Noncitizens'
Rights in Removal Proceedings*, Feb. 19, 2026 .......................................................19

TRAC IMMIGR., IMMIGRATION COURT BACKLOG TOPS 3 MILLION; EACH JUDGE
ASSIGNED 4,500 CASES (Dec. 18, 2023) ...................................................................7

U.S. Dep't of Just., Exec. Off. of Immigr. Rev., *About the Office* (updated May
29, 2025) .....................................................................................................................4

U.S. Dep't of Just., Exec. Off. for Immigr. Rev., *Adjudication Statistics* (Jan. 26,
2026) ..........................................................................................................................14

U.S. Dep't of Just., Exec. Off. for Immigr. Rev., Form EOIR-26: Notice of
Appeal From a Decision of an Immigration Judge (last visited Feb. 25, 2026).......9

U.S. Dep't of Just., Exec. Off. for Immigr. Rev., *Types of Appeals, Motions, and
Required Fees* (updated Feb. 18, 2026) ...............................................................9, 15

## I.      INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are former immigration judges ("IJs") and former members of the Board of Immigration Appeals ("BIA" or the "Board"), listed in Appendix A, with substantial, combined years of service and intimate knowledge of the U.S. immigration system.  *Amici* seek to assist the Court by explaining the established procedures governing review before the Board, the Board's longstanding function within the statutory framework of immigration adjudication, and the ways in which the Department of Justice's Interim Final Rule, 91 Fed. Reg. 5,267 (Feb. 6, 2026), would undermine that structure.

*Amici* are invested in the issues presented by Plaintiffs because they have dedicated their careers to improving the fairness and efficiency of the U.S. immigration system, even after departing from the bench.  Given *amici*'s familiarity with the procedures and realities of the immigration adjudication system, *amici* respectfully submit that the Rule would effectively eliminate agency appellate review, disregarding noncitizens' due rights and flooding the United States Circuit Courts of Appeal with new cases.  Accordingly, we support Plaintiffs' Emergency Motion for a Stay under 5 U.S.C. § 705.

## II.      INTRODUCTION

As former immigration judges and former members of the BIA, *amici* have long understood the administrative appeals process to be a critical safeguard within the immigration adjudication system.  For decades, the Board's review has served as the principal mechanism by

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than *amici*, its members, and its counsel) have contributed money to fund the preparation or submission of this brief.

which legal error is identified, factual mistakes are corrected, and uniformity is maintained across thousands of decisions issued each year by immigration judges nationwide.

On February 6, 2026, the Executive Office for Immigration Review ("EOIR"), an agency within the Department of Justice, issued an Interim Final Rule, "Appellate Procedures for the Board of Immigration Appeals" ("IFR" or the "Rule").[2]  Effective March 9, 2026, the Rule would significantly amend the EOIR's regulations to effectively remove the appellate review of immigration judge decisions in all but a few cases.  We therefore submit this brief to address the consequences of the IFR for EOIR's appellate function, and to explain why the Rule's restructuring of that process threatens the very features that have enabled the Board to operate as a meaningful appellate tribunal.

As explained below, the new Rule is a radical departure from past practice and the Congressional vision for appellate body with EOIR.  It shortens the deadline for filing the Notice of Appeal from 30 to 10 days for most cases (excepting some asylum cases), a timeline that appears to be aimed at limiting the opportunity to submit a substantive appeal rather than creating any significant administrative efficiency.  More radically, however, the Rule imposes a timeline on the Board that all but eliminates any meaningful review of immigration judge decisions within EOIR. The Rule requires that an appeal be docketed, assigned to a Board attorney for initial review, then adjudicated by a single Board member within 10 calendar days—in all cases, no more than 8 business days, and in many cases 5 or 6 working days.  An appellant will be allowed to submit a brief only if an *en banc* panel of the Board has voted to allow briefing within that same 10-day period.  Any review of substance is simply impossible under this new system.  Indeed, the aim here is not any sort of due process, but, as the Rule acknowledges, to have the Board "summarily

---

[2] 91 Fed.  Reg. 5,267 (Feb. 6, 2026).

dismiss[] all appeals." 91 Fed. Reg. 5,270. Simply put, EOIR is abdicating its appellate review responsibility and placing the burden of first-instance review of immigration judge decisions on the federal courts.

Although our focus rests on EOIR itself—its institutional design, statutory responsibilities, and longstanding adjudicatory practices—we cannot ignore that the Rule also carries serious ramifications for those individuals who must navigate the appeals system. As Plaintiffs explain in their Complaint, the Rule substantially impedes effective representation and access to counsel for noncitizens. By substantially reducing the time permitted to file a notice of appeal, the Rule increases the likelihood that unrepresented noncitizens, already facing substantial barriers in accessing the record and understanding their obligations, will be unable to preserve their right to administrative review. For these individuals, the inability to meet a compressed deadline does not simply result in the loss of an opportunity to appeal within the agency; it also risks foreclosing any avenue to federal court review, as failure to timely file an appeal to the Board may be treated as failure to exhaust administrative remedies required by 8 U.S.C. § 1252(d).

