# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMICA CENTER FOR IMMIGRANT
RIGHTS et al.,

       *Plaintiffs*,

    v.

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW et al.,

       *Defendants*.

Case No. 26-cv-00696-RDM

Hon. Randolph D. Moss

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PARTIAL SUMMARY JUDGMENT AND EMERGENCY MOTION
TO STAY AGENCY ACTION UNDER 5 U.S.C. §705**

## INTRODUCTION

The Executive Office for Immigration Review (EOIR) published an interim final rule (IFR) on February 6, 2026 to address prospectively the massive backlog of immigration cases pending at the Board of Immigration Appeals (BIA or Board) that is currently estimated at over 200,000 cases. *Appellate Procedures for the Board of Immigration Appeals*, 91 Fed. Reg. 5,267, 5,270 (Feb. 6, 2026). The backlog poses serious obstacles to the Nation's immigration system by undermining the timely adjudication of appeals and delaying aliens' access to judicial review in the courts of appeals.

To address this vexing problem, the Department has enacted several commonsense measures that streamline appellate review of Immigration Judges' (IJs) decisions, including creating a summary dismissal procedure for non-asylum appeals that do not warrant its review and are often meritless. These changes affect only the BIA's review process—something that is wholly within the Attorney General's authority and not regulated by the Immigration and Nationality Act (INA)—and do not impact aliens' right to a trial-type hearing in immigration court where they receive substantial procedural protections prescribed by the INA, including notice of their right to counsel at their own expense. Nor do these changes impair aliens' ability to obtain judicial review in the courts of appeals through petitions for review; in fact, the Rule would "allow[] aliens to seek Federal court review expeditiously, rather than potentially waiting for years for a Board decision that in the vast majority of cases would affirm the underlying Immigration Judge decision." 91 Fed. Reg. at 5,270.

The Attorney General's Rule provides an adequate rationale for the changes it contains and is tailored to address the specific issues at hand. The Agency has carefully considered the problem, as well as alternative solutions. It has also considered the impact of the Rule on aliens in removal proceedings and concluded that the benefits of the reforms outweigh that potential impact.

It is important to remember the context of this Rule; the Attorney General has enacted various measures over the last two decades in an attempt to address the same problem—an overwhelming appellate docket—including "streamlining" the BIA's review process in the early 2000s by allowing the BIA to affirm IJ decisions without a separate opinion. Virtually all of the challenges that aliens raised to those reforms were rejected by the courts of appeals. 91 Fed. Reg. at 5,271. The problem is not new and in fact has become worse. In line with its prior streamlining efforts, the Attorney General is issuing this Rule "to better address lengthy appeal backlogs," *id.* at 5,268, so the Board can "focus on appeals with particularly novel or complex legal questions without becoming bogged down in mine-run or straightforward cases that may already be subject to being affirmed without an opinion or summarily affirmed," *id.* at 5,271. The Attorney General's Rule promotes fairness by allowing those with meritorious claims to gain access to judicial review more quickly while ensuring that those with meritless claims can no longer exploit the backlog's delay to gain a multi-year stay of removal, eliminating a perverse incentive in the appeals process. *Id.* at 5,273 (citing *INS v. Doherty*, 502 U.S. 314, 323 (1992) ("as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States")). The Attorney General is entitled to tailor the scope and procedures of administrative review of immigration matters as a matter of discretion to alleviate this enormous burden. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 524-25 (1978).

Plaintiffs seek, through preliminary relief in the form of a stay under 5 U.S.C. §705 (Administrative Procedure Act/APA), to halt these reforms before the Rule goes into effect. The Court should deny the motion because they have failed to show a likelihood of success on the merits. Their complaint is defective both jurisdictionally and substantively. *First*, Plaintiffs— immigrant advocacy organizations—lack standing because they have failed to sufficiently plead a

non-speculative injury-in-fact and causation, and in any event they fall outside the INA's zone of interests. *Second*, the Rule is consistent with the INA, which does not regulate the BIA at all, much less regulate its procedures. *Third*, the Rule is neither arbitrary nor capricious, and the Department was not required to provide an opportunity for notice and comment because the Rule is a procedural rule and impacts foreign policy.

The stay motion should also be denied because Plaintiffs have failed to establish irreparable harm. Their assertion of harms amounts to merely downstream consequences of their own voluntary choices about how to allocate their resources in response to the Rule. That is insufficient to meet this Circuit's rigorous test for establishing irreparable harm. Failure to meet that factor alone is fatal to Plaintiffs' motion. Moreover, given the significant Government interest in reducing the BIA's appellate backlog and the relatively weak interest of aliens in prosecuting mostly meritless administrative appeals when they retain full recourse to the courts, the balance of the equities and public interest weigh in Defendants' favor.

Finally, the Court lacks authority to issue the stay Plaintiffs request for two independent reasons: (1) 8 U.S.C. §1252(f)(1) expressly prohibits relief in this context because such relief would "restrain" the Government from implementing removal proceedings as the Attorney General has proposed under her Rule; and (2) §705 stays must comply with traditional equitable principles, which likewise prohibit such relief, *see Trump v. CASA, Inc.*, 606 U.S. 831, 851-52, 859 (2025).

The Court should also deny Plaintiffs' converted motion for summary judgment as to the notice and comment claim. Dkt. 17. On May 2, 2026, the Court ordered that Plaintiffs' pending motion for a stay of agency action under 5 U.S.C. §705 shall be treated as a motion for summary judgment with respect to Plaintiffs' notice and comment claim, or, in the alternative, as a motion

for a Section 705 stay on all of the issues Plaintiffs raise. As we explain below, Plaintiffs' notice and comment claim fails because the Rule falls within two exceptions to the notice and comment requirement. Therefore, summary judgment on that claim is not warranted.

Furthermore, summary judgment is not appropriate at this stage of the case because Defendants are requesting that the Court allow time to take jurisdictional discover under Fed. R. Civ. P. 56(d) regarding the issue of organizational standing. In that regard, Defendants are contemporaneously filing a motion and the required declaration under Rule 56(d) as to why they "cannot present facts essential to justify [their] opposition."

## BACKGROUND

### I.    EOIR and Removal Proceedings.

The Attorney General has the authority to "establish such regulations … as the Attorney General determines to be necessary" for carrying out the INA and may "delegate such authority." 8 U.S.C. §1103(g)(2). Under 28 U.S.C. §510, she may also "authoriz[e] the performance by any other officer, employee, or agency of [DOJ] of any function of the Attorney General."

EOIR is a regulatory body headed by a Director who is appointed by the Attorney General to oversee the immigration courts and the BIA. 8 C.F.R. §§1003.0, 1003.1(a)(1), (b). EOIR conducts removal proceedings, the broad contours of which are set forth in the INA. *See* 8 U.S.C. §1229a. That statute affords aliens extensive procedural protections in their immigration hearings, including notice of the right to counsel at their own expense, the opportunity to contest the charges, move to suppress evidence, apply for relief from removal, and present testimony and evidence. *Id.* The specific procedures and practices for administering removal proceedings are governed by regulation. *See generally* 8 C.F.R. pt. 1003.

IJ decisions are reviewed by the BIA, which is also a creature of regulation. *See* 8 C.F.R. §1003.1(b). Both the alien and the government may appeal an IJ decision to the BIA. *See* 8 C.F.R.

§1003.3(a)(1). Only an alien, however, may seek judicial review of a final order of the BIA through a petition for review before a court of appeals. 8 U.S.C. §1252(a).

For years the regulations have authorized the BIA to "streamline" the normal appellate process in certain cases. For example, the BIA may affirm an IJ decision without writing a separate opinion. 8 C.F.R. §1003.1(e)(4). In those circumstances, the IJ's decision becomes the "final agency determination," *Id.* §1003.1(e)(4)(ii), which the courts of appeals review through petitions for review. Further, even prior to this Rule, the BIA had authority to summarily dismiss an appeal in certain instances. *Id.*, §1003.1(e)(2). Under this section, either a single BIA member (also referred to as an "Appellate Immigration Judge") or a three-member panel may summarily dismiss an appeal for, *inter alia*, failure to specify the reasons for the appeal and where the appeal lacks an arguable basis in fact or in law. *Id.* §1003.1(e)(2)(A) & (D); *Singh v. Gonzales*, 416 F.3d 1006, 1015 (9th Cir. 2005) (holding that petitioner "has not established that the BIA's regulations— authorizing summary dismissal for failure to either file a brief or specify the grounds for appeal— violated his due process rights"). The regulations further allow a single Board Member to adjudicate an appeal on the merits in certain circumstances if that decision is not appropriate for affirmance without opinion. *Id.* at §1003.1(e)(5).

## II. The Backlog and Prior Efforts to Address the Problem.

As discussed above, the Attorney General's efforts to address the appellate backlog by reforming the BIA's adjudication procedures and the appeal process are not new. In 1999, after a "more than 9-fold increase in annual appeal and motion receipts over the course of 14 years," the Department adopted certain streamlining measures designed, in part, to "eliminate its backlog of cases." 91 Fed. Reg. at 5268 (citing *Executive Office for Immigration Review; Board of Immigration Appeals; Streamlining*, 64 Fed. Reg. 56,135, 56,136 (Oct. 18, 1999) ("In 1984, the

Board received fewer than 3,000 new appeals and motions. In 1994, it received more than 14,000 new appeals and motions. In 1998, in excess of 28,000 new appeals and motions were filed.")). "To do so, the Board limited the use of three-member panels to review appeals and allowed for AWO [affirmance without opinion]" by a single Board member in specific circumstances." *Id.* These efforts proved successful in increasing "Board productivity." *Id.* Thus, in 2002, the Department published a final rule that, "while maintaining the basic AWO process, *mandated* the use of AWO in any case that met the regulatory threshold criteria." *Id.* (citing *Board of Immigration Appeals: Procedural Reforms To Improve Case Management*, 67 Fed. Reg. 54878 (Aug. 26, 2002)) (emphasis added).

Despite these reforms, the backlog continued to grow. 91 Fed. Reg. at 5268. In 2020, the Department published a notice of proposed rulemaking (NPRM) that proposed to amend EOIR's regulations to again address the backlog issue. *Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure*, 85 FR 52491, 52491 (Aug. 26, 2020) ("Appellate Procedures NPRM"). *Id.* The NPRM explained that changes to various procedures were necessary due to significant increases in the Board's pending cases such that the Department needed "to again review the BIA's regulations to reduce any unwarranted delays in the appeals process and to ensure the efficient use of BIA and EOIR resources." *Id.* Several of the changes the Appellate Procedures NPRM made are also part of the IFR at issue in this case. These changes include: (1) simultaneous briefing; (2) limiting briefing extensions; (3) harmonizing the 90- and 180-day Board adjudication timelines to both start from when the record is complete; (4) limiting the Chief Appellate Immigration Judge's ability to hold a group of cases while awaiting certain outside actions; and (5) removing the process for IJ review of proceeding transcripts. *Id.* The Department received 1,287 comments during the 30-day comment period. *Id.* On December 16,

2020, the Department published a final rule, responding to the comments received and adopting the regulatory language proposed in the Appellate Procedures NPRM with minor changes. *Id.* (citing *Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure*, 85 Fed. Reg. 81,588 (Dec. 16, 2020) ("Appellate Procedures Final Rule"). The Appellate Procedures Final Rule's effective date was January 15, 2021, but the rule was preliminarily enjoined on March 10, 2021, before its measures were fully implemented. *Id.* (citing *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919 (N.D. Cal. 2021)).

