**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS *et al.*, <br><br>         *Plaintiffs*, <br><br> v. <br><br> EXECUTIVE OFFICE FOR IMMIGRATION REVIEW *et al.*, <br><br>         *Defendants*. | Case No. 1:26-cv-00696 |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR EMERGENCY STAY
UNDER 5 U.S.C. § 705**

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    Defendants' Threshold Arguments Fail ................................................................ 2

      A.    Plaintiffs have standing ............................................................................. 2

            1.    Plaintiffs will suffer harm to their core business activities because
                  of the IFR ...................................................................................... 2

            2.    Plaintiffs will suffer financial injury as a result of the IFR ............. 8

      B.    Plaintiffs are within the INA's zone of interests .................................... 9

II.   Plaintiffs Have Demonstrated Success on the Merits ........................................ 10

      A.    Defendants failed to comply with notice-and-comment procedures .......... 10

            1.    The foreign-affairs exception does not apply ............................ 10

            2.    The procedural rule exception does not apply ........................... 11

      B.    The IFR is contrary to the INA ............................................................ 14

            1.    The IFR contravenes the INA's right to counsel ...................... 14

            2.    The IFR contravenes Congress's deliberate decision in the INA
                  that the BIA should conduct meaningful appellate review .............. 18

            3.    The IFR violates 8 U.S.C. § 1158(d)(5)(A)(iv) .......................... 20

      C.    The IFR is arbitrary and capricious ..................................................... 21

            1.    Defendants failed to consider the impact of the IFR on noncitizens
                  and their counsel ........................................................................ 21

            2.    Defendants failed to account for recent, sweeping changes to
                  immigration court practice and how the IFR would exacerbate
                  existing barriers .......................................................................... 24

            3.    Defendants' transformation of the BIA failed to consider reliance
                  interests ...................................................................................... 25

            4.    Defendants relied on erroneous data ......................................... 26

            5.    Defendants failed to consider the impact of the IFR on the courts
                  of appeals ................................................................................... 27

            6.    Defendants failed to consider reasonable alternatives .............. 29

III.    The IFR Irreparably Harms Plaintiffs and the Equities Weigh in Favor of a Stay ........... 30

IV.     Plaintiffs Are Entitled to a Stay or Vacatur of the IFR in its Entirety ............................. 33

CONCLUSION .................................................................................................................... 34

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*AFL-CIO v. National Labor Relations Bd.*, 57 F.4th 1023 (D.C. Cir. 2023) ........................ 12, 14

*All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ..................................................................... 33

*Am. Gateways v. U.S. Dep't of Just.*, 01370, No. 25-cv-01370, 2025 WL 2029764
(D.D.C. July 21, 2025) ................................................................................................................. 8, 25

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ..................................................... 26

Ass'n of Am. Univs. v. Dep't of Def., 792 F. Supp. 3d 143 (D. Mass. 2025) ............................. 31

*Biwot v. Gonzales*, 403 F.3d 1094 (9th Cir. 2005) ........................................................................ 15

*CAIR Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ...................................................... 10, 11

*Campaign Legal Ctr. v. FEC*, 466 F. Supp. 3d 141 (D.D.C. 2020) ................................................. 3

*Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919 (N.D.
Cal. 2021) .................................................................................................................................. 24, 30

*CLINIC v. EOIR*, 513 F. Supp. 3d 154 (D.D.C. 2021) .................................................. 2, 9, 25, 33

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799 (2024) ..................... 34

*Cuevas v. I.N.S.*, 43 F.3d 1167 (7th Cir. 1995) ............................................................................. 19

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ..................... 26

*Dickson v. Sec'y of Def.*, 68 F.3d 1396 (D.C. Cir. 1995) .............................................................. 27

*Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112 (D.D.C. 2025) ................................... 21

*E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020) ........................................ 11

*E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58 (D.D.C. 2022) ................................................... 11

*EPIC v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1 (D.C. Cir. 2011) ...................................... 13, 14

*Escobar Molina v. DHS*, __ F. Supp. 3d ___, 2025 WL 3465518 (D.D.C. 2025) ...................... 34

*Escobar v. Garland*, 122 F.4th 465 (1st Cir. 2024) ...................................................................... 20

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ............................................... 25

iv

*Farmworker Ass'n of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311 (S.D. Fla. 2024) .................... 31

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ....................................................... 2, 3, 7

*Garland v. Aleman Gonzalez*, 596 U.S. 543 ...................................................................... 34

*Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002) ................................................................ 22, 23

*Gonzales-Julio v. INS,* 34 F. 3d 820 (9th Cir. 1994) .................................................................. 23

*Guentchev v. INS*, 77 F.3d 1036 (7th Cir. 1996)....................................................................... 18, 19

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................................. 2

*Hou Ching Chow v. Att'y Gen.*, 362 F. Supp. 1288 (D.D.C. 1973)................................................ 12

*Humana of S.C., Inc. v. Califano*, 590 F.2d 1070 (D.C. Cir. 1978).............................................. 11

*Humane Soc'y of the U.S. v. Dep't of Agric.*, 41 F.4th 564 (D.C. Cir. 2022)................................ 2

*Lamoille Valley R.R. Co. v. ICC*, 711 F.2d 295 (D.C. Cir. 1983)............................................ 13, 14

*League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ............................................................................... 3

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .............................. 30, 33

*Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ............................................................................................................... 33, 34

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................................................................ 2

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)............................................................................................................................ 9, 10

*Matter of C-I-G-M & L-V-S-G-*, 29 I. & N. Dec. 291 (BIA Oct. 2025) ...................................... 20

*Matter of R-C-R-*, 28 I. & N. Dec. 74 (B.I.A. 2020)...................................................................... 26

*McFarland v. Scott*, 512 U.S. 849 (1994)...................................................................................... 15

*MD/DC/DE Broadcasters Ass'n v. F.C.C.*, 236 F.3d 13 (D.C. Cir. 2001)................................... 14

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ...................................................................... 13

*Narenji v. Civiletti*, 481 F. Supp. 1132 (D.D.C.), rev'd on other grounds, 617 F.2d 745 (D.C. Cir. 1979) ................................................................................................ 11

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) .................. 33

*Nw. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31 (D.D.C. 2020) ............................................................................................. 2, 3, 10, 32, 33

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ........................................... 2, 4, 9, 10

*Ohio v. EPA*, 603 U.S. 279 (2024) ............................................................................... 23

*Ordonez Azmen v. Barr*, 965 F.3d 128 (2d Cir. 2020) ................................................... 20

*Orellana- Mejia v. Bondi*, No. 24-6224, 2026 WL 353248 (9th Cir. Feb. 9, 2026) .................. 19

*Orozco-Lopez v. Garland*, 11 F.4th 764 (9th Cir. 2021) ................................................. 17

*PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015) .............................................................. 3

*Portland Cement Ass'n v. EPA*, 665 F.3d 177 (D.C. Cir. 2011) ......................................... 24

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025) ......................................................................................... 2, 3, 4, 9, 10, 34

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100 (D.D.C. 2016) ............................................................................................................... 27

*Santos-Zacaria v. Garland*, 598 U.S. 411 (2023) ......................................................... 19

*Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005) .................................................... 11

*Taylor v. McKeithen*, 407 U.S. 191 (1972) .................................................................. 19

*Whitman-Walker Clinic v. HHS*, 485 F. Supp. 3d 1 (D.D.C. 2020) .................................... 4

*Yu Sheng Zhang v. Dep't of Justice*, 362 F.3d 155 (2d Cir. 2004) .................................... 18

**FEDERAL STATUTES**

5 U.S.C. § 705 ........................................................................................................... 2

8 U.S.C. § 1101(a)(47) ................................................................................. 12, 18, 33, 34

8 U.S.C. § 1158(b)(1)(B)(iii), ...................................................................................... 12

8 U.S.C. § 1158(d)(4)(A)-(B) ...................................................................................... 10

8 U.S.C. § 1158(d)(5) ................................................................................................ 18

8 U.S.C. § 1158(d)(5)(A) .................................................................. 12, 18, 20, 21

8 U.S.C. § 1158 (d)(5)(A)(iii) .................................................................................. 12

8 U.S.C. § 1158(d)(5)(A)(iv)…………………………………………………………..12

8 U.S.C. § 1225(2) ................................................................................................... 10

8 U.S.C. § 1225(b)(1)(B)(iv) .................................................................................. 10

8 U.S.C. § 1225(b)(1)(C) ......................................................................................... 20

8 U.S.C. § 1229a ............................................................................................... 15, 34

8 U.S.C. § 1229a(b)(4)(C) ....................................................................................... 20

8 U.S.C. §§ 1229a(b)(6) ........................................................................................... 12

8 U.S.C. §§ 1229a(c)(4)(C) ..................................................................................... 12

8 U.S.C. §§ 1229a(c)(5) ..................................................................................... 12, 18

8 U.S.C. § 1231(a)(1) ............................................................................................... 29

8 U.S.C. § 1231(a)(1)(B)(i) ..................................................................................... 33

8 U.S.C. § 1252(a)(1) ......................................................................................... 13, 20

8 U.S.C. § 1252(e) ................................................................................................... 20

8 U.S.C. § 1252(a)(2)(B) ........................................................................................... 8

8 U.S.C. § 1252(a)(2)(D) ......................................................................................... 20

8 U.S.C. § 1252(a)(5) ................................................................................................. 9

8 U.S.C. § 1252(b)(9) ................................................................................................. 9

8 U.S.C. § 1252(c)(1) ............................................................................................... 29

8 U.S.C. § 1252(d) ...................................................................... 5, 12, 13, 18, 19, 20

8 U.S.C. § 1252(f) ................................................................................................... 34

8 U.S.C. § 1362 ............................................................... 10, 12, 14, 15, 18, 34

## FEDERAL REGULATIONS

8 C.F.R. § 208.30(e)(6) ........................................................................... 20

8 C.F.R. § 1003.1 .................................................................................. 15

8 C.F.R. § 1003.1(a)(5) .......................................................................... 23

8 C.F.R. § 1003.1(d) .............................................................................. 26

8 C.F.R. § 1003.38 ................................................................................ 28

Appellate Procedures for the Board of Immigration Appeals, 91 Fed. Reg. 5,267 (Feb. 6, 2026) ............................................................. 1, 14, 15, 22, 26, 28

Reducing the Size of the Board of Immigration Appeals, 90 Fed. Reg. 15,526 (Apr. 14, 2025) ........................................................................................ 29

## INTRODUCTION

The Interim Final Rule (IFR), Appellate Procedures for the Board of Immigration Appeals, 91 Fed. Reg. 5,267 (Feb. 6, 2026), challenged in this case is the anthesis of reasoned and deliberate rulemaking required by the Administrative Procedure Act (APA). As Plaintiffs' uncontroverted evidence—and basic common sense—demonstrate, the IFR will significantly injure and irreparably harm Plaintiff organizations (an effect Defendants entirely ignored in promulgating the IFR); will eviscerate the Board of Immigration Appeals (BIA) as a functioning administrative body for congressionally mandated review of removal orders; and will by design close the BIA's doors to literally hundreds of thousands of noncitizens per year, thereby shielding the significant violations of noncitizens' due process and statutory rights occurring every day so that Defendants can rapidly expel as many noncitizens as possible before a court of review can do anything about it. It is no exaggeration to say that countless noncitizens who would likely prevail on appeal to the BIA but for this IFR will instead be wrongly deported to the very dangers they seek protection from, to face persecution, or worse.

