**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br>　　v.<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*,<br><br>　　　　　*Defendants.* | Civil Action No. 26-696 (RDM) |

**<u>MEMORANDUM OPINION</u>**

On February 6, 2026, the Executive Office for Immigration Review ("EOIR"), a component of the U.S. Department of Justice, issued an interim final rule aimed at "streamlin[ing] administrative appellate review by the Board of Immigration Appeals." Appellate Procedures for the Board of Immigration Appeals, 91 Fed. Reg. 5267, 5267 (Feb. 6, 2026) ("the Rule" or "IFR"). Among other changes, the IFR mandates the summary dismissal of every appeal filed by an individual seeking appellate review of an adverse Immigration Judge or Department of Homeland Security ("DHS") decision, unless a majority of the Board of Immigration Appeals ("BIA" or "the Board"), sitting en banc, votes to review the case on the merits within 10 days of receiving the Notice of Appeal. The IFR is set to take effect tomorrow, March 9, 2026.

On Defendants' telling, this "notable," IFR, 91 Fed. Reg. at 5271, change in how the BIA will adjudicate administrative appeals constitutes a lawful and necessary step to redress inefficiencies in the administrative process and to combat the BIA's ever-increasing and now-overwhelming backlog. Plaintiffs, five non-profit legal and social service organizations that

represent, counsel, or advise individuals in immigration and removal proceedings, disagree.  On their telling, the shift from a presumption of merits review by the BIA as-of-right to a presumption of summary dismissal, along with the other changes adopted in the IFR, represent an unconsidered and unlawful effort to erode the fundamental fairness of immigration removal proceedings, posing extraordinary (and at times insurmountable) barriers to their organizational missions and ability to represent their clients.

Plaintiffs' Complaint, filed shortly after the EOIR extended the comment period for the Rule but declined to extend the Rule's effective date, asserts five claims under the Administrative Procedure Act ("APA"), the Due Process Clause of the Constitution, and the Regulatory Flexibility Act, and challenges both the substance of the Rule and the procedures the EOIR employed in adopting it.  *See* Dkt. 1 at 42–49 (Compl ¶¶ 121–64).  Pending before the Court is Plaintiffs' motion for an emergency stay of the effective date of the IFR pursuant to 5 U.S.C. § 705.  Dkt. 2.  That motion focuses on Plaintiffs' three APA claims and argues that the Rule: (1) was promulgated without the required opportunity for notice and public comment prior to implementation, in violation of 5 U.S.C. § 553; (2) runs afoul of the Immigration and Nationality Act's ("INA") guarantees of the rights to counsel, meaningful intermediate appellate review by the BIA, and a period of 30 days to file an administrative appeal from the denial of an asylum application; and (3) is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). Defendants oppose that motion, arguing that Plaintiffs lack standing; that Plaintiffs' claims fail on the merits; that Plaintiffs cannot establish irreparable harm; and that the Court lacks authority to grant the requested relief of a stay.  *See* Dkt. 26.

For reasons explained in its earlier Memorandum Opinion and Order, Dkt. 17, the Court decided "that it will treat the pending motion as a motion for summary judgment on the notice-

and-comment claim or, in the alternative, as a motion for a Section 705 stay on all of the issues Plaintiffs raise." Dkt. 17 at 6; *cf.* Fed. R. Civ. P. 65(a)(2).  As explained below, the Court now concludes that Plaintiffs are entitled to prevail as a matter of law on much, although not all, of their challenge to the EOIR's failure to comply with the dictates of 5 U.S.C. § 553 by fundamentally curtailing the availability of meaningful administrative review of adverse immigration decisions, without first providing an opportunity for notice and comment.  Because this issue can be resolved on the face of the IFR and involves a discrete legal question, which the EOIR addressed in the IFR itself, there is no reason to delay final resolution of this issue.  With respect to those portions of the IFR that are arguably exempt from the notice-and-comment requirement, however, the Court must go on to consider Plaintiffs' motion for a Section 705 stay. As further explained below, the Court is unpersuaded that Plaintiffs are entitled to emergency relief with respect to those remaining provisions, principally because they have failed to carry their burden of demonstrating that giving immediate effect to those provisions (*e.g.*, the rule relating to simultaneous briefing before the BIA) will cause them irreparable injury.

The Court will, accordingly, **GRANT** in part and **DENY** in part Plaintiffs' motion for partial summary judgment and will **DENY** Plaintiffs' motion for a Section 705 stay in part as moot and in part for lack of irreparable injury.  The Court will **VACATE** the IFR in part, as further described below, and will **REMAND** the matter to the EOIR for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.    Statutory and Regulatory Background

In 1952, Congress enacted the Immigration and Nationality Act "set[ting] out a comprehensive scheme that governs entry and removal of aliens from the United States." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 43 (D.D.C.

2025) ("*RAICES*"); *see* 8 U.S.C. § 1101 *et seq.*  Among other things, the INA

"specifies . . . which previously admitted aliens are subject to removal; what protections aliens

can claim; and the procedures for removing aliens."  *RAICES*, 793 F. Supp. 3d at 43 (citing 8

U.S.C. §§ 1227, 1158, 1231, 1225(b)(1), 1229a).  The Attorney General is authorized to

promulgate regulations related to many provisions of the INA, *see* 8 U.S.C. § 1103(g), and may

delegate that authority, as appropriate, to the Director of EOIR, *see id.*; 6 U.S.C. § 521; 8 C.F.R.

§ 1003.0.

Since 1952, Congress has amended the INA several times.  In 1996, Congress enacted the

Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208,

Div. C., 110 Stat. 3009-546 (1996).  Since then, removal proceedings have followed two

alternative routes: "formal" or "regular" removal under Section 1229a, which "follows the pre-

IIRIRA approach," and "expedited removal" under Section 1225(b).  *RAICES*, 793 F. Supp. at

46–47.  This case implicates the former of the two: regular removal proceedings under Section

1229a.  Regular removal proceedings are conducted before an Immigration Judge within the

EOIR.  *See* 8 U.S.C. § 1229a.  Under current law, aliens are entitled to challenge their removal in

administrative proceedings with various procedural guarantees, including the rights to written

notice of the charge of removability, to appear at a hearing before an Immigration Judge and to

present evidence, to counsel (at no expense to the government), to notice of a decision, to appeal

an adverse decision to the BIA, and to seek judicial review.[1]  *Id.* §§ 1229(a)(1), 1229a(b)(4),

---

[1] The parties use different nomenclature to refer to those individuals subject to removal
proceedings—Plaintiffs refer to "noncitizens," while Defendants refer to "aliens."  The Court
recognizes that both formulations carry policy-laden implications.  The Court uses the term
"aliens" simply because that is the term used in the IFR that is at issue here.

1252(b); 8 C.F.R. §§ 1003.1(b), 1240.10, 1240.13, 1240.15. These rights (or interests) form the focal point of the pending motion.

       1.    *Right to Counsel and Other Procedural Rights*

The INA provides that "[i]n proceedings under this section, . . .

    (A)    the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

    (B)    the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government . . ., and

    (C)    a complete record shall be kept of all testimony and evidence produced at the proceeding.

8 U.S.C. § 1229a(b)(4); *see* 8 C.F.R. §§ 292.5(b), 1240.10(a)(1). In addition, the INA requires aliens to be "provided (i) a period of time to secure counsel" and (ii) lists of pro bono legal service providers who may be able to assist them. *See* 8 U.S.C. § 1229(a)(1)(E), (b)(2); 8 C.F.R. § 1003.61(b). The right to counsel extends to "any appeal proceedings before the Attorney General from any such removal proceedings." 8 U.S.C. § 1362.

     An alien placed in formal removal proceedings may avoid removal by establishing, through the adversarial process, that he or she is eligible for asylum, *see* 8 U.S.C. § 1158(b)(1)(A),[2] withholding of removal, *see* 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(b), or Convention Against Torture ("CAT") protection, *see* 8 U.S.C. § 1231 note, 8 C.F.R.

---

[2] An alien may not apply for asylum: (1) "if the Attorney General [or Secretary] determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality . . . ) in which the alien's life or freedom would not be threatened," 8 U.S.C. § 1158(a)(2)(A); (2) if the alien cannot "demonstrate[] by clear and convincing evidence" that he or she filed his or her asylum application within one year after arriving in the United States, subject to certain exceptions, *id.* § 1158(a)(2)(B); or (3) if the alien, again subject to certain exceptions, "previously applied for asylum and had such application denied," *id.*§ 1158(a)(2)(C).

§ 208.16(c)(2).  *See* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. §§ 208.2(b), 1240.1(a)(1)(iii).  As in all removal proceedings, "[a]t the time of filing an application for asylum, the Attorney General shall [] [a]dvise the alien of the privilege of being represented by counsel" and "provide the alien a list of persons . . . who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis."  8 U.S.C. § 1158(d)(4).

Although the precise contours of the statutory right to counsel are unclear, courts generally agree that the INA's provisions regarding the "privilege of being represented" and its implementing regulations are an integral part of, and help effectuate, aliens' entitlement to procedural due process rights in the context of removal proceedings.  *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (per curiam) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (citation modified)); *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *22 (D.C. Cir. Nov. 22, 2025) (per curiam) (statement of Millett and Childs, JJ.) ("Due process generally must [] ensure fair consideration of a person's claims that they should not be removed before it occurs.").  Despite these protections, only 33% of individuals in removal proceedings in 2024 were represented.  Holly Straut-Eppsteiner, Cong. Rsch. Serv., IF12158, *U.S. Immigration Courts: Access to Counsel in Removal Proceedings and Legal Access Programs* 1 (2024).

    2.    *Appellate Process and Procedure*

Under 8 U.S.C. § 1229a(c), upon entering an order of removal, the Immigration Judge "shall inform the alien of the right to appeal that decision," and "if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal."  *Id.* § 1229a(c)(5), (c)(4)(C); *see also id.* § 1158(b)(1)(B)(iii) (referencing the "rebuttable presumption of credibility on appeal" from denials of asylum applications where the IJ made "no adverse credibility determination").

The availability of Article III judicial review of final removal orders resulting from formal removal proceedings is codified at 8 U.S.C. § 1252, which provides: "Notwithstanding any other provision of law (statutory or nonstatutory) . . . a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter." *Id.* § 1252(a)(5). The petition for review "must be filed not later than 30 days after the date of the final order of removal." *Id.* § 1252(b)(1). An Immigration Judge's determination "shall become final upon the earlier of [] (i) a determination by the [BIA] affirming such order; or (ii) the expiration of the period in which the alien is permitted to seek review of such order by the [BIA]." *Id.* § 1101(a)(47)(B). "A court may review a final order of removal only if [] the alien has exhausted all administrative remedies available to the alien as of right." *Id.* § 1252(d)(1).

The INA also explicitly references *administrative* appeals. First, as discussed above, 8 U.S.C. § 1101(a)(47) specifies that an order of deportation is not "final" until the BIA issues a determination affirming the order or until the time to file a BIA appeal has expired. 8 U.S.C. § 1101(a)(47)(B). Second, 8 U.S.C. § 1229a(b)(6) states that "[t]he Attorney General shall, by regulation . . . specify the circumstances under which an *administrative appeal* of a decision or ruling will be considered frivolous and will be summarily dismissed." *Id.* § 1229a(b)(6)(B) (emphasis added). Third, as explained above, 8 U.S.C. § 1362 provides that the right to counsel extends to "any removal proceedings before an immigration judge and . . . *any appeal proceedings* before the Attorney General from any such removal proceedings." *Id.* § 1362 (emphasis added).

As for asylum seekers, the right to an administrative appeal in the INA is more explicit. Section 1158(d)(5)(A) of the INA provides that "any administrative appeal shall be filed within

30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 1229a of this title, whichever is later."  8 U.S.C. § 1158(d)(5)(A)(iv); *see also id.* § 1158(d)(5)(A)(iii) ("not including administrative appeal" in the 180-day deadline to complete administrative adjudication of asylum applications).

Beyond the INA, current EOIR regulations provide for administrative appellate review of adverse Immigration Judge decisions.  *See generally* 8 C.F.R. § 1003.1 *et seq*; *id.* § 1240.15. The BIA "function[s] as an appellate body charged with the review of those administrative adjudications under the Act that the Attorney General may by regulation assign to it."  *Id.* § 1003.1(d)(1).  "[T]hose administrative adjudications," *id.*, include a myriad of decisions by Immigration Judges.  *See generally id.* § 1003.1(b).  As relevant here, "[a]ppeals may be filed . . . from . . . [d]ecisions of Immigration Judges in removal proceedings."  *Id.* § 1003.1(b), (b)(3).  A Notice of Appeal, Form EOIR-26, along with fees or fee waiver requests, must be filed with the BIA within 30 calendar days of an adverse decision from an Immigration Judge, and "must identify the reasons for the appeal."  *Id.* § 1003.3(a), (b); *see also id.* § 1003.38(b).  "The date of filing of the Notice of Appeal . . . shall be the date the Notice is received by the Board." *Id.* § 1003.38(c).

Once the BIA receives a Notice of Appeal, the Board's "case management screening plan shall promptly identify cases that are subject to summary dismissal."  8 C.F.R. § 1003.1(d)(2)(ii); *see also id.* § 1003.1(e)(1).  Summary dismissal, in turn, is authorized only in narrowly defined circumstances, including:

> (A)    The party concerned fails to specify the reasons for the appeal on Form EOIR-26 or Form EOIR-29 (Notices of Appeal) or other document filed therewith;

(B)    The only reason for the appeal specified by the party concerned involves a finding of fact or a conclusion of law that was conceded by that party at a prior proceeding;

(C)    The appeal is from an order that granted the party concerned the relief that had been requested;

(D)    The Board is satisfied, from a review of the record, that the appeal is filed for an improper purpose, such as to cause unnecessary delay, or that the appeal lacks an arguable basis in fact or in law unless the Board determines that it is supported by a good faith argument for extension, modification, or reversal of existing law;

(E)    The party concerned indicates on Form EOIR-26 or Form EOIR-29 that he or she will file a brief or statement in support of the appeal and, thereafter, does not file such brief or statement, or reasonably explain his or her failure to do so, within the time set for filing;

(F)    The appeal does not fall within the Board's jurisdiction, or lies with the Immigration Judge rather than the Board;

(G)    The appeal is untimely, or barred by an affirmative waiver of the right of appeal that is clear on the record; or

(H)    The appeal fails to meet essential statutory or regulatory requirements or is expressly excluded by statute or regulation.

*Id.* § 1003.1(d)(2)(i).

After initial screening, the case is usually "assigned to a single Board member for disposition." 8 C.F.R. § 1003.1(e). That Board member "shall arrange for the prompt completion of the record of proceeding and transcript, and the issuance of a briefing schedule, as appropriate." *Id.* § 1003.1(e)(3). "In those cases that are transcribed, the briefing schedule shall be set by the Board after the transcript is available." *Id.* § 1003.3(c)(1). Parties have 21 days to file their briefs from the day the briefing schedule is set, which proceeds simultaneously or concurrently depending on whether the alien is detained. *Id.* The Board may authorize the filing of reply briefs and may grant extensions for up to 90 days for good cause shown. *Id.* To obtain

leave to file a reply brief, the party must identify some "surprise at the assertions of the other party."  BIA Practice Manual, § 4.6(h) (last revised Jan. 8, 2021).

After briefing, the Board member "shall determine the appeal on the merits," applying the standards of review set forth in 8 C.F.R. § 1003.1(d)(3).  8 C.F.R. § 1003.1(e)(3).  From there, the Board member has three options.  First, she "shall affirm the decision . . . without opinion if [she] determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial;" *and* that either "[t]he issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation" or "[t]he factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case."  *Id.* § 1003.1(e)(4)(i).  Second, if the Board member determines, "upon consideration of the merits, that the decision is not appropriate for affirmance without opinion, [she] shall issue a brief order affirming, modifying, or remanding the decision under review."  *Id.* § 1003.1(e)(5).  Finally, the Board member "may summarily dismiss an appeal after completion of the record of proceeding," *id.* § 1003.1(e)(3), based on the limited warranting circumstances prescribed by Section 1003.1(d)(2)(i).  Although affirmances without opinion render "[t]he decision below . . . the final agency determination," *id.* § 1003.1(e)(4)(ii), summary dismissals or substantive orders constitute final decisions of the Board, *id.* § 1003.1(d)(2)(ii), (d)(7)(i).  The Board member "shall issue a decision on the merits as soon as practicable," and "shall dispose" of the case "within 90 days of completion of the record."  *Id.* § 1003.1(e)(8), (i).