The Rule compounds these concerns by elevating the Notice of Appeal—Form EOIR-26 ("E-26")—into the central, and in many cases exclusive, means of raising issues to the Board. That form has functioned as only a preliminary filing, to be followed by briefing after the full record, including the transcript of the oral decision of the immigration judge, is available. Under the Rule's new framework, however, issues not articulated on the E-26 may be deemed waived, even when the noncitizen has had no meaningful access to a transcript, digital recording, or any other part of the record necessary to identify the errors requiring review. Indeed, the Board itself would not have the full record until and unless it votes to take the case to briefing. This heightened risk of waiver poses a significant danger not only to the fairness of the administrative process, but also

to the viability of subsequent judicial oversight, since federal courts rely on properly raised and considered claims to conduct their review of agency action.

In light of these structural concerns, *amici* submit that the IFR undermines the essential purpose of the administrative appeals process and jeopardizes both the integrity of EOIR's adjudication and the rights of those who depend upon it.

## III.    ARGUMENT

### A.    Board Review Is a Critical Appellate Function

The Rule posits that the Board is a mere administrative indulgence.[3]  We strongly disagree. The structure of the Immigration & Nationality Act ("INA") and the immigration court system clearly contemplate a level of administrative review before a case is presented to the federal courts.

### 1.    *The Establishment of the BIA and its Purpose*

The BIA has, since its creation in 1940, served as the nation's centralized administrative appellate tribunal for immigration cases.  When immigration functions were moved from the Department of Labor to the Department of Justice that year, the Attorney General established the Board through 5 Fed. Reg. 3,502 (Sep. 4, 1940) to bring order and coherence to an adjudicatory system that had previously relied on dispersed bodies and inconsistent practices.  Contemporary accounts and EOIR's own historical summaries make clear that the Board was created to provide a structured appellate mechanism capable of producing consistent, legally grounded decisions across the country.[4]

---

[3] *See, e.g.,* "[T]here is no statutory requirement for an appellate process." 91 Fed. Reg. at 5,270-5,271; "[T]he Board's appellate authorities have been delegated by the Attorney General and delineated by regulation, rather than by statute." 91 Fed. Reg. at 5,268.

[4] *See, e.g.,* U.S. Dep't of Just., Exec. Off. of Immigr. Rev., *About the Office* (updated May 29, 2025), https://www.justice.gov/eoir/about-office.

From the outset, the Board's mandate included ensuring uniformity in the application of immigration law. Prior to 1940, appeals were handled through administrative units whose authority varied and sometimes overlapped, resulting in inconsistent outcomes.[5] The establishment of a single appellate body allowed for the development of unified legal standards and contributed to the evolution of a coherent body of immigration jurisprudence.

Equally central to the Board's purpose is its role as a check on immigration judges. Earlier structures, such as the Board of Review within the Department of Labor, lacked independent decision-making authority and could only make recommendations.[6] The 1940 reforms replaced that model with an appellate body empowered to correct factual and legal errors in first-instance decisions and to ensure that adjudications comported with governing law. This shift marked a deliberate commitment to more reliable and professionalized administrative adjudication—one that recognized the stakes of removal proceedings and the need for appellate oversight.

Throughout our service on the bench, *amici* relied on the Board's oversight to maintain accuracy, consistency, and fairness across the system. The Board's historic structure and purpose remain foundational to the integrity of immigration adjudication today, and any rule that

---

[5] 5 U.S.C. app. at 104 (1940) (Roosevelt statement to Congress), https://www.govinfo.gov/content/pkg/USCODE-2010-title5/pdf/USCODE-2010-title5-app-reorganiz-other-dup4.pdf.

[6] Am. Immigr. Law.'s Assoc., AILA Testimony on BIA Reform, Statement of Stephen Yale-Loehr of Am. Immigr. Law.'s Assoc. on The Operations of the Executive Office for Immigration Review (EOIR), before the House Comm. on the Judiciary Subcomm. on Immigr. and Claims (Feb. 6, 2002), https://www.aila.org/library/aila-testimony-on-bia-reform#:~:text=Single%2DMember%20Review%20and%20New,factual%20determination%20by%20an%20IJ. ("As historical background, a Board of Review functioned within the Department of Labor between 1922 and 1940 and was empowered with reviewing immigration cases and making recommendations to the Secretary of Labor as to their disposition. In 1940, the administration of immigration affairs was transferred to the DOJ, and the Board of Review was replaced with the Board of Immigration Appeals. The new Board was empowered to render final administrative decisions in such matters, subject only to possible review by the Attorney General.").

diminishes its ability to perform these essential appellate functions undermines the system Congress intended.

### 2.    *BIA Is a Statutory Construction That Effectuates the Meaningful Administrative Appeals Process Required by 8 U.S.C. § 1252(d)*

The Board's role as the nation's immigration appellate tribunal is not an accident of administrative design, but the product of a statutory and structural framework that presupposes meaningful administrative review.  Not only does the Immigration and Nationality Act ("INA") enumerate the Board by name at 8 U.S.C. § 1101(a)(47)(B), Congress constructed the modern judicial-review scheme on the premise that noncitizens would have access to a functioning administrative appeal and that the agency would provide reasoned adjudication before matters reached the federal courts.  For example, section 1252(d), which requires exhaustion of "administrative remedies available to the [noncitizen] as of right," reflects that intent.  8 U.S.C. § 1252(d)(1).