On September 8, 2023, after reconsidering the Appellate Procedures Final Rule, the Department published an NPRM proposing to remove the preliminarily enjoined regulatory language codified by that Rule, with certain exceptions, as well as proposing standards for IJs and Appellate Immigration Judges to consider when adjudicating requests for the administrative closure or termination of proceedings. *Id.* (citing *Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure*, 88 Fed. Reg. 62,242 (Sept. 8, 2023)). The Department finalized that rule in May 2024. *Id.* (citing *Efficient Case and Docket Management in Immigration Proceedings*, 89 Fed. Reg. 46,742 (May 29, 2024) ("ECDM Final Rule"). "As a result, the relevant regulatory provisions of the [2020] Appellate Procedures Final Rule that are further addressed in this IFR were rescinded." *Id.* "Notably, neither the NPRM nor the final rule addressed the efficiency reasons the Department provided for those measures in the Appellate Procedures Final Rule. Indeed, despite the fact that the Board's backlog continued to grow, the 2024 rule enacted no procedures aimed at increasing case completions." *Id.*

In 2024, the Attorney General published a Rule expanding the Board to 28 members in an effort "to increase case completions." 91 Fed. Reg. at 5,271 (citing *Expanding the Size of the Board of Immigration Appeals*, 89 Fed. Reg. 22,630 (Apr. 2, 2024)). But last year the Attorney General

reduced the size of the Board to 15 members after concluding that "the data available do not conclusively demonstrate that the increased Board size will lead to increased case adjudications." *Id.* (citing *Reducing the Size of the Board of Immigration Appeals*, 90 Fed. Reg. 15,525, 15,526 (Apr. 14, 2025) (citing case completion statistics since 2015).

At the end of fiscal year 2025, the Board had a backlog of 202,946 pending appeals (even higher now). 91 Fed. Reg. at 5,270. That is a "five-fold" increase from fiscal year 2015, when the backlog of pending appeals was 37,285. *Id.* "The Board is at a point where, even were it to have additional resources and better management, without significant reforms, it would not be able to keep up with incoming filings while tackling the backlog in any meaningful way." *Id.* This IFR addresses the longstanding problem. It would allow the BIA to "focus its limited resources on adjudicating the more than 200,000 pending appeals and, going forward, on selecting decisions for review that present novel issues warranting the Board's attention." *Id.*

## III.    The Final Rule.

On February 6, 2026, the Department published the IFR. 91 Fed. Reg. 5,267. The Rule provides for an effective date of March 9, 2026. Among the changes the IFR made are the following:

(1)    Establishes a "default" rule that the BIA will summarily dismiss appeals, unless a majority of the current BIA members vote to consider the appeal on the merits within 15 days of filing the appeal, 91 Fed. Reg. 5,270-71 (Jan. 15, 2026). This rule applies "prospectively" only to IJ decisions issued on or after the Rule's effective date. *Id.* at 5,271;

(2)    Shortens the timeline for filing an appeal with the BIA from 30 days to 10 days (except for appeals of asylum decisions on the merits). *Id.* at 5,272;

(3)    For cases that are not summarily dismissed, the Rule requires simultaneous briefing within 20 days of the BIA setting the briefing schedule and no reply briefs, 91 Fed. Reg. 5,272-73. The BIA may grant extensions of time for "exceptional circumstances." *Id.* at 5,273;

(4)     Eliminates the requirement that immigration judges continue to review transcripts of their oral decisions before adjudication of appeal, 91 Fed. Reg. 5,273-74;

(5)     Removes or revises provisions authorizing the Chief Appellate Immigration Judge to either extend adjudication deadlines in particular cases or to hold cases based on pending action, 91 Fed. Reg. 5,274;

(6)     Provides that an argument not raised in the Notice of Appeal to the BIA is considered waived. 91 Fed. Reg. 5,278.

## IV.    This Lawsuit.

Plaintiffs are five legal services organizations that serve immigrants. Dkt. 1 at 5, ¶15. Plaintiffs' complaint alleges that the Rule violates the Administrative Procedure Act (APA), 5 U.S.C. §701 *et seq.*, the INA, the Regulatory Flexibility Act (RFA), 5 U.S.C. §§603-04, and the Due Process Clause.  Dkt. 1 at 42-48, ¶¶ 121-168.

Twenty days after the Rule's publication and eleven days before its effective date, Plaintiffs filed an Emergency Motion for a Stay Under 5 U.S.C. §705. Dkt. No. 2-1. In that motion, Plaintiffs allege: Defendants failed to comply with notice-and-comment procedures, *id.* at 9-17; the Rule is contrary to the INA, *id.* at 17-24; the Rule is arbitrary and capricious, *id.* at 24-36; Plaintiffs have standing and the balance of equitable factors warrants a stay, i*d.* at 36-43.[1] Plaintiffs seek a universal stay of agency action enjoining the rule "pending the resolution of these proceedings." *Id.* at 43.

### STANDARDS OF REVIEW

## I.      5 U.S.C. §705 – Relief Pending Review.

Plaintiffs have moved for a stay under 5 U.S.C. §705, which provides, in relevant part, that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury,

---

[1] Plaintiffs' stay motion does not assert an argument under the Regulatory Flexibility Act so that claim is not currently before the Court.  *See generally* Dkt. 2-1.

the reviewing court … may … postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "The factors governing issuance of a preliminary injunction also govern issuance of a §705 stay." *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). A preliminary injunction is "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## II.    Summary Judgment Under Federal Rule of Civil Procedure 56.

Summary judgment under Rule 56 is the proper mechanism for deciding, as a matter of law, whether an agency action is consistent with the standard of review under the APA. *See Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010). Due to the limited role the court plays in reviewing the administrative record, the typical summary judgment standards set forth in Rule 56 are not applicable. *See Visinscaia v. Beers*, 4 F. Supp. 3d 126, 130 (D.D.C. 2013); *see also* Comment to Local Civil Rule 7(h). Rather, the Court should enter summary judgment for the agency unless it violated the APA by taking an action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Deppenbrook v. Pension Benefit Guar. Corp*, 778 F.3d 166, 171 (D.C. Cir. 2015); *Resolute Forest Prods., Inc. v. Dep't of Agric.*, 130 F. Supp. 3d 81, 89 (D.D.C. 2015). Whether the agency complied with the governing APA standard is entirely a question of law. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

**ARGUMENT**

Plaintiffs' claims conflict with the authority vested in the Department by the INA and recognized by well-established law.  As the Supreme Court has explained: "[T]his much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances, the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978) (quotation omitted)). The Attorney General "enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures … and priorities." *See Mobil Oil Expl. & Producing Se. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991). Plaintiffs' attempts to substitute their own policy choices for the Attorney General's are unavailing, and they show neither that they are clearly entitled to relief nor that extreme or very serious damage will result from the denial of a stay.

**I.     Plaintiffs Are Unlikely to Succeed on the Merits and Have Failed to Meet the Standard for Summary Judgment on Their Notice and Comment Claim.**

Plaintiffs are unlikely to succeed on the merits of their claims because they lack standing and fall outside the INA's zone of interests, and the Rule is consistent with the INA and not arbitrary and capricious. The Court should thus deny Plaintiffs' request for a 5 U.S.C. §705 stay. Furthermore, the Court should deny Plaintiffs' motion for summary judgment as there was no requirement that the Department provide a notice and comment period before adopting the Rule because it is a procedural rule and impacts foreign policy.

A.    **Plaintiffs Lack Constitutional and Statutory Standing.**

1.    **Plaintiffs' assert no direct, concrete injuries to their operations from the challenged government action, relying only on speculative forecasting to support Article III standing.**

Plaintiffs—all of whom are immigrant rights organizations, not aliens—lack Article III standing to pursue their pre-implementation challenge to the IFR. Specifically, Plaintiffs have failed to demonstrate a non-speculative injury-in-fact that has been caused by the IFR. Because Plaintiffs lack standing, this Court lacks jurisdiction to stay the IFR or grant summary judgment to Plaintiffs.[2]

a. To demonstrate Article III standing, a plaintiff must show (i) "it has suffered or likely will suffer an injury in fact," (ii) "the injury likely was caused or will be caused by the defendant," and (iii) "the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The injury in fact "must be real and not abstract" and "must affect the plaintiff in a personal and individual way and not be a generalized grievance." *Id.* at 381. The injury-in-fact inquiry therefore "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* And the requirement of demonstrating causation means that "it is ordinarily substantially more difficult to establish" standing when "a plaintiff challenges the government's unlawful regulation of *someone else.*" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Causation cannot be premised on

---

[2] The elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof" at the given stage of litigation. *Lujan*, 504 U.S. at 561. As to their motion for a stay under 5 U.S.C. §705, Plaintiffs have the burden to demonstrate a "substantial likelihood" of standing. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). If this Court evaluates any of Plaintiffs' claims at summary judgment instead, Plaintiffs must demonstrate there are no genuine issues of material fact with regard to their standing by citing "specific facts" in the record, and not the "conclusory allegations of an affidavit." *Humane Soc'y of the U.S. v. Purdue*, 935 F.3d 598, 603 (D.C. Cir. 2019).

"speculation about the unfettered choices made by independent actors not before the courts," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 (2013), nor on "distant (even if predictable) ripple effects," *Hippocratic Med.*, 602 U.S. at 383. Like the injury-in-fact requirement, the causation requirement too "screens out plaintiffs who were not injured by the defendant's action," keeping courts from becoming "virtually continuing monitors of the wisdom and soundness of government action." *Id.* at 384.

Here, Plaintiffs base their Article III standing almost entirely on their organizational standing. *See* Dkt 2-1, at 39-45. They do not allege associational standing on behalf of the aliens they represent or will represent. Plaintiffs do this even though the rule regulates the BIA and aliens, not lawyers at advocacy organizations. Plaintiffs therefore must meet the requirements of organizational standing. To demonstrate injury in fact, organizational plaintiffs must show more "more than a frustration of its purpose because frustration of an organization's objectives is the type of abstract concern that does not impart standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted). The D.C. Circuit asks "first, whether the agency's action … injured the organization's interest and, second, whether the organization used its resources" or will use its resources "to counteract that harm." *Id.* (cleaned up). There must be an actual likely injury to the organization; "a general legal, moral, ideological, or policy objection to a particular government action" will not do. *Hippocratic Med.*, 602 U.S. at 381.

A diversion of resources in response to agency action does not itself confer standing. *Hippocratic Medicine* rejected medical associations' theory of standing born from the FDA regulations' impairment of the associations' "ability to provide service and achieve their organizational missions." 602 U.S. at 394. It was not enough that the associations were allegedly "forced" to "expend considerable time, energy, and resources" in response to the FDA's actions.

*Id.* at 394–95; *see also United States v. Texas*, 599 U.S. 670, 678 (2023) (no standing where Defendants "do[] not exercise coercive power" over "the [organizational] plaintiff[s]"); *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (downstream, incidental effects not a sufficient "invasion of a legally protected interest" to support Article III standing). Rather, an unregulated organization must show that the challenged action imposes an affirmative "impediment" to its "core business activities." *Hippocratic Medicine*, 602 U.S. at 394–95.