Defendants' response turns a blind eye to reality. Defendants question Plaintiffs' standing as "speculative," positing that perhaps the IFR might not lead the BIA to summarily dismiss appeals that are not fully substantiated in the Notice of Appeal—ignoring that the IFR's very purpose is to bring about that result. Defendants suggest Plaintiffs' harms are "self-inflicted"— ignoring the IFR's inevitable consequences for Plaintiffs' core business activities, which are substantiated in detail in Plaintiffs' unrebutted declarations and by plain common sense. And Defendants suggest the IFR's pernicious consequences for the noncitizens Plaintiffs serve did not merit consideration in a notice-and-comment rulemaking process or any reasoned decision— dismissing those harms as the "unfortunate" cost of a more "efficient" BIA.

Those callous and dismissive fictions cannot save the IFR. Because the IFR and its goal of dismantling the BIA as a functioning appellate body violates the INA and the APA, causes Plaintiffs and many thousands of noncitizens immediate irreparable harm, and fails bedrock requirements for reasoned decisionmaking, the Court should postpone the IFR's effective date

under 5 U.S.C. § 705 and grant Plaintiffs summary judgment on their notice and comment claim.

## ARGUMENT

### I.   Defendants' Threshold Arguments Fail

#### A.  Plaintiffs have standing

Defendants create no factual dispute as to whether Plaintiffs have established (1) "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant," and (3) could be "redressed by a favorable decision." *Humane Soc'y of the U.S. v. Dep't of Agric.*, 41 F.4th 564, 567 (D.C. Cir. 2022). Although only one Plaintiff need have standing for the claims asserted, *see Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), each Plaintiff has readily demonstrated standing because the IFR harms their core business activities and causes financial injury to the organization. Defendants do not contest that Plaintiffs have established traceability and redressability. *See Nw. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 50 (D.D.C. 2020) ("NWIRP").

This Court, and other judges in this District, have held that similar organizational injuries—such as harms to operations or funding—are sufficiently concrete and non-speculative to establish standing. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem* ("*RAICES*"), 793 F. Supp. 3d 19, 67-69 (D.D.C. 2025); *NWIRP*, 496 F. Supp. 3d at 46-50; *O.A. v. Trump*, 404 F. Supp. 3d 109, 142-43 (D.D.C. 2019); *CLINIC v. EOIR*, 513 F. Supp. 3d 154, 169-71 (D.D.C. 2021). Defendants fail to address any of these cases in their brief.

#### 1.   Plaintiffs will suffer harm to their core business activities because of the IFR

Plaintiffs have organizational standing because the IFR directly interferes with their core programs providing legal representation and assistance to noncitizens in removal proceedings. "[O]rganizations may have standing 'to sue on their own behalf for injuries they have sustained.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024) (quoting *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 n.19 (1982)). As Defendants acknowledge, Dkt. 26 at 14 (Defs.' Mem. in Supp. Mot. Summ. J., herein "Opp."**)**, courts in this circuit have understood this test to be

met where "(1) the agency action or omission . . . injure[s] the organization's interest, and (2) the organization . . . used its resources to counteract that harm." *Campaign Legal Ctr. v. FEC*, 466 F. Supp. 3d 141, 153 (D.D.C. 2020) (citing *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)); *see also League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-946, 2025 WL 1187730, at *23 (D.D.C. Apr. 24, 2025) (observing that "[p]rior circuit precedent is consistent with the organizational-standing principles articulated in *Alliance for Hippocratic Medicine*").[1]

Plaintiffs readily satisfy that standard. The IFR "directly affect[s] and interfere[s] with [their] core business activities," which is sufficient to establish organizational standing. *All. for Hippocratic Med.*, 602 U.S. at 394–95 (quotation marks and citations omitted). Plaintiffs' core activities include providing direct legal services to noncitizens in removal proceedings, including representation of individuals before the IJs and the BIA, as well as pro se assistance to individuals who proceed without counsel. *See* Dkt. 2-5 at 2-3 (Mayer-Salins Decl. ¶¶ 6-7), Dkt. 2-3 at 2, 3 (Jones Decl. ¶¶ 6, 12); Dkt. 2-4 at 3 (Koop Decl. ¶ 11); Dkt. 2-6 at 3 (St. John Decl. ¶¶ 9-10); Dkt. 2-2 at 3 (Brown Decl. ¶¶ 9-10). These programs reflect Plaintiffs' central mission to protect the rights of noncitizens facing removal. *See* Dkt. 2-4 at 2, 18 (Koop Decl. ¶¶ 5, 86); Dkt. 2-6 at 2 (St. John Decl. ¶ 3); Dkt. 2-3 at 2 (Jones Decl. ¶ 5); Dkt. 2-2 at 8 (Brown Decl. ¶ 30); Dkt. 2-5 at 9 (Mayer-Salins Decl. ¶ 35).

The IFR materially impairs the quality and quantity of those services. If it takes effect, the IFR will immediately render Plaintiffs' representation of current clients far more labor-intensive and costly and significantly diminish their ability to take on new clients whom they otherwise would have been able to represent or assist through their pro se programs. Judges in this District routinely find organizational standing where government action "perceptibly impair[s]" an organization's service programs. *See, e.g.*, *NWIRP*, 496 F. Supp. 3d at 46-50 (organizational standing satisfied where challenged action "perceptibly impaired [Plaintiffs'] ability to provide

---

[1] This Court has noted that "[i]t is unclear whether" the second "use-of-resources" prong "is still required after *Alliance of Hippocratic Medicine*," but considered the requirement, "if it still exists," "out of an abundance of caution." *RAICES*, 793 F. Supp. 3d at 22 n.7. Plaintiffs meet the test in either formulation.

counseling and [application] services for low-and moderate-income [immigrants]") (citation omitted); *RAICES*, 793 F. Supp. 3d 19, 69 (organizational standing satisfied, including for Plaintiff FIRRP, where challenged action "will impair its ability to provide legal services to those seeking asylum, withholding of removal, and CAT protection); *O.A.*, 404 F. Supp. 3d at 142 (organizational standing satisfied for CAIR Coalition (now Plaintiff Amica) where the challenged rule would impair ability to "provid[e] direct legal services" and "if allowed to take effect, [would] impose substantial, tangible costs on the organization"); *Whitman-Walker Clinic v. HHS*, 485 F. Supp. 3d 1, 21 (D.D.C. 2020) (organizational standing satisfied where a clinic's "ability to provide adequate care and time to [its] patients" would be limited by the challenged action, and the clinic would have "to provide costlier and more involved treatment" (quotation marks and alteration omitted)).

Defendants do not meaningfully dispute that the IFR interferes with Plaintiffs' service programs. Instead, they argue that Plaintiffs' harms are "speculative," Opp. at 15, and "self-inflicted," *id.* at 14–15. Neither contention has merit.

First, Defendants' contention that Plaintiffs' injuries are "self-inflicted," Opp. at 14–15, is incorrect. Plaintiffs are not choosing to expend resources merely to oppose the IFR; they are responding to obligations they already have. Plaintiffs have existing clients with whom they have undertaken an attorney-client relationship, and have existing contractual obligations to support pro se individuals in removal proceedings. *See, e.g.*, Dkt. 2-2 at 7 (Brown Decl. ¶ 24) (explaining how the IFR's compressed appeal deadline will require attorneys to prepare appeals while simultaneously litigating other cases); *id.* at 4 (Brown Decl. ¶ 15) (describing a grant requiring "continuous legal services" that the IFR makes harder to fulfill); Dkt. 2-6 at 30-31 (St. John Decl. ¶ 100) (explaining that FIRRP represents approximately 100 clients with serious mental health issues under the National Qualified Representation Program, and the IFR will significantly increase the time and resources required to maintain their representation of these individuals). By compressing appellate timelines, the IFR directly burdens Plaintiffs' ability to carry out these commitments.

Second, Defendants' assertion that Plaintiffs' injuries are "speculative," Opp. at 15, fares no better. Plaintiffs point to their decades of experience practicing immigration law, including representation before the BIA, to explain the harms the IFR will cause. *See, e.g.*, Dkt. 2-6 at 2-3 (St. John Decl. ¶¶ 2, 5, 8), Dkt. 2-4 at 2 (Koop Decl. ¶¶ 1-4), Dkt. 2-3 at 2 (Jones Decl. ¶¶ 3-4). Based on Plaintiffs' common-sense interpretation of the IFR, and the IFR's stated goal of quickly dismissing BIA appeals to clear the backlog, Plaintiffs have clearly shown that the IFR materially impairs the quality and quantity of their services, as follows:

*First*, the IFR will force Plaintiffs to pursue substantially more petitions for review ("PFRs") in federal courts because it constrains their ability to correct IJ errors before the BIA. PFR litigation is far more time- and resource-intensive than BIA appeals, often requiring emergency motions for stays of removal and oral argument. Plaintiffs currently lack the staff, expertise, and funding to litigate PFRs at the volume the IFR will generate. *See, e.g.*, Dkt. 2-2 at 3 (Brown Decl. ¶ 11); Dkt. 2-6 at 6–7 (St. John Decl. ¶ 20); Dkt. 2-3 at 6 (Jones Decl. ¶¶ 28–29). As a result, diverting resources to PFR litigation will necessarily reduce the number of clients Plaintiffs can serve, *see* Dkt. 2-5 at 6 (Mayer-Salins Decl. ¶ 21), Dkt. 2-4 at 16–17 (Koop Decl. ¶ 79), and will "result in the deportation of [Plaintiffs'] clients who are eligible for immigration relief and status based on IJ decisions that contain legal and factual errors," Dkt. 2-3 at 6 (Jones Decl. ¶ 30).

*Second*, Plaintiffs will be required to devote more time and work on an expedited timeline just to preserve their clients' right to appeal an adverse IJ decision and avoid waiver of substantive issues, necessary steps before filing a PFR. *See, e.g.* 8 U.S.C. 1252(d) (requiring exhaustion of administrative remedies before filing a PFR). Under the current framework, attorneys have at least 7 weeks to prepare an appeal and supporting briefing, *see* 91 Fed. Reg. at 5,272. The IFR reduces that timeline to just 10 days because it requires that issues be fully articulated in the Notice of Appeal, or risk waiver. *See* Dkt. 2-4 at 7–8 (Koop Decl. ¶¶ 33–34); Dkt. 2-3 at 7–8 (Jones Decl. ¶¶ 36, 39). Attorneys will therefore have to review hearing recordings, reconstruct the record, research legal claims, and draft detailed appellate arguments within a drastically shortened

5

window. Plaintiffs' declarations explain that completing this work in 10 days will require significant additional resources and changes to case management systems. *See* Dkt. 2-5 at 8 (Mayer-Salins Decl. ¶ 30); Dkt. 2-4 at 9 (Koop Decl. ¶ 42).