In the alternative, the assigned Board member may determine that "the case is appropriate for review and decision by a three-member panel under the standards of paragraph (e)(6) of this section."  8 CFR 1003.1(e)(3).  Section 1003.1(e)(6), in turn, identifies several circumstances

that may merit three-member panel review, such as "[t]he need to establish a precedent construing the meaning of laws, regulations, or procedures;" "[t]he need to resolve a case or controversy of major national import;" "[t]he need to review a clearly erroneous factual determination by an [I]mmigration [J]udge;" or "[t]he need to resolve a complex, novel, unusual, or recurring issue of law or fact." *Id.* § 1003.1(e)(6). Panels must comply with the same procedures described above. Panel cases must be resolved "within 180 days" of assignment. *Id.* § 1003.1(e)(8)(i).

Finally, the Board may, "on its own motion by a majority vote of the permanent Board members, or by direction of the Chairman, consider any case en banc, or reconsider as the Board en banc any case that has been considered or decided by a three-member panel." 8 C.F.R. § 1003.1(a)(5) (emphases omitted). "En banc proceedings are not favored, and shall ordinarily be ordered only where necessary to address an issue of particular importance or to secure or maintain consistency of the Board's decisions." *Id.*

## B.    Prior Administrative Actions

The challenged IFR is not the EOIR's first foray at reform. In August 2020, the EOIR published a Notice of Proposed Rulemaking ("NPRM") proposing "a number of changes to [its] regulations . . . to ensure that cases heard at the BIA are adjudicated in a consistent and timely manner." Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81588, 81588 (Dec. 16, 2020) ("2020 Rule"). In December 2020, after a 30-day comment period, the EOIR promulgated the 2020 Rule. *Id.* Among other changes, the 2020 Rule: (1) "reduce[d] the maximum allowable time for an extension of the briefing schedule for good cause shown from 90 days to 14 days," *id.*; (2) "adopt[ed] simultaneous briefing schedules instead of consecutive briefing schedules for all cases," *id.*; (3) prevented the BIA from "remand[ing] a case to the immigration court solely to

consider a request for voluntary departure" and "limit[ed] the scope of motions to remand that

the BIA may consider" in general, *id.* at 81589; (4) "remov[ed] the Attorney General's previous

general delegation of *sua sponte* authority to the BIA and Immigration Judges to reopen or

reconsider cases and instead limit such *sua sponte* reopenings only to correct minor mistakes,"

*id.* at 81591; (5) "amend[ed] the regulations to allow the filing of a motion to reopen,

notwithstanding the time and number bars," when an alien claims an intervening change of law

or fact or that he or she is a citizen, *id.*; and (6) "harmonize[d] the time limits for adjudicating

cases so that both the 90- and 180-day deadlines are set from . . . when the record is complete,"

and "established specific time frames for review," *id.*

Before the 2020 Rule was set to take effect, two district courts preliminarily enjoined or

stayed the rule. *See Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919

(N.D. Cal. 2021) ("*Centro Legal*"); *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr.

Rev.*, No. 21-cv-00094, 2021 WL 3609986 (D.D.C. Apr. 4, 2021). In *Centro Legal*, the

plaintiffs, a group of legal-service non-profit organizations alleged that "defendants violated the

APA by providing only a 30 day comment period" which "denied the public a meaningful

opportunity to comment on a rule of this magnitude." *Centro Legal*, 524 F. Supp. 3d at 953–54.

The plaintiffs also claimed that "the Rule [was] arbitrary and capricious under the APA." *Id.* at

962. The court concluded that the plaintiffs were likely to succeed on their notice-and-comment

claim because "in light of the breadth and import of the new regulations, a 30 day comment

period is extremely limited," *id.* at 955, and even "defendants acknowledged that the Rule

constitute[d] a significant regulatory action," *id.* (citation modified).[3] The court also concluded

---

[3] The district court also concluded that the "already-short 30 day period" was further exacerbated
by the effects of the global COVID-19 pandemic and the "piecemeal method in which the

that the 2020 Rule was likely arbitrary and capricious because, among other things, the EOIR

"did not even mention or consider the report it specifically commissioned to analyze the very

concerns that purportedly animate the Rule," *id.* at 963, and did not consider the effects of the

briefing schedule changes on aliens and their lawyers, *id.* at 964–66.  In a similar challenge

brought in this Court, Judge Leon stayed the 2020 Rule under Section 705 based on the

plaintiffs' likelihood of success on the notice-and-comment claim, for many of the same reasons

identified in *Centro Legal*.  *See Cath. Legal Immigr. Network, Inc.*, 2021 WL 3609986, at *3.

    After the change in administration, the EOIR issued an NPRM "proposing to rescind

[the] enjoined . . . 2020 [R]ule," and the EOIR promulgated a final rule in May 2024, after notice

and comment, that rescinded the proposed changes in the 2020 Rule.  *See* Efficient Case and

Docket Management in Immigration Proceedings, 89 Fed. Reg. 46742, 46742 (May 29, 2024)

("2024 Rule").  The 2024 rule "was designed to largely codify the currently operative status

quo."  *Id.*

## C.    The Challenged 2026 Interim Final Rule

    On February 6, 2026, the EOIR promulgated the IFR, without prior notice and comment,

and directed that the IFR take effect on March 9, 2026.  *See* IFR, 91 Fed. Reg. at 5267.  The

notice accompanying the IFR explains that "until 2021, with various amounts of success, the

Department has instituted measures to address increasing case receipts by the Board and the

backlog that has accrued when the Board has been unable to keep up with them."  *Id.* at 5270;

*see also id.* at 5268–69 (listing past measures).  Despite these efforts, however, "between fiscal

year 2015 and the end of fiscal year 2025, the Board's pending case load increased more than

---

Departments published this NPRM and other related proposed rules."  524 F. Supp. 3d at 956,
958.

five-fold—from 37,285 pending appeals to [a backlog of] 202,946 pending appeals." *Id.* at 5270. As a result, while "recogniz[ing] that th[e] IFR represents a notable procedural change to how the Board has operated," *id.* at 5271, and while noting in a footnote that it has "considered the potential impacts of these amendments individually and in context with the other amendments . . . on aliens and attorneys appearing before EOIR," *id.* at 5270 n.9, the IFR "reconsidered the Board's role as an appellate tribunal," *id.* at 5270. To that end, the IFR seeks to "provide the Board more flexibility in reviewing appeals" and to "focus its limited resources on . . . selecting decisions for review that present novel issues," rather than adjudicating the vast majority of appeals on the merits. *Id.* The IFR also "adopts other measures previously adopted by the [2020 Rule]." *Id.*

For present purposes, the key changes made by the IFR are as follows:

1.    *Presumption of Summary Dismissal*

First, and most notably, the IFR modifies 8 C.F.R. § 1003.1(d)(2)(ii) to provide that "for all appeals of any decision issued on or after March 9, 2026," except for certain appeals not relevant to this case:

> the Board shall summarily dismiss the appeal unless a majority of the permanent Board members vote en banc to accept the appeal for adjudication on the merits. Such dismissals shall be made by a single Board member without further consideration, unless the single Board member refers an appeal for consideration by the Board en banc. If such a referral is made, the Board shall vote en banc on whether to accept the appeal no later than 10 days after the appeal is filed. If the Board fails to vote en banc within that time, the appeal shall be deemed to have been summarily dismissed under this paragraph (d)(2)(ii). All dismissals under paragraph (d)(2)(i) or (ii) of this section shall be effectuated through the issuance of a written order no later than 15 days after the appeal is filed. When an appeal is summarily dismissed under this paragraph (d)(2)(ii), the Immigration Judge's decision is adopted by the Board and articulates the rationale for removal that is subject to judicial review.

IFR, 91 Fed. Reg. at 5277.  "An order dismissing any appeal pursuant to this paragraph (d)(2) shall constitute the final decision of the Board, and 'the final order of removal' for purposes of section 242(b)(1) of the Act."  *Id.* (proposing addition of 8 C.F.R. § 1003.1(d)(2)(iii)).

As explained, under the pre-existing regulation, the Board is required to review all appeals on the merits unless a summary dismissal is authorized for certain narrowly defined (and clearly dispositive) reasons.  As amended by the IFR, however, the "default" rule for appeals from Immigration Judge decisions "will be summary dismissal unless a majority of current Board members vote to consider the appeal on the merits" within 10 calendar days of the Notice of Appeal.  *Id.* at 5270.  The IFR provides that, in cases of summary dismissal, "the Department intends that the Immigration Judge's decision become the final agency decision for purposes of Federal court review."  *Id.* at 5271.  According to the IFR, "[t]his change will allow the Board to focus on appeals with particularly novel or complex legal questions without becoming bogged down in mine-run or straightforward cases that may already be subject to being affirmed without an opinion or summarily affirmed."  *Id.*

2.    *Notice of Appeal Deadline and Waiver Provisions*

Second, the IFR "reduc[es] the appeal period from 30 days to 10 days for all cases, except for those cases where the alien's asylum application was denied on grounds other than those specified in section 208(a)(2)(A), (B), or (C) of the INA."  IFR, 91 Fed. Reg. at 5272; *see id.* at 5278 (proposed changes to 8 C.F.R. § 1003.38).  Any party seeking to appeal an adverse decision to the BIA, including certain asylum applicants, must file a Notice of Appeal within 10 calendar days of the Immigration Judge's decision, whether that decision was issued in writing or orally.  *See id.* at 5278.  The IFR takes the position that, "with the Board's adoption of electronic filing in 2021, which allows parties to submit Notices of Appeal at any time of day from any location with internet access, removing concerns related to mail delays and the

restrictions business hours create to meet filing deadlines, there is no operational need" for a 30-day appeal filing period. *Id.* at 5272. Although existing regulations require that the Notice of Appeal "identify the reasons for the appeal," *see* 8 C.F.R. 1003.3(b), moreover, the IFR adds a waiver provision, providing that "[a]ny issue not raised in the Notice of Appeal from a Decision of an Immigration Judge . . . shall be deemed waived." IFR, 91 Fed. Reg. at 5278 (proposed modifications for 8 C.F.R. § 1003.38(b)); *see also* Brief of *Amici Curiae* Former Immigration Judges and Former Members of the Board of Immigration Appeals in Support of Plaintiffs' Emergency Motion for a Stay, *Amica Center for Immigr. Rights v. Exec. Off. for Immigr. Rev.*, No. 26-cv-696, Dkt. 24 at 7, 13–14 (D.D.C. Mar. 2, 2026) (hereinafter "Amicus Brief") (noting that under current regulations the Notice of Appeal "functioned as only a preliminary filing" but that the Rule would render the form "in many cases[,] [the] exclusive, means of raising issues to the Board").

3.    *Transcript and Record Preparation Changes*

Third, the IFR modifies regulations regarding the record and transcript preparation. Under pre-existing regulations, "[i]f an appeal is taken from a decision of an [I]mmigration [J]udge, the record of proceeding shall be promptly forwarded to the Board upon the request or the order of the Board," and Immigration Judges have 14 days to review the transcript and approve their decisions. 8 C.F.R. § 1003.5(a). The existing regulations contemplate early preparation of the transcript and the "record of proceeding," as the assigned Board member for any appeal is authorized to set a briefing schedule only after receipt of the transcript, or to summarily dismiss an appeal after completion of the record of proceeding. *See id.* § 1003.3(c)(1); *id.* § 1003.1(e)(3). Concluding that the Immigration Judges' transcript review procedures are "not necessary because EOIR utilizes reliable digital audio recording technology that produces clear audio recordings and more accurate transcriptions," IFR, 91 Fed. Reg. at

5273, the IFR eliminates portions of 8 C.F.R. § 1003.5 requiring the preparation and review of

these transcripts, *see id.* at 5273, and modifies 8 C.F.R. § 1003.1(e)(8) to note that "the record"

need only be "complete upon the earlier of either filing of the last brief or pleading or the

passage of the last deadline for filing a brief or pleading," *id.* at 5277.

4.    *Briefing Schedule Changes*

Finally, the IFR further "standardizes the Board's briefing schedule for appeals . . . to

require simultaneous briefing within 20 days of the Board setting the schedule in all cases not

summarily dismissed, with no reply briefs and limited extensions," *id.* at 5272, in the case of

"exceptional circumstances, as defined by section 240(e)(1) of the INA," *id.* at 5273; *see also id.*

at 5277–78 (proposed changes to 8 C.F.R. § 1003.3(c)(1)).  Acknowledging the departure from

prior briefing procedures, the IFR notes that "the Department now believes that for all

cases . . . simultaneous briefing . . . provides both parties sufficient opportunity to address any

issues needed to be resolved on appeal . . . while balancing the need to expeditiously resolve the

case," *id.* at 5273 (citation modified), and that "in the Board's experience, [] reply briefs rarely,

if ever, positively contribute to the arguments at issue," *id.*

**D.    Procedural History**

As discussed above, Defendants promulgated the IFR on February 6, 2026, with a 30-day

comment period, and a March 9, 2026, effective date.  *See* IFR, 91 Fed. Reg. at 5267.  On

February 26, 2026, "in response to a request from a group of interested organizations, and to

allow for commenters to have additional time to review and submit comments," the EOIR

extended the comment period by another 30 days, to April 8, 2026, but reaffirmed the IFR's

effective date.  Appellate Procedures for the Board of Immigration Appeals; Extension of

Comment Period, 91 Fed. Reg. 9705, 9705 (Feb. 27, 2026).

Within hours of that decision, Plaintiffs, Amica Center for Immigrant Rights ("Amica"), Brooklyn Defender Services ("BDS"), Florence Immigrant and Refugee Rights Project ("Florence Project"), HIAS, and National Immigrant Justice Center ("NIJC"), Dkt. 1 at 5–7 (Compl. ¶¶ 15–20), filed this suit against the EOIR, its Director Daren Margolin, the Department of Justice, and Attorney General Pam Bondi. *id.* at 7–8 (Compl. ¶¶ 21–24). Plaintiffs contemporaneously filed the pending motion for an emergency Section 705 stay. *See* Dkt. 2. Plaintiffs assert the following claims under the APA, the Constitution, and the Regulatory Flexibility Act:

First, Plaintiffs allege that the IFR violates the APA's notice-and-comment requirements because the "IFR is a legislative rule" to which the exceptions that the EOIR invoked do not apply. Dkt. 1 at 43 (Compl. ¶¶ 124–25) (Count I).

Second, they allege that the IFR is "contrary to law because it violates the INA in multiple ways," including the provisions related to the right to counsel, 8 U.S.C. §§ 1362, 1229a(b)(4)(A); the provisions relating to procedural rights and record keeping, *id.* §§ 1229a(b)(4)(B), (b)(4)(C); the provisions requiring "BIA's ability to conduct meaningful appellate review," *id.* § 1101(a)(47); and the provisions providing "for a 30-day deadline to file an appeal in asylum cases," *id.* § 1158(d)(5)(A)(iv). Dkt. 1 at 43–44 (Compl. ¶¶ 130–35) (Count II).

Third, they allege that the IFR is arbitrary and capricious because, among other things, the EOIR "failed to consider the impact of the upending of appellate practice on noncitizens in removal proceedings and the attorneys and organizations seeking to assist them," "the reliance interests of Plaintiffs and other pro bono legal service providers," "reasonable alternatives to the changes contained in the IFR in addressing case backlogs," and "the Fifth Amendment's Due

Process Clause and the rights of noncitizens in removal proceedings." Dkt. 1 at 45–46 (Compl. ¶¶ 142–43, 146, 147, 149). Plaintiffs also contend that "Defendants . . . substantially altered their prior position without adequate explanation," "rel[ied] on faulty data," and gave "explanations [that] run counter to the evidence before the agency," *Id.* at 46 (Compl. ¶¶ 145, 148) (Count III).