Federal courts have repeatedly interpreted this provision to presuppose the existence of an adjudicatory body capable of addressing errors in the first instance and providing a complete administrative record suitable for judicial review.  In reviewing petitions for review, the courts of appeals have described the Board's oversight as indispensable to ensuring that immigration judges adhere to legal standards and that the administrative record is sufficiently developed for judicial evaluation.  When the Board has not lived up to this standard, the federal courts have noticed.  The Seventh Circuit, for example, noted in *Benslimane v. Gonzales*, 430 F.3d 828, 830 (7th Cir. 2005) that "the adjudication of [immigration] cases at the administrative level had fallen below the minimum standards of legal justice," a condition that made the Board's checking function all the more important.  Such decisions reflect the judiciary's longstanding expectation that the Board will identify and correct errors before a case reaches the courts of appeals.

*Amici*'s own experience confirms why Congress built the current statutory structure around the availability of meaningful administrative appellate review. Those of us who were immigration judges relied on the Board to review and correct legal or factual errors that we, despite best efforts, could sometimes miss. That oversight benefited not only the individuals whose cases were on appeal, but also the accuracy of our future adjudications. Board decisions routinely clarified legal standards, resolved inconsistent interpretations, and ensured that our rulings aligned with national norms. As caseloads increased and the pressures on trial-level adjudication grew—pressures well documented in both agency history and federal court commentary[7]—appellate review became even more essential to maintaining the system's integrity.

Administrative appellate review before the Board also plays a central role in enabling proper federal court oversight. The vast majority of the Board's decisions may be challenged directly in the U.S. Courts of Appeals through a petition for review, which is the mechanism Congress has prescribed for judicial review of removal orders. Section 1252 specifies that review of a final order of removal lies in the circuit court with jurisdiction over the immigration court that issued the underlying decision, subject to certain limitations on classes of decisions that may not be appealed. In adopting this framework, Congress assumed that the Board would supply a reasoned, reviewable decision that clarified the issues for judicial evaluation and ensured that the administrative record reflected both the legal and factual foundations of the agency's ruling. The petition-for-review system therefore depends on the existence of a meaningful intermediate layer of agency review.

---

[7] For example, each immigration judge was assigned to 4,500 cases by November 2023. TRAC Immigr., Immigration Court Backlog Tops 3 Million; Each Judge Assigned 4,500 Cases (Dec. 18, 2023), https://tracreports.org/reports/734/.

### 3. *Federal courts have established basic standards of administrative adjudication that the Board is required to meet*

Federal courts have repeatedly underscored the importance of this appellate layer, and their discussions of the deficiencies they observe at the trial level only reinforce the necessity of robust Board review. Indeed, Circuit Courts have routinely expressed frustration at the inadequacy of the Board's review process in its current state in satisfying the basic requirements of administrative adjudication. For example, writing for the court in *Benslimane v. Gonzales*, Judge Richard Posner noted that different panels of the Seventh Circuit reversed the BIA in whole or part "in a staggering 40 percent of the 136 petitions to review the Board that were resolved on the merits" in a single year. Over the course of that single year, Judge Posner identified multiple rulings that highlighted BIA's factual mistakes, improper reasoning, reliance on conjecture, speculation, or unwarranted assumptions, and other conduct inconsistent with the basic requirements of adjudication.

More recent decisions from other circuits reflect similar concerns. For instance, in *Marquez v. Bondi*, 160 F.4th 418, 428, 430 (4th Cir. 2025), the Fourth Circuit held that both the immigration judge and the Board committed legal error by disregarding "credible, unrebutted, and legally significant evidence," and emphasized that ignoring the Petitioner's "credible, unrebutted, legally significant testimony" that was "supported by [additional unrebutted] country condition evidence" constitutes an abuse of discretion requiring remand. A similar principle appears in the Eleventh Circuit's decision in *Dong v. U.S. Attorney General*, 550 F. App'x 700, 702 (11th Cir. 2013) where the court concluded that remand was necessary because the agency had "selectively consider[ed] evidence" and "ignor[ed]" the country conditions evidence that corroborated the applicant's claims.

Taken together, these rulings confirm a principle that is neither new nor optional: an adjudicator who fails to grapple with the evidence before it has not discharged its legal obligations.

Federal courts demand that the agency demonstrate it has genuinely engaged with the record and applied the governing standards to the facts as they actually exist.  An administrative system that overlooks, minimizes, or selectively ignores probative evidence cannot produce decisions that withstand judicial scrutiny, and it cannot fulfill the role Congress assigned to it as the first forum for correcting error.  And yet ignoring probative evidence—indeed, ignoring *all* appellate arguments in nearly every case—is precisely what the Rule proposes for the Board.

### 4.    *The Board has Long Functioned in a way That Respects its Role as a Review Body*

The Board has long functioned as a serious appellate review body, with procedures that are fair and deliberate.  We explain below how the Board has long operated to consider appeals and correct immigration judge errors.

### a.    Filing Form E-26, Notice of Appeal

Under the existing regulatory framework, the appellate process begins with the filing of a Notice of Appeal, Form EOIR-26 ("E-26")[8] by either party, the noncitizen Respondent or the Department of Homeland Security.  The E-26 must be received by the Board within thirty days of the immigration judge's oral decision or, more rarely, the immigration judge's written order.  If filed by the noncitizen, the E-26 must also now be accompanied now by a fee of $1,030 or a fee waiver request.[9]

This thirty-day deadline governs all appeals from immigration judge decisions, and parties must file the E-26 within that period to invoke the Board's jurisdiction.  The Notice of Appeal

---

[8] *See, e.g.*, U.S. Dep't of Just., Exec. Off. for Immigr. Rev., Form EOIR-26:  Notice of Appeal From a Decision of an Immigration Judge, https://www.justice.gov/eoir/page/file/1327636/dl?inline (last visited Feb. 25, 2026).