b. Under these standards, the organizational Plaintiffs here lack Article III standing. Plaintiffs' primary argument is that because IFR changes the rules for administrative proceedings, Plaintiffs forecast that their work may increase, there will be uncertainty in litigation, and they may have to reduce the number of aliens they represent—all speculation about the potential future effects of the IFR. *See* Dkt. 2-1 at 39–45. Plaintiffs even admit that it is entirely "uncertain[]" "what types of cases" the BIA judges will hear if the IFR goes into effect, *id.* at 41, demonstrating that their claims about the impact of the IFR on their workload—including whether they will have to litigate the kinds of cases they take more often in federal court—are entirely speculative. *See Scenic Am., Inc. v. DOT*, 836 F.3d 42, 50 (D.C. Cir. 2016) (where "[t]he existence of one or more of the essential elements of standing … depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, becomes substantially more difficult to establish standing") (cleaned up). After all, there is no way for Plaintiffs to know how the BIA judges will exercise their discretion, and they point to nothing concrete that demonstrates that discretion will be exercised in a manner that will harm Plaintiffs. "Article III requires more than maybes—it demands that harms be actual or imminent." *Coal. For Humane Immig. Rights v. DHS*, 780 F. Supp. 3d 79, 90 (D.D.C. 2025) (finding no standing of organization pursuing challenge to an

interim final rule). For example, Plaintiffs assert that the IFR's changes may result in Plaintiffs having to take on more litigation in federal courts of appeals to prevent meritorious challenges to IJ decisions, which they contend will take more time and complain that they do not experience in. Dkt. 2-1, at 39–40. It is not only speculative whether the BIA would no longer hear those cases and whether aliens would then choose to seek appeal in the federal courts; Plaintiffs' response (filing more federal court petitions) is not compelled by the IFR and any additional work resulting from that choice is self-inflicted. In fact, Plaintiffs have little to base their claims of additional work on, given that the IFR aims to streamline BIA review such that the total number of hours spent on removal proceedings should decrease. Next, Plaintiffs contend that having to file notices of appeal within ten days of certain IJ decisions will be more time consuming and allow them to serve fewer people than the current system. Dkt. 2-1, at 40–41. Yet the IFR includes no requirement that the notices of appeal must be comprehensive briefs like those they currently submit to the BIA; in fact, the new rule is actually likely to reduce the time Plaintiffs spend on BIA proceedings, since full briefing will no longer be necessary in many cases. Plaintiffs also complain about the "increased uncertainty" from the IFR because they do not know what type of cases the BIA will hear on the merits, Dkt. 2-1, at 41, but that simply demonstrates that Plaintiffs' purported harms are entirely speculative before the IFR goes into effect. Next, Plaintiffs say they are harmed by the fact that the briefing schedules for cases the BIA does take on the merits will have reduced extension opportunities and thus reduce their capacity to take on more clients. Dkt. 2-1, at 42. But it is entirely speculative whether the IFR will result in the series of "rolling emergencies" Plaintiffs claim might occur, and as they admit the IFR does not even specify a period for a briefing schedule. *See id.* Plaintiffs also point to the difficulties the IFR's new deadlines would create for individuals who proceeded pro se at the IJ-level but seek counsel on

appeal. Dkt. 2-1, at 42. But Plaintiffs improperly repackage the alleged harm to those individuals as harm to their organizations, and nevertheless ignore the long period in which individuals can obtain counsel during IJ proceedings. Lastly, Plaintiffs allege that it will be more difficult to maintain pro bono programs because, for example, it may be difficult to find a law-firm partner during the shortened time period for certain BIA appeals. Dkt. 2-1, at 43–44. Yet Plaintiffs point to no evidence for their contentions and simply rely on speculation about the IFR's effects. One organization alleges they cancelled a pilot pro bono program given the IFR based on "anticipation," but miss that this voluntary action is simply self-inflicted harm inappropriate for demonstrating standing. *See* Dkt. 2-1, at 42.

In reality, Plaintiffs' purported injuries are either speculative or downstream consequences of their own voluntary self-inflicted choices about how to allocate their resources in response to the government's action. Plaintiffs' grievances are nothing more than those of "concerned bystanders" who "believe[] that the government is acting illegally," so they do not have standing to bring their claims in federal court. *Hippocratic Med.*, 602 U.S. at 381.

The law forecloses the kind of "lawyer standing" that Plaintiffs assert here. In *Hippocratic Medicine*, the Supreme Court considered "various monetary and related injuries" a group of doctors alleged they would suffer from the FDA's relaxation of mifepristone regulations. *Id.* at 390. Namely, "diverting resources and time from other patients to treat patients with mifepristone complications," as well as an attendant increase in potential malpractice suits and insurance costs. *Id.* The Court held that FDA's regulatory actions and the alleged injuries were too speculative and attenuated a causal link to sustain federal jurisdiction. *Id.* at 391 ("[T]here is no Article III doctrine of 'doctor standing' that allows doctors to challenge general government safety regulations."). The

Court recognized the consequences of such a "sweeping doctrinal change"—the virtual abolition of any meaningful standing requirement. *Id.* at 392.

Much like the doctors in *Hippocratic Medicine*, here lawyers assert that they could sue to challenge administrative procedures they contend might cause them to have to do more work to win cases because, for example, they may have to take on more petitions for review in federal court. They thus contend that the IFR "will immediately affect [their] ability to serve their existing clients and take on new clients." Dkt. 2-1 at 37. But that is the kind of alleged injury that *Hippocratic Medicine* said was insufficient. *See also Mil.-Veterans Advoc. v. Sec'y of Veterans Affairs*, 7 F.4th 1110, 1129 (Fed. Cir. 2021) (concluding that allegation that "challenged rules purportedly ma[d]e it more difficult for veterans to obtain benefits, thereby frustrating the Organizations' general purpose of helping veterans obtain benefits" did not establish organizational standing). Indeed, Plaintiffs cite no case in which lawyers had standing in their own right to challenge a change in procedural rules or statutes that would affect their current and future clients, such as a reduction in the time to appeal a judgment or a restriction in a court's jurisdiction. That is because such changes are traditionally challenged by affected litigants in their respective proceedings. *See, e.g., INS v. St. Cyr,* 533 U.S. 289, 298–314 (2001) (determining whether statute stripped courts of jurisdiction to determine question of law presented in habeas petition).

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), does not salvage Plaintiffs' standing argument. The Supreme Court in *Hippocratic Medicine* explained why the organizational plaintiffs could establish standing in *Havens*—which the Court emphasized was an "unusual case" that it "has been careful not to extend … beyond its context." *Hippocratic Medicine*, 602 U.S. at 395–96. In *Havens*, the defendant's challenged practice was providing the organization plaintiffs "false information about apartment availability," a direct injury to the organizational plaintiffs "not

dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 395. Here, unlike *Havens*, Plaintiffs can point to no such direct injury from the IFR. Instead, they complain principally that they will need to allocate more resources per client to obtain the same results in removal proceedings. *See* Dkt. 2-1 at 40–44. But that is no different from firefighters who must allocate more resources to fight fires following the passage of "relaxed building codes that increase fire risks," police officers who must allocate more resources to fight crime if a state "legalize[s] certain activities that are associated with increased crime," or "[t]eachers in border states" who must allocate more resources to teach in "overcrowded classrooms" resulting from "lax immigration policies." *Hippocratic Medicine*, 602 U.S. at 392. As the Supreme Court explained, none of them would have Article III standing. Neither do Plaintiffs.

Finally, Plaintiffs' alleged financial injury does not establish Article III standing. *See* Dkt. 2-1 at 42. That is because Plaintiffs' alleged injury is self-inflicted. Even if their predictions come true about how much extra time they will need to spend on appeals to the Board, they do not explain why they could not reduce the number of Board appeals they take on, instead reallocating those resources to less onerous kinds of representation and allowing them to maintain the total number of clients they represent. *See id.* Likewise for their claimed lack of funding to litigate in the courts of appeals. *See id.* In other words, Plaintiffs are asserting an injury from not being able to continue representing clients the same way as they have previously—not a financial injury. And just like doctors who want to continue practicing medicine the way they did before a change in FDA regulations, lawyers do not have standing to challenge regulations just because they don't want to change how they practice law. Moreover, Plaintiffs fail to demonstrate impending financial harm because their "funding streams" allegedly "cannot be used to file petitions for review" in federal court. Dkt. 2-1 at 37. Only one declaration they cite even makes an assertion that some of

a single organization's grants could not be used for such representations, but it is entirely speculative whether such grant terms could not be rearranged in light of the Rule's changes to the BIA process. Moreover, Plaintiffs even admit that they have been able to find grants from "private foundations" to appeal the particular claims covered by the grants—those of "individuals designated incompetent by an [IJ]"—to federal court. Dkt. 2-5 ¶ 18. Nevermind that it is entirely speculative whether the new process would even cause those particular type of IJ orders to not be taken up by the BIA in general, nor reversed by the BIA at lower rates than before.

At its core, Plaintiffs' grievance with the IFR is a policy disagreement. *See* Dkt. 2-1 at 41 ("[T]he IFR frustrates NIJC's core mission to ensure that all immigrants receive a fair day in court."). The IFR does not force Plaintiffs to take or refrain from any action. How they voluntarily change their behavior to adapt to the new procedural rules is not a legally cognizable injury. Plaintiffs have not shown Article III standing.

### 2. Plaintiffs are not within the INA's zone of interests.

An APA plaintiff must show that it is "aggrieved … within the meaning of a relevant statute," 5 U.S.C. §702, meaning "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute … in question." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987). A plaintiff "suing under the APA must satisfy" the zone-of-interests test. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Thus, in an APA case the plaintiff lacks a valid cause of action if he is not "within the class of plaintiffs Congress has authorized to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). Here, "using traditional principles of statutory interpretation," it is clear Plaintiffs are not within that class. The INA supplies a cause of action to challenge issues arising from removal proceedings under 8 U.S.C. §1229a *only to individuals*

*subject to removal proceedings*, and only through judicial review in the courts of appeals following administrative proceedings, 8 U.S.C. §§1252(a), (a)(5), (b)(9). None of these jurisdictional provisions allow for suits by anyone not subject to removal proceedings, much less by legal service organizations.

Organizations therefore cannot be within the INA's zone of interests. When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources … does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers). The D.C. Circuit has thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *Fed'n for Am. Immigration Reform (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996); *accord Ayuda, Inc. V. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (explaining that if the statute explicitly provides only for aliens to challenge removal proceedings, then "organizational plaintiffs" may not raise such claims); *Am. Immigration Laws. Ass'n v. Reno*, 199 F.3d 1352, 1359 (D.C.Cir. 2000) (explaining that the INA, specifically 8 U.S.C. §1252, evinces Congressional intent that only "aliens aggrieved by the statute" my sue to challenge its application).[3]

### B.    The Attorney General's Reforms Are Consistent with the INA.

Plaintiffs argue that the Rule is contrary to the INA because it contravenes both several specific statutory provisions relating to, *inter alia*, an alien's right to obtain counsel and the

---

[3] While the Ninth Circuit held otherwise in *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1270 (9th Cir. 2020), it did not consider *FAIR*, 93 F.3d at 903, which is controlling in this Circuit.

statutory filing deadline for administrative appeals of asylum decisions, *see* 8 U.S.C. §§1158(d)(5)(A)(iv), 1229a(b)(4)(A), 1362, as well as the broader framework the statute establishes for appellate review, *see* Dkt 2-1 at 20-27. However, the rule is expressly authorized by the INA and consistent with background principles of administrative law.

### 1.    The Rule is authorized by the INA.

The Attorney General has broad authority to implement procedural rules governing whether, how, or under what circumstances the Board may consider administrative appeals from immigration judge decisions. The Board is an entirely regulatory creation exercising authority delegated to it by the Attorney General. *See* 5 Fed. Reg. 2,454 (July 3, 1940) (establishing the modern Board and providing that it "shall have authority to exercise the powers of the Attorney General" in delineated classes of cases). And since its creation, the Attorney General has provided for its structure, scope of authority, and procedural rules. *See*, *e.g.*, *id.* at 2,454-55; *see also* 8 C.F.R. §§90.02–90.12 (1940). Her authority to enact different rules, revise the existing rules, or in any way amend the mechanisms surrounding Board review continues to be safeguarded explicitly by statute. *See* 8 U.S.C. §1103(g). Here, the Rule relied on that broad grant of authority to the Attorney General, *see* 91 Fed. Reg. at 5,267-77, and the determination to revise the appellate procedures governing Board review of immigration judge decisions unquestionably falls within that statutory provision.

Moreover, the Attorney General's provision of specific procedural rules and practices for the Board is consistent with background principles of administrative law. The Supreme Court has consistently asserted that "administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vermont Yankee*, 435 U.S. at 543 (internal quotation marks and citations

omitted); *accord Mobil Oil Expl. & Producing Se.*, 498 U.S. at 230-31. That is exactly what the agency did here: it assessed the significant backlog of administrative appeals and the pressures that puts on the immigration system, the many points within the process where needless delay inheres, and the fact that the vast majority of appeals are dismissed, and crafted a response targeting these problems and thus allowing the agency to better fulfill its regulatory mandate. *See generally* 91 Fed. Reg. 5,267. This Rule falls clearly within the context of the Supreme Court's admonition that courts should be extremely wary of altering procedures or superimposing other practices on an administrative agency which is, after all, better positioned to understand its needs than any federal court. *See Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) ("[I]t is long since settled that a reviewing court is generally not free to impose additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel.") (quotation marks and citation omitted); *Vermont Yankee*, 435 U.S. at 549 (courts should "not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good"); *see also FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 141-44 (1940).