While Defendants dispute that the IFR makes the Notice of Appeal "an extremely high-stakes document" requiring "exceptional detail and attention" akin to a full legal brief, Dkt. 2-6 at 17 (St. John Decl. ¶ 58), Opp. at 16, they do not contest the factual basis for Plaintiffs' conclusions.[2] *See, e.g.*, Dkt. 2-4 at 7-8 (Koop Decl. ¶¶ 33-34) (NIJC must keep informal transcripts, attach evidence, and fully explain legal arguments in the Notice of Appeal because no record will be transmitted to the BIA unless the case is not summarily dismissed); Dkt. 2-3 at 7, 8 (Jones Decl. ¶¶ 36, 39) (BDS must review digital audio recordings and file all written arguments in the Notice of Appeal to avoid summary dismissal and preserve appellate issues). That this work must now be completed in 10 days rather than 30 is undisputed.

Defendants incorrectly suggest that because most BIA appeals will no longer require merits briefing, Plaintiffs should not spend as much time on these appeals. Opp. at 16. This is incorrect for multiple reasons. Under current practice, Plaintiffs can raise issues in both the Notice of Appeal and the subsequent brief, avoiding waiver. Dkt. 2-4 at 7-8 (Koop Decl. ¶ 34). The IFR, by contrast, deems any issue not raised in the Notice of Appeal waived, and eliminates the opportunity to file merits briefs in most cases. Plaintiffs therefore must prepare detailed Notices of Appeal in just 10 days—the only window to persuade the BIA. Defendants offer no evidence that the IFR would function differently than Plaintiffs describe, and their conclusory statements do not controvert Plaintiffs' claims that they will need to dramatically change their case management systems to make appeals to the BIA feasible, *see* Dkt. 2-5 at 8 (Mayer-Salins Decl. ¶ 30), Dkt. 2-4 at 9 (Koop Decl. ¶ 42), and reduce the number of people they can represent on appeal.

---

[2] Indeed, Defendants' claims that Plaintiffs misinterpret the IFR demonstrate the harms that flow from the lack of notice and comment and the rush to implement this drastic change in how the BIA treats appellants and their attorneys. Were there a pre-implementation notice-and-comment period, Plaintiffs could have raised these concerns and received official agency guidance about the meaning of the IFR.

Even if a full brief were not required in 10 days, the compressed timeline forces attorneys with existing clients to choose among three harmful options: (1) complete weeks of work in 10 days, delaying or declining other cases; (2) add staff, diverting resources from other clients; or (3) forgo representation entirely. *See* Dkt. 2-2 at 7 (Brown Decl. ¶ 24). There is no way for Plaintiffs to maintain current service levels. *See* Dkt. 2-6 at 27 (St. John Decl. ¶ 88); Dkt. 2-3 at 4, 9 (Jones Decl. ¶¶ 16, 48); Dkt. 2-2 at 5 (Brown Decl. ¶ 19).

*Third*, the IFR will significantly hinder Plaintiffs' ability to provide pro se assistance or represent noncitizens who proceeded pro se before the IJ. These services are a central part of Plaintiffs' core work, and interference with them constitutes harm to the organizations themselves, not just to the individuals they serve. *See All. for Hippocratic Med.*, 602 U.S. at 394–95. As Plaintiffs previously explained, *see* Dkt. 2-1 at 42-43 (Pls.' Mem. in Supp. Mot. to Stay, herein "Pls.' Mem."), the curtailed timeline to file a Notice of Appeal means that Plaintiffs will no longer be able to conduct intakes with the majority of potential clients before their appeals are due. Dkt. 2-4 at 9, 11 (Koop Decl. ¶¶ 40, 52); Dkt. 2-5 at 7-8 (Mayer-Salins Decl. ¶ 28); Dkt. 2-2 at 7-8 (Brown Decl. ¶¶ 25-27); Dkt. 2-6 at 10-13 (St. John Decl. ¶¶ 38-51).

*Fourth*, the IFR will substantially impair Plaintiffs' ability to partner with pro bono attorneys on appellate representation, which will reduce their capacity to serve clients. Defendants dismiss this as "speculation," Opp. at 17, but ignore Plaintiffs' detailed explanation: under a 10-day timeline, there is insufficient time for firms to staff matters, resolve conflicts, and complete even basic BIA training. *See* Dkt. 2-5 at 9 (Mayer-Salins Decl. ¶ 33); Dkt. 2-4 at 12 (Koop Decl. ¶ 56). As a result, Amica Center can no longer place BIA appeals with pro bono attorneys, and NIJC has already been forced to cancel a pilot appellate pro bono project because the IFR makes it "impossible" to rely on pro bono attorneys—drastically limiting NIJC's ability to accept BIA appeals. Dkt. 2-4 at 4–5, 12 (Koop Decl. ¶¶ 19, 57). This is not a voluntary decision, as Defendants suggest, Opp. at 17, but a direct consequence of the IFR's constraints.

*Fifth*, the IFR will leave many noncitizens without meaningful appellate review at all. The BIA conducts de novo review of IJs' discretionary determinations, and federal courts lack

jurisdiction over such decisions. *See* 8 U.S.C. 1252(a)(2)(B). Many forms of relief—such as waivers of inadmissibility, adjustment of status, and cancellation of removal—are discretionary, meaning that under the IFR, many of Plaintiffs' clients will have no opportunity to challenge IJ denials. *See* Dkt. 2-2 at 9 (Brown Decl. ¶ 32). In addition, DHS has begun dismissing removal proceedings for noncitizens it anticipates may face expedited removal. *See* Pls.' Br. 33. Because IJ grants of these motions do not produce final removal orders, affected noncitizens cannot seek circuit court review. *See* Dkt. 2-4 at 7 (Koop Decl. ¶ 32); Dkt. 2-5 at 3-4 (Mayer-Salins Decl. ¶ 10). Thus, the IFR's gutting of administrative appellate review through default summary dismissals will mean that in many circumstances, Plaintiffs are left with *no* ability to vindicate their clients' appellate rights, directly impeding their provision of high-quality legal services.

### 2.    Plaintiffs will suffer financial injury as a result of the IFR

Plaintiffs have shown two independent sources of financial harm sufficient for standing. *See, e.g.*, Pls.' Mem. at 40, 45. Moreover, Defendants' request for jurisdictional discovery requests information on how Plaintiffs have attempted to mitigate financial harms from the IFR, *see* Dkt. 25 (Defs.' Mot. for Disc.), and therefore presumes that Plaintiffs *will* suffer financial harm from the IFR.

*First*, Plaintiffs Amica Center, Brooklyn Defender Services, NIJC, and FIRRP, serve as appointed counsel as part of the National Qualified Representative Program (NQRP), which funds representation for clients adjudicated incompetent to represent themselves. *See Am. Gateways v. U.S. Dep't of Just.*, No. 25-cv-01370, 2025 WL 2029764, at *10 (D.D.C. July 21, 2025). NQRP clients often require BIA intervention to correct errors by IJs who are unfamiliar with the situations of people living with serious mental illnesses and disabilities. Dkt. 2-6 at 22 (St. John Decl. ¶ 72 & n.3). But NQRP funding does not cover PFRs, Dkt. 2-6 at 30 (St. John Decl. ¶ 100), and because the IFR's summary dismissal provision will increase the need to file PFRs for NQRP clients, Plaintiffs will be forced to forgo appellate litigation for these vulnerable clients—even for those with meritorious claims—or divert resources from other services to file PFRs for NQRP clients.

Dkt. 2-6 at 30-31 (St. John Decl. ¶ 100); Dkt. 2-4 at 16-17 (Koop Decl. ¶ 79); Dkt. 2-5 at 5 (Mayer-Salins Decl. ¶¶ 18–19).

*Second*, many of Plaintiffs' funders provide payments based on the number of clients served. Because the IFR will force Plaintiffs to serve fewer clients, Plaintiffs will be unable to meet deliverables or maintain existing funding levels. Dkt. 2-4 at 16–17 (Koop Decl. ¶¶ 79, 81); Dkt. 2-5 at 4–5 (Mayer-Salins Decl. ¶¶ 18–21); Dkt. 2-6 at 29–31 (St. John Decl. ¶¶ 96–97, 100). Defendants offer no substantive challenge to Plaintiffs' conclusion that the IFR will make each case more labor-intensive and reduce Plaintiffs' capacity to serve clients.

### B. Plaintiffs are within the INA's zone of interests

Defendants do not address and therefore concede that neither 8 U.S.C. § 1252(a)(5) nor 8 U.S.C. § 1252(b)(9) strips this Court of jurisdiction. As several judges in this District have held, the INA does not bar nonprofit organizations from bringing "a facial challenge to the validity of a regulation of general applicability." *O.A.*, 404 F. Supp. 3d at 128; *CLINIC*, 513 F. Supp. 3d at 167. Instead, Defendants make the novel assertion that organizations—as a general matter—cannot fall within the INA's zone of interests as an attempted end-run around the well-established principle articulated in *O.A. See* Opp. at 21. That effort to exclude organizations from the INA's zone of interests lacks merit and improperly seeks to expand the jurisdictional bar.

The test for whether a plaintiff's interests fall within the zone of interests "is not meant to be especially demanding" and "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Plaintiffs easily exceed that low bar. Plaintiffs represent and assist noncitizens seeking review before IJs and the BIA—work that "furthers the purposes of the INA" to provide legal representation to noncitizens, *RAICES,* 793 F. Supp. 3d at 75-76, and is contemplated by the INA, *see e.g.*, 8 U.S.C. § 1225(b)(1)(B)(iv) (providing noncitizens with the right "to consult" before a credible fear interview); *id.* § 1229(b)(2) (requiring noncitizens in removal proceedings to be

provided a list of pro bono attorneys); *id.* § 1443(h) (requiring the Attorney General to work with "relevant organizations" to "broadly distribute information concerning" the immigration process); *id.* § 1158(d)(4)(A)-(B) (requiring list of services providers to be distributed to asylum seekers with advisal about the right to counsel); *id.* § 1362 (providing a right to counsel in any removal proceeding or appeal from removal proceedings). By no stretch of the imagination can Plaintiffs' interests be said to be "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indian*, 567 U.S. at 225.

For this reason, numerous courts in this District have already found that groups that provide legal and other direct immigration services—like Plaintiffs here—are within the zone of interest of the INA. *RAICES,* 793 F. Supp. 3d at 75-76; *O.A.*, 404 F. Supp. 3d at 144; *see also NWIRP*, 496 F. Supp. 3d at 52; *CAIR Coal. v. Trump*, 471 F. Supp. 3d 25, 43 (D.D.C. 2020). The government's under-developed argument fails to account for those decisions or make any attempt to demonstrate that Plaintiffs' interests are so "marginally related to or inconsistent with the purposes" of the laws Plaintiffs invoke that "it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225.

## II.  Plaintiffs Have Demonstrated Success on the Merits

The IFR's effective date must be vacated or stayed under the APA for several reasons: because it was promulgated without notice and comment procedures; because it is contrary to law under the APA; and because it is arbitrary and capricious under the APA. See Compl. ¶¶ 122–52. Plaintiffs have demonstrated success on the merits of each of these claims.