Fourth, they allege that the IFR "violates the Due Process Clause because it[] . . . deprive[s] noncitizens of the ability to meaningfully exercise their right to counsel or have their claims fairly considered." *Id.* at 47 (Compl. ¶ 156).

Fifth, and finally, they allege that the "IFR's regulatory flexibility analysis does not comply with the [Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*], because Defendants unlawfully concluded that the IFR does not require such an analysis." *Id.* at 48 (Compl. ¶ 163).

The day after Plaintiffs filed suit and moved for emergency relief, the Court held a status conference to set a briefing and oral argument schedule. Min. Entry (Feb. 27, 2026). As illuminated during that status conference, Dkt. 16 at 9–11, and because the notice-and-comment claim presented a "narrow legal issue" that turned exclusively on the law, the Court subsequently ordered the parties to address "whether it would be appropriate to treat the pending motion for a Section 705 stay, Dkt. 2, in the alternative, as a motion for summary judgment as to that claim" and to identify "any specific objections either party may have to the Court proceeding in that manner." Min. Order (Mar. 1, 2026). Plaintiffs did not object to treating the pending motion as a motion for summary judgment on the notice-and-comment claim, but they requested that if the Court do so, it "stay briefing on the remaining arguments in the motion for a Section 705 stay." Dkt. 14 at 1. Defendants, in contrast, objected on the grounds that "Plaintiffs' motion raises several threshold questions including statutory jurisdiction, Article III standing, and irreparable

harm;" that they may want to seek "jurisdictional discovery on Plaintiffs' assertions as to their organizational standing;" and that they had "expended significant resources and effort over the weekend to prepare a response to the 705 motion." Dkt. 15 at 1–2.

The Court considered these arguments in its earlier Memorandum Opinion and Order, Dkt. 17, and concluded that it was appropriate to "treat the pending motion as a motion for summary judgment on the notice-and-comment claim or, in the alternative, as a motion for a Section 705 stay on all of the issues Plaintiffs raise." *Id.* at 6. The Court explained that addressing the notice-and-comment claim on the merits would follow a course similar to that contemplated for consolidating a hearing on the merits with a motion for a preliminary injunction under Rule 65(a)(2) of the Federal Rules of Civil Procedure. *Id.* at 2. Doing so in this context would "secure the just, speedy, and inexpensive determination" of the action, as contemplated by Rule 1, and would avoid unnecessary delay or duplication of proceedings. *Id.* at 5–6. Unlike other more record or fact-dependent claims, Plaintiffs' notice-and-comment claim presented only a narrow legal question, which the EOIR had already addressed in the IFR and Plaintiffs had already addressed in its briefing. *Id.* at 2. Neither party, moreover, identified any need for further time to consider or address the merits of that claim. To the contrary, Defendants' only arguable basis for resisting consolidating the emergency motion with the merits was the possibility that they might want to seek jurisdictional discovery. As to that argument, the Court observed that Defendants could, as in any case, employ Rule 56(d) to oppose summary judgment on the ground that they need jurisdictional discovery before fully responding to the motion. *Id.* at 4. The Court cautioned that its decision was limited to the unique context and factual circumstances presented by Plaintiffs' notice-and-comment claim: the fact that the IFR already addressed the notice-and-comment issues, that the legal question was narrow and could be

resolved without consideration of an extensive administrative record, and that the issue may be mooted out by the issuance of a final rule and by the normal course of litigation. *Id.* at 5.

Defendants subsequently filed a motion seeking jurisdictional discovery, Dkt. 25, and the Court promptly held a hearing on that motion, Min. Entry (Mar. 4, 2026). At the hearing, however, Defendants' counsel was unable to identify any material jurisdictional facts that required discovery; rather, most of Defendants' arguments merely posited that, in their view, Plaintiffs' declarations failed to satisfy Plaintiffs' burden on summary judgment of demonstrating that they have standing. Dkt. 30 at 34. Moreover, when asked to identify a single occasion when the government had sought jurisdictional discovery in a similar context, Defendants' counsel was unable to do so. *Id.* at 4–5. Notwithstanding this failure to satisfy the dictates of Rule 56(d), the Court requested that Plaintiffs make a witness available at the upcoming hearing on their emergency motion to address any questions related to standing that government counsel might have. *Id.* at 34–36. At the Court's urging, government counsel also filed a notice of topics that the witness should be prepared to address. *See* Dkt. 29. Government counsel, then, cross-examined the witness at the hearing, *see* Min. Entry (Mar. 6, 2026), and, since then, has not raised any additional jurisdictional objections and has failed to identify any material facts that are in dispute regarding standing. The Court, accordingly, denied the governments Rule 56(d) in part as moot and in part for failure to satisfy the dictates of Rule 56(d). Mar. 6, 2026 Hrg. Tr. (Rough at 99).

In light of the Court's decision to consolidate Plaintiffs' motion for emergency relief, in part, with the merits, the Court granted Defendants' request for a short extension in the briefing schedule. *See* Dkt. 17 at 6 n.2; Dkt. 21; Min. Order (Mar. 2, 2026). Defendants submitted their opposition on March 4, *see* Dkt. 26, Plaintiffs submitted their reply on March 6, *see* Dkt. 31, and

the Court heard testimony on standing and oral argument that same day, *see* Min. Entry (Mar. 6, 2026).  Plaintiffs' motion for a Section 705 stay, or in the alternative, for summary judgment, is now ripe for decision.

## II. LEGAL STANDARD

"On such conditions as may be required and to the extent necessary to prevent irreparable injury," the APA allows a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  The standard of review for relief under 5 U.S.C. § 705 is the same as the standard of review for preliminary injunctions: "[E]ach is governed by the four-part preliminary injunction test applied in this Circuit."  *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

Accordingly, to prevail on a motion for a Section 705 stay, the moving party must show (1) "that [it] is likely to succeed on the merits," (2) "that [it] is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [its] favor," and (4) "that an injunction is in the public interest."  *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  For many years, the D.C. Circuit evaluated these factors on a "sliding scale."  *See, e.g.*, *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999).  In recent years, however, the circuit has noted that it is "questionable" whether "the sliding scale approach remains good law" following the Supreme Court's formulation of the preliminary injunction factors in *Winter*.  *Clevinger v. Advoc. Holdings*, 134 F. 4th 1230, 1235, 1236 n.2 (D.C. Cir. 2025) (collecting cases).  Although that question remains unresolved, it is clear, however, that the plaintiff's likelihood of success on

the merits is a "key issue [and] often the dispositive one" at the preliminary injunction stage, *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011), and "[w]hen a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors" for a preliminary injunction, *id.* at 1088. Similarly, "[a] movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction" regardless of the other three factors. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

In the normal course, summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010) (alteration in original). On the other hand, "[i]n a case involving review of a final agency action under the Administrative Procedure Act, . . . the Court's role is limited to reviewing the administrative record, so the standard set forth in Rule 56(c) does not apply." *Id.* at 32 (citation omitted). Instead, summary judgment serves as "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 90 (D.D.C. 2009).

## III. ANALYSIS

### A.    Threshold Issues

The Court starts with two threshold arguments raised in the government's opposition brief: First, the government contends that Plaintiffs lack organizational standing to bring suit because their "purported injuries are either speculative or downstream consequences of their own voluntary self-inflicted choices about how to allocate their resources in response to the

government's action." Dkt. 26 at 17; *see also id.* 15–20.  Second, it argues that Plaintiffs are

"not within the INA's zone of interests."  *Id.* at 20.

    1.    *Article III Standing*

To establish Article III standing, a plaintiff must demonstrate a "concrete and

particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be

redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The extent and nature of that

burden varies at each "successive stage[] of the litigation."  *Lujan*, 504 U.S. at 561.  This means

that, in order to obtain a preliminary injunction or Section 705 stay, the moving party must,

among other things, "show a 'substantial likelihood' of standing.'"  *Food & Water Watch, Inc. v.

Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation modified).  But at the summary judgment

stage, the moving party faces a more demanding standard and "must establish that there exists no

genuine issue of material fact as to [standing]."  *Dep't of Com. v. U.S. House of Representatives*,

525 U.S. 316, 329 (1999); *see also Public Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 83 (D.D.C.

2019).  As organizations, Plaintiffs may "assert standing on [their] own behalf, on behalf of

[their] members or both."  *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir.

2011).  For present purposes, Plaintiffs rely on the first approach.

"The Court's standing inquiry is slightly different when a plaintiff seeks to vindicate a

procedural right, such as having been unlawfully denied the opportunity to comment on a

proposed rule."  *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 37–38 (D.D.C.

2020).  Here, the harm associated with the challenged conduct—*i.e.*, that the "Defendants failed

to provide notice and an opportunity for public comment on the IFR in any manner prior to its

issuance on February 6, 2026," Dkt. 1 at 42–43 (Compl. ¶ 123); Dkt. 31 at 14 n.2; Dkt. 2-6 at 8

(St. John Decl. ¶ 27)—is a "procedural injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488,

496 (2009). Procedural losses, without more, are not enough to establish an injury in fact. As the Supreme Court explained in *Summers v. Earth Island Institute*, the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.* In addition to a concrete interest, Plaintiffs must establish "a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Fla. Audubon Soc'y. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996). Once a plaintiff clears the hurdles of injury-in-fact and causation, however, the procedural standing doctrine "relax[es] the immediacy and redressability requirements." *New Hampshire v. Holder*, 293 F.R.D. 1, 6 (D.D.C. 2013) (three-judge court). As a result, in a procedural injury case, the "litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

Plaintiffs assert that the injuries to their organizational interests are sufficiently concrete to establish an injury in fact beyond a mere procedural violation. *See generally* Dkt. 31 at 10–17. In so doing, they rely on the framework recognized in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ("*Havens*"). In that case, a fair housing organization claimed that the defendant's discriminatory housing practices "perceptibly impaired" the organization's ability to "provide counseling and referral services for low- and moderate-income homeseekers," forcing it "to devote significant resources to identify and counteract" the alleged discriminatory practices. *Id.* at 379 (citation modified). The Supreme Court held that the organization had standing to challenge the housing practices. As the Court explained, "there [could] be no question that the organization . . . suffered injury in fact" because it established a "concrete and demonstrable

injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests." *Id.*

Notably, the *Havens* framework is not a free pass to standing in cases brought by organizations that oppose the challenged policies. An organization that seeks to establish *Havens* standing may not, for example, rely on a "self-inflicted budgetary choice," *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) ("*ASPCA*") (citation modified), or an effect on the "organization['s] lobbying activities," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005). Nor is it sufficient to show that the policy is contrary to the organization's mission. Rather, the organization must show that the challenged action "directly affect[s] and interfere[s] with" the organization's "core business activities," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), and that "the [organization will need to] use[] its resources to counteract that injury" or will incur other tangible losses, *ASPCA*, 659 F.3d at 25.

Plaintiffs satisfy this demanding burden. Each of the five Plaintiff organizations has identified various ways that the IFR will interfere with their core business activities of providing direct legal services to (or in support of) individuals at risk of removal in proceedings before the EOIR.

### a.

The Court begins with Plaintiff Florence Project, as it both submitted a declaration, and the declarant, Ms. Laura St. John, testified (and was cross-examined) at the hearing on the pending motion. *See* Mar. 6, 2026 Hrg. Tr. (St. John) (Rough at 4–23). The Florence Project meets its burden of demonstrating that the IFR will substantially frustrate its core business

activities and will impair its ability to provide legal services to those in removal proceedings. The Florence Project's mission is to "provide free legal and social services to detained adults and unaccompanied children facing immigration removal proceedings in Arizona," and its attorneys "annually represent hundreds of clients who are held in isolated detention centers . . . before the EOIR and the BIA."  Dkt. 2-6 at 3 (St. John Decl. ¶¶ 9–10).  In 2024, the Florence Project provided full representation to over 1,000 unaccompanied minors and nearly 300 adults in Immigration and Customs Enforcement ("ICE") custody facing removal, and the organization provided additional direct representation to detained individuals in removal proceedings, including BIA appeals.  *Id.* at 5–6 (St. John Decl. ¶¶ 17–18); Mar. 6, 2026 Hrg. Tr. (St. John) (Rough at 6) (testifying that the Florence Project directly represented at least 42 clients in front of BIA in 2025).

St. John attests that the combination of "timelines created by the Rule . . . will require significant shifting of resources and training and, ultimately, will inevitably result in [the Florence Project] being able to help fewer people."  Dkt. 2-6 at 7 (St. John Decl. ¶ 23).  At the hearing, St. John testified that, due to the express waiver provision, the Florence Project is planning to prepare "something that looks much more like a full appellate brief in the notice of appeal process" to preserve issues and to ensure exhaustion.  Mar. 6, 2026 Hrg. Tr. (St. John) (Rough at 16).  She described at length the steps that Florence Project attorneys will need to take to file a Notice of Appeal (sufficient to protect their clients' appellate rights) within the 10-day window provided for by the IFR, for the range of the different kinds of clients that the Florence Project currently serves.  *Id.* (St. John) (Rough at 18–23).  This short deadline, when combined with the summary dismissal and waiver provisions, will preclude the Florence Project from

placing "nearly any BIA appeals with pro bono attorneys, thus cutting off a significant source of pro bono support for the organization."  Dkt. 2-6 at 31 (St. John Decl. ¶ 101).

The Florence Project "has just two attorneys who specialize in representing [clients with] cases in [petitions for review] before the Ninth Circuit."  *Id.* at 7 (St. John Decl. ¶ 20); *see also id.* at 5 (St. John Decl. ¶ 15) (noting that "90 to 95% of [Florence Project's] core work is focused on removal defense and related matters before EOIR and the BIA" and that the "remaining 5-10%" of work is providing legal services "in federal court litigation").  St. John testified that the organization has already begun preparing for the IFR by assessing the additional training its staff, most of whom are not admitted to practice in front of the Court of Appeals, will require to shift their BIA work to the Ninth Circuit.  *See* Mar. 6, 2026 Hrg. Tr. (Rough at 7–9); *see id.* at 9 (testifying to Florence Project's success in securing reversals and remands for clients from BIA). This shift will also have consequences for the organization's pro se program.  The Florence Project will have to expend "significant resources from [its] *pro se* cohort to explain the [appellate] process, update and improve *pro se* materials, and orient and support individuals in the [petition for review] process," Dkt. 2-6 at 23 (St. John Decl. ¶ 75), which "surely will require substantial additional fundraising to sustain," *id.* at 30 (St. John Decl. ¶ 98), as its two appellate attorneys "will nowhere near meet the need for representation in [petitions for review] that this Rule will create," *id.* at 26 (St. John Decl. ¶ 82).

The Florence Project "will not only lose income that previously was provided for appeals to the BIA, but will also need to divert funds to provide representation to these clients at the Ninth Circuit."  *Id.* at 31 (St. John Decl. ¶ 100); *see also id.* at 30–31 (noting that Florence Project's National Qualified Representative Program ("NQRP") contract to represent incompetent individuals is based on how many new cases it accepts, which will decline as a

result of the Rule); *see* Mar. 6, 2026 Hrg. Tr. (St. John) (Rough at 10–11) (describing NQRP flat-rate agreements based on the number of open cases, which would not include cases before the courts of appeals).

**b.**

The declaration of Zoey Jones, the Associate Director of the Immigration Practice at BDS, describes that organization's mission in similar detail. *See* Dkt. 2-3 at 2 (Jones Decl. ¶¶ 3, 6–7) (noting mission of the Immigration Practice is to "advance access to legal representation and lawful status for low-income noncitizens as they navigate legal systems" and that it has "advised or represented 6,000 clients in approximately 10,500 immigration matters, including removal defense"). Jones attests that the IFR will interfere with that mission and will impose substantial tangible burdens on the organization. In particular, Jones attests that the IFR's "summary dismissal process will severely curtail BDS's ability to obtain BIA review of [] [Immigration Judge] errors," "will increase the number of [petitions for review] BDS must file to obtain correction of [Immigration Judge] errors, the number of filing fees BDS must pay or seek to have waived," and will force BDS to engage in the "more costly and resource intensive process" of seeking court of appeals review, which "will impose additional resource, staffing, and financial burdens on BDS." *Id.* at 4–5 (Jones Decl. ¶¶ 21, 23–24); *see id.* at 5 (Jones Decl. ¶ 25) ("If the 23 BDS BIA appeals granted since 2021 had instead been summarily dismissed, this would have required BDS to either litigate 23 [in forma pauperis] motions or pay $13,800 in filing fees"). Jones also explains that "BDS has no full-time [petition for review] attorneys" and that, given the IFR's shift to the courts of appeals the lion's share of review of Immigration Judge decisions, BDS will need to shift its "limited supervision and staff resources to pursue

substantive appellate review" and will need to "train additional attorneys," while lacking the "funding to hire additional immigration staff." *Id.* at 6 (Jones Decl. ¶¶ 28–29).