[9] U.S. Dep't of Just., Exec. Off. for Immigr. Rev., *Types of Appeals, Motions, and Required Fees* (updated Feb. 18, 2026), https://www.justice.gov/eoir/types-appeals-motions-and-required-fees.

itself is a three-page (not inclusive of instructions) summary document that identifies the issues for review in broad terms. It was never designed to serve as a full explication of arguments or a substitute for briefing. Rather, it functions as the preliminary filing necessary to initiate the appeal, with the expectation that the record will later become available and that the parties will have the opportunity to develop their arguments in written briefs.

Indeed, the E-26 is a summary document in recognition that it must often be filed before the appealing party has meaningful access to the underlying decision or the record. Immigration judges issue the overwhelming majority of their decisions orally. Accordingly, the appeal clock typically starts before the parties have access to a written decision. In most cases, the only source of the decision is the Digital Audio Recording ("DAR"), but the DAR is not automatically or immediately available. Even represented individuals may be unable to obtain the DAR for several days after the hearing. For unrepresented individuals, access is even more limited: they cannot listen to the DAR until the Board has docketed the appeal and counsel of record—if any—has entered an appearance. Until that point, they must rely on their own notes of an oral ruling, and those notes may be incomplete or nonexistent if the noncitizen appeared *pro se*, the hearing proceeded at a rapid pace, or language barriers complicated the proceeding. Even where the DAR is available, information gaps may exist, for example, where there may be crosstalk or where recorded words may be inaudible or open to interpretation.

More to the point, the DAR is at best a difficult source to cite. Only the transcript of the immigration judge's decision serves as the official record of the hearing – and more crucially, it contains the reasoning of the immigration judge. As a matter of standard practice, transcripts are generated by the Board only *after* the appeal has been filed and a briefing schedule has been set; there is no mechanism by which a party can obtain a transcript in advance of filing the E-26. This

means that appellants are routinely required to identify legal or factual errors without the ability to consult the ruling itself, without the benefit of a transcript, and without access to the exhibits or testimony upon which the immigration judge relied.  In some cases, the DAR itself remains inaccessible until the Board has processed the initial appeal filing, leaving appellants with no ability to confirm the content of the ruling before the jurisdictional deadline expires.

The administrative record is similarly unavailable at the outset of the appeal.  In paper-record cases—which still constitute a significant portion of the docket—there is no way for appellants to review the evidence submitted below before filing the E-26.  They cannot verify whether exhibits were admitted, excluded, misplaced, or misunderstood, nor can they confirm whether the immigration judge accurately summarized or relied upon the evidence.  Even in fully electronic cases, the EOIR Case Access System ("ECAS") does not always reflect the full set of materials considered by the immigration judge.  Documents may appear in the system without indicating whether they were accepted as exhibits, and there may be no clear delineation between materials filed but rejected and materials admitted into evidence.  As a result, parties frequently enter the appellate process without the ability to determine whether the record supports the immigration judge's findings or whether errors occurred that warrant review.

These structural features of the current system mean that even under the existing thirty-day timeframe—which Congress and the Department have long understood to be the minimum period necessary for meaningful access to administrative review—the Board receives Notices of Appeal that are necessarily skeletal, imprecise, and provisional.  The appellate process has accordingly developed around this reality, with the expectation that the record will be assembled after the appeal is filed and that the parties will later have a fair opportunity to develop, substantiate and articulate their appellate arguments in legal briefs.

### b.    Review by the Board Clerk's Office

Once a Notice of Appeal has been filed, the first stage of the Board's process is carried out by the Clerk's Office, which is responsible for lodging the appeal and ensuring that the case is properly entered into the Board's docketing system—a task that can take several days under normal circumstances but often can extend to more than a week.  The Clerk's Office performs the preliminary review necessary to determine whether the E-26 and, if applicable, the accompanying E-27 (*i.e.*, the notice of appearance of the attorney or representative), have been completed correctly.  This review is not perfunctory.  If the Clerk identifies defects—such as an incorrect or missing fee payment, incomplete information, missing signatures, or inconsistencies in party identification—those technical issues must be resolved before the appeal can proceed.  If the noncitizen filed a fee waiver, the Clerk must also rule on the fee waiver, either granting the request or issuing an order demanding payment from the noncitizen.

Once the appeal is lodged and any defects are cured, the Clerk initiates the steps necessary for the Board to assemble the administrative record.  This includes ordering the transcript of the immigration judge's oral decision when one is required and ensuring that the Record of Proceedings ("ROP") is obtained from the immigration court.  The ROP contains all evidence submitted onto the record, including exhibits, filings, and any supplemental materials provided during the hearing.  The Clerk is also responsible for issuing the briefing schedule, which governs when the parties must file their written submissions.

### c.    Review by the Board attorney and Board Member

After the Clerk has completed the above steps, and the parties have submitted briefs (or declined to do so, in some cases), the case is assigned to a Board attorney for substantive review. In carrying out that review responsibility, Board attorneys rely on the transcript of the immigration

judge's oral (or, very rarely, written) decision, the parties' briefing, and the assembled ROP. Even without considering the parties' briefs, reviewing the substance of a case requires significant time.