## 2.    Plaintiffs' contrary arguments lack merit.

Plaintiffs do not argue that the Attorney General lacked authority to promulgate the Rule and fail to address entirely the background principles that support the Rule. Instead, Plaintiffs argue that the Rule *contravenes* the INA in numerous ways, but those arguments are unavailing.

***The Right to Counsel Is Not Violated:*** Plaintiffs contend that the Rule violates the INA's various right-to-counsel provisions, *see* Dkt. 2-1 at 20 (citing 8 U.S.C. §§1129a(b)(4)(A), 1362), because the 10-day filing deadline for an administrative appeal will allegedly impose hurdles on aliens' ability to obtain counsel for the administrative appellate proceedings. The form those

hurdles allegedly take varies based on context, *see* Dkt. 2-1 at 21-24, but whatever the context Plaintiffs' arguments lack merit.

To begin, the Rule is entirely focused on the administrative appellate process; nothing in the Rule forecloses, inhibits, or otherwise limits an alien's ability to obtain counsel of their choosing when initially placed into removal proceedings or at any other point in time. Plaintiffs entirely ignore the fact that aliens will have months, and often *years* to obtain counsel prior to the need for any appeal to the Board arising. They also ignore the fact that aliens are entitled by statute to only 10 days to seek counsel before their case may proceed at the trial level, 8 U.S.C. §1229(b)(1), which is fully consistent with the Rule's 10-day period at the appellate level. They also fail to offer any evidence that individuals who proceed *pro se* before the immigration court seek counsel for appellate purposes or frequently fail to obtain counsel following entry of the immigration judge's decision, or that represented aliens switch counsel or seek to do so in the same timeframe. Plaintiffs also ignore the fact that initial representation agreements should indicate the scope of that agreement, including whether the retained counsel will continue through any level of appellate review, and that aliens are thus on notice at the very outset of proceedings regarding the potential need for alternative counsel should an appeal be desired.

Instead, Plaintiffs focus entirely on the period between when the immigration judge eventually enters his or her decision and when an appeal must be filed with the Board. Even in that context, Plaintiffs' argument has hypothetical valence only for non-asylum related appeals, since many asylum appeals (including those with collateral applications for other relief or protection), will continue to proceed on a 30-day filing deadline. *See* 91 Fed. Reg. at 5,272. Within the non-asylum subset of appeals, Plaintiffs present two basic theories for why the Rule violates the statutory right to counsel: 1) the shortened time frame will limit the ability of aliens to obtain

counsel, especially detained aliens, who present issues of access; and 2) even with representation, that counsel will not be able to provide "effective" representation, given the need to file a notice of appeal promptly, delineating the relevant issues and the subsequent 20-day simultaneous briefing deadline with limitations on extensions.

Plaintiffs' first argument falters on the reality that, again, aliens will have months if not years to obtain counsel prior to an appeal to the Board being a possibility, and that even for represented aliens who for some reason require new counsel for appellate proceedings, that fact would have been spelled out in the representation agreement. Given this reality, the 20-day difference in a potentially year-long process cannot realistically be seen as any violation of the right to counsel. Nor does that statutory right entail actually *securing* counsel. *See, e.g., Ponce-Leiva v. Ashcroft,* 331 F.3d 369, 376 (3d Cir. 2003) ("[T]he mere inability to obtain counsel does not constitute a violation of due process," and citing cases from the Eighth, Ninth, and Tenth Circuits). Again, aliens are on notice when being placed into proceedings of their right to seek and retain counsel, 8 U.S.C. §1229(a)(1)(E), and there will unquestionably be a reasonable amount of time between the service of the Notice to Appear and any decision by the immigration judge to search for and obtain counsel. The agency can permissibly establish a narrow window for a subsequent portion of the proceeding, even if that may curtail the time an alien may have to seek substitute or new counsel. *See Orozco-Lopez v. Garland*, 11 F.4th 764, 777-79 (9th Cir. 2021). If an alien actually fails to obtain counsel in such circumstances, that may be unfortunate, but it is not a violation of any statutory right the alien holds. *See, e.g., id.* at 778-79 (the "statutory entitlement to counsel does not mean that a non-citizen must have counsel before an IJ can proceed, but only that a non-citizen must at least be informed of the entitlement to counsel and have an

opportunity to seek counsel within" the 10-day period contemplated by the credible-fear regulation).

Nor are the filing or briefing deadlines impediments to effective representation. Again, the more complex merits-based asylum determinations remain subject to the longer 30-day filing deadline for appeals. For other cases, there is no reason that counsel should be unable to file an adequate notice of appeal within ten days identifying with the requisite specificity the relevant issues to be considered on appeal. Plaintiffs fear waiver if the notice is inadequate, *see* Dkt. 2-1 at 24, but there is no indication that issues must be raised with the merits-level exactitude Plaintiffs hypothesize. The 20-day briefing schedule likewise does not stand as a hurdle to effective representation. Existing counsel will be familiar with the case from the lengthy removal proceeding, and even for newly retained counsel there will be more than the 20-days in which to get caught up on the case, its legal issues, and the relevant arguments. *See* 91 Fed. Reg. at 5,277-78 (establishing the broader process from filing the notice of appeal through briefing). Attorneys consistently juggle many cases and obligations and yet can still be required to undertake prompt briefing on newly emergent issues—as has been done by counsel in this case and on a timeline significantly more compressed than any contemplated by the Rule. And, of course, extensions of time are still permitted under the Rule for exceptional circumstances. *See* 91 Fed Reg. at 5,277. In the end, the fact that Plaintiffs would prefer a more liberal extension regime with longer periods for both filing the notice of appeal and submitting the briefing is an inadequate basis for concluding that the statutory privilege of counsel is violated by the Rule.

***The INA Does Not Require BIA Review***: Plaintiffs raise amorphous statutory arguments effectively contending that the INA requires "meaningful review" by the Board. *See* Dkt. 2-1 at 24-26. Yet nowhere in the INA has Congress *required* the existence of the Board which is, after

all, only the regulatory creation of the Attorney General. As the Seventh Circuit has observed, "[t]he Attorney General could dispense with the Board and delegate her powers to the immigration judges or could give the Board discretion to choose which cases to review[.]" *Guentchev v. INS*, 77 F.3d 1036, 1037 (7th Cir. 1996). If the Attorney General can dispense with the Board entirely and not run afoul of the INA, she can surely take the lesser step of directing summary dismissal of appeals when certain circumstances are met, as this Rule directs. Plaintiffs place too much weight on the word "determination" in the statutory definition of finality, *see* Dkt. 2-1 at 22 (quoting 8 U.S.C. §1101(a)(47)(B)), contending that this imposes some level of minimal review or exercise of decision-making authority so as to safeguard effective judicial review. Leaving aside that the logical extension of Plaintiffs' argument is that the existing summary affirmance procedures would be invalid—despite having been universally upheld in the courts of appeals—the Supreme Court has consistently noted the discretion adjudicators have in whether or how they write opinions, especially in the context of summary disposition procedures. *See Taylor v. McKeithen*, 407 U.S. 191, 194 n.4 (1972). The combination of the Board's order, whatever form it takes, and the decision of the immigration judge after a trial-type hearing is sufficient to safeguard meaningful review in the courts of appeals, and the Board itself is not required by statute or otherwise to issue a decision in any particular form or engaging in any particular level of analysis on the issues presented for appeal. *See Guentchev*, 77 F.3d at 1038.

Plaintiffs remaining arguments on this point are even more attenuated. Regardless of what form any ultimate decision by the Board may take, the alien will *still* be informed of their right to appeal the immigration judge decision, while nothing in the Rule hampers their ability to exercise that right, and *still* will enjoy "a rebuttable presumption of credibility on appeal," even if the Board concludes that the appeal should be summarily dismissed. *See* Dkt. 2-1 at 26. The contention that

this Rule negates the "complete record" requirement is conclusory, *see* Dkt. 2-1 at 25 (quoting 8 U.S.C. §1229a(b)(4)(C)), and nothing in the statute requires that the record be available on any particular time-line. Such a complete record will continue to be compiled and kept under the Rule, and the fact that the administrative appeals deadline must now move on a faster track in no way displaces that statutory requirement. Moreover, any record will be available for purposes of judicial review. *Cf.* Dkt. 2-1 at 26.

  ***The Rule Is Consistent with the Asylum Statute:***  *Finally*, Plaintiffs argue that the Rule conflicts with 8 U.S.C. §1158(d)(5)(A)(iv), which provides that, in asylum cases, "any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge[], whichever is later." Plaintiffs argue that by excepting cases where an alien has been found ineligible to *apply* for asylum, *see*, *e.g.*, 91 Fed. Reg. at 5,272 (citing 8 U.S.C. §§1158(a)(2)(A) – (C)), the Rule contravenes the statute, which makes no such distinction between the grounds of denial, *see* Dkt. 2-1 at 26-27. The statute wholly supports the distinction drawn in the Rule. First, the Attorney General's authority to *grant* or *deny* asylum is provided by Section 1158(b), which also includes the relevant "[c]onditions for granting asylum." That section comes *after* the provisions limiting who may *apply* for asylum. In other words, the statutory administrative appeals deadline is concerned with aliens whose applications are actually considered under Section 1158(b), not those who may not even *apply* for asylum under Section 1158(a). Second, where an alien is barred from *applying* for asylum, no decision to *grant* or *deny* the application is made by the adjudicator. As illustrated by the regulations implementing the U.S.-Canada Safe Third Country Agreement, a determination that the alien is ineligible to apply entails prompt removal and no determination on the merits of the application, which, again, the alien is not entitled to

submit in any event. *See* 8 C.F.R. §§208.30(e)(6) & (i), (7) & (i). In short, Section 1158(d)(5)(A)(iv) does not address the administrative appeals deadline for aliens who are barred from applying for asylum, let alone prohibit a deadline of less than 30 days.

Plaintiffs also contend that the deadline for *all* asylum appeals will effectively be only 10 days, because those cases will almost invariably include applications for related protection, such as withholding of removal and protection under the regulations implementing the Convention Against Torture, that fall *outside* the 30-day filing deadline. *See* Dkt. 2-1 at 26-27. Nothing in the Rule remotely supports Plaintiffs' contention or would require a seriatim approach to appealing issues. The Rule explicitly provides that "[i]n *cases* where an Immigration Judge has adjudicated an asylum application" on the merits, the notice of appeal "shall be filed directly with the Board within 30 calendar days of the" decision. 91 Fed. Reg. at 5,278 (quoting 8 C.F.R. §1003.38(b)(2) (emphasis added)). So long as the immigration judge has resolved an asylum application on its merits, the administrative filing deadline is 30 days, and that applies to the *case* itself, not only to the discrete issues that comprise the broader case. There is thus no reason to file a challenge targeting the ancillary determinations relating to withholding of removal and related protection within the 10-day filing deadline; consideration of those issues will proceed in tandem with the asylum denial—the focal point of the case—and thus any appeal would be subject to the longer, 30-day filing deadline.

###     C.    The Court Should Deny Plaintiffs' Converted Summary Judgment Motion Because the Rule Satisfies the APA's Procedural Requirements.

Plaintiffs contend that the IFR is unlawful because the Agency promulgated the Rule without pre-publication notice and comment. *See* Dkt. 2-1, at 12. This argument fails because the IFR falls within two well-established exceptions to the APA's notice and comment requirement: (1) the procedural rule exception, 5 U.S.C. §553(b)(4)(A), and (2) the foreign affairs exception, 5

U.S.C. §553(a)(1). *See* 91 Fed. Reg. at 5,274-75. Plaintiffs have failed to meet the standard for summary judgment because the Defendants' reliance on these exceptions is in accordance with the law. *See Deppenbrook v. Pension Benefit Guar. Corp*, 778 F.3d 166, 171 (D.C. Cir. 2015). And for similar reasons, Plaintiffs are likely to succeed on the merits of this claim if this court instead considers it in the §705 stay posture.