### A.  Defendants failed to comply with notice-and-comment procedures

#### 1.  The foreign-affairs exception does not apply

The foreign-affairs exception does not excuse notice-and-comment procedures because the IFR does not clearly and directly involve activities or actions characteristic of foreign relations. Pls.' Mem. at 13-15. Defendants' contrary arguments are meritless.

Defendants suggest that the court should not apply the "clearly and directly" standard

because it is derived from legislative history. Opp. at 34. But legislative history or not, that is the law of this circuit. As the D.C. Circuit held in *Humana*, the phrase "to the extent that there is involved" used in multiple provisions of § 553, including the foreign affairs provision, means that "any one of the enumerated categories is 'clearly and directly' involved in the regulatory effort at issue." *Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978). Defendants wisely do not suggest that phrase can mean different things in different statutes, and so their argument fails. *See Smith v. City of Jackson, Miss*., 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, . . . is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

Defendants also contend that the IFR satisfies the "clearly and directly" test because the IFR identifies the "purpose of [] international efforts and negotiations" to "streamline the removal process and encourage other countries to cooperate with the United States' efforts to remove illegal aliens and support the return of their citizens." Opp. at 35. As explained, this bare speculation— unsupported by evidence of supposed "negotiations" does not come close to "clearly and directly involv[ing] activities or actions characteristic to the conduct of international relations." *See E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 64 (D.D.C. 2022); Pls.' Mem. at 14-15. Rather, this is no different than the vague, barebones contention rejected by other courts to address the same argument. *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1279 (9th Cir. 2020) (rejecting identical argument in context of rule regulating asylum and removal proceedings); *CAIR Coal.*, 471 F. Supp. 3d at 44 (same); *see also Narenji v. Civiletti*, 481 F. Supp. 1132, 1137 (D.D.C.), *rev'd on other grounds*, 617 F.2d 745 (D.C. Cir. 1979) ("the executive [may not] invoke the foreign affairs exemption to control a matter that essentially involves naturalization and deportation"); *Hou Ching Chow v. Att'y Gen*., 362 F. Supp. 1288, 1290–91 (D.D.C. 1973) (same).

### 2.    The procedural rule exception does not apply

The IFR is not a procedural rule because it alters the rights and interests of regulated parties, imposes burdens that affect substantive outcomes, and encodes a substantive value judgment. Pls.' Mem. at 16-20. Defendants' contentions otherwise fail.

Defendants contend the "IFR does not alter rights or interests to which parties appearing before the BIA are entitled" because there is "no statute which clearly conveys the right to a BIA adjudication on the merits of an appeal, much less a specific timeframe, briefing schedule, or manner of consideration for such appeals." Opp. at 30. That is wrong. As explained in the initial motion and below, the INA provides for a right to counsel "in any appeal proceedings . . . from any [] removal proceedings," 8 U.S.C. § 1362, repeatedly refers to an administrative appeal, a *right* to such an appeal, and requires IJs to inform all noncitizens of "the right to appeal," *id.* §§ 1158(b)(1)(B)(iii), (d)(5)(A)(iii), (iv), 1229a(b)(6), (c)(4)(C), (c)(5), 1252(d), 1362, entitles noncitizens to a "complete record" of proceedings, *id.* § 1229a(b)(4)(C), requires the "Board of Immigration Appeals" to make a "determination" while referring to "review of such [a removal] order," *Id.* § 1101(a)(47), and mandates a 30-day appeal deadline for all asylum applicants. *Id.* § 1158(d)(5)(A)(iv). These provisions establish a carefully reticulated administrative and judicial review scheme designed to ensure noncitizens can fully and fairly present their claims in administrative proceedings and before federal courts of appeal, consistent with due process. The IFR wipes them away with the stroke of a pen, and puts the government thumb firmly on the scale of altering substantive outcomes by requiring summary dismissal of all appeals as the default rule, dramatically expanding BIA waiver rules, drastically shortening appeal deadlines, requiring simultaneous briefing, limiting extensions to "exceptional circumstances," eliminating review of transcripts by IJs before they are transmitted on appeal, preventing litigants from accessing a complete record prior to filing an appeal, and otherwise limiting BIA authority to extend deadlines or hold cases in abeyance for any reason. Far from simply "alter[ing] the manner in which the parties present themselves" to the BIA, *AFL-CIO v. National Labor Relations Bd.*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) (quotation marks omitted), the IFR completely eviscerates longstanding substantive and procedural "rights or interests of parties." *Id; see Lamoille Valley R.R. Co. v. ICC*, 711 F.2d 295, 328 (D.C. Cir. 1983) (explaining that if "a rule prescribes a timetable for asserting substantive rights," and "the time allotted is so short as to foreclose effective opportunity to make

one's case on the merits," a rule must is subject to notice and comment).[3]

Defendants dismiss these concerns, contending "[w]here an appeal to the BIA is summarily dismissed, the decision of the Immigration Judge below becomes the final agency decision absent the Attorney General's exercise of discretionary review" and "the [noncitizen] may continue to file a petition for review of a final removal order in accordance with the procedures set forth by Congress in 8 U.S.C. §1252(a)(1)." Opp. at 31. That ignores reality: under the IFR, the BIA will summarily dismiss appeals before a record is available, and the IFR deems waived all issues not raised in the notice to appeal. As government counsel conceded, in those circumstances the noncitizens' claims will be unexhausted, and thus waived, Dkt. 16, Hr'g Tr. (Feb. 27, 2026), 33:15-34:6—a radical departure from prior practice limiting access to "remedies available . . . as of right," 8 U.S.C. § 1252(d), and thus why notice and comment is required. *See Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) ("exception for procedural rules is narrowly construed, and cannot be applied where the agency action trenches on substantial private rights and interests." (cleaned up)). Defendants also waive away right to counsel concerns, contending the right is limited to "removal proceedings before the Immigration Judge." Opp. at 31–33. But that ignores Congress's clear directive that the right to counsel applies "[i]n any removal proceedings before an immigration judge *and in any appeal* proceedings before the Attorney General from any such removal proceedings." 8 U.S.C. § 1362 (emphasis added). So, again, the IFR clearly impacts substantive rights.

Defendants nevertheless suggest that the "IFR's streamlining provisions adjust only internal agency mechanisms by which the BIA will dispose of appeals," Opp. at 32, and "merely provides new procedures for the BIA in reviewing and disposing of appeals." *Id.* at 32. The ultimate question, however, "is one of degree depending upon whether the substantive effect is sufficiently

---

[3] Even were the government correct—which it is not—that the INA does not afford noncitizens these various rights and protections, the IFR fails the procedural rule test for another reason: the government has chosen to confer on noncitizens the very substantive and procedural protections, through decades of rulemaking, BIA precedent, and practice, such that eliminating it in so radical a change to prior practice requires notice and comment procedures. *Cf. EPIC v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5–6 (D.C. Cir. 2011).

grave so that notice and comment are needed to safeguard the policies underlying the APA." *EPIC*, 653 F.3d at 5–6 (quotation marks omitted). As explained, that is the case here.

Last, Defendants appear to contend the court should carve up the IFR and suggest individual pieces are mere internal mechanisms. The Court must view the collective whole, which cumulatively upends settled expectations and makes receiving a reasoned appeal determination virtually impossible. *See Lamoille Valley*, 711 F.2d at 328.

In the same vein, Defendants contend that the court should conduct a severability analysis should it find notice and comment required, suggesting the D.C. Circuit did so in *AFL-CIO*, 57 F.4th at 1049. Opp. at 33. But that fundamentally misreads *AFL-CIO* and this Circuit's severability law. In *AFL-CIO*, the government actually identified each individual provision of the challenged rule it contended was procedural, and, to the extent a provision was procedural, explained how each provision operated independently of one another. 57 F.4th at 1043-49. The government has done no such thing here. Instead they contend that the IFR as a whole is procedural without identifying any specific provision that is or is not procedural or explaining how, if some provisions of the IFR are not procedural, the other provisions "could function sensibly without [the stayed] provisions." *MD/DC/DE Broadcasters Ass'n v. F.C.C.*, 236 F.3d 13, 22 (D.C. Cir. 2001). Nor could they, even had they tried. Here, each of the challenged provisions of the IFR work together to erect substantive and procedural hurdles that foreclose fair consideration of a noncitizen's appeal. Indeed, the entire "efficiency" rationale for the IFR depends on the 10-day automatic dismissal provision—without which, the IFR concedes, the immigration courts would not "function more efficiently." 91 Fed. Reg. at 5,270. That provision is beyond doubt not procedural, and without its scaffolding, the entire IFR must fall. In any event, there are multiple other grounds to stay the IFR unrelated to notice and comment, so severability is doubly improper here.

### B. The IFR is contrary to the INA

#### 1. The IFR contravenes the INA's right to counsel

The IFR fundamentally interferes with (1) the ability of pro se and/or detained noncitizens to find counsel; and (2) noncitizens' ability to receive their counsel's advice and assistance on

appeal. This violates the INA, which guarantees a right to counsel not only in removal proceedings before an IJ, but in "any appeal proceedings before" the BIA.  8 U.S.C. §§ 1362, 1229a; *see also* 8 C.F.R. § 1003.1 (delegating authority to the BIA). And the INA's right to counsel means that a noncitizen must have a meaningful opportunity to retain counsel and for counsel to have a meaningful opportunity to represent their client. *See Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) *McFarland v. Scott*, 512 U.S. 849, 858 (1994). Defendants contest none of this.

Contrary to Defendants' contention, Plaintiffs *did* demonstrate that "individuals who proceed pro se before the immigration court seek counsel for appellate purposes" or "that represented [noncitizens] switch counsel or seek to do so in the same timeframe." Opp. at 24. Defendants also concede in the IFR that "the Department recognizes that some [noncitizens] whose cases are subject to the 10-day appeal period in this IFR may seek counsel to assist with their appeals after they receive a removal order." 91 Fed. Reg. at 5,272 n.16. As Plaintiffs explained, a core component of Plaintiffs' work includes advice to pro se noncitizens and taking new cases for appeal after the noncitizen has lost in front of the IJ. *See* Pls.' Mem. at 29 (citing Dkt. 2-6 at 5, 7 (St. John Decl. ¶¶ 18, 21–22); Dkt. 2-4 at 4 (Koop Decl. ¶¶ 15–16); Dkt. 2-2 at 3 (Brown Decl. ¶ 10)). For example, HIAS provided examples of two of their clients—one who proceeded pro se before the IJ, Dkt. 2-2 at 6 (Brown Decl. ¶ 23), and one who was represented by a different counsel before the IJ, *id.* at ¶ 22, and described how HIAS could not have adequately represented either client under the IFR's 10-day appeal deadline.[4] And NIJC "represented more than 88 individuals in their cases before the BIA" in 2025, many of whom "were *pro se* in the immigration court and often they were detained in detention centers around the country." Dkt. 2-4 at 4 (Koop Decl. ¶ 15). NIJC, too, explains how they would be unable to adequately represent these clients under the IFR's 10-day appeal deadline. *See id.* ¶¶ 35–47. Defendants confront none of this and provide no basis

---

[4] Defendants' repeated assertion that "even for represented [noncitizens] who for some reason require new counsel for appellate proceedings, that fact would have been spelled out in the representation agreement," Opp. at 24, 25, 40, entirely misses the point. Noncitizens may seek new counsel before the BIA for a myriad of reasons, including—critically—if there are grounds to claim ineffective assistance of counsel.

for their attempt to contradict the common-sense reality that many noncitizens may need to proceed pro se before the IJ, then will seek counsel when the IJ tells them that they will be deported.