The truncated appeals deadline will also "make it significantly more difficult for BDS attorneys to undertake all necessary tasks before filing an adequate [Notice of Appeal]." *id.* (Jones Decl. ¶ 32), and will "significantly increase the amount of work and time it takes an attorney to prepare a [Notice of Appeal]" due to the waiver provision and the lack of access to a written transcript, *see id.* at 8 (Jones Decl. ¶¶ 38–41).  Finally, the "shortened briefing deadline, and the limitation on briefing extensions—would make it significantly more difficult for BDS staff to draft ethically responsible BIA briefs . . . and would therefore require that BDS take on fewer new clients." *Id.* at 9 (Jones Decl. ¶ 48).

**c.**

Similarly, HIAS has shown that the IFR will substantially impair its ability to provide legal services to immigrants.  Stephen Brown, the Director of Immigration Legal Services at HIAS, for example, attests that the organization "provides direct legal representation to asylum seekers, asylees, refugees, and other forcibly displaced persons in a wide range of humanitarian- and family-based immigration relief," and that "[p]roviding representation to clients at risk of removal is a core component of HIAS's . . . program."  Dkt. 2-2 at 2–3 (Brown Decl. ¶¶ 8–9); *see also id.* at 3 (Brown Decl. ¶ 10) (noting that a third of HIAS's clients "are currently, or were previously, in removal proceedings before EOIR").  HIAS does not typically provide representation in federal courts of appeals.  *See id.* (Brown Decl. ¶ 11).  Brown attests that the "IFR [will] result[] in an inability for HIAS to perform [its] core services and [to] meet financial deliverables and grant requirements to program funders, . . . [because] many federal, state, and local funders expressly forbid use of [] funds in federal court proceedings against the federal

government," *id.* (Brown Decl. ¶ 12), and "HIAS will have to expend its own unrestricted funds, or identify and bid for new grant opportunities, to develop [its appellate] practice," *id.* at 9 (Brown Decl. ¶ 31); *see also id.* at 4 (Brown Decl. ¶¶ 12, 15) (referencing grant from the Office for Refugee Resettlement and local grant from Montgomery County, Maryland as examples of grants that HIAS could not use on circuit court practice).

"To continue to serve [its] clients at the same level [it] ha[s] done for decades, and to do so competently and zealously, HIAS would need to develop a robust federal appellate litigation practice from scratch," causing "significant financial costs" for admissions, training, and hiring, and "divert[ing] [its] time and energy from [its] historical work of representing clients before immigration courts and USCIS." *Id.* at 4 (Brown Decl. ¶ 14). The truncated deadline for filing a BIA appeal, moreover, means that HIAS will "either need to serve fewer clients or provide fewer services to our existing clients," *id.* at 5 (Brown Decl. ¶ 19), and will require HIAS to significantly expand its once-a-month "limited-scope legal services," because under the new 10-day filing deadline, if HIAS were to continue with its existing services, "most potential clients would likely not reach [HIAS] in time for [it] to assist them," *id.* at 7 (Brown Decl. ¶ 25); *see also id.* at 8 (Brown Decl. ¶ 27) (HIAS "will likely have to turn people away needlessly due to impending or indiscernible filing deadlines.").

### d.

NIJC faces similar operational difficulties and hurdles to its organizational mission. NIJC "provides high quality immigration legal services for as many low-income individuals and families as it can possibly reach" through "full legal representation directly to the clients, including through the appeals processes before the BIA and federal courts," by providing "*pro se* support via" a helpdesk, and by providing "legal services to individuals" at detention centers.

Dkt. 2-4 at 3 (Koop Decl. ¶¶ 6–9). "For many years now, NIJC's core priority has been representing people in a defensive posture before EOIR, particularly for asylum and related claims." *Id.* (Koop Decl. ¶ 11); *see id.* at 4 (Koop Decl. ¶¶ 13, 15, 16) (In 2025, NIJC "supported more than 8,200 noncitizens in their immigration cases, including removal defense cases," "represented more than 88 individuals in their cases before the BIA," and assisted "13 people file their own *pro se* appeals to the BIA"). The organization's National Director of Legal Services, Lisa Koop, attests that the IFR will "completely upends NIJC's practice at the BIA." *Id.* at 5 (Koop Decl. ¶ 19). The IFR's summary dismissal, truncated deadline, and waiver provisions mean that "NIJC's attorneys will have to put significantly more work—hours more— into preparing just the notice of appeal," "without knowing if the brief will be accepted." *Id.* at 7, 11 (Koop Decl. ¶¶ 33, 50) (emphases omitted).

"NIJC is regularly appointed counsel to individuals whom [Immigration Judges] have determined are not competent to represent themselves before the department," and Koop attests that "10 days [to file a Notice of Appeal] is not sufficient in these cases." *Id.* at 9 (Coop Decl. ¶ 39). The truncated deadline will also hamstring NJIC's pro se services, requiring it to "either completely change how [it] prioritize[s] intakes or face the likelihood that [it] would not be able to help a person in this posture at all." *Id.* (Koop Decl. ¶ 40). The filing and briefing deadlines will also make it such that NIJC, which "routinely relie[s] on pro bono attorneys for BIA representation as a means of maximizing NIJC's limited resources," *id.* at 12 (Koop Decl. ¶ 56), will "be unable to place BIA cases with pro bono attorneys," *id.* at 11 (Koop Decl. ¶ 51). "Indeed[,] NIJC has already cancelled a proposed pro bono pilot program in anticipation of this Rule." *Id.* at 17 (Koop Decl. ¶ 82). The IFR's provisions will "diminish the number of cases [NIJC] is able to take" *id.* at 13 (Koop Decl. ¶ 61), will "jeopardize [] funding streams because

NIJC will be unable to represent as many clients," and will require it to "increase [its] staff devoted to providing *pro se* services just to continue serving the same number of people," *id.* at 17 (Koop Decl. ¶¶ 81, 83).

**e.**

Finally, the Managing Appeals Attorney for the Detained Adults Program at Amica, Aimee Mayer-Salins, offers a similar account of how the IFR will interfere with the organization's ability to engage in its core business activities and to provide competent legal services to its clients. Mayer-Salins describes the mission of the organization and explains how the IFR will prevent the organization from performing its work and will impose serious additional costs on it. Dkt. 2-5 at 2–3 (Mayer-Salins Decl. ¶¶ 5–7). "The lion's share of Amica Center's overall work is supporting people in a defensive posture before EOIR, either through full representation or pro se support." *Id.* at 3 (Mayer-Salins Decl. ¶ 7); *id.* (noting that in 2025, Amica "represented approximately 820 clients who were in active removal proceedings" and over the past two years, "has represented approximately 200 clients before the BIA, the vast majority of whom are detained."). Although "Amica Center maintains a robust [petition for review] practice," it "faces barriers to expanding [these] services." *Id.* at 5 (Mayer-Salins Decl. ¶ 16); *id.* at 3 (Mayer-Salins Decl. ¶¶ 8, 10) (describing that "hundreds of hours of staff time can go into one PFR," whereas most attorneys spend about "25 to 35 hours on a BIA appeal.").

Among other things, some of Amica's grants "do not permit [it] to bill for federal court representation," such as its grant from NQRP or "require[] [its] largest bucket of deliverables to be representation in administrative proceedings," such as its grant from the Maryland Legal Services Corporation, and its "grants are either structured based on the number of separate matters or the number of individuals served," both of which would disincentivize the very

33

petitions for review the IFR contemplates. *Id.* at 5–6 (Mayer-Salins Decl. ¶¶ 18–21). Amica "would need to either find additional funders or hope existing funders are willing to adjust deliverables." *Id.* at 6 (Mayer-Salins Decl. ¶ 21). "If this IFR goes into effect, it would be nearly impossible for an [Amica] attorney who did not represent the client during [Immigration Judge]-level proceedings to take on representation before the BIA," given the compressed timeline and Notice of Appeal requirements would make it "likely" that "Amica Center . . . would not learn about the case before the appeal deadline has passed." *Id.* at 7–8 (Mayer-Salins Decl. ¶¶ 26–28). The truncated deadlines will also mean that "Amica Center would need to overhaul [its] appeals procedures to a more resource-intensive model to make appeals to the BIA and therefore a circuit court feasible," which will "require significant training for staff" and "drain organizational resources." *Id.* at 8–9 (Mayer-Salins Decl. ¶¶ 30, 32, 35).

\*   \*   \*

These declarations support the common-sense proposition that the IFR will "directly affect[] and interfere[] with" the organizations' "core . . . activities" of providing legal services in the context of administrative removal proceedings. *All. for Hippocratic Med.*, 602 U.S. at 395. The organizations will need to fundamentally reorganize how they operate, will incur training and other expenses in doing so, will face impossible (or near impossible) deadlines in seeking to convince the BIA that their clients' appeals do not merit summary dismissal, will lose funding based on the shift in their work away from the BIA and toward the courts of appeals, and will be able to represent fewer clients with less care, in contravention of their core missions. Based on the detailed declarations, and St. John's testimony at the hearing on Plaintiffs' motion, the Court finds that Plaintiffs have established a concrete injury separate from the procedural deprivation and "a causal connection between the government action that supposedly required the

disregarded procedure and some reasonably increased risk of injury to its particularized interest.'" *Fla. Audubon Soc'y*, 94 F.3d at 664. No more is required to establish standing under the procedural injury doctrine.

Defendants raise a bevy of counterarguments, none of which is availing.

*First*, at various points, Defendants challenge the substance of Plaintiffs' declarations. *See, e.g.*, Dkt. 26 at 16 ("Plaintiffs have little to base their claims of additional work on, given that the IFR aims to streamline BIA review such that the total number of hours spent on removal proceedings should decrease."); *id.* ("[T]he new rule is actually likely to reduce the time Plaintiffs spend on BIA proceedings, since full briefing will no longer be necessary in many cases."). That, of course, is a predictive judgment. But Plaintiffs have offered detailed explanations, based on years of experience, supporting their conclusions. Defendants, in contrast, offer only one reason to believe that the IFR will reduce—rather than increase— Plaintiffs' workload: Plaintiffs will quickly lose virtually every appeal that they bring before the Board. That argument, of course, ignores Plaintiffs' unrebutted (and common-sense) testimony that litigating cases before the courts of appeals is more expensive and time-intensive than litigating cases in an administrative forum and that, without the availability of BIA remands or other forms relief, Plaintiffs will need to file additional cases in the courts of appeals. It also ignores Plaintiffs' evidence regarding the successes that they have previously achieved before the Board; Jones attests, for example, "[o]f the approximately 104 merits appeals BDS has filed since 2021, the BIA has sustained 23 (issuing a final decision in 1 case and remanding in 22) and dismissed 22." Dkt. 2-3 at 4 (Jones Decl. ¶ 18).[4] Under the IFR, this record will be

---

[4] In the remaining cases, BDS withdrew as counsel (once); BDS withdrew the appeal before decision (thirteen times), or the BIA has yet to issue a decision (forty-five times). Dkt. 2-3 at 4 (Jones Decl. ¶ 18).

unsustainable, and BDS will need to look to the courts of appeals for relief. That will inevitably require more time and resources. In any event, "[a] defendant's actions need only cause a 'perceptibl[e] impair[ment],' and some attendant expenditure or loss of resources," *RAICES*, 793 F. Supp. 3d at 69 (alterations in original) (quoting *Havens Realty Corp.*, 455 U.S. at 379), and Plaintiffs "have made that showing—and then some," *id.*

More fundamentally, Defendants miss the point: Plaintiffs are in the business of representing clients before the Board, and effectively closing that courthouse door will interfere with their ability to engage in that core aspect of their business. Defendants' argument is like telling Habitat for Humanity that a rule limiting new home construction will help, rather than hurt, the organization because it will incur fewer costs acquiring lumber and nails. Plaintiffs are in the business of representing clients before the BIA, and the IFR replaces the extant right to file an appeal with what Defendants aptly characterizes as limited "discretionary" review. IFR, 91 Fed. Reg. at 5267.

*Second*, Defendants contend that "[a] diversion of resources in response to agency action does not itself confer standing." Dkt. 26 at 14. But for the reasons explained above, Plaintiffs' injuries go far beyond the mere need to "divert[] [their] resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 370. Rather, Plaintiffs must "expend resources in a manner that keeps [them] from pursuing [their] true purpose[s]" of providing legal services in administrative immigration proceedings. *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). Moreover, as explained in the declarations, and as St. John explained at the hearing, Plaintiffs' financial losses include both the inability to use current sources of funding for mitigation efforts made necessary by the IFR, such as courts of appeals practice, and lost incoming revenue streams.

*Third*, Defendants argue that, based on the Supreme Court's decision in *Alliance for Hippocratic Medicine*, "[t]he law forecloses the kind of 'lawyer standing' that Plaintiffs assert here." Dkt. 26 at 17. They assert: "Much like the doctors in *Hippocratic Medicine*, here lawyers assert that they [can] sue to challenge administrative procedures" because the IFR "will immediately affect [their] ability to serve their existing clients and take on new clients," "the kind of alleged injury that *Hippocratic Medicine* said was insufficient." *Id.* at 18 (second alteration in original) (citation omitted). Defendants further maintain that "Plaintiffs cite no case in which lawyers had standing in their own right to challenge a change in procedural rules or statutes that would affect their current and future clients." *Id.* The Court is unpersuaded.

In *Alliance for Hippocratic Medicine*, a group of pro-life doctors and associations sued the FDA over a rule relaxing its regulatory requirements for mifepristone, an abortion drug. 602 U.S. at 372–73. The Supreme Court considered two *separate* theories of standing: the individual standing of the pro-life doctors based on asserted injuries to their conscience and professional practice, *see id.* at 386–93, and the organizational standing of the medical associations on their own behalf, *id.* at 393–96. As to the former, the Court concluded that the individual doctors had failed to establish that the FDA regulation caused their asserted conscience injuries, because "the broad and comprehensive conscience protections guaranteed by federal law" "breaks any chain of causation between FDA's relaxed regulation of mifepristone and any asserted conscience injuries to the doctors." *Id.* at 390. In addition, the Court declined to create a "novel standing doctrine" that "allows doctors to challenge general government safety regulations," because such a standing rule "would be an unprecedented and limitless approach and would allow doctors to sue in federal court to challenge almost any policy affecting public health." *Id.* at 391–92. As to the latter, the Court considered the medical associations' organizational standing and concluded

that their expenditure of "money to gather information and advocate against the defendant's actions" was not the kind of impact on "core business activities" required under the familiar organizational standing framework set forth by *Havens*. *Id.* at 394–95.

Here, Plaintiffs invoke *only* the latter theory explored in *Alliance for Hippocratic Medicine*: they are organizations bring suit on their own behalf, asserting injuries to their core business activities. The relevant discussion in *Alliance for Hippocratic Medicine* is as follows:

> The medical associations respond that under *Havens Realty Corp. v. Coleman*, standing exists when an organization diverts its resources in response to a defendant's actions. That is incorrect. Indeed, that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies. *Havens* does not support such an expansive theory of standing.
>
> The relevant question in *Havens* was whether a housing counseling organization, HOME, had standing to bring a claim under the Fair Housing Act against Havens Realty, which owned and operated apartment complexes. Havens had provided HOME's black employees false information about apartment availability—a practice known as racial steering. Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service. And when Havens gave HOME's employees false information about apartment availability, HOME sued Havens because Havens "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." In other words, Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer.
>
> That is not the kind of injury that the medical associations have alleged here. FDA's actions relaxing regulation of mifepristone have not imposed any similar impediment to the medical associations' advocacy businesses.
>
> At most, the medical associations suggest that FDA is not properly collecting and disseminating information about mifepristone, which the associations say in turn makes it more difficult for them to inform the public about safety risks. But the associations have not claimed an informational injury, and in any event the associations have not suggested that federal law requires FDA to disseminate such information upon request by members of the public.