In short, the way the system is structured, the E-26 can play only a limited role in the administrative appellate process, consistent with its abbreviated form. The development of issues occurs in the briefs and in the record, not in the brief statements contained in the initial Notice of Appeal. (The E-26 is largely irrelevant to the Board attorney's substantive analysis because by design—even filed 30 days after the immigration judge decision —it lacks the key information that would be necessary to formulate an accurate appellate decision.) Only after the Board attorney has completed the initial substantive review of the case and prepared the draft decision does the matter proceed to a Board Member. Board Members are responsible for issuing decisions that reflect the record, the law, and the arguments presented, but they depend on the detailed review performed by the staff attorneys to ensure that the relevant issues have been identified and fully evaluated.

A significant portion of the Board's work is conducted through single-member review, which encompasses both merits decisions and summary dismissals. Summary dismissal has long been authorized under 8 C.F.R. § 1003.1(d)(2), permitting the Board to dismiss appeals for specified procedural reasons—for example, when the appellant has not filed a promised brief, when deadlines have been missed, or when the appeal otherwise does not meet regulatory requirements. Most summary dismissals arise not from a lack of merit but from procedural deficiencies that persist even after the appealing party has had an opportunity to brief the case, and all summary dismissals are issued with prejudice, foreclosing further administrative review. At the same time, single-member review also produces a substantial volume of full-merit decisions,

reflecting the Board's ongoing responsibility to adjudicate the legal and factual questions raised in properly perfected appeals.

### d.    Panel and *en banc* Review

Cases requiring closer examination or presenting more substantial questions typically proceed to panel review. Panel review ensures that three Board Members consider the issues presented, bringing additional perspectives to cases with complex factual records or significant legal implications. *En banc* review of at least a majority of Board Members is reserved for a small category of mature cases, *i.e.,* those that have already undergone full attorney review and been drafted, circulated, and voted on for *en banc* consideration. Only after a case has reached this advanced stage does the Board convene to decide whether *en banc* adjudication is warranted, reflecting the extraordinary nature of such review.

These layers of review operate within the constraints imposed by the Board's staffing and workload. The Board faces a significant backlog not because the current system allows real appellate review, but because the Board lacks the personnel required to manage the volume of appeals it receives. In FY 2025, the Board received 99,603 appeals and, operating across approximately 248 working days, faced roughly 400 appeals per day.[10] In that same year, the Board completed 35,362 appeals, meaning that 64,241 cases—nearly two thirds of the total, were added to the growing pile of pending appeals. And yet that same year, despite the growing backlog, EOIR cut the size of the Board from 28 to 15 permanent members.[11] The Rule answers this workload problem by deciding simply not to work. No work, no load.

---

[10] U.S. Dep't of Just., Exec. Off. for Immigr. Rev., *Adjudication Statistics* (Jan. 26, 2026), https://www.justice.gov/eoir/media/1344986/dl?inline.

[11] 90 Fed. Reg. 15,525, 15,527 (Apr. 14, 2025). In that rule, EOIR claimed that shrinking the Board will produce greater efficiency. But that is a misunderstanding of how the Board actually functions: the vast majority of decisions are issued by single Board Members or three-member

e.    **Congress Intended for Immigration Judge Decisions to be Subject to Agency Review**

Congress has never approved or designed an immigration adjudication system in which the decisions of immigration judges proceed directly to the federal courts without meaningful agency review. The statutory framework governing removal proceedings is built around the assumption that the Executive Branch, acting through the Attorney General and the BIA, will provide an internal appellate check before any matter reaches federal courts.

The INA's design confirms this intent. Congress vested the Attorney General with responsibility for the adjudication and review of immigration matters under 8 U.S.C. § 1103(g), a role that has historically included the Board's appellate work. And Congress expressly tied federal-court review to the requirement that a noncitizen exhaust "administrative remedies available … as of right" in 8 U.S.C. § 1252(d)(1)—a condition that necessarily assumes such remedies exist in substance, not merely in name. Nothing in these statutes authorizes the Department to collapse the appellate structure into a process that affords no real opportunity for correction of error.

Just last year Congress affirmed the presumption of serious appellate review, raising the fees for Board appeals. The fee structure enacted in the One Big Beautiful Bill Act ("OBBBA") strongly underscores Congress's intent that BIA review remains meaningful. Under OBBBA, the fee to appeal an IJ decision to the Board increased nearly tenfold to $900 in FY 2025. 8 U.S.C. § 1812(d)(2)(A). EOIR now charges a fee of $1,030 for filing Form E-26.[12] Yet, the Rule's transformation of the Board into an entity that summarily dismisses almost all cases, rarely permits

---

panels, not by the full Board, so reducing the number of available adjudicators can only decrease capacity, not increase it.

[12] U.S. Dep't of Just., Exec. Off. for Immigr. Rev., *Types of Appeals, Motions, and Required Fees* (updated Feb. 18, 2026), *supra* note 9.

briefing, and often acts without a record raises the unavoidable question: what, exactly, is the $1,000 fee paying for?  A system that charges litigants a four-figure fee while simultaneously eliminating meaningful review cannot be reconciled with the statutory structure Congress enacted or with the basic premise that administrative appeal must serve as a genuine safeguard against error.

### f.      Appellate Review Provides Discipline and Guidance to Immigration Judges

In our experience, immigration judges rely on the BIA's review and articulated decisions to model their own decisions in appropriate cases.  The Board makes available not only published precedential decisions, but "unpublished" decisions that provide broad sets of examples representing how the Board will deal with various fact-based scenarios arising under regulations and statutes.  These decisions, available to immigration judges and the public, guide decision-making and the presentation of arguments.  In this way, the BIA's appellate role permits consistency, efficiency, and uniformity in immigration judge decision-making across the country.