### 1.    Procedural rule exception.

Under the APA, agencies are not required to provide notice and comment for "rules of agency organization, procedure, or practice." 5 U.S.C. §553(b)(A). The procedural rule exception "covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Jem Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (citation omitted). Rules are treated "as procedural if they are 'primarily directed toward improving the efficient and effective operations of an agency.'" *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014)).

The IFR fits squarely within this exception. *First*, the IFR does not alter rights or interests to which parties appearing before the BIA are entitled. *Contra* Dkt. 2-1, at 17. There is no statute which clearly conveys the right to a BIA adjudication on the merits of an appeal, much less a specific timeframe, briefing schedule, or manner of consideration for such appeals. *See Dia v. Ashcroft*, 353 F.3d 228, 237 (3d Cir. 2003) (en banc) (noting the "INA says nothing whatsoever regarding the procedures of an administrative appeal, or, for that matter, any other procedures employed by the BIA."); *see also Guentchev*, 77 F.3d at 1037-38 ("The Attorney General could dispense with the Board and delegate her powers to the immigration judges, or could give the Board discretion to choose which cases to review (a la the Appeals Council of the Social Security

Administration, or the Supreme Court exercising its certiorari power)."). As observed in the IFR, courts of appeals have routinely determined that aliens have no constitutional or statutory right to a particular form or manner of Board decision. *See Yu Sheng Zhang v. U.S. DOJ*, 362 F.3d 155, 157-58 (2d Cir. 2004); *Hang Kannha Yuk v. Ashcroft*, 355 F.3d 1222, 1229-32 (10th Cir. 2004); *Dia*, 353 F.3d at 242; *Denko v. INS*, 351 F.3d 717, 729-30 (6th Cir. 2003); *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 850-51 (9th Cir. 2003); *Khattak v. Ashcroft*, 332 F.3d 250, 252-53 (4th Cir. 2003); *Mendoza v. U.S. AG*, 327 F.3d 1283, 1288-89 (11th Cir. 2003); *Albathani v. INS*, 318 F.3d 365, 376-77 (1st Cir. 2003).

Plaintiffs assert that the IFR "eliminates multiple protections" for aliens seeking an appeal before the BIA. *See* Dkt. 2-1, at 17. But Plaintiffs do not clearly identify those rights to which they are entitled. Plaintiffs conflate the substantive rights generally attending removal proceedings and what they refer to as "settled expectations among litigants." *Id.* As addressed in the IFR, nothing in the Rule displaces the statutory or regulatory provisions for review of a final order of removal. *See* 8 U.S.C. §1101(a)(47)(B); 8 C.F.R. §1241.1. Where an appeal to the BIA is summarily dismissed, the decision of the Immigration Judge below becomes the final agency decision absent the Attorney General's exercise of discretionary review. *See, e.g.*, 8 C.F.R. §1003.1(h). Consequently, the alien may continue to file a petition for review of a final removal order in accordance with the procedures set forth by Congress in 8 U.S.C. §1252(a)(1).

Furthermore, "the privilege of being represented, at no expense to the government, by counsel of the alien's choosing who is authorized to practice in such proceedings," 8 U.S.C. §1229a(b)(4)(A), is a right preserved in removal proceedings before the Immigration Judge below. *See* 8 C.F.R. §§1003.15(b) (providing for notice requirements including notice of an alien's privilege of counsel), 1003.16. Even in the case of pro se litigants, such litigants were notified of

their privilege of counsel and afforded opportunity to secure counsel in the proceedings before the Immigration Judge, and Plaintiffs offer no support for the contention that an alien is entitled to different or new counsel simply by filing their notice of appeal with the BIA. *See* 91 Fed. Reg. at 5,272 n.16; *see generally* Dkt. 2-1, at 20-24. Nothing in the IFR eliminates the requirement that aliens be notified of their ability to seek counsel at no cost to the government in removal proceedings or provided an opportunity to seek counsel in removal proceedings.

*Second*, Plaintiffs contend that the procedural changes made by the IFR so significantly reduce the time for presenting claims and creates other procedural hurdles that they are somehow substantive. Dkt. 2-1, at 17. But all of the IFR's streamlining provisions adjust only the internal agency mechanisms by which the BIA will dispose of appeals brought before it. The IFR does not prevent aliens from filing a notice of appeal, nor does the IFR prohibit the BIA from disposing of such appeals under the mechanisms available to it—*inter alia*, summary dismissal, summary affirmance, and adjudication on the merits. Assuming *arguendo* that an alien is entitled to appellate review by the BIA, the IFR continues to provide for that review while addressing the inefficiencies with the current process. As previously explained, Plaintiffs fail to identify authority which entitles the alien to any specific process by the BIA or an adjudication on the merits in every case. Furthermore, the mere fact that some of the changes may have some effect on the outcomes of individual cases is not a sufficient basis for concluding that the changes are substantive and, thus, not procedural. *See, e.g., Jem Broad. Co.,* 22 F.3d at 327 (concluding that the FCC's "hard look" rules depriving applicants of an opportunity to correct errors or defects in filings was not "so significant as to have required the FCC to conduct notice and comment rulemaking."). Here, the IFR clearly identifies the enormous backlog of appeals brought about by years of inefficiency in appellate processes. *See* 91 Fed. Reg. at 5,268-71; *accord Mendoza*, 754 F.3d at 1023.

*Finally*, Plaintiffs' contention that the IFR establishes "standards of conduct or entitlement" for the public are without merit. Dkt. 2-1, at 19 (citing *Batterton v. Marshall*, 648 F.2d 694, 707 n.70 (D.C. Cir. 1980)). On the contrary, the IFR merely provides new procedures for the BIA in reviewing and disposing of appeals. The onus on the parties to appeal is the same. Appellants must file their notice of appeal in accordance with the rules set forth by the agency, and, in those cases which the BIA determines merits review is warranted, the parties must submit briefing in accordance with a briefing schedule determined by the agency. *See* 91 Fed. Reg. at 5,272-74. Consistent with *Batterton*, the IFR does not propose to alter parties' rights nor establish different standards of conduct for BIA appeals. 648 F.2d at 707 n.70. Plaintiffs' reading of the IFR would effectively read 5 U.S.C. §553(b)(1)(A) out of the APA by requiring any procedural change that subjected litigants to conform with different timelines or other procedural requirements go through pre-publication notice and comment, rendering the procedural rule exception virtually unworkable.

In sum, the IFR does not alter the substantive rights or interests of the parties to an appeal before the BIA. Instead, they merely streamline the processes by which the BIA disposes of appeals. Consequently, the IFR need not implement the notice and comment procedures required by the APA, 5 U.S.C. §553(b)(4)(A).

If the Court determines otherwise with respect to any provision of the IFR, the Court should conduct a severability analysis to ensure that the many, clearly procedural aspects of the IFR can be implemented. The D.C. Circuit did exactly that in the *AFL-CIO* case on which the Plaintiffs rely heavily. There, the Court determined that two parts of an NLRB rule met the procedural rule exception and could be issued without notice and comment, but another three portions did not and therefore vacatur was appropriate until those aspects were repromulgated with notice and comment. 57 F.4th at 1049. This approach is supported by the IFR in this case, which includes

standard severability language expressing EOIR's intent that that if any part of the IFR is "stayed" or "enjoined," "all other parts of the rule that are capable of operating in the absence of the specified portion" should "remain in effect." 91 Fed. Reg. at 5,274.

### 2.    Foreign affairs exception.

Additionally, the Agency permissibly invoked the foreign affairs exception to notice-and-comment rulemaking. That exception applies "to the extent that there is involved ... a ... foreign affairs function." 5 U.S.C. §553(a)(1). The IFR readily satisfies that test. The Rule is part of a joint effort with other nations to address illegal migration and is predicated on sharing border management among "all countries in the region," as reflected in the Administration's "active[] engage[ment] [in] negotiations including wide-ranging discussions with foreign partners on matter related to border security …." 91 Fed. Reg. at 5,275. And the IFR is necessary for the United States to demonstrate that "it is taking immediate action … to streamline the removal process and encourage other countries to cooperate with the United States' efforts to remove illegal aliens and support the return of their citizens." *Id.*

Plaintiffs argue that the foreign affairs exception applies only where a rule "clearly and directly" involves a foreign affairs function. Dkt. 2-1, at 15 (quoting *Capital Area Immigrants' Rights Coal. v. Trump* ("*CAIR*"), 471 F. Supp. 3d 25, 55-57 (D.D.C. 2020)). That language is found nowhere in the APA, and in fact comes from legislative history (House and Senate reports), not statutory text. *Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1082 & nn.87–88 (D.C. Cir. 1978) (discussing a different exemption from the APA's notice and comment requirements).  Of course, "legislative history is not the law," *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019), and the statute here exempts from notice and comment requirements to the extent they "involve[]" foreign-affairs functions, 5 U.S.C. §553(a)(1), not the higher standard Plaintiffs propose.

And even if that is the test, the Rule satisfies it. As the IFR explains, "[t]he United States' border management strategy is predicated on the belief that migration is *a shared responsibility* among all countries in the region," and that addressing illegal immigration, delays in the removal process, and perverse incentives to engage in illegal immigration into the United States, "will demonstrate to international partners the United States's commitment to addressing challenges related to deterring illegal migratory movements." 91 Fed. Reg. at 5,275, n.21 (detailing DHS coordination with the governments of Honduras and Colombia in conducting a charter flight for aliens opting to self-deport). Indeed, as noted above, the IFR explicitly identifies the "purpose of these international efforts and negotiations: to streamline the removal process and encourage other countries to cooperate with the United States's efforts to remove illegal aliens and support the return of their citizens." *Id*. Delaying the implementation of this IFR would reduce the United States' ability to demonstrate that "it is committed to taking quick and robust action to remove aliens and encourage them to depart the United States, which depends on international cooperation." *Id.* There is thus a closer nexus here to core foreign affairs functions than the "*indirect*" "downstream effects" the agency hoped the rule in *CAIR* would have "in other countries, and perhaps on [] negotiations." *CAIR*, 471 F. Supp. 3d at 55. This Rule thus falls under the foreign affairs exception because it "involve[s]" a "foreign affairs function of the United States." 5 U.S.C. §553(a)(1), "involving the relationships between the United States and its [noncitizen] visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980). *See also Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (D.D.C. 2018) (holding "agencies were not required" to "engage in formal rule-making" for regulation related to the exchange visitor visa program because foreign affairs exception applied). The foreign affairs exception applies.

### D.    The Rule is Neither Arbitrary nor Capricious.

"[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* The agency's decisions are entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," *Id.* at 416. At bottom, arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (where a statute delegates discretionary authority to an agency, "the role of the reviewing court under the APA" is to ensure the "agency has engaged in reasoned decisionmaking within" the bounds of the delegated authority) (internal quotation marks and citations omitted).

The Rule easily meets that deferential standard. It was promulgated as a measure to increase efficient disposition of administrative appeals at a time when the enormous backlog continues to grow, streamline and simplify the Board's case management system, and ensure that the Board's limited time and resources are spent on important cases requiring the expertise of its members. *See* 91 Fed. Reg. at 5,268-70. The Rule is reasonably related to all of these objectives.

*First*, by creating a presumption of summary dismissal absent a majority vote of the Board to consider a case on its merits, the Rule will effectuate a quicker final disposition of incoming appeals, thereby both relieving the existing backlog of cases and implementing a mechanism to

ensure that the backlog does not reemerge. Moreover, by creating that presumption in the vast majority of cases, the Rule "will allow the Board to focus on appeals with particularly novel or complex legal questions without becoming bogged down in mine-rune or straightforward cases[.]" 91 Fed. Reg. at 5,271.