Rather than dispute the factual basis showing that the IFR directly interferes with noncitizens' right to counsel—by sharply compressing the time for appellate counsel to be identified, accept representation, review the case, and prepare an appeal, *see* Pls.' Mem. at 21 (citing Dkt. 2-2 at 4, 6 (Brown Decl. ¶¶ 16, 21–23), Dkt. 2-4 at 7-8 (Koop Decl. ¶ 34); Dkt. 2-5 at 7 (Mayer-Salins Decl. ¶¶ 26–27), Dkt. 2-3 at 7 (Jones Decl. ¶ 33)—Defendants offer only an unsupported assertion that noncitizens will "have months, and often years, to obtain counsel prior to the need for any appeal to the Board," Opp. at 24. But reality belies this contention. Many noncitizens, particularly those who are indigent, are not able to have a lawyer on standby ready to represent them on appeal while they wait weeks, months, or over a year for an IJ decision—and all the while they will not know whether the IJ's decision will be adverse. And nowhere do Defendants contest that obstacles such as the week-plus wait time for intake appointments, *see, e.g.*, Dkt. 2-4 at 9 (Koop Decl. ¶ 40); Dkt. 2-2 at 7 (Brown Decl. ¶ 25), and the several-day process to request and receive the oral record of the IJ proceedings, *see e.g.*, Dkt. 2-6 at 12 (St. John Decl. ¶¶ 45–46); Dkt. 2-5 at 7 (Mayer-Salins Decl. ¶ 27), seriously hinder, if not preclude, the ability of noncitizens who proceeded pro se before the IJ to obtain counsel in time to file the Notice of Appeal. *See* Dkt. 2-1. at 22. While Defendants opine (Opp. at 26) that "counsel should [not] be unable to file an adequate notice of appeal within ten days," they make no genuine attempt to controvert Plaintiffs' sworn affidavits that it is extremely difficult—and impossible in some instances for pro se and/or detained noncitizens—for counsel to identify all appealable issues, Pls.' Mem. at 23–24, without the benefit of a written transcript, *id*. at 24, and effectively have to substantively brief these issues to avoid summary dismissal, *see, e.g.*, Dkt. 2-4 at 7 (Koop Decl. ¶ 30) ("This puts attorneys in an impossible position of having to rapidly file robust Notices of Appeal that fully present legal arguments even in the absence of complete information, in order to maximize the chances that their client's case will not be summarily dismissed."). Nor do Defendants rebut Plaintiffs' point that any forfeiture of appealable issues—which the IFR will

make more commonplace—will impair immigration counsel's ability to vindicate the noncitizens' rights in federal court. *See* Pls.' Mem. at 24. The IFR's arbitrary briefing schedule and limitation on extensions only compounds these difficulties. *See* Pls.' Mem. at 24.

Defendants also make no mention whatsoever of the IFR's impact on the right to counsel of detained noncitizens—who are unable to reliably contact their counsel from ICE detention—and therefore Defendants have effectively conceded Plaintiffs' argument that the IFR will cause detained noncitizens to face extreme difficulty meaningfully exercising their right to counsel. *See* Pls.' Mem. at 23 (citing Dkt. 2-4 at 8-9 (Koop Decl. ¶¶ 38, 40); Dkt. 2-6 at 14-17 (St. John Decl. ¶¶ 52–55); Dkt. 2-3 at 7 (Jones Decl. ¶ 33)).

Betraying the weakness of their defense, Defendants resort to the argument that if a noncitizen "fails to obtain counsel in such circumstances, that may be unfortunate, but it is not a violation of any statutory right." Opp. at 25. That, however, sidesteps the thrust of Plaintiffs' argument, which is that while the INA does not guarantee that the noncitizen will be represented by counsel in every instance, it does guarantee that noncitizens have a meaningful opportunity to retain counsel, and once they have done so, an opportunity for counsel to preserve their rights. *See* Pls.' Mem. at 20–21. Defendants make no effort to explain how the IFR complies with that well-established meaning of the INA's right to counsel. In fact, the case cited by Defendants, *Orozco-Lopez v. Garland*, 11 F.4th 764 (9th Cir. 2021), *see* Dkt. 24 at 24, proves Plaintiffs' point instead: "[t]o infuse the critical right to counsel with meaning, we have held that IJs must provide aliens with reasonable time to locate counsel and permit counsel to prepare for the hearing," which may depend on "the realistic time necessary to obtain counsel" and "any barriers that frustrated a petitioner's efforts to obtain counsel, such as being incarcerated or an inability to speak English." 11 F.4th at 778 (explaining that an IJ would not violate the INA by denying a continuance for a reasonable fear hearing in which "counsel's role is largely to help her client testify convincingly about her fear so that the IJ will find it reasonable").

### 2. The IFR contravenes Congress's deliberate decision in the INA that the BIA should conduct meaningful appellate review

The INA provides noncitizens with the right to appeal adverse IJ decisions. Many INA provisions either guarantee or contemplate the right to an administrative appeal. *See, e.g.*, 8 U.S.C. § 1158(d)(5) (right to administrative appeal for asylum applications); *id.* § 1158 ("rebuttable presumption of credibility on appeal"); *id.* § 1362 (right to counsel in removal proceedings before an IJ and "in any appeal proceedings before the Attorney General"); *id.* § 1158(d)(5)(A)(iii), (iv), (deadlines for administrative appeals in asylum cases); *id.* § 1101(a)(47) (requires the BIA to make a "determination" on the removal order); *id.* § 1229a(b)(6) (directing attorney general to define "the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed"); *id.* § 1229a(c)(5) (IJ must provide notice to noncitizen of "right to appeal"); *id.* § 1252(d)(1) (circuit courts may only consider a petition for review if "the [noncitizen] has exhausted all administrative remedies available to the [noncitizen] as of right"). *See also Yu Sheng Zhang v. Dep't of Justice*, 362 F.3d 155, 157 (2d Cir. 2004) ("Various sections of the Immigration and Nationality Act indicate that Congress did contemplate some form of appellate review of IJ decisions by the BIA.") (listing INA provisions).

Defendants' contention that Congress did not create the BIA is beside the point—Congress has created the right to an appeal, and the Attorney General has delegated the authority to decide the appeals to the BIA. Opp. at 26–27. And while Defendants cite *Guentchev v. INS*, 77 F.3d 1036 (7th Cir. 1996), for the proposition that the "Attorney General can dispense with the Board entirely and not run afoul of the INA," Opp. at 27, that is an inaccurate description of the dicta in that case, which instead was relevant to whether constitutional requirements would be satisfied in that hypothetical, *Guentchev,* 77 F.3d at 1037, and in any event predates Congress's major amendments to the INA in 1996, including the addition of section 1101(a)(47).

The IFR's summary-dismissal provision also flouts the INA's requirement that the BIA make a "determination" to affirm the IJs order. *See* Pls.' Mem. at 25. Defendants' response that "Plaintiffs place too much weight on the word 'determination'" is unpersuasive. Opp. at 27. Nor

do the prior cases on summary affirmance procedures, *see id.*, have any relevance here.[5] First, those cases appear to deal primarily with whether summary affirmances deny applicants due process (Defendants do not contend otherwise). *See, e.g.*, *Guentchev*, 77 F.3d at 1038. Second, in the summary affirmances at issue in those cases, the "Board's order says . . . that the Board agrees with the immigration judge's reasons."[6] *Id.* In other words, a BIA member actually reviews a file and makes a "determination." That is categorically unlike the IFR process, which requires the BIA to automatically dismiss appeals based solely on the expiration of a 10-day period—without any actual review or decision and without access to a complete record.

Moreover, it is clear from case precedent that the BIA does not have the discretion to not review an appeal. The premise of federal courts' consistent holdings that noncitizens "must exhaust their challenges to an IJ's conclusions before the BIA in order to preserve the issues for appeal," *Orellana- Mejia v. Bondi*, No. 24-6224, 2026 WL 353248, at *2 (9th Cir. Feb. 9, 2026), is that BIA review is available "as of right"—were it otherwise, section 1252(d)(1)'s requirement that noncitizens "exhausted all administrative remedies available to the [noncitizen] *as of right*" would not apply. 8 U.S.C. § 1252(d)(1) (emphasis added). And, as the Supreme Court has explained, an "'appeal as of right' is one over which the court has no discretion to deny review," *Santos-Zacaria v. Garland*, 598 U.S. 411, 424 (2023) (second quotation omitted). Because an appeal to the BIA is an appeal "as of right" within the meaning of 1252(d)(1), the BIA has no discretion to deny review.

The IFR also renders the INA's "complete record" requirement, 8 U.S.C.

---

[5] Defendants cite *Taylor v. McKeithen*, 407 U.S. 191, 194 n.4 (1972), in support of this proposition, but the principle in that footnote that "the courts of appeals should have wide latitude in their decisions of whether or how to write opinions" is inapposite. There is no opinion here.

[6] For example, in *Cuevas v. I.N.S.*, 43 F.3d 1167, 1170 n.1 (7th Cir. 1995), the summary affirmance decision at issue reads: "PER CURIAM. The appeal is dismissed. We have reviewed the record of proceedings, the immigration judge's decision, and the respondents' contentions on appeal. As we find that the immigration judge adequately and correctly addressed the issue of whether the respondents had proven their statutory eligibility for a grant of asylum or withholding of deportation, the decision below is affirmed in its entirety. The request for oral argument is denied. 8 C.F.R. § 3.1(e)."

§ 1229a(b)(4)(C)), meaningless by requiring parties to make their whole case, and the BIA to decide whether to conduct review, without the benefit of the record and then waive any issues not raised within the 10-day appeal deadline. *See* Pls.' Mem. at 25. While Defendants contend that the record will still be available for judicial review, *see* Opp. at 28, that is meaningless where noncitizens were already compelled to forfeit appealable issues that would be discoverable in any record under the IFR.