*Id.* at 395–96 (citations omitted).

If anything, this discussion bolsters Plaintiffs' claim to standing.  As in *Havens*, Plaintiffs are "not only . . . issue-advocacy organization[s]," but they also "operate[]" BIA appellate "counseling service[s]," *id.* at 395, and, indeed, represent clients before the BIA.  And, as in *Havens*, Plaintiffs have demonstrated that the IFR will "perceptibly impair[]" their "ability to provide counseling and [related] services."  *Id.* (citation modified).  "In other words," as in *Havens*, the IFR will "directly affect[] and interfere[] with [Plaintiffs'] core business activities."  *Id.*  Indeed, the "core business activities" of Plaintiffs in this case are not dissimilar to the interests of a "vendor who is prevented from selling his product to third parties by [an] unlawful regulation" and who "may challenge that regulation on the basis of the vendor-vendee relationship alone."  *Lepelletier v. Fed. Deposit Ins. Corp.*, 164 F.3d 37, 44 (D.C. Cir. 1999) (citation modified).  "No more is required to establish standing under *Havens* and *Alliance for Hippocratic Medicine*."  *RAICES*, 793 F. Supp. 3d at 69.  Defendants' contention that Plaintiffs instead assert "lawyer standing" misreads their declarations and briefs, which focus on the effect that the IFR will have on *their* core business activities.

*Finally*, Defendants contend that Plaintiffs' "forecast[s]" about the impacts of the IFR on their work are "all speculation about the potential future effects of the IFR," Dkt. 26 at 15, that "Plaintiffs' response . . . is not compelled by the IFR," *id.* at 16, and that their "alleged financial injur[ies] . . . [are] self-inflicted," *id.* at 19.  That is incorrect, as Defendants' own arguments show.  For instance, Defendants say, "[a]fter all, there is no way for Plaintiffs to know how the BIA judges will exercise their discretion, and they point to nothing concrete that demonstrates that discretion will be exercised in a manner that will harm Plaintiffs."  *Id.* at 15.  But that is precisely the point.  Plaintiffs attest that the IFR will require them to spend significantly more time and resources preparing likely futile Notices of Appeal in a shorter window in the hopes of

securing BIA review and serving their clients in the same way they have for years. Plaintiffs also attest that these burdens will be exacerbated for clients who they seek to represent on BIA appeal but who appeared pro se during immigration proceedings. *See, e.g.*, Dkt. 2-2 at 3, 6 (Brown Decl. ¶¶ 10, 12, 22–23); Dkt. 2-5 at 7–8 (Mayer-Salins Decl. ¶¶ 26–28); Dkt. 2-4 at 4, 8, 11 (Koop Decl. ¶ 15, 34, 52).

Elsewhere, Defendants suggest that Plaintiffs could "reduce the number of Board appeals they take on, instead reallocating those resources to less onerous kinds of representation and allowing them to maintain the total number of clients they represent." Dkt. 26 at 19. But that is simply to admit that Plaintiffs would need to restructure their operations and redefine their core business activities. Far from being self-inflicted or speculative, those injuries will inevitably flow from the IFR, and the rule will impede on how Plaintiffs go about their businesses. The IFR will affect the quantity and quality of services Plaintiffs can provide; it will require Plaintiffs to restructure their programs; and it will affect their client relationships, pro bono relationships, and funding. *See Equal Rts. Ctr.*, 633 F.3d at 1140 (an injury being self-inflicted does not "depend on the voluntariness or involuntariness of the plaintiffs' expenditures," but whether "they undertook the expenditures in response to, and to counteract, the effects of the defendants' [policy]"). Finally, it bears note that Plaintiffs' injuries do not and will not "arise[] from the effect of the regulations on [their] lobbying activities" or any "pure issue-advocacy" on their part, such as this lawsuit. *Ctr. for Law & Educ.*, 396 F.3d at 1161–62.

"Courts have never required an organization to prove that it is entirely hamstrung by challenged actions," *O.A.*, 404 F. Supp. 3d at 143, and the injuries to their business activities that Plaintiffs have identified are more than sufficient.

2.      *Zone-of-Interests Standing*

Defendants also argue that Plaintiffs fail the zone-of-interests test.  Dkt. 26 at 20–21.

According to Defendants, the "INA supplies a cause of action to challenge issues arising from

removal proceedings under 8 U.S.C. § 1229a *only to individuals subject to removal proceedings*,

and only through judicial review in the courts of appeals following administrative proceedings."

*Id.* (emphasis in original) (citing 8 U.S.C. § 1252(a), (a)(5), (b)(9)).[5]  Defendants tread familiar,

yet unsuccessful, ground.

---

[5] At an initial status conference, Defendants suggested that 8 U.S.C. §§ 1252(a)(5) and
1252(b)(9) divest this Court of subject matter jurisdiction over Plaintiffs' suit.  Dkt. 16 at 30–31.
8 U.S.C. § 1252(a)(5) mandates that "a petition for review filed with an appropriate court of
appeals . . . shall be the sole and exclusive means for judicial review of an order of removal," and
8 U.S.C. § 1252(b)(9) consolidates "[j]udicial review of all questions of law and fact . . . arising
from any action taken or proceeding brought to remove an alien from the United States" into
"judicial review of a final order" of removal.  Defendants no longer press either argument and,
instead, simply cite these provisions as evidence that Congress did not intend for immigration
organizations, like Plaintiffs, to fall within the INA's zone of interests.  Dkt. 26 at 20–21.

Because the Court has an independent obligation to ensure that it has subject matter jurisdiction,
the Court has nonetheless considered the jurisdictional argument previously raised by
Defendants and concludes for the reasons given in *O.A. v. Trump*, 404 F. Supp. 3d 109, 127–37
(D.D.C. 2019), that neither provision divests this Court of jurisdiction.  Plaintiffs, in short, are
organizations that are not subject to removal proceedings, and their claims do not arise from
removal proceedings, removal orders, actions taken to remove an alien, or questions of law or
fact that arose in a specific removal proceeding.  Instead, Plaintiffs' claims arise from the IFR
that alters the appellate procedure applicable to all BIA appeals, and they "seek[] to set aside the
regulation itself."  *Id.* at 132; *see also id.* at 128 (noting that "[t]he plain language of § 1252(a)
and § 1252(a)(5) makes clear that those provisions do not, standing alone, apply to Plaintiffs'
challenge" because "they bring a facial challenge to the validity of a regulation of general
applicability based on the administrative record generated in the rulemaking"); *id.* at 132–33
(concluding that section 1252(b)(9) does not bar plaintiffs' claims because they did not "seek to
set aside an order of removal, a decision to initiate removal proceedings, the rejection of any
defensive asylum claim, or a detention order," but instead "ask that the Court consider a series of
questions of law 'arising from' a rulemaking of general applicability"); *Centro Legal*, 524 F.
Supp. 3d at 951–53; *Cap. Area Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 39–40 (rejecting
similar argument in the context of organizational standing); *Cath. Legal Immig. Network, Inc. v.
Exec. Off. for Immig. Rev.*, 513 F. Supp. 3d 154, 167–69 (D.D.C. 2021) (relevant sections do
not bar judicial review of APA challenge to a rule increasing existing immigration proceeding
filing fees); *Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F.

Zone-of-interests standing is not a jurisdictional doctrine but, rather, requires that the "plaintiff's complaint fall[s] within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citation modified); *see also Citizens for Const. Integrity v. Census Bureau*, 115 F.4th 618, 627 (D.C. Cir. 2024) (The zone-of-interests inquiry "is a merits issue, not a jurisdictional one." (citation modified)).  The "modern zone of interests formulation" is, in other words, "a limitation on the cause of action for judicial review conferred by the [APA]." *Lexmark Int'l Inc.*, 572 U.S. at 129 (citation modified). "[I]n keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable,'" the test, at least in the APA context, "'is not meant to be especially demanding.'" *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)).  "The interest [the plaintiff] asserts must be arguably within the zone of interests to be protected or regulated by the [underlying] statute that [the plaintiff] says was violated." *Id.* at 224 (citation modified).  Courts "do not require any indication of congressional purpose to benefit the would-be plaintiff," and the Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Id.* at 225 (citation modified).  "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (citation modified).  In sum, the question is merely whether the plaintiffs are "reasonable—indeed, predictable—challengers of" the agency conduct in light of the topics encompassed by the statute. *Id.* at 227.

---

Supp. 3d 16, 29 (D.D.C. 2020) (noting that sections 1252(a)(5) and (b)(9) do not bar challenges to "the validity of a regulation of general applicability" (quoting *O.A.*, 404 F. Supp. 3d at 128)).

For the same reasons that the Court has explained in similar cases, Plaintiffs readily meet the permissive zone-of-interests test. *See, e.g.*, *O.A.*, 404 F. Supp. 3d at 143–45; *RAICES*, 793 F. Supp. 3d at 75–76. To start, Plaintiffs' interests in providing legal assistance to individuals in removal proceedings, including representation before the BIA, is consistent with the INA's guarantee of "the privilege of being represented (at no expense to the Government) by such counsel" "in any appeal proceedings before the Attorney General from any such removal proceedings," 8 U.S.C. § 1362. It is also consistent with the INA's broader purposes of establishing an orderly system for removal proceedings, *see* 8 U.S.C. § 1229a, that affords certain procedural guarantees such as "the privilege of being represented . . . by counsel," *id.* § 1229a(b)(4)(A). Notably, Congress required that individuals in removal proceedings under 8 U.S.C. § 1229a be given "written notice . . . specifying [that] . . . [t]he alien may be represented by counsel" and that he or she "will be provided (i) a period of time to secure counsel . . . and (ii) a current list of counsel" "who have indicated their availability to represent pro bono aliens in proceedings under section 1229a," 8 U.S.C. § 1229(a)(1)(E), (b)(2). Defendants cannot reasonably dispute that Plaintiffs are "reasonable—indeed, predictable—challengers," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 227, to an IFR that allegedly interferes with their ability to further these statutory objectives.

Defendants seek support for their position in a handful of older cases, which they say stand for the general proposition that "organizations are outside the immigration statutes' zone of interests." Dkt. 26 at 21 (citing *Fed'n for Am. Immigr. Reform, Inc. v. Reno* ("*FAIR*"), 93 F.3d 897, 900–04 (D.C. Cir. 1996); *Immigr. & Naturalization Serv. v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor* ("*LAP*"), 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers); *Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993); *Am. Immigr. Laws. Ass'n v. Reno*, 199

43

F.3d 1352, 1359 (D.C. Cir. 2000)).  The Court has previously considered and rejected this same

contention.  As the Court wrote in *O.A.*:

> Neither [*LAP*] nor [*FAIR*] supports [Defendants' position].  Justice O'Connor's
> in chambers opinion in *LAP* reflects the views of a single Justice relating to a
> different statute, IRCA.  *FAIR*, too, is inapposite.  The organization at issue in
> that case was "dedicated to ensuring that levels of legal immigration are
> consistent with the absorptive capacity of the local areas where immigrants are
> likely to settle," and it brought suit challenging the INA's scheme for "parole
> and adjustment of status of Cuban nationals" into the United States.  *FAIR*, 93
> F.3d at 899.  The D.C. Circuit held that the organization's mission bore no more
> than a "marginal relationship" to the statutory purposes of the INA, because it
> pointed to no language of congressional intent that "even hinted at a concern
> about regional impact" of immigration.  *Id.* at 900–01.

404 F. Supp. 3d at 145 n.14 (citation modified); *see also Cap. Area Immigrants' Rts. Coal.*, 471

F. Supp. 3d at 43–44 (distinguishing *LAP* and *FAIR*).  Defendants fail to explain why a different

conclusion is warranted here.

Nor do any of the other cases that Defendants cite support a different conclusion.  Like

Justice O'Connor's in chambers decision in *LAP*, *Ayuda* involved the district court's jurisdiction

under the IRCA, *see* 7 F.3d at 250, not prudential standing under the INA, and it concluded that

the organizational plaintiffs lacked Article III standing (rather than prudential standing under the

INA) for reasons similar to *FAIR*:  The organizations "could not have had any connection to [the

policy], even had it occurred," *id.* at 250 & n.10.  Finally, *American Immigration Lawyers*

*Association* was about third-party organizational standing to challenge the Attorney General's

regulations under IIRIRA, 199 F.3d at 1356, which the D.C. Circuit explicitly noted was

"distinct from" "the 'zone of interests' test, an aspect of prudential standing," *id.* at 1357; *see*

*also Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 627 (D.C. Cir. 2020) ("*American Immigration*

rejected third-party organizational standing by the American Immigration Lawyers Association

itself as a basis to sue under Subsection 1252(e)(3).").  Here, each Plaintiff seeks to vindicate its

own organizational interests rather than those of unnamed third parties.  *Cf. Cap. Area*

*Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 40 (noting, in the context of similar arguments made against organizational standing, that "the text of Section 1252 provides no support for the proposition that organizations may not facially challenge under the APA immigration-related regulations that *harm their own interests*" (emphasis added)); *see also RAICES*, 793 F. Supp. 3d at 72 n.8, 75–76 & n.9.

More fundamentally, these cases preceded and thus fail to engage with the standard set forth in *Lexmark International* and *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians. See Cap. Area Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 44 ("[R]ecently the Supreme Court has consistently adopted a broader view of the [zone-of-interests] test than the one Justice O'Connor espoused in *LAP*." (collecting cases)).  Defendants' arguments cannot be squared with the statutory provisions discussed above, which show that Plaintiffs' interests, at the very least, "arguably" fall within the INA's purposes, or with the overwhelming consensus in the cases that have confronted similar arguments.  *See*, *e.g.*, *O.A.*, 404 F. Supp. 3d at 143–45; *RAICES*, 793 F. Supp. 3d 75–76; *Cap. Area Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 42–44; *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 51–53 (D.D.C. 2020); *Cath. Legal Immigr. Network, Inc.*, 513 F. Supp. 3d at 171; *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, 783 F. Supp. 3d 200, 217–18 (D.D.C. 2025).

Plaintiffs have prudential standing to bring this suit.

## B.    Notice-And-Comment Claim

In the first count of their Complaint, Plaintiffs challenge the IFR on the ground that the EOIR failed to comply with the APA's notice-and-comment requirements. Dkt. 1 at 42–43 (Compl. ¶¶ 121–27).  Defendants do not dispute that the IFR is set to take effect without first complying with the APA's usual notice-and-comment procedures. Dkt. 26 at 29–30.  But they maintain that those procedures do not apply here for two reasons.  First, as explained in the IFR,

the notice-and-comment requirements do not apply to "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), and, according to the EOIR, the IFR merely establishes "the most efficient processes" for adjudicating BIA appeals.  IFR, 91 Fed. Reg. at 5274.  Second, as also explained in the IFR, the notice-and-comment requirements do not apply to rules that "involve . . . a military or foreign affairs function of the United States," 5 U.S.C. § 553(a)(1), and, according to the EOIR, the IFR involves foreign affairs because it "will allow the United States Government to build on momentum with international partners to address shared challenges to border security and illegal immigration."  IFR, 91 Fed. Reg. at 5275.

Unsurprisingly, Plaintiffs disagree.  In their view, the IFR does not simply "streamline administrative appellate review by the Board," *id.* at 5267, but, instead, deprives most individuals in removal proceedings of *any* meaningful administrative appeal.  And far from "involv[ing] the conduct of international affairs," in Plaintiffs' view, the IFR reshapes "removal proceedings, which occur domestically, and which involve individuals inside the country."  Dkt. 2-1 at 14.  They, accordingly, maintain that the IFR must be set aside for failure to comply with a fundamental procedural requirement.  Dkt. 1 at 42–43 (Compl. ¶¶ 121–27).  For the reasons explained below, the Court agrees with Plaintiffs that the IFR fails to offer an adequate justification for declining to comply with the notice-and-comment requirement and that the Rule, accordingly, was promulgated "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

### 1.

In the usual course, an "agency may promulgate a final [substantive] rule only after providing notice and opportunity for comment," *U.S. Dep't of Educ. v. Brown*, 600 U.S. 551, 558 (2023), and only after considering and responding to any comments that raise significant issues

with the proposed agency action, *see Bloomberg L.P. v. SEC*, 45 F.4th 462, 476 (D.C. Cir. 2022). This requirement ensures that those who may be affected by rules adopted outside the usual democratic processes receive "at least some opportunity to make their views heard and to have them given serious consideration," *Biden v. Missouri*, 595 U.S. 87, 105 (2022) (Alito, J., dissenting); *see also Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980) ("The essential purpose of according . . . notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies."), and it ensures that administrative agencies proceed in a deliberative and informed manner, *see Bloomberg L.P.*, 45 F.4th at 476–77, which is one of the hallmarks of administrative law, *see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48–49 (1983).  The requirement, however, is not categorical, and is subject to certain statutory exemptions, including the two exemptions at issue in this case.