As immigration judges, we also learned from appellate review.  We made mistakes and appreciated being corrected.  We did our best to render fair and accurate decisions in cases that carried enormous consequences to the noncitizens who appeared before us.  But if we got it wrong, we very much wanted our errors to be rectified.

### B.      The Interim Final Rule Functionally Eliminates the BIA as an Appellate Body

We are very familiar with the backlogs at the immigration courts and the Board.  Rather than address this backlog, due in part to EOIR's decision to eliminate staff and adjudicators, the Rule instead proposes to attack the problem by "summarily dismissing all appeals."  91 Fed. Reg. at 5,270.  The Rule is designed to make it impossible for any merits consideration of life-and-death cases, despite the demand that appealing noncitizens pay a fee of more than $1,000.  The Rule

does not provide appellate review, or a semblance of due process, but instead is intended to allow for the speedy issuance of removal orders, which will also be effectuated with haste while noncitizens are left to petition Federal Courts of Appeal for emergency stays of removal and review of immigration judge oral decisions.

The Rule's first obstacle to appellate review is the imposition of a ten-day filing deadline for appellants to file the Notice of Appeal, a drastic reduction from the long-standing thirty-day period.  The Rule provides only narrow exceptions for certain asylum cases, and it specifies that the deadline runs in calendar days, pausing only when the final day falls on a weekend or federal holiday.  This compressed deadline requires parties—many of whom lack counsel, meaningful access to the record, or even a transcript—to identify appealable issues and perfect jurisdiction within a period that is, for most appellants, wholly unrealistic.  As explained above, the vast majority of immigration judge decisions are oral decisions, therefore recorded only by audio, which is not immediately accessible (and in many cases not accessible at all within 10 days of the hearing).  Parties seeking to appeal are therefore left to their own notes and memories of what the immigration judge said when completing the E-26.

This new 10-day filing deadline will be nearly impossible to meet in many foreseeable circumstances, none of which fall under the "exceptional circumstances" standard explained in the Rule.[13]  While the Rule seems to assume that filing will be made electronically, there are still thousands of cases that remain on the old paper filing system, for which electronic filing is not

---

[13] 91 Fed. Reg. at 5,273: "the IFR authorizes extensions in cases of exceptional circumstances, as defined by section 240(e)(1) of the INA, 8 U.S.C. § 1229a(e)(1) ('The term "exceptional circumstances" refers to exceptional circumstances (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the alien, or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien.')".

available.  For these paper cases, noncitizens may not receive the mailed copy of the immigration judge decision well into the 10-day period, or even past that date.  Filing a paper Form E-26 at the Board within 10 days of the immigration judge decision will need to account for mail delays, but even standard First-Class USPS delivery is up to five business days (nearly the entire 10 calendar day period).  Snow storms, floods, tornados and other inclement weather events go entirely unconsidered when demanding a filing within 10 calendar days.

But the most effective obstacle to any meaningful administrative review is the timeline imposed on the Board itself.  Once the E-26 is filed, the Board *must* summarily dismiss the appeal *unless* the *en banc* Board—in other words, *a majority of Board members*—agree, within ten days of filing of the E-26, to allow full briefing.[14]  That *en banc* decision has to be made within ten *calendar* days, which, in some periods including weekends and holidays, would be as few as *five business days.*[15]

Let us explain what has to happen in this period of just ten calendar days set by the Rule in order for a party to get permission to brief their appeal: the Clerk's Office has to docket the appeal, identify any technical errors in the E-26 (including payment of fees), assign the matter to an attorney, who then has to review the case (including the record), and then communicate the proposed decision to a Board Member, who has to decide whether to put it before the *en banc* panel, which then has to consider, deliberate and vote on whether to allow briefing.  Unless all this happens within 10 days, the appeal must be summarily dismissed at or before a total of 15 calendar days of filing the E-26.[16]

---

[14] Proposed 8 C.F.R. § 1003.38(b)(1).

[15] 8 C.F.R. § 1001.1(h).

[16] Proposed 8 C.F.R, § 1003.1(d)(2)(ii).

And in the rare case where the *en banc* panel does grant briefing due to "novel" or "complex" issues?  The Rule sets forth more unrealistic timelines:  the parties have 20 days to file simultaneous briefs (or less, if that schedule would go past 35 days after filing the E-26).[17]  And, as noted above, extensions will be permitted only in "extraordinary circumstances" when the noncitizen's own incapacity prevents timely filing, even though noncitizens play little role in the appeals briefing.  Attorney workload, record availability, transcript delays, and all other ordinary constraints facing litigators appear to be excluded as bases for additional time.

In our experience it is impossible—and we use that word literally—for the Board to provide any meaningful review of a case on this schedule.  No one at the Board will be able to review and analyze appellate issues on this timeline.  Indeed, it is hard to imagine that review will encompass much more than the identity of the party.[18]

We can envision so many examples where appellate review caught errors, and which never be corrected if the Rule goes into effect.  A common ground of appeal is that the immigration judge made an error of fact, often by overlooking key evidence.  Many of these errors are corrected by the Board, but some make it to the Federal Courts of Appeal.  For instance, last year the First Circuit concluded that the agency had failed to consider key evidence, explaining that the Board

---

[17] 91 Fed. Reg. at 5,272: "The IFR also standardizes the Board's briefing schedule for appeals filed directly with the Board to require simultaneous briefing within 20 days of the Board setting the schedule in all cases not summarily dismissed, with no reply briefs and limited extensions."