*Second*, by streamlining case management rules, the Board ensures that appeals are filed in an expeditious fashion and considered promptly without potentially years-long delays. The 10-day filing deadline for many administrative appeals encourages prompt case initiation before the Board, as does curtailment of the period immigration judges used to utilize to review and approve the transcription of their oral decisions. Coupled with the presumption of summary dismissal, these rules will operate in lockstep to finally resolve many cases within 30 days from the immigration judge's decision. For those cases where a majority of the Board does vote for merits review, the provision for simultaneous briefing, the general prohibition on reply briefs, and the allowance of extensions in only extraordinary circumstances, will all work towards resolving appeals promptly, again contributing to both a diminution of the existing backlog and the creation of an environment where a substantial backlog would be unlikely to arise again.

*Third*, the Rule otherwise safeguards the Board's discretion in how to approach cases. A single Board member may request a vote on whether a case should be considered on its merits rather than summarily dismissed, the Board retains authority to grant briefing extensions in appropriate circumstances, and, when considering a case on its merits, the Board enjoys discretion to request supplemental or additional briefing. These measures ensure that the Board continues to exercise maximum decisional autonomy during the appellate process, while focusing its time and resources on the compelling cases that require full utilization of its collective expertise.

Turning to Plaintiffs' specific arguments, Dkt. 2-1 at 27-39, they argue that the Rule is arbitrary and capricious because the Department purportedly "failed to consider" its "impact" on aliens and their counsel, Dkt. 2-1 at 28-31, "failed to account for recent, sweeping changes to immigration court practice and how [it] would exacerbate existing barriers," *id*. at 32-34, "failed to consider reliance interests," *id*. at 34-36, "relied on erroneous data," *id*. at 36, "failed to consider" its "impact" on "courts of appeals," *id.* at 37-38, and "failed to consider reasonable alternatives," *id*. at 39. Plaintiffs' arguments are belied by the Rule itself, however. The Rule is a well-reasoned exercise of the Department's broad discretion to set its own procedures, and Plaintiffs' disagreement with the regulation does not render it arbitrary and capricious.

### 1.    The Department properly considered the Rule's impact.

Plaintiffs assert that Defendants failed to consider the Rule's impact on aliens and their counsel, particularly the impact on unrepresented aliens' statutory right to counsel. Dkt. 2-1 at 28-31. But the Department expressly considered and addressed those very concerns. 91 Fed. Reg. at 5,272 n.16. The Rule acknowledges the possibility that reducing the appeal period "may impact the[] ability [of pro se aliens] to obtain counsel to file a Notice of Appeal." *Id*. The Rule further acknowledges that the shortened timeframe "may make it more difficult for them to find counsel." *Id*. It explains, however, that pro se aliens have already had time to obtain counsel prior to their immigration court proceedings and are advised of their appeal rights by the Immigration Judge and can appeal to the Board without counsel. *Id*. And again, the statutory right to counsel does not entail actually retaining counsel, *Ponce-Leiva*, 331 F.3d at 376, discrediting Plaintiffs' due process concerns, *see* Dkt. 2-1 at 29-30 (arguing that the Rule violates the due process rights of pro se aliens and pro se detained aliens because it renders them "unable to appeal" or "effectively prevent[s]" them from appealing"). Further, aliens, pro se or not, have "no right to a merits

adjudication of any appeal in the first instance," 91 Fed. Reg. at 5,272, a factor that Plaintiffs sidestep.

The Rule also considers that for pro se aliens who file a Notice of Appeal and obtain counsel *after* the 10-day period, "they may not have the opportunity to submit briefing as their appeal may be summarily dismissed under this rule." *Id.* n.16. That contemplated population is forecasted to be "relatively small," *id.*, which Plaintiffs dispute. Dkt 2-1 at 29. But the D.C. Circuit does not require a precise data set to support an agency's policy. *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 392 (D.C. Cir. 2018) (a "less than perfect" dataset "does not amount to arbitrary decision-making"). Moreover, the Board has held that it has authority to accept what are otherwise untimely appeals, and consider them timely, in certain situations where the alien can establish that equitable tolling should apply because 8 C.F.R. § 1003.38(b) is a claim-processing rule and not a jurisdictional provision. *Matter of Morales-Morales*, 28 I. & N. Dec. 714, 717 (BIA 2023).

Plaintiffs particularly worry about pro se detained aliens, arguing that this population will be disproportionately affected by the reduced appeal time. Dkt 2-1 at 29-30. They contend that the Rule largely ignores this population primarily because it only references the word "detained" once. *Id.* at 30. This alone surely does not render the rule arbitrary and capricious. In any event, the entirety of the discussion about pro se aliens also applies to those who are detained. *See* 91 Fed. Reg. at 5,272 n.16; *see id.* at 5,276 n.22 ("As noted in footnote 16 above, there may be hypothetical or speculative situations in which the IFR will have some cost. Nevertheless, for the reasons given throughout this IFR, any such costs—if they even exist beyond the realm of the hypothetical—are far outweighed by the benefits of the IFR.").

Plaintiffs ignore the reality that nothing in the Rule limits any alien's ability to obtain counsel when initially placed into removal proceedings or at any other point in time. And any

attendant difficulties that pro se detained aliens may face by virtue of their detention, *see* Dkt. 2-1 at 30, existed prior to the Rule. Plaintiffs contend that the Rule effectively curtails this population's ability to timely appeal to the Board due to mail delays and lack of reliable (or any) access to the internet. *Id*. But they do not provide any specifics as to what percentage of their clients it will actually affect. Nor do they account for the various regulations that implement an alien's right to counsel by requiring immigration judges to advise them of that right and the availability of pro bono legal services and to ascertain they have received a list of such providers. 8 C.F.R. §§1240.10(a)(1), (a)(2); *see* 8 C.F.R. §1003.61(b) (requiring the Director of EOIR to maintain the "List of Pro Bono Legal Service Providers and update it "not less than quarterly"); *see United States v. Valdivias-Soto*, 112 F.4th 713, 722 (9th Cir. 2024) (explaining these regulations). They further overlook that immigration judges regularly grant continuances for aliens to obtain counsel. *See Gonzalez-Veliz v. Garland*, 996 F.3d 942, 949 (9th Cir. 2021). Should aliens retain counsel in those circumstances, this logically reduces the numbers of unrepresented aliens appearing before the immigration courts *and* the Board because, as discussed, the representation agreements should indicate whether retained counsel will continue through any level of appellate review. And even for those aliens, detained or not, who received an adverse decision and did not obtain counsel during their immigration court proceedings, they *still* have time to obtain counsel for their Board appeal. Plaintiffs also fail to recognize that the Rule does not affect, change, or otherwise limit any aliens' right to request reconsideration in the event their appeal is dismissed as untimely. *See* 8 C.F.R. §1003.2(b). The Rule explicitly considered the impact on unrepresented aliens. 91 Fed. Reg. at 5,272 n.16. Plaintiffs' disagreement and speculation do not establish arbitrary or capricious rulemaking. *Hispanic Affairs Project*, 901 F.3d at 392 ("So long as the agency 'explained the

available evidence' and rationally connected the facts to the choice made, it acted reasonably and its determination will be upheld.") (citation omitted).

Plaintiffs contend the Rule "does not articulate the specific criteria or standards the BIA will apply when assessing whether a case should be reviewed on the merits, underscoring its arbitrary nature." Dkt. 2-1 at 31. But nothing in the Rule changes or affects how the Board evaluates appeals under its existing en banc procedures. *See* 8 C.F.R. §1003.1(a)(5). Moreover, their assertion that the Rule fails to account for "the confusion" it will cause due to its alleged "dual-tiered system of deadlines in asylum cases," Dkt. 2-1 at 31, is premised on their own misreading of the regulation, *supra* p.25 ("So long as the immigration judge has resolved an asylum application on its merits, the administrative filing deadline is 30 days, and that applies to the case itself, not only to the discrete issues that comprise the broader case."). And to the extent they contend the Rule fails to consider the impact on counsel's ability to protect their clients' rights, Dkt. 2-1 at 29, they do not meaningfully explain this argument.

### 2. The Attorney General adequately considered the Rule in light of other changes.

The Department considered the intersection of the Rule's impact with the recent increase to the Board's filing fees. *See* Dkt. 2-1 at 32. The Rule recognizes that since the enactment of the fee increase, "it has not appreciably affected the volume of appeals." 91 Fed. Reg. at 5,270 n.10. It further contemplates that the fee increase's impact "may be minimal in practice" because there is no prohibition on fee waivers. *Id.*

Plaintiffs acknowledge fee waivers as "theoretically available" but assert that they are "categorically unavailable for certain types of appeals" and cite *Matter of Garcia Martinez*, 29 I. & N. Dec. 169 (BIA 2025). Dkt. 2-1 at 32 n.3. That decision does not stand for that proposition. *See id.* Instead, the Board in that case rejected a fee waiver request filed by a non-detained alien

with retained counsel, explaining, "[t]o warrant a fee waiver, an alien will need to explain how he or she is able to pay legal fees but cannot pay a filing fee." *Matter of Garcia Martinez*, 29 I. & N. Dec. at 171. The Board further rejected the request because "a fee waiver request from a non-detained adult alien that contains zeros in all income blocks is presumptively invalid…. particularly [one filed by an alien who] is not pro se and detained, should be rejected when it is not accompanied by evidence to explain why the [alien] has no income or otherwise cannot pay the applicable fees." *Id.* Those specific circumstances hardly support Plaintiffs' rejection of fee waivers as "categorically unavailable." *See* Dkt. 2-1 at 32 n.3. Nor do they render the Rule arbitrary and capricious.

Plaintiffs also argue that recent Board decisions (they cite three) "dramatically curtail the procedural protections available to noncitizens before IJs." Dkt. 2-1 at 33. Those decisions, they contend, in combination with the Rule, which they describe as "effectively eliminat[ing] review of [Immigration Judge decisions] by the BIA," results in "further constricti[on] [of] appellate review." *Id.* at 34. But it is unclear—and Plaintiffs fail to explain—why the Attorney General was required to consider these BIA decisions in the rulemaking. The BIA decisions do not "further constrict" Board review but provide reasonable procedural requirements for the filing of an asylum application in immigration court. And again, "aliens have no constitutional or statutory right to a particular form or manner of a Board decision." 91 Fed. Reg. at 5,271 (citing cases).

### 3. The Attorney General properly considered reliance interests.

Plaintiffs are unlikely to succeed on their reliance argument. Dkt. 2-1 at 34-35. To begin, Plaintiffs do not explain how the Rule upsets reliance interests given that it applies "only prospectively and not to appeals pending when the rule becomes effective." 91 Fed. Reg. at 5,271. "Instead, it will apply only to decisions otherwise subject to appeal that are issued by either an

Immigration Judge or DHS on or after the rule's effective date." *Id.* Furthermore, the Attorney General explicitly considered the reliance interests at stake. As the Rule explains, "there is no right to a merits adjudication of any appeal in the first instance, and because the rule does not change the process for aliens who submitted an appeal with the expectation of receiving a different process, this change will not undermine any reliance interests of either an alien or DHS." 91 Fed. Reg. at 5271. The Attorney General also reasonably explained that "there is no evidence … an alien brings a claim for relief or protection from removal based on the availability of an appeal to the Board" and there is no "logical reason" they would do so. *Id.* Plaintiffs talk in generalities about aliens' alleged "serious reliance interests," *see* Dkt. 2-1 at 36, but fail to identify any specific reliance interests that would be upset by the Rule in light of its prospective application and the lack of any right to a particular process. They fail to explain how the Rule "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 280 (1994).