### 3.    The IFR violates 8 U.S.C. § 1158(d)(5)(A)(iv)

As explained, section 1158(d)(5)(A)(iv) provides for a 30-day appeal deadline in all cases involving an asylum claim, whether they arise under section 1158(a) or (b). Pls.' Mem. at 26-27. Defendants' sole rejoinder is that asylum applications arising under section 1158(a) are not subject to appeal at all, and so not subject to the 30-day deadline. Opp.  at 28-29. That is wrong. Whether someone is subject to the asylum bars codified at § 1158(a) is a question of law that is subject to judicial review, and thus administrative appeal. *See* 8 U.S.C. § 1252(a)(2)(D); *Ordonez Azmen v. Barr*, 965 F.3d 128, 136-38 (2d Cir. 2020) (reviewing on petition for review whether BIA correctly applied section 1158(a)(2), and reversing and remanding because the "BIA misinterpreted the asylum statute"); *Escobar v. Garland*, 122 F.4th 465, 477 (1st Cir. 2024) (similar, collecting cases).[7]

Defendants also deny that the IFR effectively requires all appeals, including of withholding or CAT claims, be filed in 10 days. Opp.  at 29. But, as explained, that will inevitably occur under the IFR given how immigration courts require noncitizens to litigate their claims for relief from removal. Pls.' Mem. at 26-27; Dkt. 2-6 at 10 (St. John Decl. ¶ 34). Defendants now attempt to narrow the IFR post hoc, suggesting that any case involving an "asylum application [decided] on

---

[7] Defendants point to regulations that govern the Safe Third Country Agreement with Canada, which arises under section 1158(a)(2)(A), to suggest noncitizens are not entitled to appeal. Dkt at 26-27. But those regulations apply in *expedited* removal proceedings, *see* 8 C.F.R. § 208.30(e)(6), from which no right to appeal arises. *See* 8 U.S.C. §§ 1225(b)(1)(C); 1252(a)(1), (e). Where section 1158(a)(2)(A) applies to regular removal proceedings, the noncitizen is of course entitled to an administrative and judicial appeal. *See Matter of C-I-G-M & L-V-S-G-*, 29 I. & N. Dec. 291 (BIA Oct. 2025) (reviewing claim arising under section 1158(a)(2)(A).

its merits," regardless of other relief, is subject to the 30-day rule. Opp. at 28. The IFR of course does not say that, but given Defendants' concession, the Court should find the IFR lawful with respect to section 1158(d)(5)(A) only to the extent it allows all applicants for asylum, under both section 1158(a) and (b), to appeal any decision in their case within 30-days, including if they raise other claims for relief.

### C.  The IFR is arbitrary and capricious

#### 1.  Defendants failed to consider the impact of the IFR on noncitizens and their counsel

The IFR's compressed timeline, default rule of summary dismissals, and waiver provision impose significant challenges for noncitizens and/or their counsel to appeal an adverse IJ decision—both before the BIA and ultimately in federal court. *See* Pls.' Mem. at 28–31. Indeed, Defendants have conceded that noncitizens will "be precluded from raising the issue [in the court of appeals] if they failed to exhaust it [before the BIA]." Hr'g Tr. 33:24–34:2 (Feb. 27, 2026).[8] And for detained pro se noncitizens, it will be altogether impossible to appeal an adverse IJ decision. *See* Pls.' Mem. at 28–31. These constraints directly undermine noncitizens' statutory and due process rights, yet Defendants failed to consider that the IFR would undermine noncitizens' rights under the INA and the Fifth Amendment, rendering their decision arbitrary and capricious. *See Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 146 (D.D.C. 2025).

Defendants' contrary position that they "expressly considered" the IFR's impact on noncitizens and their counsel lacks merit.[9] Opp. at 38. The only support that Defendants can muster is a citation to a single footnote in the IFR that perfunctorily states that "the Department recognizes that . . . decreasing the appeal period to 10 days may make it more difficult for [noncitizens that

---

[8] Defendants argued that individuals—such as detained or pro se individuals—who were unable to file a Notice of Appeal or identify every appealable issue in their notice could argue before the court of appeals that "there was some unfairness in the process that caused them to waive the issue." Hr'g Tr. at 34:2–2-3 (Feb. 27, 2026). But that would require courts of appeals judges to decide on a case-by-case basis—in tens of thousands of cases—that the IFR renders exhaustion before the BIA futile.

[9] Defendants also appear to claim that the IFR "addressed" these concerns, but nothing in their brief or the cited IFR footnote indicates that Defendants made any effort to alleviate the IFR's impact on noncitizens' statutory and constitutional due process rights. Opp. at 38.

seek counsel after adverse IJ decision] to find counsel" but nonetheless "believes that the benefits of the reforms in this rule outweigh that potential impact," 91 Fed. Reg. at 5,272 n.16. But that does not demonstrate reasoned decisionmaking under the APA. An agency cannot satisfy its obligation by merely acknowledging a rule's likely consequences and asserting—without analysis—that the benefits outweigh them. *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (Merely "stating that a factor was considered—or found—is not a substitute for considering or finding it.") (cleaned up). This is especially true where, as here, the IFR's consequences implicate critical statutory and constitutional rights. Yet Defendants made no attempt to analyze whether noncitizens would be able to comply with the IFR's requirements, and included no consideration of the practical realities identified in Plaintiffs' declarations regarding the time required to obtain records, confer with clients, and prepare an appeal—in plain violation of the APA. *See* Pls.' Mem. at 22–24.

Defendants do not and cannot argue that it will not be impossible for detained pro se noncitizens to appeal an adverse IJ decision altogether under the IFR. Opp. at 38. Nor do Defendants contest that they did not consider this consequence in the IFR. Instead, they respond that Plaintiffs "do not provide any specifics as to what percentage of their clients it will actually affect"—which has no relevance to whether the agency considered the consequences in the IFR— and that pro se noncitizens should simply retain counsel—which is similarly beside the point. *Id.* at 40. The agency did not consider the IFR's impact on detained pro se noncitizens, and Defendants' post hoc explanation does not withstand scrutiny. *See id.* at 39–40. And regardless of whether a pro se noncitizen is able to retain counsel *later*, that counsel's hands are already tied before the BIA and the court of appeals due to the IFR's appeal deadline and waiver provision.

Perplexingly, Defendants also argue that they were not required to consider the consequences to detained pro se noncitizens because of a "catch-all" footnote in the IFR that states that "there may be hypothetical or speculative situations in which the IFR will have some cost. Nevertheless, for the reasons given throughout this IFR, any such costs—if they even exist beyond the realm of the hypothetical—are far outweighed by the benefits of the IFR." *Id.* at 39 (quoting

91 Fed. Reg. at 5,276 n.22). As above, it is insufficient under the APA to merely say that the agency considered an issue (and here, Defendants did not even do that). *Gerber*, 294 F.3d at 185. In short, Defendants' response underscores the central defect in the IFR: Defendants acknowledged that the IFR would make it harder for noncitizens to obtain counsel and pursue an appeal, but they never meaningfully examined the scope or significance of that problem.

Defendants also ignore, and therefore concede, Plaintiffs' argument that the IFR failed to consider that the 10-day appeal deadline would render detained noncitizens proceeding pro se unable to appeal an adverse IJ decision, flouting their due process rights. Pls.' Mem. at 29–30. As Plaintiffs explained, the IFR will frustrate pro se individuals' ability to appeal to the BIA or the court of appeals because they lack reliable internet access (or access to the ECAS system), would have to rely on mail, and face additional obstacles, including language barriers, that require assistance—issues that existed before but which become insurmountable obstacles under the IFR's shortened timeline. Defendants "simply ignore[d]" this aspect of the problem, in violation of the APA. *Ohio v. EPA*, 603 U.S. 279, 293 (2024).

Defendants also miss the mark when arguing that "nothing in the Rule changes or affects how the Board evaluates appeals under its existing *en banc* procedures." Opp. at 41. The regulation they cite states that "[e]n banc proceedings are not favored, and shall ordinarily be ordered only where necessary to address an issue of particular importance or to secure or maintain consistency of the Board's decisions." 8 C.F.R. § 1003.1(a)(5). That is the extent of the guidance that noncitizens and counsel have when attempting to submit a Notice of Appeal that somehow warrants *en banc* review and properly preserves all issues for court of appeals review through a petition for review. Nowhere do Defendants define what is an issue of "particular importance" such that noncitizens and counsel are on notice of what may rise to the level of non-summary dismissal. As to the contention that the two deadlines applicable to asylum appeals need not have been addressed in the IFR, Plaintiffs' evidence from experienced practitioners that the IFR will cause confusion and cause them to file everything within 10 days and to avoid waiver belies Defendants' assertions. *See* Dkt. 2-6 (St. John Decl.) ¶ 34.

23

### 2.    Defendants failed to account for recent, sweeping changes to immigration court practice and how the IFR would exacerbate existing barriers

Defendants do not dispute that they failed to consider a number of recent agency and Congressional actions that drastically alter the procedures for noncitizens facing removal. Opp. at 41-42. Instead, they altogether ignore many of the changes to agency proceedings that Plaintiffs raise and attempt to minimize the few that they acknowledge. Defendants might disagree with Plaintiffs about the severity or wisdom of recent "significant policy and regulatory changes," but that does not excuse their failure to meaningfully consider the "interaction" of these actions and their cumulative impact on people in removal proceedings. *Centro de la Raza v. EOIR*, 524 F. Supp. 3d 919, 958 (N.D. Cal. 2021); *see also Portland Cement Ass'n v. EPA,* 665 F.3d 177, 187 (D.C. Cir. 2011).

Defendants clearly recognize the relevance of immigration court procedure, pointing to the right to a "trial-type hearing" with IJs as a sufficient procedural safeguard for noncitizens who lose administrative appellate review under the IFR. Opp. at 2, 27. Yet they provide *no* response to two of the fundamental changes instigated by the agency in the past year: 1) the widespread practice of dismissing noncitizens' proceedings over their objection for placement in expedited removal, resulting in IJ decisions that cannot be reviewed by the Courts of Appeal; and 2) EOIR's mass firing of IJs with substantive expertise and hiring of temporary IJs with no immigration law background and little training, thereby increasing the likelihood of IJ-level error. Pls.' Mem. at 33-34. But these actions fundamentally impact the procedures and correctness of outcomes in immigration court and thus the need for BIA review, rendering Defendants' failure to consider them when gutting such review arbitrary and capricious.

Similarly, Defendants misconstrue both the holdings and import of the agency decisions that they failed to consider. Opp. at 38. Those decisions do not create mere "procedural requirements" for filing asylum applications but in fact mean that thousands of noncitizens never have the opportunity for a "trial-type hearing" in immigration court at all, let alone a full or fair one. Pls.' Mem. at 25. *See* Dkt. 2-5 at 8, 9 (Mayer-Salins Decl. 30, 32) (describing speed with which IJs grant DHS pretermission motions); Dkt. 2-2 at 8, 10 (Brown Decl. ¶¶ 30, 37) (explaining

IJ practice to pretermit cases frequently including on eve of merits hearing). Their relevance to an IFR that further upends agency procedures for determining removability is self-evident, and Defendants do not defend their failure to provide a "reasoned explanation . . . for disregarding" them. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

And while Defendants address recent changes to BIA fees, they make no attempt to justify ignoring the combined impact of the IFR and the statutory fee increase on noncitizens, instead doubling down on the IFR's passing mention of the fee change in the context of efficiency. Opp. at 40.