The first exemption at issue applies to "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), and the second applies "to the extent that there is involved . . . a military or foreign affairs function of the United States, *id.* § 553(a)(1).  Both must be "narrowly construed and only reluctantly countenanced."  *N.J. Dep't of Env't Protection v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980); *see also AFL-CIO v. NLRB*, 57 F.4th 1023, 1035 (D.C. Cir. 2023); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6 (D.C. Cir. 2011) ("*EPIC*"); *E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 62–63 (D.D.C. 2022).  Only in this manner can the courts ensure that "[t]he salutary effect of the [APA's] public comment procedures" are not eroded by administrative convenience or expediency.  *Am. Bus Ass'n v. United States*, 627 F.2d 525, 528 (1980) (citation modified).  As with other exceptions to the notice-and-comment requirement, the Court reviews "the agency's legal conclusion[s] . . . *de novo*," but accords

appropriate deference to the "agency's factual findings and expert judgments . . . unless such findings and judgments are arbitrary and capricious." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 & n.3 (D.C. Cir. 2014); *see also Bauer v. DeVos*, 325 F. Supp. 3d 74, 97 (D.D.C. 2018). The essential question is whether the agency has justified, and has adequately explained, "its decision to skip" an otherwise essential "procedural step" in promulgating a binding rule. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021); *see also U.S. Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 20 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." (citation modified)).

## 2.

As the EOIR did in the IFR, the Court starts with the exception for "procedural rules." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (citation modified). Under that exception, the usual notice-and-comment procedures do not apply to "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Although often referred to as the "procedural exception" to the notice-and-comment requirement, *see AFL-CIO*, 57 F.4th at 1034, the D.C. Circuit has repeatedly—over a course of decades—made clear that "not all rules that might be categorized as procedural are exempted" and that, instead, "the limited carveout is intended for 'internal house-keeping measures organizing agency activities,'" *id.* (quoting *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987)). That reading of the statutory text is supported by the familiar *noscitur a sociis* canon, which instructs that "a word is known by the company it keeps." *Ali v. FBI*, 552 U.S. 214, 226 (2008) (citation modified). Like "agency organization," the concepts of "agency procedure" and "agency practice" focus on the "internal operations" of the agency, *AFL-CIO*, 57 F.4th at 1034 (citation modified), and, read in this light,

the exception "ensure[s] that agencies retain latitude in organizing their internal operations,"

*Mendoza*, 754 F.3d at 1023 (citation modified).

In applying this exception, courts "have struggled with the distinction between 'substantive' and 'procedural' rules." *JEM Broad. Co., Inc. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994). Almost all nominally "procedural rules affect substantive rights to greater or lesser degree," *Lamoille Valley R. Co. v. ICC*, 711 F.2d 295, 328 (D.C. Cir. 1983), just as most nominally substantive rules are bounded and defined by procedural dictates. For almost fifty years, however, the D.C. Circuit has applied a more concrete test to distinguish between "rules of agency organization, procedure, or practice," which are not subject to 5 U.S.C. § 553, and substantive rules, which are. Thus, as far back as 1980, the circuit observed that "the exemption's critical feature is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency," *Batterton*, 648 F.2d at 707, and as recently as 2023, the D.C. Circuit reaffirmed this test in almost identical terms, *see AFL-CIO*, 57 F.4th at 1034. In the years in between, moreover, the circuit has applied that test without fail. *See, e.g.*, *Lamoille Valley R. Co.*, 711 F.2d at 328; *Neighborhood TV Co., Inc. v. FCC*, 742 F.2d 629, 637 (D.C. Cir. 1984); *Am. Hosp. Ass'n*, 834 F.2d at 1047; *JEM Broad. Co.*, 22 F.3d at 326; *Chamber of Com. of U.S. v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999); *EPIC*, 653 F.3d at 5; *Mendoza*, 754 F.3d at 1023; *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000). For its part, the EOIR agrees that "any rule that 'alter[s] the rights or interests of parties' is not 'procedural.'" IFR, 91 Fed. Reg. at 5274 (alteration in original) (quoting *James V. Hurson Assocs.*, 229 F.3d at 280).

Application of this test poses a question "of degree—whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." *Lamoille Valley R. Co.*, 711 F.2d at 328. Relevant inquiries include whether the rule "change[s] the substantive standards by which the [agency] evaluates [claims]," *James V. Hurson Assocs.*, 229 F.3d at 280 (emphasis omitted); whether it "imposes substantive burdens," "encodes a substantive value judgment," "trenches on substantial private rights or interests," or "otherwise alters the rights or interests of parties," *AFL-CIO*, 57 F.4th at 1034–35 (citation modified); and whether notice and comment is needed to "safeguard the policies underlying the APA," including "'the need for public participation in agency decisionmaking" and need "to ensure the agency has all pertinent information before it when making a decision," *EPIC*, 653 F.3d at 317–18 (citation modified). Indeed, even a rule that "prescribes a timetable for asserting substantive rights" requires notice and comment when "the time allotted is so short as to foreclose effective opportunity to make one's case on the merits." *Lamoille Valley R. Co.*, 711 F.2d at 328.

Against this backdrop, the Court must consider how to apply the governing standard to the IFR at issue here. In Defendants' view, the Court must do so on a provision-by-provision basis, essentially "conduct[ing] a severability analysis to ensure that the many, clearly procedural aspects of the IFR can be implemented." Dkt. 26 at 33. With one caveat, the Court agrees. As Defendants observe, that is the approach that the D.C. Circuit took in *AFL-CIO*, 57 F.4th at 1035–47. In that case, as here, the IFR, included an express severability provision, *compare* Representation-Case Procedures, 84 Fed. Reg. 69524, 69525 n.5 (Dec. 18, 2019), *with* IFR, 91 Fed. Reg. at 5274, and in that case, as here, the agency invoked the procedural rule exception across the board, without making findings with respect to each relevant portion of the rule,

*compare* Representation-Case Procedures, 84 Fed. Reg. at 69528, *with* IFR, 91 Fed. Reg. at

5274.  The caveat is, unlike in *AFL-CIO*, certain provisions at issue here are intertwined in a

manner that precludes the type of line-by-line (or clause-by-clause) analysis that Defendants

propose.  The Court will first address the portions of the Rule that are subject to the notice-and-

comment requirement before turning to those that, at least based on the present record, the Court

cannot conclude are subject to the notice-and-comment requirement.

## Substantive Provisions

At least three portions of the rule work hand-in-glove and, accordingly, need to be

considered together.  Indeed, Defendants themselves acknowledge that the central features of the

IFR—the ten-day filing deadline and the "presumption of summary dismissal"—"operate in

lockstep."  Dkt. 26 at 37.  The IFR, in particular, creates a fast-track mechanism for disposing of

the vast majority of BIA appeals by (1) requiring, except in certain cases challenging the denial

of an asylum application, that the interested party file a Notice of Appeal from a decision of an

Immigration Judge within ten calendar days of the Immigration Judge's oral decision or the

mailing or electronic notification of her decision, IFR, 91 Fed. Reg. at 5278 (proposed changes

to 8 C.F.R. § 1003.38(b)); (2) treating "[a]ny issue not raised in the Notice of Appeal" as

"waived," *id.* (proposed change to 8 C.F.R. § 1003.38); and (3) summarily dismissing the appeal

unless within ten days of the filing of a Notice of Appeal, the assigned "Board member refers

[the] appeal for consideration by the Board en banc" and the Board votes en banc to accept the

appeal, *id.* at 5277 (proposed changes to 8 C.F.R. § 1003.1(d)).  In short, the affected party has

ten days from the issuance of the Immigration Judge's oral or written decision to file a Notice of

Appeal that is sufficiently detailed and persuasive to permit a Board member to see sufficient

merit in the appeal to refer it to the en banc Board and to permit the en banc Board, in turn, to

vote to accept the appeal—all within ten days of the filing of the Notice of Appeal.  "If the Board

fails to vote en banc within that [ten-day] time, the appeal shall be deemed to have been

summarily dismissed."  *Id.*  Such a dismissal must then "be effectuated through the issuance of a

written order no later than 15 days after the appeal is filed."  *Id.*  All of this must occur,

moreover, without the benefit of a transcript of the Immigration Judge's oral decision, since a

transcript will be created only if the en banc Board votes to accept the appeal for merits review

and further decides that preparation of a transcript of the immigration court proceeding is

"warranted."  *Id.* at 5278 (proposed changes to 8 C.F.R. § 1003.5(a)); *id.* at 5277 (proposed

changes to 8 C.F.R. § 1003.3).

      The parties offer very different characterizations of how these new rules will operate.  On

Defendants' telling, the rules will simply streamline the appellate process and will reduce the

backlog of cases pending before the Board.  *Id.* at 5267.  The IFR is, in the EOIR's words,

"undoubtedly directed toward improving the efficient and effective operations of the Board."  *Id.*

at 5274.  On Plaintiffs' telling, in contrast, these provisions will operate in combination to

deprive almost all affected parties of the administrative appellate review "that they were

previously entitled to under the INA and the regulations."  Dkt. 2-1 at 17.

      An amicus brief filed by over sixty former Immigration Judges and Board Members

echoes that view, characterizing the IFR as "a radical departure from past practice" that includes

timetables and requirements under which "[a]ny review of substance [will be] simply

impossible."  Dkt. 24 at 6.  That same brief then details the practical hurdles that the IFR would

pose to obtaining any review—much less meaningful review.  *See generally id.* at 13–18

(documenting the current behind-the-scenes BIA process from the filing of a Notice of Appeal to

potential en banc review); *id.* at 20–25 (describing the obstacles to appellate review imposed by

the IFR's timelines).  To take just one example, which counsel for Defendants did not dispute at

oral argument, Mar. 6, 2026 Hrg. Tr. (Rough at 83), during the ten-day period (no more than

eight and often five or six business days) between the filing of a Notice of Appeal and the entry

of a presumptive summary dismissal, the BIA's clerk would need to docket the appeal and would

need to "identify any technical errors . . . (including payment of fees)" and then "assign the

matter to an attorney."  Dkt. 24 at 22.  The attorney, in turn, would need "to review the case

(including the record), and then communicate the proposed decision to a Board Member, who

[would need] to decide whether to put it before the en banc panel, which then [would need] to

consider, deliberate and vote on whether to allow briefing."  *Id.* (emphasis omitted).  All of this

would need to occur, moreover, in the context in which "roughly 400 appeals" are filed per day.

*Id.* at 18.  Against this backdrop, one can only conclude that the overwhelming majority of BIA

appeals will receive no meaningful consideration.  *See generally* Dkt. 2-7 at 8–9 (Former

Appellate Immigration Judges, Comment Letter on RIN 1125-AB37/EOIR Docket No. EOIR-

26-AB37 (Feb. 25, 2026)).

     For present purposes, the Court need not decide whether the IFR is consistent with the

INA and whether it is arbitrary and capricious.  The question before the Court is simply whether

these changes to long-standing BIA regulations "alter the rights or interests of parties,"

*Batterton*, 648 F.2d at 707, or "trench[] on substantial private rights and interests," *Mendoza*, 754

F.3d at 1023 (citation modified), in a manner that "is sufficiently grave . . . that notice and

comment are needed to safeguard the policies underlying the APA," *EPIC*, 653 F.3d at 5–6

(citation modified).  As explained above, even "[w]hen a rule prescribes a timetable for asserting

substantive rights . . . the proper question is whether the time allotted is so short as to foreclose

effective opportunity to make one's case on the merits."  *Lamoille Valley R. Co*., 711 F.2d at

328.  Here, the Court is persuaded that this case falls well beyond the bounds of the narrow

exception, *AFL-CIO*, 57 F.4th at 1034, for rules of agency procedure or practice that lack the

type of "substantive effects" that implicate the "policies underlying the APA['s]" requirement for

notice and comment, *JEM Broad. Co*., 22 F.3d at 327 (citation modified).

 As an initial matter, the Court notes that the Department of Justice itself has recognized

that "[i]n the case of immigration proceedings, the private interests at stake are undoubtedly very

weighty," Executive Office for Immigration Review; Board of Immigration Appeals:

Streamlining, 64 Fed. Reg. 56135, 56138 (Oct. 18, 1999), and it has, accordingly, proceeded by

notice-and-comment rulemaking when considering and adopting similar—albeit far less

Draconian—"streamlining" measures in the past, *see id.* at 56137, including the IFR's earlier

iteration, the 2020 Rule, 85 Fed. Reg. at 81592.  The public interest in rules regulating the

administrative appeals process in immigration proceedings was sufficient to invite 1,284

comments in thirty days when the Trump Administration sought to promulgate the 2020 Rule.

*Id.*

 Here, moreover, the IFR does not merely "alter the manner in which the parties present

themselves [and] their viewpoints to the agency."  *Batterton*, 648 F.2d at 707.  To the contrary, it

dictates results.  Whereas a party subject to an adverse order from an Immigration Judge

currently has at least the hope of persuading the BIA that the Immigration Judge erred, as soon as

the IFR takes effect, that same party will almost certainly lose his case before the BIA before it

even begins; in the vast majority of cases, the case will be disposed of by summary dismissal.

By most lawyers' count, that is a loss.

 Although less palpable than an order of summary dismissal, the related provisions of the

IFR impose equally "grave" substantive effects on parties to immigration proceedings.  *Lamoille*

*Valley R. Co.*, 711 F.2d at 328.  Thus, under the IFR, an individual subject to an adverse decision from an Immigration Judge has ten days (except in certain asylum cases) to obtain counsel (if not already represented), to arrange for payment of the $1030 filing fee or to request a waiver, to identify all appellate issues (often without the benefit of a written decision), and to prepare and file a notice of appeal—all on pain of waiving any issue not raised in the Notice of Appeal and thereby defeating any opportunity for further administrative and (perhaps) judicial review.  *See* Dkt. 2-1 at 10.  That all must be done, moreover, with sufficient detail, explanation, and justification to have at least some hope, no matter how remote, that the BIA might (within ten days) see sufficient merit in his or her appeal to avoid summary dismissal.  If there is ever a case that satisfies the D.C. Circuit's test for applying the notice-and-comment requirement to "rule[s] [that] prescribe[] . . . timetable[s] for asserting substantive rights," *Lamoille Valley R. Co.*, 711 F.2d at 328, this is it; that is, this is a case in which "the time allotted is so short as to foreclose effective opportunity to make one's case on the merits," *id.*  Indeed, as the IFR acknowledges, that is precisely why the EOIR is making these changes.  The changes, in the words of the IFR, "will allow the Board to focus on appeals with particularly novel or complex legal questions without becoming bogged down in mine-run or straightforward cases" and will "offset a peculiar asymmetry in immigration proceedings" that permits "aliens [to] seek Federal court review of Board decisions, but [not] DHS."  IFR, 91 Fed. Reg. at 5271.

At both oral argument and earlier proceedings in this case, the parties have addressed another important way in which the IFR will likely affect the substantive rights of litigants.  As noted above, the IFR requires litigants to file a Notice of Appeal within ten calendar days of the issuance of the Immigration Judge's decision and further provides that "[a]ny issue not raised in the Notice of Appeal . . . shall be deemed waived."  *Id.* at 5278 (proposed changes to 8 C.F.R.