[18] Perhaps that's the point—the Board need know only *who* is appealing the immigration judge's decision.  Judging by the agency's precedent decisions over the last year, the Board is nearly uniformly ruling in favor of the Department of Homeland Security and against noncitizens. *See* Nat'l Immigr. Project, *The BIA and AG's Systemic Destruction of Noncitizens' Rights in Removal Proceedings*, Feb. 19, 2026 ("From January 31, 2025 through February 13, 2026, the BIA/AG have issued 77 decisions. Of these 77 decisions only one was clearly favorable to the noncitizen."), available at https://nipnlg.org/work/resources/bia-and-ags-systemic-destruction-noncitizens-rights-removal-proceedings.

had an "obligation to consider the record as a whole", and an agency decision that "turn[s] a blind eye to salient facts" or "'completely overlook[s] critical evidence' is erroneous as a matter of law." *Contreras v. Bondi*, 134 F.4th 12, 20, 21 (1st Cir. 2025) (alterations in original).

Under the Rule, there would be no chance for the Board to determine whether an immigration judge had "consider[ed] all evidence in the record" or had even overlooked critical evidence. On the ten-day timeline imposed by the Rule, the Board attorney reviewing the appeal would have no time to review *any* part of the record (or perhaps even access the record), and the Board member responsible for determining whether summary dismissal is warranted would have even less time for review. By our estimates, every Board member would need to consider about 2-3 cases per hour every working hour, without leaving time for any other duties.

This is not serious review, and it is not serious government. It is the very caricature of adjudication that Appleseed warned against in its 2009 report "Assembly-Line Injustice," where immigration adjudication proceeds at such speed and with such disregard for the fundamentals of fair process that outcomes become detached from the law and from the record itself.[19] What the Rule proposes is even more stark: a system in which the Board only pretends to perform appellate review while racing through cases on a conveyor belt, an image so far removed from the sober exercise of judicial judgment that it evokes not an appellate body but Lucille Ball frantically stuffing chocolates into her hat as they cascade past on the candy factory wrapping line.[20] The comparison is not hyperbole; it is the natural consequence of a framework that demands adjudication without time, record, or deliberation.

---

[19] APPLESEED, ASSEMBLY LINE INJUSTICE, BLUEPRINT TO REFORM AMERICA'S IMMIGRATION COURTS (May 2009), https://www.chicagoappleseed.org/wp-content/uploads/2015/10/Assembly-Line-Injustice-2009.pdf.

[20] I LOVE LUCY, *Lucy and Ethel at the Chocolate Factory* (Paramount Plus, accessed Feb. 25, 2026), https://www.youtube.com/watch?v=AnHiAWlrYQc.

The real-word impact is chilling.  By allowing briefing only in cases presenting "novel" issues, 91 Fed. Reg. at 5,270, the Rule effectively concedes that every other case—regardless of its life-and-death stakes or the presence of clear legal error—should be summarily dismissed without further review.  That design would require the Board to allow erroneous denials of protection to stand: denials of asylum in cases where the immigration judge's mistakes expose individuals to persecution; denials of cancellation of removal that impose exceptional and extremely unusual hardship on U.S. citizen children; and even removal orders against U.S. citizens in cases where the Department of Homeland Security has not carried its burden to prove alienage. A system that obligates adjudicators to ignore errors is not merely flawed.  It is, in the strictest sense, irrational—an appellate structure that abandons the very purpose of appellate review.

The Notice states that the Department of Justice "has reconsidered the Board's role as an appellate tribunal.  The Board cannot—and does not need to—adjudicate every case on the merits[,]" 91 Fed. Reg. at 5,270.  In fact, by issuing the IFR, the Department is instead stating that the BIA cannot—and does not need to—adjudicate *any* case on the merits.

## IV.    CONCLUSION

The intent of this Rule is obvious to us, as former immigration judges and Board members: eliminate appellate review in order to issue final removal orders as quickly as possible, allowing the Department of Homeland Security to deport noncitizens before the federal courts can intervene. This is a political agenda, not fair administrative adjudication, and certainly not due process.

Dated:  March 2, 2026

Respectfully submitted,

*/s/ John R. Jacob*
John R. Jacob
  D.C. Bar No. 444412
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Tel:  (202) 887-4000
Fax:  (202) 887-4288
Email:  jjacob@akingump.com

*Counsel to* Amici Curiae *Former Immigration Judges and Former Members of the Board of Immigration Appeals*

## APPENDIX A

### Former Immigration Judges and Members of the Board of Immigration Appeals

Hon. Steven Abrams, Immigration Judge, New York, Varick St., and Queens Wackenhut, 1997-2013

Hon. Lori Adams, Immigration Judge, New York 2021-2025

Hon. Silvia R. Arellano, Immigration Judge, Phoenix and Florence, AZ, 2010- 2019

Hon. Terry A. Bain, Immigration Judge, New York, 1994-2019

Hon. Maria Baldini-Potermin, Immigration Judge, Chicago, 2023-2025

Hon. Elisa C. Brasil, Immigration Judge, San Francisco, 2023-2025

Hon. Sarah M. Burr, Assistant Chief Immigration Judge and Immigration Judge, New York, 1994-2012