Additionally, Plaintiff sweeping statement of "serious reliance interest" highlight the importance of Defendants' jurisdictional arguments. Plaintiffs overlook the fact that aliens may, and indeed should, raise their reliance arguments in administrative and judicial proceedings. *See* , *J.E.F.M.*, 837 F.3d at 1035; *Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1294-96 (9th Cir. 2018) (addressing whether new agency rule should be applied retroactively to petitioner); *Matter of Cordero-Garcia*, 27 I. & N. Dec. 652, 657 (B.I.A. 2019) (same); 8 U.S.C. §§1252(a)(5), (b)(9) (requiring channeling of all removal-related claims through removal proceedings). These issues will need to be litigated in the context of fact-specific individual cases; otherwise it would be very difficult to define in advance a class of people who will have acquired a vested interest or

demonstrated reliance on the prior law.  Broad and generalized concerns about alleged downstream effects are wholly speculative and do not account for either the case-by-case nature of adjudication or the fact-intensive nature of many cases.

For similar reasons, Plaintiffs cannot prevail on their claim based on their own alleged reliance interests, which boil down to the need to change their business practices. *See* Dkt. At 35. Again, the Rule operates prospectively to give Plaintiff organizations notice of the changes. More fundamentally, Plaintiffs fail to cite a single case supporting their apparent position that attorneys who represent regulated parties—but who themselves are not being regulated—must be considered when an agency issues a rule. Such a requirement would grind the rulemaking process to a halt because every rule issued impacts the legal community in some way. *Cf. All. for Hippocratic Med.*, 602 U.S. 367.

### 4. The Attorney General appropriately considered relevant facts and data.

Plaintiffs contend that the Rule relies "on faulty data" in asserting that a party's appeal is rarely sustained. *See* Dkt. 2-1 at 36 (citing 91 Fed. Reg. at 5,270 n.8). But the motion does not support that bold assertion. Plaintiffs rely entirely on a Declaration from former EOIR adjudicators with no knowledge whatsoever about the data collection in this case. *See* Dkt. 2-1 at 36 (citing Dkt. 2-7). Moreover, the Declaration's own assertions establish the limitations of Plaintiffs' striking contention; the coding methodology utilized by EOIR does not capture cases with exactitude, given the multiple decisional outcomes that may be nested within a single case. *See* Dkt. 2-7 at 4. The data is thus not "faulty," just imperfect, as any broad collection may be, especially where the underlying data to be captured is nuanced and not necessarily susceptible to a simple distillation. *See, e.g., Ashland Exploration, Inc. v. FERC*, 631 F.2d 817, 822 (D.C. Cir.

1980) (agencies "may rationally turn to simplicity … and administrative convenience" in compiling relevant data).

Nor is there any indication that there is a significant problem with the numbers as proffered by the Rule. Plaintiffs contend that appeals were sustained in 450 cases over a 15-month period (10/1/23 – 12/31/24), *see* Dkt. 2-7 at 4, whereas the Rule asserted that appeals were sustained in only 123 cases over an overlapping 23.5-month period (10/1/23 – 9/15/25), *see* 91 Fed. Reg. at 5,270 n.8. A difference of a couple hundred cases out of *tens of thousands*, *see* 91 Fed. Reg. at 5,270 n.8, is not statistically significant and does not establish any error in how EOIR collected the data or in how it made use of the data it collected. Indeed, even if the Agency adopted Plaintiff's data, it would not change the underlying point: regardless of whether the number is 123 or 450 out of a population of over 40,000, the overwhelming majority of appeals to the Board are dismissed. At bottom, Plaintiffs seem to argue that the Department had to establish its data-set with absolute accuracy. But Plaintiffs are not entitled to a form of data review that embodies 100% accuracy and are not entitled to any particular form or manner of data collection, beyond a methodology that allows the Department to make a reasoned choice based on available evidence. *See White Stallion Energy Ctr., L.L.C. v. EPA*, 748 F.3d 1222, 1248 (D.C. Cir. 2014) (concluding that agency's "data-collection process was reasonable, even if it may not have resulted in a perfect dataset"); *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994) (agency may use model or methodology "even when faced with data indicating that it is not a perfect fit"); *Hispanic Affairs Project*, 901 F.3d at 392 (a "less than perfect" dataset "does not amount to arbitrary decision-making"); *cf. Allied Local & Reg'l Mfrs. Caucus v. U.S. EPA*, 215 F.3d 61, 71 (D.C. Cir. 2000) ("[w]e generally defer to an agency's decision to proceed on the basis of imperfect scientific information"). The

Department undertook that review in this case and offered permissible reasons for the decision it ultimately reached; arbitrary-and-capricious review requires nothing more.

5.    <strong>The Attorney General reasonably considered the effect of the Rule on the courts of appeals.</strong>

The Department explicitly considered the Rule's impact on the courts of appeals. 91 Fed. Reg. at 5,271 n.14; *contra* Dkt. 2-1 at 37. The Rule notes "there is no logical reason to expect [this regulation] to change parties' behavior" regarding petitions for review filed with the courts of appeals because aliens who receive a favorable decision will not appeal and those who receive an unfavorable decision will. 91 Fed. Reg. at 5,271 n.14. Therefore, aliens who receive an adverse decision will be expected to appeal, as they would have prior to the Rule, so it "should have no impact of the net volume of appeals over time" or "cause a significant increase" in petitions for review. *Id*. The Rule further acknowledges the potential for an "increase in the number of petitions for review filed per year" due to its goal of increasing the number of Board decisions issued per year. *Id*. But "[t]his potential does not outweigh the Department's significant interest in timely adjudications." *Id*. "When conducting arbitrary-and-capricious review, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Sierra Club v. FERC*, 153 F.4th 1295, 1304 (D.C. Cir. 2025) (cleaned up).

Plaintiffs' contention that the Department "altogether ignores" that the Rule "strips the BIA of its ability to correct IJ errors [] by requiring parties to make their whole case without a 'complete record' of removal proceedings," Dkt. 2-1 at 37 (quoting 8 U.S.C. §1229a(b)(4)(C)), is premised on a misreading of the Rule. As discussed, the statute does not require that the record be made available on a particular timeframe, and the complete record will continue to be compiled and kept under the Rule. Importantly, any record will be available for purposes of review before the courts of appeals.  And if the record in a particular case is, for some reason, not available for judicial

review, the alien can certainly make that argument to the courts of appeals, who can hold the case for the filing of the complete record or remand where the record is incorrect.

Plaintiffs also allege the Rule includes a "waiver requirement" and fear that "requirement" will result in claims being rejected as waived by appellate courts. Dkt. 2-1 at 37; *see id*. at 10 ("Moreover, the IFR mandates that any argument not raised in the Notice of Appeal be deemed 'waived.' 91 Fed. Reg. 5,278."). As discussed, nothing in the Rule indicates that aliens must raise issues in their Notices of Appeal with the merits-level precision they presume. Additionally, Plaintiffs fail to consider that pro se pleadings "must be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers," *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 591 (D.C. Cir. 2025) (cleaned up). The courts of appeals regularly apply this principle to immigration petition-for-review cases. *Sembiring v. Gonzales*, 499 F.3d 981, 990 (9th Cir. 2007) ("It is a long-established principle that the submissions of pro se [petitioners] should be liberally construed.").

### 6.    The Attorney General considered reasonable alternatives to the IFR.

Plaintiffs argue that the Rule fails to consider "reasonable alternatives," Dkt. 2-1 at 38, but that strange argument is belied by the Rule itself. For instance, Plaintiffs contend that "[o]ne readily apparent alternative was to increase the size of the" Board. *See id.* Alterations to the size of the Board were explicitly noted in the Rule, which went on to observe that a larger Board has traditionally proven less efficient in disposing of appeals. *See* 91 Fed. Reg. at 5,269 n.4 (citing 90 Fed. Reg. 15,525 (April 14, 2025)). Thus, this alternative was sufficiently raised and considered and then rejected for permissible reasons—inefficiencies from an expanded Board obviously do not fit with the efficiency-directed justifications for the Rule.

Plaintiffs also fault the Department for not considering an older report commissioned on the problem of backlogs in the broader immigration system. *See* Dkt. 2-1 at 38. But they offer no compelling argument that this report contains recommendations relevant to the efficiency rationales animating this Rule. For instance, Plaintiffs note a recommendation that immigration judges provide written, rather than oral, decisions, as a way to make appeals more efficient. *See ibid.* That recommendation clearly offers no efficiency gains—it delays issuance of the IJ's decision for an unspecified period of time between the merits hearing and whenever a written decision may be produced without in anyway changing the disposition or bottom-line rationale to be utilized. Nor do Plaintiffs otherwise offer hypothetical reasonable alternatives that "should" have been considered. And Plaintiffs make these assertions without acknowledging the repeated efforts that the Attorney General has made over the past two decades to address the problem.

An agency is required to consider *reasonable* alternatives, not every conceivable path potentially open to it in pursuing its stated goal. *See Spirit Airlines, Inc. v. U.S. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) ("An agency is required to consider responsible alternatives to its chosen policy.") (internal quotation marks and citation omitted); *see also Laclede Gas Co. v. Fed. Energy Regul. Com.*, 873 F.2d 1494, 1498 (D.C. Cir. 1989) (requiring consideration of "facially reasonable alternatives") (emphasis added). The Rule considered the possibility of an expanded Board, which is the only ostensible reasonable alternative consistent with the efficiency aims of the Rule, and tellingly, Plaintiffs point to no other alternative that the agency should have considered. Nothing more was required. *Cf. Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) (agency acted reasonably in only considering binary alternatives, i.e., whether to take proposed action or not take proposed action).

III.    **Plaintiffs Cannot Establish Irreparable Harm, and the Balance of Equities Tips in the Government's Favor.**

Plaintiffs are not aliens in removal proceedings. Their fear that the IFR will "upend[] access to a full and just removal process with every provision it enacts," Dkt. 2-1 at 41, is of irreparable harm to *others*, not themselves. That does not entitle them to a stay of the IFR. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (stating that, to obtain preliminary relief, a movant must show "that it would suffer irreparable injury" absent that relief (emphasis added)).

As the Supreme Court has held, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of" that relief. *Winter*, 555 U.S. at 22. The Court expressly rejected that "a strong likelihood of prevailing on the merits" permits preliminary relief to be entered "based only on a 'possibility' of irreparable harm." *Id.* at 21. Thus, "[t]he requirement of showing irreparable harm is an independent requirement: if a plaintiff does not demonstrate that it is likely to suffer irreparable harm in the absence of preliminary relief, the Court may deny the motion without considering the other factors." *Fla. EB5 Invs., L.L.C. v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020). And "[e]ven if the other three factors entering the calculus merit such relief," "[a] movant's failure to show any irreparable harm is [still] grounds for refusing to issue" that relief. *Dallas Safari Club v. Bernhardt*, 453 F. Supp.3d 391, 398 (D.D.C. 2020). Indeed, *Winter* compels an even stronger conclusion—a failure to show "that irreparable harm is *likely* in the absence of" preliminary relief is by itself dispositive of a motion for that relief. 555 U.S. at 22.

Moreover, to demonstrate irreparable harm, Plaintiffs must meet a "high standard." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. They must show both that the harm is "certain and great, actual and not theoretical, and so imminent that there is a clear and present need

for equitable relief to prevent irreparable harm" and that the harm is "beyond remediation." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016).

Plaintiffs' speculation about how the IFR will affect their operations does not carry that heavy burden. *See* Dkt. 2-1 at 37–41. As explained in Defendants' standing arguments, the indirect downstream effects of the IFR on how Plaintiffs choose to allocate their resources are not legally cognizable injuries—much less irreparable harm supporting preliminary relief. Even if the IFR did mean that their clients are less likely to prevail in removal proceedings, that does not constitute irreparable harm to Plaintiffs. Plaintiffs will still be free to work the same amount to represent their clients. Perhaps it is true that they will not be able to represent as many clients with that same amount of work if they choose to pursue "many more" petitions for review, *id.* at 37, or administrative appeals, *id.* at 38–39. Again, that would still be harm to the aliens they do not take as clients, not Plaintiffs themselves. Likewise for Plaintiffs' fear of difficulties for pro se or detained aliens in pursuing administrative appeals, *id.* at 39–40, and their fear of not being able to find pro bono attorneys for aliens appealing their removal orders, *id.* at 40–41.