### 3. Defendants' transformation of the BIA failed to consider reliance interests

Defendants provide no meaningful response to their failure to consider individuals' and organizations' reliance interests when decimating agency procedures that have protected noncitizens' appellate rights for decades. Opp. at 42-43. First, Defendants are simply incorrect that they should not have been expected to consider the IFR's impact on legal service providers. Courts in this district have explicitly held that failure to do so is arbitrary and capricious. *See* Pls.' Mem. at 40, 44, 45 (citing *CLINIC,* 513 F. Supp. 3d 175). As held in a similar case, when "multiple legal service providers raise[] the alarm that [agency rulemaking] would adversely impact their organizations and would depress their capacities to provide pro bono and low-cost legal services," EOIR's failure to consider that impact on the organizations was arbitrary and capricious. *CLINIC*, 513 F. Supp. 3d at 174; *see also Am. Gateways*, 2025 WL 2029764 at *4 (head of EOIR likely acted arbitrarily and capriciously by failing to consider how terminating program would impact "organizations that provide services to affected population," including Amica, FIRRP, and NIJC). Here, too, Defendants' failure to consider how the IFR would impact the legal service providers, many of whom are part of EOIR's own list of pro bono providers,[10] was arbitrary and capricious.

Nor does Defendants' belief that there is "no right" to a merits adjudication by the BIA excuse their failure to take reliance interests into account. Opp. at 43. Such an interest need not be

---

[10] EOIR, *List of Pro Bono Legal Service Providers* (Feb. 11, 2026), https://perma.cc/TNH4-TQ2N, EOIR, *List of Pro Bono Legal Service Providers* (Jan. 2026), https://perma.cc/SL2Q-VQME.

"legally cognizable" to require consideration by the agency. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30-31 (2020). Next, Defendants' repeated contention that the IFR is "prospective" also fails, as they do not contest that it applies to people currently in removal proceedings. Opp. at 42-43. Such individuals have, without question, made decisions in reliance on the understanding that they would receive a procedurally and substantively full and fair agency proceeding. *See Matter of R-C-R-,* 28 I. & N. Dec. 74, 77 (B.I.A. 2020) (collecting cases). That includes consideration of the availability of appellate proceedings to correct any IJ error in their cases. *See* Pls.' Mem.at 37. Take, for example, someone who draws an IJ with an extremely low asylum grant rate, as compared to the national average, who then retains costly private counsel because that attorney assures them that even if this IJ denies asylum, the BIA frequently reverses that IJ so they have a good chance on appeal. Or someone in the same position who chooses to forgo retaining expensive private counsel at the immigration court stage, upon assurances during a legal consult prior to this IFR that they could secure appellate counsel and preserve their rights that way. Or even someone similarly situated who chooses to remain detained to pursue relief because they have read the regulations that ensure "impartial" Board review. 8 C.F.R. 1003.1(d). Such self-evident reliance interests fly in the face of Defendants' conclusory statement that there "no logical reason" anyone would rely on appellate review. Opp. at 43 (citing 91 Fed. Reg. at 5,271). *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (agency's "conclusory statements will not do"). Lastly, while Defendants suggest that the reliance interests of noncitizens could be litigated in individual removal proceedings, Opp. at 43-44, that possibility has nothing to do with whether the agency adequately considered those interests in the IFR.

### 4. Defendants relied on erroneous data

Defendants concede that the data they rely on is "imperfect" and that "the coding methodology utilized by EOIR does not capture cases with exactitude." Opp. at 44. But they understate the significance of what amounts to about a 265% error rate in their statement of the numbers of successful appeals at the BIA. *See* Dkt. 2-7 at 3 (comment from former appellate immigration judges showing review of publicly available decisions establishes at least 450

sustained appeals in just a *one-year* period, compared with the IFR's calculation of 123 sustained appeals over a *two-year* period). Notably, Defendants do not suggest that these calculations are wrong and instead posit that the data is "nuanced" and "not susceptible to a simple distillation." Opp. at 44. Yet a simple—and erroneous—distillation is precisely what the IFR relies on to support its conclusion that the appealing party rarely succeeds at the BIA. And it is that conclusion that undergirds the Defendants' determination that it is appropriate to convert the BIA into a summary dismissal machine. Such action is arbitrary and capricious. *See Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 123 (D.D.C. 2016) ("[W]here an agency has relied on incorrect or inaccurate data or has not made a reasonable effort to ensure that appropriate data was relied upon, its decision is arbitrary and capricious and should be overturned.").

Moreover, as the former BIA judges' comment to the IFR points out, the disparity between Defendants' proffered number of sustained appeals and the actual number is likely even greater than the snapshot the comment provided, because Defendants "omitted thousands, if not tens of thousands, of cases that were remanded (and coded "REM") for further proceedings in light of an error, not merely for background checks or a new application for relief." Dkt. 2-7 at 4. Importantly, Defendants offer no explanation for why it is appropriate to rely only on a subset of data (those coded as "sustained") and not include other categories that encompass successful appeals. That renders their use of this data further arbitrary and capricious. *See Dickson v. Sec'y of Def.,* 68 F.3d 1396, 1404 (D.C. Cir. 1995) ("[T]he APA mandat[es] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision.") (citation omitted).

### 5. Defendants failed to consider the impact of the IFR on the courts of appeals

Defendants contend that they considered the impact of the IFR on the courts of appeals, but rest entirely on a footnote that disclaims any significant increase in petitions for review. *See* Opp. at 46; 91 Fed. Reg. at 5,271 n.14. Defendants claim, puzzlingly, that they expect no change in "behavior" of those who receive an unfavorable BIA determination, failing to acknowledge that

the logical result of the BIA summarily dismissing appeals will be for noncitizens to seek recourse through a petition for review at the circuit courts. *Id.* To the extent that Defendants concede a "potential" increase in petitions for review, the IFR's purported "efficiency" rationale swallows any meaningful consideration of the impact on the courts of appeals—and ignores historical evidence that prior BIA efforts to streamline adjudications resulted in a flood of petitions for review. *See* Pls.' Mem. at 37; Prepared Statement of Mary M. Schroeder, Judge, United States Court of Appeals, Ninth Circuit (Sept. 23, 2008), https://perma.cc/586C-SVHB (describing an increase in petitions for review from 900 in 2001 to 6,000 in 2005 filed in the Ninth Circuit alone, driven by the BIA's "streamlining" and related changes).

Defendants' other arguments about the IFR's impact on circuit court review rest on magical thinking. The IFR explicitly states that "[a]ny issue not raised in the Notice of Appeal from a Decision of an Immigration Judge (Form EOIR–26) shall be deemed waived." 91 Fed. Reg. at 5,278 (new 8 C.F.R. § 1003.38). Defendants blithely dismiss rational concerns that this requires a full articulation of arguments via the Notice of Appeal (without the benefit of a record), *see* Opp. at 47, but noncitizens and their counsel cannot rely on Defendants' self-serving litigation position when the stakes are exile from the United States. Moreover, Defendants' suggestion that the record will be compiled for purposes of court of appeals review (or, if it is not, that noncitizens can "make the argument" about an incomplete or inaccurate record to the appeals court) fails to cure multiple problems that the IFR creates. Even if the certified administrative record eventually becomes available to the courts of appeals on a petition for review, those courts will be denied the benefits of the BIA having narrowed or clarified the issues for review. And the record will not be available at all at the critical, early stages of the petition for review process. For example, when a noncitizen simultaneously files a motion to proceed in forma pauperis or motion for a stay of removal with their petition for review at an appeals court (because without a stay of removal, the Department of Homeland Security may execute a removal order, *see* 8 U.S.C. 1231(a)(1)), there will be no record of the IJ's reasoning for the court of appeals to look to in determining the noncitizen's likelihood of success on the merits of their case. *See* Dkt. 2-6 at 23 (St. John Decl. ¶ 74); Dkt 2-4 at 6-7 (Koop

Decl. ¶ 28). The agency decision must also be attached to the petition for review, but due to the IFR's express contemplation that no record will be compiled or even a written IJ decision issued before summary dismissal, this statutory requirement is rendered nugatory—creating a cascade of problems at the courts of appeals that Defendants did not consider. *See* 8 U.S.C. § 1252(c)(1); Dkt. 2-6 at 23 (St. John Decl. ¶ 74); Dkt 2-4 at 7-8 (Koop Decl. ¶ 28).

### 6.    Defendants failed to consider reasonable alternatives

Defendants claim that they considered the alternatives to the IFR including expanding the size of the BIA, but that "consideration" is nothing more than the conclusory statement that they decided that having more adjudicators to decide cases did not make the BIA more efficient. *See* Opp. at 47; 91 Fed. Reg. at 5,269 n.4. But the expansion of the BIA to 28 members was the result of a 2024 Rule that had only been in effect about a year when Defendants abruptly reversed course and shrank the BIA again to 15 members. *See* Reducing the Size of the Board of Immigration Appeals, 90 Fed. Reg. 15,526, 15,526 (Apr. 14, 2025). Fluctuations in the BIA's size over time, combined with higher numbers of appeals filed year over year, make it difficult to draw definitive conclusions about the relationship between the size of the BIA and the rate of the adjudications of appeals. As such, the failure to actually consider alternatives to summary dismissal was arbitrary and capricious. *See* Dkt. 24 (Amicus Brief of Former Immigration Judges and Former Members of the Board of Immigration Appeals) at 18 ("The Board faces a significant backlog not because the current system allows real appellate review, but because the Board lacks the personnel required to manage the volume of appeals it receives."); *id*. n.11 (EOIR's claim that "shrinking the Board will produce greater efficiency" rests on "a misunderstanding of how the Board actually functions: the vast majority of decisions are issued by single Board Members or three-member panels, not by the full Board, so reducing the number of available adjudicators can only decrease capacity, not increase it.").

As to Defendants' argument that requiring IJs to issue more written than oral decisions is less efficient, that conclusion contradicts the results of the study that EOIR itself commissioned. Defendants are of course free to disagree with that conclusion, but "[t]he fact that EOIR did not

even mention or consider the report it specifically commissioned to analyze the very concerns that purportedly animate the Rule raises significant questions as to whether the agency "entirely failed to consider an important aspect of the problem [and] offered an explanation for its decision that runs counter to the evidence before the agency." *Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 963 (N.D. Cal. 2021).

### III. The IFR Irreparably Harms Plaintiffs and the Equities Weigh in Favor of a Stay

Defendants fail to rebut Plaintiffs' showing that Plaintiffs are irreparably harmed by the IFR or that the balance of the equities tips in Plaintiffs' favor.