§ 1003.38(b)).  The IFR also provides, however, that "[w]hen an appeal is summarily dismissed . . . , the Immigration Judge's decision is adopted by the Board and articulates the rationale for removal that is subject to judicial review."  *Id.* at 5277 (proposed changes to 8 C.F.R. § 1003.1(d)).  The difficulty arises because the INA provides that the courts of appeals may review final orders of "removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right."  8 U.S.C. § 1252(d)(1).

Set aside for a moment the individuals, such as pro se and/or detained individuals, *see, e.g.*, Dkt. 2-4 at 8–10 (Koop Decl. ¶¶ 38, 40, 45); Dkt. 2-5 at 6–7 (Mayer-Salins Decl. ¶¶ 22–25) (describing particular hardships of the IFR to these populations), for whom the ten-day Notice of Appeal window may pose an insurmountable barrier to filing and who may forfeit their right to judicial review in the courts of appeals by failing to exhaust their BIA remedy as a result, *see Bejar v. Ashcroft*, 324 F.3d 127, 132 (3d Cir. 2003) ("we have held that an alien's failure timely to appeal to the BIA the IJ's denial of his motion to reopen constitutes a failure to exhaust administrative remedies"); *Grullon v. Mukasey*, 509 F.3d 107, 111 (2d Cir. 2007) (failure to appeal an immigration judge's determination to BIA bars judicial review for failure to exhaust under Section 1252(d)(1)); *Soberanes v. Comfort*, 388 F.3d 1305, 1308–09 (10th Cir. 2004) ("Neglecting to take an appeal to the BIA constitutes a failure to exhaust administrative remedies as to any issue that could have been raised, negating the jurisdiction necessary for subsequent judicial review.").  Defendants would be hard-pressed to argue that these individuals and those that assist them lack a right or interest implicated by the IFR, and, in fact, at oral argument, Defendants noted that they "would be willing to stay the rule as [to] pro se detained aliens . . . given those . . . considerations."  Mar. 6, 2026 Hrg. Tr. (Rough at 84).

But even those who will be able to file *some* Notice of Appeal within the ten-day deadline will risk undermining any appeal that they might subsequently pursue in the appropriate Article III court; they will be required to prepare and file their BIA Notices of Appeal with little time or opportunity to evaluate potential arguments, yet may forego the ability to raise any claim or argument in subsequent proceedings that they fail to "exhaust" before the Board.  Plaintiffs maintain that BIA exhaustion is required and the sole remedy, if any, for those who miss an issue in the rush to file a BIA Notice of Appeal would be to ask the court of appeals to recognize an equitable exception to the exhaustion requirement.  Mar. 6, 2026 Hrg. Tr. (Rough at 33–35).  Defendants, in turn, are less certain and, when asked at oral argument, counsel was unable to express a firm position on this important question.  *See id.* (Rough at 72–76).  In any event, it is a near certainty that the IFR will invite extensive litigation on waiver and exhaustion in the courts of appeals and very possible that, at least in some cases, substantive claims will be lost forever.  At a minimum, moreover, this debate and attendant uncertainty show why the notice-and-comment procedures are so important.  Issues that are so fundamental to the rights of tens of thousands of individuals (and that will guide how organizations and lawyers present their claims to the BIA) ought to be considered and addressed before—rather than after—a rule takes effect.

Nor does the IFR reasonably explain why these changes in existing law fall within the exception to the notice-and-comment requirement.  The IFR first asserts that the changes "are undoubtedly directed toward improving the efficient and effective operations of the Board." IFR, 91 Fed. Reg. at 5274.  But that rationale does little to support application of the "narrow" exception.  *See AFL-CIO*, 57 F.4th at 1035.  By the IFR's same reasoning, a rule requiring the BIA to summarily dismiss all appeals currently pending before it would "undoubtedly" lighten the Board's workload, and it would put a quick end to the existing backlog, but it is difficult to

fathom a world in which such a rule could be implemented without the benefit of notice and comment. In short, an appeal to efficiency of operations, standing alone, does not justify an abdication of the notice-and-comment processes that the APA generally requires.

The IFR seems to acknowledge as much, noting that "any rule that 'alter[s] the rights or interests of parties' is not 'procedural.'" IFR, 91 Fed. Reg. at 5274 (alteration in original) (quoting *James V. Hurson Assocs.*, 229 F.3d at 280)). But the IFR then proceeds to apply only half of this test. It asserts that "there is no right to an appeal to the Board based on any particular timeframe nor is there a right to a specific briefing schedule or manner of consideration," and, "[i]ndeed, there is no clear statutory right to an appeal to the Board at all." *Id.* Notably, the EOIR avoids any categorical denial of a statutory right to file an administrative appeal; it merely asserts that any such right is not "clear" and that, if such a right exists, it does not carry with it any "particular timeframe," "briefing schedule," "manner of consideration," or right to file a brief. *Id.* But those qualifications miss the point. Plaintiffs do not contend that the INA or the due process clause dictates a particular briefing schedule; they merely contend that the changes included in the IFR are so "grave" that they will, in practice, eviscerate the ability to obtain meaningful review. *See Lamoille Valley R. Co.*, 711 F.2d at 328.

Even putting this all aside, however, the IFR considers only half of the test that the D.C. Circuit has applied over the last half-century—and that the IFR itself quotes. The court of appeals does not pick its words lightly, and, here, the court has over and over again inquired whether the rule at issue "alter[s] the rights *or interests* of parties," *Batterton*, 648 F.2d at 707 (emphasis added), or "trenches on substantial private rights *and* interests," *Mendoza*, 754 F.3d at 1023 (emphasis added and citation modified). And, as noted above, the Department of Justice has itself recognized that "the private interests at stake" in immigration proceedings "are

undoubtedly very weighty."  Board of Immigration Appeals: Streamlining, 64 Fed. Reg. at

56138.  That proposition, moreover, is self-evident, and it is self-evident that those who face

removal and other adverse immigration actions have a significant "interest"—regardless of

whether that right is protected by statute—in administrative review of adverse Immigration

Judge decisions.  That interest is currently enshrined in regulations, and the IFR would—at

minimum—sharply curtail the ability of interested parties to pursue that remedy.  The fact that

the IFR entirely sidesteps the essential question whether the changes at issue would "trench[] on

substantial private . . . interests," *Mendoza*, 754 F.3d at 1023 (citation modified), is reason

enough to set aside the agency's invocation of the procedural rule exception, *see Sorenson

Commc'ns Inc.*, 755 F.3d at 706 & n.3.

### Arguably Procedural Provisions

Plaintiffs have not, however—at least at this stage of the proceeding—carried their

burden of demonstrating that other portions of the IFR fall outside the scope of the procedural

rule exception to the notice-and-comment requirement.  To start, the Court notes that Plaintiffs

do not challenge some of the changes effectuated by the IFR—and for good reason.  *See* IFR, 91

Fed. Reg. at 5277–78 (proposed changes to 8 C.F.R. §§ 1003.1(d)(6), 1003.18)  Changing the

regulations' references of "the noncitizen" to "the alien," *id.* at 5278 (proposed changes to 8

C.F.R. § 1003.18), may have some political or public policy valence, but as far as the Court can

discern, affects no "rights" or "interests."  Similarly, adding a provision directing the Board to

"provide notice to both parties" when a "case is being placed on hold" while certain law

enforcement or security investigations "are completed or updated and the results [are] reported to

the Board," *id.* at 5277 (proposed changes to 8 C.F.R. § 1003.1(d)(6)), does not trench on any

right or interest of an affected party and, instead, merely promotes the orderly and efficient operation of the Board and the appellate process.

Plaintiffs do challenge a handful of other regulatory amendments that are more substantive but that still fail to exceed the bounds of the exception. The first of these addresses cases that are not disposed of by "a single Board member within 90 days of completion of the record, or within 180 days of completion of the record [when the case is] assigned to a three-member panel," *id.* at 5277 (proposed changes to 8 C.F.R. § 1003.1(e)(8)). *See* Dkt. 2-1 at 11–12. Although the current regulations contain mechanisms to address cases that extend beyond this period, *see* 8 C.F.R. § 1003.1(e)(8)(ii), the IFR directs that the Chairman of the BIA must "either self-assign the case or assign the case to a Vice Chairman for final decision within 14 days or shall refer the case to the Attorney General for decision." IFR, 91 Fed. Reg. at 5277 (proposed changes to 8 C.F.R. § 1003.1(e)(8)). At least on the present record, the Court is unpersuaded that this change is either non-severable from the substantive changes discussed above or inherently substantive. Rather, the change addresses the "internal operations," *Mendoza*, 754 F.3d at 1023 (citation modified), of the Board, and does not impose time limitations that are "so short as to foreclose effective" review, *Lamoille Valley R. Co.*, 711 F.2d at 328.

Second, Plaintiffs challenge the IFR's requirements that briefing on the merits proceed on the following schedule, Dkt. 2-1 at 11: In cases "in which no transcript is warranted, briefs" must be filed "simultaneously from both parties within 20 days of the Board's order setting the schedule and in no case more than 35 days after the appeal was filed," and, for cases in which a transcript is warranted, . . . within 20 days of the Board order setting the schedule and making the transcript available." IFR, 91 Fed. Reg. at 5277 (proposed changes to 8 C.F.R. § 1003.3(c)). No

reply briefs are allowed unless invited or ordered by the Board, and the Board may extend the schedule only "in exceptional circumstances." *Id.*; *see also* 8 U.S.C. § 1229a(e)(1) (defining exceptional circumstances). Current law, in contrast, provides for simultaneous briefing for detained, but not non-detained, parties, generally allows one extension, and permits parties to seek leave to file a reply brief when appropriate. *See* 8 C.F.R. § 1003.3(c)(1).

Although a closer question, the Court is also unpersuaded—at least on the present record—that these changes go beyond governing "the manner in which the parties present themselves or their viewpoints to the agency," *Batterton*, 648 F.2d at 707, while "improving the efficient and effective operations of [the] agency," *Mendoza*, 754 F.3d at 1023 (citation modified), and that they, instead, affirmatively "impede" the ability of interested parties "to make [their] case[s] on the merits," *Lamoille Valley R. Co.*, 711 F.2d at 328; *see also AFL-CIO*, 57 F.4th at 1045–46. As the D.C. Circuit has stressed time and again, the question "is one of degree"—that is, "whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." *Lamoille Valley R. Co.*, 711 F.2d at 328; *see also JEM Broad. Co.*, 22 F.3d at 327. It is difficult to see how extending the requirement of simultaneous briefing to non-detained cases, setting relatively tight briefing schedules, and limiting extensions and reply briefs cross that line.

The closest question is whether Plaintiffs have met their burden of demonstrating that the IFR's proposed changes to 8 C.F.R. § 1003.5(a) required notice and comment—or, in other words, that "the substantive effect [from these changes] is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." *Lamoille Valley R. Co.*, 711 F.2d at 328. Currently, 8 C.F.R. § 1003.5(a) provides:

> If an appeal is taken from a decision of an immigration judge, the record of proceeding shall be promptly forwarded to the Board upon the request or the

order of the Board.  Where transcription of an oral decision is required, the immigration judge shall review the transcript and approve the decision within 14 days of receipt, or within 7 days after the immigration judge returns to their duty station if the immigration judge was on leave or detailed to another location.  The Chairman and the Chief Immigration Judge shall determine the most effective and expeditious way to transcribe proceedings before the immigration judges, and shall take such steps as necessary to reduce the time required to produce transcripts of those proceedings and to ensure their quality.

8 C.F.R. § 1003.5(a).  The IFR would amend this provision to read: "For all appeals not summarily dismissed, the record shall be forwarded to the Board as promptly as possible upon receipt of the appeal."  IFR, 91 Fed. Reg. at 5278 (proposed changes to 8 C.F.R. § 1003.5(a)).

The EOIR's explanation for this change focuses on the portions of 8 C.F.R. § 1003.5(a) concerning Immigration Judge review and approval:

> The Department is also revising 8 CFR 1003.5 regarding the forwarding of the record of proceedings in an appeal to reflect changing procedures and to provide maximum flexibility in ensuring the record is forwarded as quickly as possible.  The present process in 8 CFR 1003.5(a) is largely unnecessary and only creates unwarranted delay.  For instance, the current regulations allocate time for Immigration Judges to review and approve transcripts of their oral decisions.  8 CFR 1003.5(a).  But this is not necessary because EOIR utilizes reliable digital audio recording technology that produces clear audio recordings and more accurate transcriptions, . . . and the additional 7- or 14-day review period creates an unnecessary delay in the adjudication of appeals.  Moreover, because errors should not be corrected during the review, *see, e.g.*, *Mamedov v. Ashcroft*, 387 F.3d 918, 920 (7th Cir. 2004) ("[I]n general it is a bad practice for a judge to continue working on his opinion after the case has entered the appellate process . . . "); because EOIR already has a procedure for the parties to address defective or inaccurate transcripts on appeal, EOIR Policy Manual, pt. III, ch. 4.2(f)(3) . . . , and because the Board may remedy defects through a remand for clarification or correction if necessary, 8 CFR 1003.1(e)(2), there is no operational reason for Immigration Judges to continue to review transcripts of their decisions solely for minor typographical errors.

*Id.* at 5273 (citation modified).  This explanation for the proposed modification is consistent with "the limited carveout . . . for internal house-keeping measures organizing agency activities."

*AFL-CIO*, 57 F.4th at 1034 (citation modified).  It is focused on avoiding delay resulting from an internal procedure that the EOIR has concluded is unwarranted in light of technological

developments and existing procedures to challenge defective transcripts—procedures that the IFR is not purporting to modify. The explanation, moreover, appears to envision the continued production and use of transcripts, at least at times. *See* IFR, 91 Fed. Reg. at 5273, 5277 (noting technology that provides "more accurate transcriptions," procedures to address defective transcripts, and proposed changes to Section 1003.3(c)(1) that distinguish cases "in which a transcript is warranted").

The question, then, is whether this change impinges upon a substantive interest of affected parties in a manner that requires an opportunity for notice and comment. In this respect, Plaintiffs do not argue that the Immigration Judge's review and approval of transcripts affects or alters their substantive interests. Nor do they contend that reliance on what the EOIR describes as reliable technology after a matter is taken for full consideration by the Board would "alter" or "trench on" their or their clients' substantive interests.[6] Accordingly, they have not carried their burden on summary judgment.

This is not to say that a challenge to the IFR's changes to 8 C.F.R. § 1003.5(a) could not be brought on the grounds that these changes are arbitrary and capricious or otherwise contrary to law. *See* Mar. 6, 2026 Hrg. Tr. (St. John) (Rough at 17); *see also* Dkt. 2-6 at 20 (St. John

---

[6] Although there are several older decisions that have concluded that transcript availability may implicate due process rights, these decisions note that the failure to provide a transcript does not constitute a *per se* due process violation. Rather, due process is implicated only when the failure to provide a transcript or to provide a reasonably accurate or complete transcript or record results in a "specific prejudice to [one's] ability to perfect an appeal." *See Kheireddine v. Gonzales*, 427 F.3d 80, 85 (1st Cir. 2005); *see also Ortiz-Salas v. Immigr. & Naturalization Serv.*, 992 F.2d 105, 106 (7th Cir. 1993); *Mirza v. Holder*, 313 F. App'x 409, 412 (2d Cir. 2009); *Sterkaj v. Gonzales*, 439 F.3d 273, 279 & n.2 (6th Cir. 2006); *Cisse v. Att'y Gen. of U.S.*, 536 F. App'x 227, 230–31 (3d Cir. 2013); *Maniar v. Garland*, 998 F.3d 235, 241–42 (5th Cir. 2021); *Witjaksono v. Holder*, 573 F.3d 968, 974–75 (10th Cir. 2009). Moreover, these cases predate the immigration court's electronic filing system ("ECAS") and predate technological advancements in the area of transcription services in general.

Decl. ¶ 67) (noting gaps in the IFR's provisions related to transcripts).  For present purposes, the Court merely concludes that the EOIR has adequately explained why the change is one that relates to "organizing [its] internal operations," *Mendoza*, 754 F.3d at 1023 (citation modified), rather than "trench[ing] on substantial private rights," or "otherwise alter[ing] the rights or interests of parties," *AFL-CIO*, 57 F.4th at 1034–35 (citation modified).  Plaintiffs are not entitled to judgment as a matter of law on their notice-and-comment claim challenging the IFR's modifications to 8 C.F.R. § 1003.5(a).