Hon. Sarah Cade, Immigration Judge, Boston, 2021-2025

Hon. Olivia Cassin, Immigration Judge, New York, 2015-2025

Hon. Katharine E. Clark, Appellate Immigration Judge, Board of Immigration Appeals, 2023-2025

Hon. Daniel Caudillo, Immigration Judge, Laredo, TX 2021-2025

Hon. Florence Chamberlin, Immigration Judge, Concord, CA, 2023-2025

Hon. Jeffrey S. Chase, Immigration Judge, New York, 1995-2007

Hon. George T. Chew, Immigration Judge, New York, 1995 - 2017

Hon. Joan V. Churchill, Immigration Judge, Washington, D.C./ Arlington, VA - 1980 - 2005

Hon. Raisa Cohen, Immigration Judge, New York, 2016-2024

Hon. Chloe Dillon, Immigration Judge, San Francisco, 2022-2025

Hon. Bruce J. Einhorn, Immigration Judge, Los Angeles, 1990-2007

Hon. Cecelia M. Espenoza, Appellate Immigration Judge, Board of Immigration Appeals, 2000-2003

Hon. Carla Espinoza, Immigration Judge, Chicago, 2023-2025

Hon. Noel A. Ferris, Immigration Judge, New York, 1994-2013

Hon. James R. Fujimoto, Immigration Judge, Chicago, 1990-2019

Hon. Annie S. Garcy, Immigration Judge, Newark, NJ, and Philadelphia, 1990-2023

Hon. Alberto E. Gonzalez, Immigration Judge, San Francisco, 1995 - 2005

Hon. John F. Gossart, Jr., Immigration Judge, Baltimore, 1982-2013

Hon. Miriam Hayward, Immigration Judge, San Francisco, 1997-2018

Hon. Megan Herndon, Assistant Chief Immigration Judge, Richmond, VA, 2021-2025

Hon. Rebecca Holt, Immigration Judge, Memphis, 2010-2025

Hon Sandy Hom, Immigration Judge, New York, 1993-2018

Hon. Charles M. Honeyman, Immigration Judge, New York and Philadelphia, 1995-2020

Hon. William P. Joyce, Immigration Judge, Boston, 1996-2002

Hon. Edward F. Kelly, Appellate Immigration Judge, Board of Immigration Appeals, 2017-2021; Deputy Chief Immigration Judge, 2013-2017; Assistant Chief Immigration Judge, EOIR Headquarters, 2011-2013

Hon. David Kim, Immigration Judge, New York, 2022-2025

Hon. Carol King, Immigration Judge, San Francisco, 1995-2017

Hon. Eliza C. Klein, Immigration Judge, Miami, Boston, Chicago, 1994-2015; Senior Immigration Judge, Chicago, 2019-2023

Hon. David Koelsch, Immigration Judge, Baltimore, Hyattsville, MD, 2018-2025

Hon. Elizabeth A. Lamb, Immigration Judge, New York, 1995 - 2018

Hon. Shira M. Levine, Immigration Judge, San Francisco, 2021-2025

Hon. Kyra S. Lilien, Immigration Judge, San Francisco, Concord, CA,  2023-2025

Hon. Homero Lopez, Appellate Immigration Judge, Board of Immigration Appeals, 2024-2025

Hon. Dana Leigh Marks, Immigration Judge, San Francisco, 1987-2021

Hon. Margaret McManus, Immigration Judge, New York, 1991-2018

Hon. Steven Morley, Immigration Judge, Philadelphia, 2010-2022

Hon. Angela Munro, Immigration Judge, Chelmsford, MA 2023-2025

Hon. Charles Pazar, Immigration Judge, Memphis, 1998-2017

Hon. Irma Perez, Immigration Judge, Los Angeles, Santa Ana, West Los Angeles, 2023-2025

Hon. George Proctor, Immigration Judge, Los Angeles, San Francisco, 2003-2008

Hon. Laura L. Ramirez, Immigration Judge, San Francisco, 1997-2018

Hon. Carmen Maria Rey Caldas, Immigration Judge, Stewart (Lumpkin, GA) and New York, 2022-2025

Hon. John W. Richardson, Immigration Judge, Phoenix, 1990-2018

Hon. Patricia A. Rohan, Immigration Judge, New York, 1982 - 2017

Hon. Lory D. Rosenberg, Appellate Immigration Judge, Board of Immigration Appeals, 1995-2002

Hon. Susan G. Roy, Immigration Judge, Newark, 2008-2010

Hon. Andrea Saenz, Appellate Immigration Judge, Board of Immigration Appeals, 2021-2025

Hon. Paul W. Schmidt, Chairperson and Appellate Immigration Judge, Board of Immigration Appeals, 1995-2003; Immigration Judge, Arlington, VA, 2003-2016

Hon. Noelle Sharp, Assistant Chief Immigration Judge, Houston, 2021-2025

Hon. Patricia M. B. Sheppard, Immigration Judge, Boston, 1993-2006

Hon. Ilyce S. Shugall, Immigration Judge, San Francisco, 2017-2019

Hon. Helen Sichel, Immigration Judge, New York, 1997-2020

Hon. Andrea Hawkins Sloan, Immigration Judge, Portland, 2010-2017

Hon. Polly A. Webber, Immigration Judge, San Francisco, 1995-2016

Hon. Robert D. Weisel, Assistant Chief Immigration Judge, Immigration Judge, New York, 1989-2016

Hon. Gabriel C. Videla, Immigration Judge, New York and Miami, 1994-2022