Beyond that, Plaintiffs' speculations about how much more work it will be to represent their clients are "theoretical," not "actual" and "certain" as they must be to sustain a finding of irreparable harm. *League of Women Voters*, 838 F.3d at 7-8. They incorrectly assert a need to undertake "full briefing of the issues in just 10 days." Dkt. 2-1 at 37. They need only *state* the issues they intend to appeal on behalf of their clients on the notice of appeal within 10 days. 91 Fed. Reg. 5,278 (amending 8 C.F.R. §1003.38(b)(3) to provide that "[a]ny issue not raised in the Notice of Appeal … shall be deemed waived"). Nor do they explain why they must prepare full briefing just for the notice of appeal for every client without any regard for the merits of a client's case. They also overstate the need for "full case investigation [and] legal research." *See* Dkt. 2-1

at 37. For cases that Plaintiffs already handled in immigration court, Plaintiffs would already know the pertinent background and legal issues. And Plaintiffs cite nothing to indicate how many appeals they take where they did not represent the alien in immigration court. *See id.*

Plaintiffs also exaggerate the "uncertainty" surrounding which cases will be referred for full briefing. *Id.* at 38. To the extent they cannot exercise professional judgment to predict what appeals are most likely to be meritorious, they will be able to see which appeals are accepted after the IFR comes into effect. And even if there were uncertainty about the deadline as to appeals involving asylum, Plaintiffs can remediate that uncertainty simply by doing as some of them have already said they would do—"assume the deadline is 10 days." Dkt. 2-1 at 38 (citing Mayer-Salins Decl. ¶ 24); *see also id.* at 40 (stating that "HIAS attorneys would need to presume that all potential appeal clients face a ten-day filing deadline" (quoting Brown Decl. ¶ 26)).

Finally, Plaintiffs' feared self-inflicted financial injuries are not sources of irreparable harm. *See* Dkt. 2-1 at 42. The evidence Plaintiffs cite does not establish that Plaintiffs will with any "certain[ty]" experience "actual" and "great" financial harm that is "beyond remediation." *League of Women Voters*, 838 F.3d at 7–8. Plaintiffs cite unspecified "deliverables" they must meet to receive their funding, but they do not give any details to explain how many clients they must represent to retain the same amount of funding or how much funding they expect to lose once the rule goes into effect. *See* Koop Decl. ¶ 81. Instead, Plaintiffs express only a general fear that their funding will be "jeopardized," *id.*, pointing to nothing showing that the loss of funding will be great or imminent, *see* Dkt. 2-1 at 42. Nor do Plaintiffs argue that they cannot renegotiate the terms of their funding grants to change the metrics under which funding is provided—or that they cannot obtain replacement funding elsewhere. *See id.* Moreover, as Plaintiffs acknowledge, they can forestall a loss of funding simply by not taking as many petitions for review. *See* Mayer-Salins

Decl. ¶ 18 (stating that "taking PFRs are an inefficient way of meeting deliverables"). Plaintiffs have therefore not demonstrated they will, without preliminary relief, likely suffer clear, great, actual, imminent financial harm that cannot be remediated.

Because Plaintiffs have not demonstrated that they will likely suffer irreparable harm in the absence of preliminary relief, they are not entitled to that relief, regardless of the strength of their showings on the other stay factors. *Winter*, 555 U.S. at 22.

Moreover, Plaintiffs minimal harms are outweighed by the significant harms to the Government and the public interest. The harm to the party opposing the stay and the public interest merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, a stay ordering the Attorney General to halt implementation of the IFR would "deeply intrude[] into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1977), including the "efficient administration of the immigration laws," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). *See also INS*, 510 U.S. at 1305-06 (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government").

Furthermore, "[t]here is always a public interest in prompt execution of removal orders[.]" *Nken*, 556 at 436; *Id.* at 427 ("[A] reviewing court may not ... reflexively hold[] a final order in abeyance pending review.... The parties and the public [are] ... generally entitled to the prompt execution of orders that the legislature has made final."). A stay of the Rule would impede the Attorney General's efforts to address the delays in BIA adjudications and therefore hamper the Administration's ability to remove aliens, many of whom have no legal basis to remain in the United States.

## IV.    The Court Lacks Authority to Issue the Requested Relief.

### A.    The District Court's Stay Is Prohibited by 8 U.S.C. §1252(f)(1).

Section 1252(f)(1) strips the lower federal courts of the "jurisdiction or authority" to "enjoin or restrain the operation of" certain INA provisions (§§1221–1232)—including §1229a, which governs removal proceedings—"other than with respect to the application of such provisions to an individual alien against whom proceedings ... have been initiated."  8 U.S.C. §1252(f)(1); *see Nielsen v. Preap*, 586 U.S. 392, 402 (2019).  By its terms, this provision bars the lower federal courts from issuing any order that commands "federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," except in regard to "individual cases."  *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022); *see N.S. v. Dixon*, 141 F.4th 279, 288-90 (D.C. Cir. 2025).

The Court lacks authority under §1252(f)(1) to issue a stay of the Rule, which would interfere with the Attorney General's discretion regarding how it chooses to implement the removal process pursuant to 8 U.S.C. §1229a.  Section 1229a sets forth the procedures for removal proceedings before an IJ but is silent with regard to the administrative appellate review process.  Under her delegated authority pursuant to 8 U.S.C. §1103(g)(2), the Attorney General may regulate the appeals process and BIA review in order to meet the needs of the Nation's immigration system. Issuing an order to stop the Attorney General from implementing the Rule runs headlong into §1252(f)(1)'s bar by "restrain[ing] the operation" of one of the covered provisions, *Aleman Gonzalez*, 596 U.S. at 550-51. Stated another way, under §1252(f)(1), the Court cannot issue a universal stay dictating how the government implements §1229a.

The fact that §1229a does not address the appeals process in removal proceedings or the scope of BIA review does not preclude application of §1252(f)(1). In *N.S.*, the issue was whether

the district court had authority to issue an order enjoining Marshals from making a civil immigration arrest because they were not lawfully authorized to do so under a regulation. 141 F.4th 279. The D.C. Circuit rejected N.S.'s argument "that the injunction has only a collateral effect on the provisions covered by §1252(f)(1)" because it restrained only Marshals from making a civil immigration arrest. *Id.* at 289. The Court reasoned that §1252(f)(1) barred a court order that "directly and substantially restricts the ability of those federal officials to 'carry out' provisions covered by §1252(f)(1) and pro tanto frustrates enforcement of the law." *Id.* at 289; *Id.* at 290 (citing *Aleman Gonzalez*, 596 U.S. at 550) ("[T]he 'operation of the provisions' is a reference 'not just to the statute itself but to the way that [it is] being carried out'")). Likewise here, a §705 stay would "directly and substantially restrict" the Attorney General's ability to "carry out" the removal process covered under §1229a pursuant to her authority under 8 U.S.C. §1103(g)(2).

Furthermore, the fact that Plaintiffs seek a stay of agency action under the APA rather than an injunction does not matter. Section 1252(f)(1)'s text goes beyond orders that "enjoin," to include those that "restrain" a covered statute's operation. Section 1252(f)(1) thus broadly reaches all relief that prohibits the Government from "carry[ing] out" any covered provisions. *Garland v. Gonzalez*, 596 U.S. 543, 549-50 (2022). Regardless of whether a §705 stay would "enjoin" the Attorney General from implementing the new appellate procedures, there is no argument that a stay would not "restrain" her. *But see Make the Rd. N.Y. v. Noem* (*MRNY*), 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (statement of Millett and Childs, JJ.).

Indeed, a neighboring provision, §1252(f)(2), directly supports Defendants' position. In §1252(f)(2), Congress used only the word "enjoin"—not "restrain." Section 1252(f)(1) does include the word "restrain," and that deliberate addition must be given effect under well-

established principles of statutory construction. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("When Congress includes particular language in one section of a statute but omits it in another, this Court presumes that Congress intended a difference in meaning." (cleaned up)).

### B.    Any Relief Must Be Sharply Limited Under Traditional Equitable Principles.

Even if this Court were to grant relief, a universal stay would be inappropriate. Relief must be tailored to the specific claims made by the organizational Plaintiffs here. The Supreme Court held in *CASA* that the district courts' equitable powers do not include the authority to grant universal equitable relief. 606 U.S. at 841. Section 705 states:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending the conclusion of review proceedings.

5 U.S.C. §705.

When a court grants interim relief under that provision, it must adhere to the traditional equitable principle that equitable remedies "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *CASA*, 606 U.S. at 852 (citation and emphasis omitted). The Ninth Circuit concluded as much, and "limit[ed a] district court's §705 Stay order" to plaintiff's clients because *CASA*'s "complete-relief principle provides some useful guidance for crafting interim equitable relief" in §705 cases, which use the same traditional equitable principles that govern the preliminary injunctions at issue in *CASA*. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995-96 (9th Cir. 2025); *but see MRNY*, 2025 WL 3563313, at *36.

Congress ordinarily legislates against the backdrop of "established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024). If Congress seeks to "depar[t] from traditional equity practice," it ordinarily "ma[kes] its desire plain." *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944). Courts therefore must presume that a statute adheres to longstanding equitable

principles "absent a clear command" to the contrary. *Starbucks Corp.*, 602 U.S. at 346. The Supreme Court has "consistently employed this presumption when interpreting a wide variety of statutes." *Id.*; *see, e.g.*, *Nken*, 556 U.S. at 433-36; *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542-44 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *Hecht Co.*, 321 U.S. at 330. Section 705, however, contains no clear statement displacing "the party-specific principles that permeate our understanding of equity." *CASA*, 606 U.S. at 844.

To the contrary, §705 provides that a court may award interim relief only "to the extent necessary to prevent irreparable injury." 5 U.S.C. §705. The phrase "irreparable injury," in the context of interim equitable relief, refers to irreparable injury to the plaintiff—not irreparable injury to third parties. *See, e.g.*, *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish … that *he* is likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)). Granting relief to non-parties is in no way "necessary to prevent irreparable injury" to the plaintiff. 5 U.S.C. §705.

Plaintiffs bear the burden of showing that something short of the nationwide stay they seek will not fully redress their particular injuries. Here, any relief must be tailored to address only these organizational Plaintiffs' alleged resource-allocation and funding harms. Plaintiffs nevertheless ask that this Court stay the Rule as to every person who may have the Rule applied to them, regardless of whether that individual would have even likely sought out legal assistance from one of these organizations. *See generally* Dkt. 2-1. Such a remedy would go far beyond *CASA*'s "complete relief" principle.

## CONCLUSION

This Court should deny Plaintiffs' motion for summary judgment and deny Plaintiffs' alternative motion for a §705 stay.

Dated:  March 4, 2026                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         *Assistant Attorney General*


                                         DREW C. ENSIGN
                                         *Deputy Assistant Attorney General*


                                         TYLER BECKER
                                         *Counsel to the Assistant Attorney General*
                                         U.S. Department of Justice, Civil Division
                                         950 Pennsylvania Avenue, NW
                                         Washington, DC 20530


                                         /s/ *Papu Sandhu*
                                         PAPU SANDHU (Mass. Bar No. 630090)
                                         *Assistant Director*
                                         *Papu.sandhu@usdoj.gov*
                                         (202) 616-9357


                                         PATRICK J. GLEN
                                         Senior Litigation Counsel


                                         CHRISTOPHER IAN PRYBY
                                         JOSH A. CLEM
                                         BRONWYN H. NAYCI
                                         Trial Attorneys
                                         U.S. Department of Justice, Civil Division
                                         Office of Immigration Litigation
                                         P.O. Box 868 Ben Franklin Station
                                         Washington, DC 20044


                                         Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2026, I electronically filed the foregoing Opposition

with the Clerk of the Court for the United States Court of for the District of Columbia by using

the CM/ECF system.  Counsel in the case are registered CM/ECF users and service will be

accomplished by the CM/ECF system.

*/s/ Papu Sandhu*
PAPU SANDHU
Assistant Director
U.S. Department of Justice