*First*, similar to their standing arguments, Defendants summarily dismiss Plaintiffs' harms as "speculative" or "self-inflicted." Opp. at 49-52. As explained above, Defendants are wrong. *See supra* Part I. The D.C. Circuit has held that obstacles that "make it more difficult for [organizations] to accomplish their primary mission . . . provide injury for purposes both of standing and irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). As explained, the IFR, upon taking effect, will immediately convert a 30-day deadline to a 10-day deadline, and then 10 days later, most appeals filed will be summarily dismissed. Plaintiffs explained that this IFR will make representation of immigrants in removal proceedings costlier and more time- and labor-intensive, which will immediately reduce the number of cases Plaintiffs can accept, impair their ability to locate and train pro bono counsel, jeopardize their funding, and overburden their pro se assistance programs. *See* Pls.' Mem. at 39-45; Dkt. 1 at 25-42 (Compl. ¶¶ 96-120); *see also supra* Part I. These harms are neither speculative nor self-inflicted. For example, Plaintiffs have established that this IFR will force them to reduce the number of noncitizens that they serve. Dkt. 2-2 at 8 (Brown Decl. ¶ 27) ("[W]e will likely have to turn people away needlessly due to impending or indiscernible filing deadlines"); Dkt. 2-4 at 7, 10-12 (Koop Decl. ¶¶ 31, 48-57) ("All told, this [IFR] will drastically limit NIJC's ability to accept BIA appeals, which will in turn impact our ability to ensure that noncitizens get a fair day in court"); Dkt. 2-6 at 7, 26-27, 30 (St. John Decl. ¶¶ 23, 84-87, 98) (explaining how the briefing schedule changes will limit the number of appeals they can competently work on). Plaintiffs cannot later provide

representation to noncitizens they are forced to turn away because those individuals lose their ability to file a BIA appeal, and thus preserve federal court review, within 10 days under the IFR. Plaintiffs cannot preserve their clients' rights to pursue a petition for review after the fact. Nor can Plaintiffs later take on extra clients to make up for that loss if the IFR is vacated. If required to reduce the number of people they serve, "[i]t would be impossible [for Plaintiffs] to meet [their] grant deliverables." Dkt. 2-5 at 9 (Mayer-Salins Decl. ¶ 32); *see also* Dkt. 2-4 at 14 (Koop Decl. ¶ 67); Dkt. 2-3 at 4 (Jones Decl. ¶ 16); Dkt. 2-2 at 4 (Brown Decl. ¶ 15); Dkt. 2-6 at 29-31 (St. John Decl. ¶¶ 96-98, 100) ("FIRRP will not only lose income that previously was provided for appeals to the BIA, but will also need to divert funds to provide representation to these clients at the Ninth Circuit.").

Defendants, in an apparent concession that Plaintiffs will lose funding as a result of the IFR, claim Plaintiffs must seek to mitigate that harm by renegotiating their grants. Opp. at 51. But Defendants cite to no authority for the proposition that Plaintiffs must engage in such fundraising activity to establish irreparable harm. To the contrary, such fundraising creates another irreparable harm. "Even just the requirement that the [organizations] reallocate existing resources—which would merely shift the harm by removing funds from other areas of the [Plaintiffs' organization]— is itself an irreparable injury." *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 179 (D. Mass. 2025); *see also Farmworker Ass'n of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311, 1341-42 (S.D. Fla. 2024) (noting that the diversion of "even more resources to fundraising" to address lost funding contributed to irreparable harm). And Defendants' argument that Plaintiffs should "not tak[e] as many petitions for review," Opp. at 51-52, ignores that, as discussed, part of the reason Plaintiffs will take fewer clients is because of what will happen before the BIA. It would also be contrary to Plaintiffs' core work to avoid assisting noncitizens with access to review of decisions ordering them removed. Pls.' Mem. at 39-40.

Finally, Defendants point to no evidence that these harms are "self-inflicted" or "exaggerated." Opp. at 17. Plaintiff NIJC's elimination of a pro bono project is precisely the type of irreparable harm attributable to the IFR that the stay would seek to prevent from occurring to

other Plaintiffs or other NIJC projects. Pls.' Mem. at 43-44; *NWIRP*, 496 F. Supp. 3d at 79–80, 81. Defendants' conclusory statement does not demonstrate otherwise. Defendants' claims that the IFR should be interpreted to have the 30-day deadline apply broadly to any case with an asylum adjudication misses the point. Opp. at 29. Plaintiffs' role is to preserve the rights of their clients, and therefore, they must take any potential ambiguity into account. Absent agency directive or a court order, Plaintiffs cannot risk waiving their clients' rights by relying on Defendants' assertions in this lawsuit. But Defendants' interpretation does not eliminate the 10-day deadline for other applications, like applications for cancellation of removal, relief under the Violence Against Women Act, or questions of citizenship.

Critically, the IFR will also place Plaintiffs' attorneys and volunteers in a "potential conflict between [their] ethical obligations and [their] capacity limits." Dkt. 2-2 at 7 (Brown Decl. ¶ 24). For example, HIAS has structured their attorneys' schedules to ensure that they can accept cases for appeal when necessary after an individual hearing at which an immigration judge decides the client's case. *Id.* Plaintiffs' pre-existing client obligations will not disappear suddenly if the 10-day deadline is instituted, and "if HIAS had less capacity to file a client's appeal, the shortened deadline would make it nearly impossible for a client to find alternative counsel," creating an ethical bind for attorneys. *Id.* Plaintiffs BDS, NIJC, and FIRRP likewise foresee ethical concerns for attorneys who seek to represent noncitizens while this IFR is in place. Dkt. 2-3 at 6, 9 (Jones Decl. ¶¶ 32, 48) (discussing the ethical duties involved in BIA representation); Dkt. 2-4 at 8, 18 (Koop Decl. ¶ 37, 85); Dkt. 2-6 at 15-16, 18-19 (St. John Decl. ¶¶ 54, 55(d), 62) (describing ethical considerations for attorneys representing noncitizens with diminished capacity).

In sum, Plaintiffs face significant and imminent harms to their programs and mission that are "beyond remediation," *League of Women Voters*, 838 F.3d at 74, if this IFR is allowed to take effect.

*Second*, the harm comes from "[t]he cumulative impact of the Final Rule," which impairs "Plaintiffs' 'ability to serve their [existing] clients" and "will lead to decreased representation"— all of which constitutes "irreparable [harm] to both Plaintiffs and the immigrant populations they

represent." *CLINIC*, 513 F. Supp. 3d at 175-76 (quoting *NWIRP*, 496 F. Supp. 3d at 79-81). As soon as the IFR takes effect, it "will interfere with the[] ability [of legal service providers] to provide essential services to their clients and/or members." *NWIRP*, 496 F. Supp. 3d at 79–80, 81. Defendants' brief does not discuss this Court's holding in *NWIRP* or attempt to distinguish it, and Plaintiffs have met that standard.

For the same reasons, the balance of equities favors a stay. Defendants' claim that staying this Rule would interfere with the prompt execution of a removal order. Opp. at 52. But individuals appealing to the BIA do not yet have a final, executable order of removal. 8 U.S.C. 1101(a)(47); 8 U.S.C. 1231(a)(1)(B)(i) ("The removal period begins...[t]he date the order of removal becomes administratively final."). Therefore a stay in this matter does not interfere with the execution of any removal order. And the only "intrusion" on the executive branch that Defendants can point to is that the regulations that have been in place for decades will remain in effect. Pls.' Mem. at 42. Because there is "generally no public interest in the perpetuation of unlawful agency action," *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citation omitted), the harms to the Plaintiffs outweigh any harm that would come to Defendants.

## IV. Plaintiffs Are Entitled to a Stay or Vacatur of the IFR in its Entirety

Because Plaintiffs have demonstrated that they are entitled to relief under Section 705 of the APA, the proper remedy is to stay or vacate the IFR in its entirety. *See Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *15-16 (D.C. Cir. Nov. 22, 2025). Likewise, should the Court rule for Plaintiffs on their notice-and-comment claims on summary judgment, the appropriate remedy is vacatur of the IFR in its entirety, not just as to Plaintiffs. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

Defendants nevertheless contend that 8 U.S.C. § 1252(f)—which prohibits courts from "enjoin[ing] or restrain[ing] the operation of" certain INA provisions precludes relief. Opp. at 53–55. But that argument is foreclosed by controlling circuit precedent. *Make the Rd. New York*, 2025 WL 3563313, at *16, 36-37 (rejecting government's position that "Section 705 stays must be confined to the plaintiffs before the court," and explaining that 705 stays "function[] as a temporary

form of vacatur" which is not "injunctive" relief and does not "restrain" the government).[11]

They also contend relief must be limited to the parties under traditional equitable principles. Opp. at 55-56. That too is contrary to controlling precedent. *See id.* *35. "Section 705 stays operate on the legal source of authority for an agency to act at all." *Id*. Therefore, Section 705 of the APA "empower[s] the judiciary to act directly against the challenged agency action." *Id*. (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys*., 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring)). The D.C. Circuit "has long recognized the availability of . . . relief . . . stay[ing] agency actions *in toto* pending judicial review." *Id.* at *36*. The Court should do so here. So too under section 706, should the Court grant Plaintiffs summary judgment on any claim. As this Court has held, "[t]o the extent Defendants argue that the vacatur remedy should be limited to the individual plaintiffs, that contention is both at odds with settled precedent and difficult to square with the statutory text of the APA, which offers no such limitation." *RAICES*, 793 F. Supp. 3d at 104 (collecting cases).

## CONCLUSION

For the foregoing reasons, the Court should vacate the IFR, or in the alternative, stay the effective date of the IFR under Section 705 pending the resolution of these proceedings.

---

[11] Even if section 1252(f)(1) applies to postponement or vacatur under the APA—which controlling precedent says it does not--§ 1252(f)(1) still would not apply because it only prevents "class-wide injunctive" relief that "enjoin or restrain the operation of" §§ 1221–32 of the INA. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550-51. It does not bar injunctive relief that "enjoin[s] the unlawful operation of a provision [in the INA] that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." *Id.* at 553 n.4 (emphasis omitted and added). The INA sections that contemplate the BIA, such as §§ 1101(a)(47), 1158, 1252, and 1362, do not fall within sections 1221-32. Indeed, Defendants claim that the BIA is a creature of regulation, not one of 1252(f)(1)'s covered provisions. While 8 U.S.C. § 1229a is a covered provision, because the primary statutes that discuss BIA review are not within the covered provisions, any effect on § 1229a is collateral. *See Escobar Molina v. DHS*, __ F. Supp. 3d ___, 2025 WL 3465518 (D.D.C. 2025) (applying the collateral effects doctrine).

Dated: March 6, 2026

Respectfully submitted,

/s/ Allyson R. Scher

Keren Zwick (D.D.C. Bar No. IL0055)
Mary Georgevich
Maria E. Dambriunas* (D.C. Bar No.
1738154)
Fizza Davwa**
Nicole May
**NATIONAL IMMIGRANT JUSTICE CENTER**
111 W. Jackson Blvd. Suite 800
Chicago, Illinois 60604
kzwick@immigrantjustice.org
mgeorgevich@immigrantjustice.org
mdambriunas@immigrantjustice.org
fdavwa@immigrantjustice.org
nmay@immigrantjustice.org
Phone: (312) 660-1364

\* Application for admission to D.D.C.
forthcoming
\*\* Application for admission *pro
hac vice* forthcoming

Erez Reuveni (D.D.C. Bar No. CA00244)
Allyson R. Scher (D.C. Bar No. 1616379)
Catherine M.A. Carroll (D.C. Bar No. 497890)
Robin F. Thurston (D.C. Bar No. 1531399)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
ereuveni@democracyforward.org
ascher@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org
Phone: (202) 448-9090

Michelle Lapointe (D.C. Bar No. 90032063)
Suchita Mathur (D.C. Bar No. 90013156)
**AMERICAN IMMIGRATION COUNCIL**
2001 L Street, NW, Suite 500
Washington, D.C. 20036
mlapointe@immcouncil.org
smathur@immcouncil.org
Phone: (202) 507-7645

*Counsel for Plaintiffs*