### 3.

That leaves the EOIR's invocation of the foreign affairs exception to the notice and comment requirement.  Under 5 U.S.C. § 553(a), the APA's notice-and-comment procedures apply, "except to the extent that there is involved . . . a military or foreign affairs function of the United States."  According to the IFR, the foreign affairs exception applies because (1) "[t]he IFR is intended to facilitate EOIR's ability to more effectively adjudicate the removability of millions of illegal aliens currently in the United States and to reach a final adjudication of removal more efficiently;" (2) "[i]mproving the efficiency of EOIR proceedings will, in turn, create disincentives for aliens to enter the United States unlawfully in the future as they will no longer be able to rely on an expectation of significant delays in their proceedings . . . at the administrative appellate level;" and (3) "moving forward with actions like this IFR immediately will allow the United States Government to build on momentum with international partners to address shared challenges to border security and illegal immigration."  IFR, 91 Fed. Reg. at 5274–75.  The IFR further asserts that "[f]ailing to address challenges related to illegal immigration and [to] reduce delays in the removal process will likely have significant foreign affairs implications by creating incentives for large numbers of migrants to make the dangerous

64

journey to the southern border of the United States through other countries, as occurred under the last Administration." *Id.* at 5275.

The IFR cites two judicial decisions in support of its invocation of the foreign affairs exception. *Id.* at 5274. Neither advances that cause.

In the first case, *E.B. v. U.S. Department of State*, Judge Kelly confronted an argument similar to the one that Defendants raise here. In that case, the plaintiffs sought to set aside an interim final rule promulgated by the State Department for failure to comply with the notice-and-comment requirement. 583 F. Supp. 3d at 62. A detailed understanding of the rule at issue in that case is unnecessary for present purposes; it suffices to note that the interim final rule required those seeking to participate in the diversity visa lottery "to obtain a passport . . . before the participant knows whether she can apply for a diversity visa." *Id.* at 60. The State Department defended its failure to comply with the notice-and-comment requirement by relying on the foreign affairs exception. *Id.* at 62. Judge Kelly was unpersuaded. His thorough analysis provides helpful guidance here.

Judge Kelly started with the statutory text and, in particular, the phrase "to the extent that there is involved." *Id.* at 63. He then looked to a D.C. Circuit decision interpreting a parallel provision of 5 U.S.C. § 553(a). In that case, *Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978), the circuit read the phrase narrowly to mean "to the extent that any one of the enumerated categories"—here, foreign affairs—"is *clearly and directly* involved in the regulatory effort at issue." *E.B.*, 583 F. Supp. 3d at 63 (emphasis in original) (quoting *Humana of South Carolina, Inc.*, 590 F.2d at 1082). Judge Kelly then read the word "function" to "narrow the exception further" by limiting the exception to "activities or actions characteristic to the conduct of international relations." *Id*. at 64. Taken together, Judge Kelly then concluded

65

that "to be covered by the foreign affairs function exception, a rule must clearly and directly involve activities or actions characteristic to the conduct of international relations." *Id.* As Judge Kelly observed, that reading of the exception is consistent with the one case in which the D.C. Circuit has applied the exception. *See Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478 (D.C. Cir. 1994) (applying exception to rule implementing international agreement regarding reciprocal recognition of commercial drivers' licenses).

The EOIR's reliance on *E.B.* is puzzling, since the IFR at issue here plainly fails the test that Judge Kelly identified. The rules governing BIA appeals do not "clearly and directly involve activities or actions characteristic of the conduct of international relations." The rules apply exclusively to proceedings: (1) taking place in the United States, (2) relating to individuals who are present here, and (3) applying U.S. law. They do not "carry out obligations to a foreign nation," *id.* at 1486, nor do they constitute or implement "quintessential foreign affairs functions such as diplomatic relations [or] the regulation of foreign missions," *City of New York v. Permanent Mission of India to the United Nations*, 618 F.3d 172, 202 (2d Cir. 2010). Far from explaining how the IFR "clearly and indirectly involve[s] activities . . . characteristic of the conduct of international relations," *E.B.*, 583 F. Supp. 3d at 66, the EOIR merely posits that the United States must demonstrate its commitment to vigorous and expeditious enforcement of the Nation's immigration laws to have credibility in encouraging cooperation from other countries and in discouraging unlawful immigration. *See* IFR, 91 Fed. Reg. at 5275. But that understanding of the exception would swallow the rule: It is difficult to conceive of any immigration regulation—or, indeed, any regulation relating to a host of other fields, from aviation to the environment—that would not support a similar justification for avoiding the notice-and-comment requirement.

Finally, the EOIR also invokes the Second Circuit's decision in *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), where the court applied a more liberal test. *See* IFR, 91 Fed. Reg. at 5274. Under that test, the Second Circuit considered whether applying the APA's "public rulemaking provisions [w]ould provoke definitely undesirable international consequences." *Id.* at 437 (citation modified). Understood in this manner, the exception would apply, for example, where notice and comment might reveal "sensitive foreign intelligence" or might impair "relations with other countries." *Id.* But the EOIR's reliance on this formulation of the test suffers from two problems. First, as Judge Kelly explained in *E.B.*, that test is both a-textual and unnecessary; it is unnecessary because the APA contains a separate exception "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *E.B.*, 583 F. Supp. 3d at 64–65 (alteration in original) (quoting 5 U.S.C. § 553(b)(4)(B)). Second, the IFR fails to identify any plausible basis to believe that subjecting the rule changes at issue to public notice and comment would "provoke definitely undesirable international consequences." To the contrary, the EOIR is soliciting public comments at this very moment, and any suggestion that complying with the presumptive standards for rulemakings in the United States would "provoke definitely undesirable international consequences," once again, proves way too much. Even assuming that the United States has a legitimate interest in demonstrating to its international partners that it is proceeding with dispatch, it can do so within the framework that Congress established for promoting both reasoned administrative decision-making and public participation (and confidence) in the exercise of the "governmental authority" that it has "delegated to [federal] agencies." *Batterton*, 648 F.2d at 703.

*    *    *

The Court, accordingly, concludes that Plaintiffs are entitled to partial summary judgment on Count I of their Complaint.

## C.    Section 705 Stay for Remaining Arguably Procedural Portions

Because the Court concludes that Plaintiffs are entitled to only partial summary judgment on Count I of the Complaint, the Court must go on to consider whether Plaintiffs are entitled to their requested alternative relief, a Section 705 stay, as to those portions of the IFR that the Court has not invalidated.  For the reasons explained below, the Court concludes that they are not.

A plaintiff seeking relief under 5 U.S.C. § 705 bears the burden of establishing a right to interim relief under the same four-factor test that applies to motions for preliminary injunctions. *See Sierra Club*, 833 F. Supp. 2d at 30.  And, as with a motion for a preliminary injunction, likelihood of success on the merits and irreparable harm "are of particular importance."  *Corp. for Pub. Broad. v. Trump*, 786 F. Supp. 3d 142, 149 (D.D.C. 2025).  "A showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases."  *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (citation modified).  "The harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm."  *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation modified).  A "failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Plaintiffs might well have been able to establish irreparable harm resulting from the immediate application of the substantive portions of the IFR discussed above.  But that question

is no longer at issue, since the Court will enter final, and not simply preliminary, relief with respect to those portions.  With respect to what remains—the arguably procedural portions of the IFR, such as the requirement for simultaneous 20-day briefing, the limitations on extensions and reply briefs, the limitations on BIA leadership's discretion to extend case adjudication timelines, and the potential elimination of transcripts in some cases—the Court is unpersuaded that allowing these provisions to take immediate effect will cause Plaintiffs' irreparable harm.  *See* Dkt. 2-1 at 11 (referencing these provisions as part of their challenge).  The core of Plaintiffs' claim of irreparable injury focuses on the IFR's presumption of summary dismissal, the Notice of Appeal deadline, and the waiver provision.  *See, e.g.*, Dkt. 31 at 38 ("[T]he IFR, upon taking effect, will immediately convert a 30-day deadline to a 10-day deadline, and then 10 days later, most appeals filed will be summarily dismissed."); Mar. 6 Hrg. Tr. (St. John) (Rough at 12) ("[O]ne of the major concerns that we have [a]s an organization is the way in which the shortened timelines are going to result in our staff needing to do much more robust work in the notice of appeal window in much less time." (cleaned up)).  These front-end requirements will necessitate engaging in "costlier and more time- and labor-intensive" representations, will affect the quantity and quality of their client-facing work, and will interfere with their "ability to locate and train pro bono counsel."  Dkt. 31 at 38–39.  Plaintiffs' loss of funding, moreover, will likely occur because of these front-end changes that will "force[] [Plaintiffs] to turn away" clients.  *Id.* at 39.

In contrast, Plaintiffs have failed to show that the arguably procedural provisions discussed above are likely to cause them any imminent and non-speculative irreparable harm. They have not argued, for example, that the 20-day briefing schedule or the requirement for simultaneous briefing will—standing alone—prevent them from competently and zealously

representing the same clients that they currently serve.  To be sure, Plaintiffs argue that these requirements—when considered in combination with the substantive portions of the IFR—will add to their difficulties.  *See, e.g.*, Dkt. 2-1 at 24 ("Because counsel cannot predict when the briefing schedule will be set (*i.e.*, when the 20-day clock will start), the IFR's 20-day brief schedule would render counsel unable to schedule their workload and time off in accordance with their client's needs."); *see* Dkt. 2-2 at 11 (Brown Decl. ¶¶ 39–42) (discussing the impact of the 20-day briefing and lack of extensions in context of the summary dismissal presumption and unpredictability of briefing schedule under such a presumption, noting that these provisions "would not diminish the existing unpredictability.").  The same goes for the changes relating to transcript preparation.  *See* Dkt. 2-3 at 8 (Jones Decl. ¶¶ 38–41) (discussing burdens imposed by a lack of transcripts in the context of shortened notice-of-appeal window); Dkt. 2-4 at 6–7 (Koop Decl. ¶ 28) (discussing potential implications of transcript preparation provisions on circuit practice).  But any concern about the cumulative effects of these array of changes made by the IFR will be allayed by the Court's order granting summary judgment in Plaintiffs' favor with respect to the substantive portions of the IFR.

What evidence is before the Court, moreover, suggests that the remaining portions of the IFR will not cause Plaintiffs irreparable harm.  To take one example, pre-existing law already required simultaneous briefing within 21 days after a briefing schedule is set and a transcript is prepared in cased involving detained individuals.  8 C.F.R. § 1003.3(c)(1).  Plaintiffs offer no evidence, however, that these requirements have proven unworkable.  Similarly, although Plaintiffs have shown that they frequently rely on extensions and reply briefs, *see, e.g.*, Dkt. 2-3 at 9 (Jones Decl. ¶ 45); Dkt. 2-5 at 8 (Mayer-Salins Decl. ¶ 29), Dkt. 2-4 at 13 (Koop Decl. ¶ 61), under the pre-existing regulations, replies and extensions are permissive but still a matter of

discretion.  8 C.F.R. § 1003.3(c)(1).  The IFR undoubtedly tightens these requirements and

might, in unique circumstances, pose an unacceptable barrier to Plaintiffs' organizational

missions.  But the prospect that Plaintiffs will imminently face a circumstance of that type—say,

for example, a case in which counsel becomes gravely ill at the last minute and cannot find

another lawyer to help and cannot obtain an extension—is too speculative to support issuance of

a Section 705 stay.  Plaintiffs' argument at the hearing did not clarify the speculative nature of

harm resulting from these provisions.  *See* Mar. 6 2026 Hrg. Tr. (Rough at 44) (noting the

hypothetical scenario where an attorney handling a case would be precluded from seeking an

extension under the IFR even if he or she has a parent or child pass away).  Finally, although

Plaintiffs offer evidence of concern regarding the purpose and downstream consequences of the

proposed modifications to 8 C.F.R. § 1003.1(e)(8), *see* Dkt. 2-4 at 15–16 (Koop Decl. ¶¶ 74–76),

which limits the discretion of BIA leadership to extend internal case adjudication deadlines and

to hold cases open based on pending actions, *see* IFR, 91 Fed. Reg. at 5277, the evidence

currently before the Court does not show that any threat of injury posed by these changes is

"certain and great" or "so imminent" as to justify preliminary relief.  *League of Women Voters*,

838 F.3d at 8 (citation modified).

Because Plaintiffs have failed to carry their burden of showing that they will suffer

irreparable injury if these arguably procedural portions of the IFR are allowed to take effect, and

because irreparable injury is the *sine qua non* for issuance of emergency relief of the type

Plaintiffs seek, the Court will deny Plaintiffs' motion for a Section 705 stay in part.  And, where

they might have fared better on the question of irreparable harm—that is, with respect to the

substantive portions of the IFR—the Court has already granted Plaintiffs final relief, thereby

mooting their motion for emergency relief in part.

### D.    Remedies

To the extent that the Court has concluded that portions of the IFR were promulgated "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), the appropriate remedy is a partial vacatur of those portions of the IFR under 5 U.S.C. § 706(2). Courts "typically vacate rules when an agency entirely fails to provide notice and comment," *Daimler Trucks North Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013) (citation modified), and, here, Defendants fail to offer any reason why this Court should decline to apply the usual rule. The Court will also declare the defective portions of the IFR invalid. Finally, because the Court has concluded that Plaintiffs' motion for a Section 705 stay is moot in part and unpersuasive in part, it need not consider Defendants' contentions that 8 U.S.C. § 1252(f) and the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), limit the Court's authority to issue a nationwide Section 705 stay.[7] Dkt. 26 at 53–56; *but see Make the Rd. N.Y.*, 2025 WL 3563313, at *16 (rejecting contention that Section 1252(f) bars issuance of a Section 705 stay).

---

[7] Although Defendants do not raise the issue, out of an abundance of caution, *see N.S. v. Dixon*, 141 F.4th 279, 288 (D.C. Cir. 2025), the Court pauses to note that 8 U.S.C. § 1252(f) "does not strip lower courts of authority to grant declaratory relief and to vacate agency action that is not in accordance with law." *RAICES*, 793 F. Supp. 3d at 65; *see also Make the Rd. N.Y.*, 962 F.3d at 635 (declaratory relief); *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022) (Section 706 vacatur); *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 72–74 (D.D.C. 2025) (Section 705 stay and Section 706 vacatur); *Las Americas Immigrant Advoc. Ctr.*, 783 F. Supp. 3d at 232–33 (Section 706 vacatur); *Miot v. Trump*, No. 25-cv-2471, 2026 WL 266413, at *15–16 (D.D.C. Feb. 2, 2026) (same); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D. Fla. 2023) (same); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022) (same). The Court has previously addressed these questions at length and need not repeat that analysis here. *See RAICES*, 793 F. Supp. 3d at 61–65. And out of a similar abundance of caution, the Court notes that the Supreme Court's decision in *CASA* says nothing about "whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." 606 U.S. at 847 n.10 (citing 5 U.S.C. § 706(2)); *id.* at 869 (Kavanaugh, J., concurring) ("And in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency rule. 5 U.S.C. § 706(2)."); *see also Coal. for Humane Immigrant Rts.*, 805 F. Supp. 3d at 104 (rejecting *CASA*'s applicability to "relief under section 706"); *cf. Make the Rd. N.Y.*, 2025 WL 3563313, at *34 ("*CASA* does not control the scope of relief available under Section

The Court will, accordingly, declare "unlawful" and will "set aside" the unlawful agency action, as required by the APA.  5 U.S.C. § 706(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment as to Count I, Dkt. 2, is hereby **GRANTED** in part and **DENIED** in part, and Plaintiffs' motion for a Section 705 stay, Dkt. 2, is **DENIED** in part as **MOOT** and is **DENIED** in all other respects.  The Court will, accordingly, **DECLARE INVALID** and will **SET ASIDE** the substantive portions of the IFR, 91 Fed. Reg. 5267 (Feb. 6, 2026), and will **REMAND** the matter to the agency for further proceedings consistent with this decision.

A separate order with issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 8, 2026

---

705 . . . [and] is *not* a case about the scope of relief for agency review authorized by the APA." (emphasis in original)).